# EXHIBIT E

Case 0:22-cv-62225-JB   Document 181-5   Entered on FLSD Docket 12/29/2023   Page 2 of 27



# DAVID HACKETT FISCHER

# Historians' Fallacies



## Toward a Logic of Historical Thought

HARPER TORCHBOOKS  TB/1545/$2.45

CHAPTER IV

# FALLACIES OF GENERALIZATION

కా

What distinguishes the historian from the collector of historical facts is generalization.

—E. H. Carr

Pour faire de l'histoire, il faut savoir compter. [To do history, one must know how to count.]

—Georges Lefebvre

Scholars still solemnly engage in controversies over questions such as "Should a historian generalize?" One might as well ask "Should a historian use words?" Generalizations are embedded in his language, in his thought, and in his explanation models. There are, of course, other modes of explanation. But none is more common, or more commonly abused, than generalization.

The term "generalization," in ordinary usage, means everything and nothing. In a recent discussion of the problem, an attentive critic found nine distinguishable conceptions of generalization:

1. "Labeling," or "classificatory," concepts; e.g., "feudalism."

2. Universal "laws" or regularity statements; e.g., "Ideas follow trade routes."

3. "Limited," or summative, general statements, specifying the conditions that obtained in a particular geographical area or during a determinate period of time; e.g., "Successful revolution occurred [in the eighteenth century] only where the agricultural population generally collaborated with middle-class leaders."

4. Statements asserting the existence of a trend or tendency; e.g., "The Speaker was a power in the House, but as the Elizabethan period went on, his power was on the wane."

5. Statistical regularities.

106 EXPLANATION

| *Federalists* | *Antifederalists* |
|---|---|
| Robert Morris, b. 1734 | Patrick Henry, b. 1736 |
| James Duane, b. 1733 | George Clinton, b. 1739 |
| George Washington, b. 1732 | Elbridge Gerry, b. 1744 |
| Benjamin Franklin, b. 1706 | John Francis Mercer, b. 1759 |
| James Madison, b. 1751 | John Lansing, Jr., b. 1754 |
| Nathaniel Gorham, b. 1738 | Benjamin Austin, b. 1752 |
| John Rutledge, b. 1739 | Luther Martin, b. 1748? |
| Roger Sherman, b. 1721 | Samuel Bryan, b. 1750? |
| W. S. Johnson, b. 1727 | Melancton Smith, b. 1744 |

These Antifederalists are, on the average, 13.9 years *younger* than the Federalists. Adding the Elkins-McKitrick arithmetical inflation quotient, we conclude, "The age difference between these groups is especially striking. The Federalists were, on the average, 14 to 16 years older than the Antifederalists."

A more comprehensive study, by Jackson T. Main, suggests that both lists are invalid. Working from a much larger sample, he found no significant age difference between friends and foes of the Constitution. "In Pennsylvania the Antifederalists were older by two years," he writes, "but in New York there was no difference at all; in South Carolina the median age of eleven Antifederalists was 33; of thirty-two Federalists, only 29; in Massachusetts, the average Antifederalist was 52, the Federalist 51. All told, the Federalists were about two years younger than their antagonists. It is hard to see how this could have made any difference."[3] Other generational interpretations of the same problem might be entertained. It is conceivable that extremists in both camps were younger than moderates; and Westerners were younger than Easterners. But the generational lines appear to have crossed party lines at right angles, *if* Main's work is correct. (Maybe it isn't.)

The probability of a sampling error tends to diminish as the size of the sample increases. But size alone is no protection. The classic example was a massive effort by the *Literary Digest* to forecast the presidential election of 1936. More than 10,000,000 ballots were sent out. Something like 2,367,523 came back, mostly marked for Alf Landon. The poll predicted 370 electoral votes for the Republican candidate, and 161 for Roosevelt. In the real election, Roosevelt won 523 votes, Landon 8. What went wrong? The *Digest*, it seems, sent

3. Jackson T. Main, *The Antifederalists: Critics of the Constitution* (Chapel Hill, 1961), p. 259. Main's conclusions may in turn be corrected by other inquiries, now in progress.

LANATION

### Antifederalists

Patrick Henry, b. 1736
George Clinton, b. 1739
Elbridge Gerry, b. 1744
John Francis Mercer, b. 1759
John Lansing, Jr., b. 1754
Benjamin Austin, b. 1752
Luther Martin, b. 1748?
Samuel Bryan, b. 1750?
Melancton Smith, b. 1744

ic average, 13.9 years *younger* than the
-McKitrick arithmetical inflation quo-
difference between these groups is es-
ts were, on the average, 14 to 16 years

udy, by Jackson T. Main, suggests that
from a much larger sample, he found
tween friends and foes of the Constitu-
ntifederalists were older by two years,"
there was no difference at all: in South
ven Antifederalists was 33; of thirty-two
ssachusetts, the average Antifederalist
ll told, the Federalists were about two
gonists. It is hard to see how this could
Other generational interpretations of the
ained. It is conceivable that extremists in
, moderates; and Westerners were younger
ational lines appear to have crossed party
work is correct. (Maybe it isn't.)
pling error tends to diminish as the size
size alone is no protection. The classic
t by the *Literary Digest* to forecast the
More than 10,000,000 ballots were sent
23 came back, mostly marked for Alf
370 electoral votes for the Republican
evelt. In the real election, Roosevelt won
went wrong? The *Digest*, it seems, sent

eralists: Critics of the Constitution (Chapel Hill,
nay in turn be corrected by other inquiries, now in

---

ballots to addresses collected from the subscription lists of magazines and also from telephone directories and automobile registration lists. But magazines, telephones, and automobiles were not randomly distributed among the American population in 1936, as many will ruefully recall.

This famous statistical disaster was not the only sampling error which was made during the presidential campaign of 1936. In October of that year, a Republican leader in Chicago discovered that demands for Alf Landon buttons greatly exceeded those for the Democratic emblems. On this basis, he wrote to Landon's headquarters, confidently predicting that the Kansas governor would carry the city. But a demand for Landon buttons was not equivalent to a demand for Landon. The Republicans had distributed a gorgeous badge for their candidate—a brown tin disk set against a yellow felt background, in the image of a Kansas sunflower. For the possession of this splendid trinket, many a red-blooded American boy in 1936 might cheerfully have sold his mother into slavery. According to one learned scholar, the exchange rate among small boys in Chicago was two or three plain, ordinary Roosevelt buttons to one of Landon's.[4] Most Americans sensibly chose the best from both parties—the Republican campaign badge and the Democratic candidate.

There are many other examples of sampling errors in historical scholarship, some of which are explicitly statistical and others implicitly so. One scholar, Edward Pessen, examined election returns in Boston during the Jacksonian era. He concluded that workingmen more generally voted Whig than Democratic and that they either rejected or ignored so-called workingmen's candidates. But another scholar sharply criticized Pessen for failing to "use some tool of analysis that will neutralize the effect of the general level of voting in the area and allow us to see to what degree voting Whig or Democratic is related to the socio-economic nature of the wards." Working from the same sources by a different and more defensible method, the critic concluded that "Jackson and his political allies did get their support from working class groups," and that there was a good inverse correlation between votes for Democratic and workingmen's candidates and an economic index.[5]

Another case of an explicitly statistical sampling error appears in Robert E. Brown's attempt to show that something which he calls a

4. Donald R. McCoy, *Landon of Kansas* (Lincoln, 1966), p. ix.
5. Edward Pessen, "Did Labor Support Jackson?: The Boston Story," *Political Science Quarterly* 64 (1949): 262–74; Robert T. Bower, "A Note on 'Did Labor Support Jackson?: The Boston Story,'" *ibid.*, 65 (1950): 441–42.

"middle class democracy" existed in pre-Revolutionary Massachusetts and that property was widely and equitably distributed, and the franchise as well. But Brown's thesis is much exaggerated in both respects, and the exaggeration is partly sustained by serious errors in the sampling of probate records, tax lists, and voter lists.[6]

Other sampling errors are implicitly, rather than explicitly, statistical. They occur in simple impressionistic statements, such as the following observation by the late V. O. Key on the alleged suicidal tendencies of Southern literati: "A depressingly high rate of self-destruction prevails among those who ponder about the South and put down their reflections in books," he wrote. "A fatal frustration seems to come from the struggle to find a way through the unfathomable maze formed by tradition, caste, race and poverty."[7]

A friend of Key's asked how many suicidal Southern writers he could name. There were only three—W. J. Cash, Clarence Cason, and another whose name Key couldn't recall.[8] Some Southern historians may consider W. J. Cash to be a host within himself, but not for the purposes of quantification.

Impressionistic sampling errors are sometimes so gross than nobody is taken in by them—probably not even the author. A Russian historian, B. I. Bukharov, has used opinions expressed in the *Daily Worker* as representative of American opinion generally.[9] But other errors can be very subtle and insidious. The difficulties entailed in statistical sampling have sometimes tended to make statistics generally suspect in the eyes of some historians, more than a few of whom are prepared to accept Disraeli's famous statement that there are lies, damned lies, and statistics. But statistics themselves do not lie—only statisticians, and if they lie, they are apt to lie to themselves, in Dostoevski's phrase. And their confusions are clarity itself compared to the impressionistic muddles which so many historians get themselves into by an even more dangerous method.

With skill, practice, and a little luck (impressionists need a lot of luck), statistical sampling can be very reliable indeed. Anglo-American intelligence officers in World War II used a sampling method to estimate German production figures from serial numbers on cap-

6. Robert E. Brown, *Middle-Class Democracy and the Revolution in Massachusetts, 1691–1780* (Ithaca, 1955); John Cary, "Statistical Method and the Brown Thesis on Colonial Democracy," *William and Mary Quarterly*, 3d ser. 20 (1963): 251–64, with a rebuttal by Brown, 265–76.

7. V. O. Key, *Southern Politics in State and Nation* (New York, 1947), p. 664.

8. Joseph L. Morrison, *W. J. Cash: Southern Prophet* (New York, 1967), p. 140.

9. See Ernest May's review in *American Historical Review* 67 (1961): 87.

110                                    EXPLANATION

Jefferson himself. But as we learn more about the politics of the early republic, Jefferson is beginning to appear as a very special sort of Jeffersonian. These three statesmen—Hamilton, Adams, and Jefferson—were exceptional men in more senses than one. Each of them, in his own way, was *sui generis*. This is not to argue that they had nothing in common with their political colleagues. But common qualities can never be located by investigation of themselves alone.

The most successful recent survey of American political history, Richard Hofstadter's *The American Political Tradition and the Men Who Made It* (New York, 1948), contains many examples of this fallacy. The book is a sequence of single facts, punctuated by sweeping generalizations. Jefferson, Jackson, Calhoun, Lincoln, Wendell Phillips, Bryan, Wilson, Hoover, and the two Roosevelts are each individually sketched as representative of "main currents of American political sentiment."[19] In only two chapters out of twelve is a different strategy developed. Hofstadter's book surely deserves its splendid reputation—what it lacks in the breadth of its empirical base, it more than matches in the depth of its remarkable intuitions. But had the author's intuitive excellence been wedded to the discipline of a better method, a very great book indeed would undoubtedly have been the result.

Other specimens of this fallacy have occurred in the field of prehistory, where archaeologists and historians have generalized broadly from a single find. Some of them concluded from a skeleton found at La Chapelle-aux-Saints that Neanderthal man had the posture of a pretzel and the locomotion of a crab—that "the head was so balanced on the spine that it hung forward; the structure of legs and feet permitted only a shuffling gait." But re-examination of the same evidence has suggested that the individual in question had a bad case of arthritis, and that normal Neanderthal men stood straight and strode confidently in pursuit of their prey.[11] It is as if an archaeologist, a millennium hence, were to generalize upon the stature of twentieth-century *Homo americanus* from the Brobdingnagian bones of Wilt-the-Stilt Chamberlain.

❧   The *fallacy of statistical special pleading* occurs whenever an investigator applies a double standard of inference or interpretation to his evidence—one standard to evidence which sustains his generalization and another to evidence which contradicts it.

Imagine a scholar who hypothesizes that Republican ladies tend to have blond hair, while Democratic females are brunette. He carefully

EXPLANATION

ə learn more about the politics of the early
ing to appear as a very special sort of Jeffer-
ɛn—Hamilton, Adams, and Jefferson—were
ises than one. Each of them, in his own way,
to argue that they had nothing in common
s. But common qualities can never be located
es alone.

ɛcent survey of American political history,
*American Political Tradition and the Men*
, 1948), contains many examples of this
nce of single facts, punctuated by sweeping
ıckson, Calhoun, Lincoln, Wendell Phillips,
i the two Roosevelts are each individually
of "main currents of American political
ıapters out of twelve is a different strategy
k surely deserves its splendid reputation—
of its empirical base, it more than matches
le intuitions. But had the author's intuitive
the discipline of a better method, a very
ıoubtedly have been the result.

s fallacy have occurred in the field of pre-
s and historians have generalized broadly
hem concluded from a skeleton found at La
anderthal man had the posture of a pretzel
b—that "the head was so balanced on the
he structure of legs and feet permitted only
ıination of the same evidence has suggested
ion had a bad case of arthritis, and that
ɔod straight and strode confidently in pur-
if an archaeologist, a millennium hence,
stature of twentieth-century *Homo ameri-*
ian bones of Wilt-the-Stilt Chamberlain.


*tistical special pleading* occurs whenever an
standard of inference or interpretation to
to evidence which sustains his generaliza-
which contradicts it.
hypothesizes that Republican ladies tend
mocratic females are brunette. He carefully

*d in History*, new ed. (Baltimore, 1964), p. 40.

---

conducts his research at two national conventions, and when he tabu-
lates his results, he discovers to his horror that they are:

|  | Blondes | Brunettes | Other |
|---|---|---|---|
| Republican ladies | 20 | 40 | 10 |
| Democratic ladies | 20 | 40 | 10 |

But our scholar is not so easily discouraged. He proceeds to the second
stage of his inquiry, which is called "interpretation" of the evidence.
First, he re-examines his twenty blond Democrats, discovers that ten
of them dyed their hair, and shifts them to the brunette column. Second,
he studies the forty brunette Republicans, discovers that twenty-five
of them had been blond in childhood, and shifts them to the blond
column. Third, he takes a look at the miscellaneous column, which in
each party includes five ladies with red, white, gray, etc., hair, and five
ladies with dark-blond or light-brown hair. The latter, if Republican,
he classifies as dark blond; but if Democrat, light brunette. He adds the
dark blondes to the blond column, and the light brunettes to the brunette
column. The results read:

|  | Blondes | Brunettes | Other |
|---|---|---|---|
| Republicans | 50 | 15 | 5 |
| Democrats | 10 | 55 | 5 |

He works out his coefficients of correlation and triumphantly pub-
lishes the results in *The American Behavioral Scientist*. None of
these manipulations necessarily involves an outright fraud. It is possible
that our scholar did not deliberately fudge any of his figures. He may
have been utterly unaware of his own errors.

There are many examples of this fallacy in actual historical prac-
tice. One of them is David Donald's *The Politics of Reconstruction*
(Baton Rouge, 1965). Donald tried to explain why Republican con-
gressmen in the Thirty-ninth Congress (1866–1867) voted as "radicals"
or "moderates" on legislation before them. He hypothesized that the
difference between them lay not in "personality, ideology, geographical
origins, or social and economic status" but rather in their political
situation—specifically, that Republicans who held safe seats—with
wide electoral margins—tended to be radical, while Republicans who
were elected by narrow and precarious pluralities tended to be moderate.
Unfortunately for Donald's hypothesis, the result of his research showed
that margins of electoral victory for both radicals and moderates were

almost identical—59.3 percent to 59.2. But Donald proceeded to "interpret" his evidence until it conformed to his hypothesis. He argued that in some states, where there was an allegedly powerful Republican organization, a majority of 52 percent was security itself for a radical, but that in another state, a majority of 58 percent was too small to serve the same purpose. One qualification was heaped upon another with an industry and an ingenuity which were worthy of a better cause.

> To maintain his propositions [one reviewer wrote] Donald is forced to resort to a "cake and eat!" approach. A Radical's election by a large vote is prima facie evidence of a safe seat. But when Moderates take office with large margins Donald introduces the realm of psychology, that is, his guess as to how secure the congressman felt. . . . There is no shortage of ingenious explanations here, but there seems to be little sense in accumulating data only to shuffle and disregard it.[12]

A second and more impressionistic example is a recent work by Alan Heimert. In *Religion and the American Mind from the Great Awakening to the Revolution* (Cambridge, 1966), he argued the thesis that there was a correlation between the religious divisions between Old Light opponents of the Awakening and New Light friends of it, on the one hand, and the political cleavage between friends and enemies of the Revolution. This interpretation is supported not with quantitative evidence but with qualitative interpretations of thought and expression. But Heimert applies a double standard of inference and interpretation to his evidence. He is often forced to argue that his historical subjects really meant the opposite of what they said.

One critic has complained.

> For Professor Heimert things are seldom what they seem, but if we know which side of the cleavage a man stands on, we need have no difficulty in penetrating the disguises of reality. . . . The world he offers us has been constructed by reading beyond the lines of what men said; and what he finds beyond the lines is so far beyond, so wrenched from the context, and so at odds with empirical evidence, that his world, to this reviewer at least, partakes more of fantasy than of history.[13]

Maybe this judgment is a little on the harsh side, but I think it is roughly correct. Heimert has so seriously overstrained his interpretation by an unfortunate—and certainly unintentional—double distortion of his evidence that it is quite impossible to know how much credence to put into his thesis until another scholar undertakes a more careful analysis of the same problem by means of a better method. Nothing

12. David Rothman in *Political Science Quarterly* 81 (1968): 334–36.
13. Edmund S. Morgan, in *William and Mary Quarterly*, 3d ser. 24 (1967): 454–59.

EXPLANATION

ent to 59.2. But Donald proceeded to
it conformed to his hypothesis. He argued
ere was an allegedly powerful Republican
2 percent was security itself for a radical,
ajority of 58 percent was too small to serve
fication was heaped upon another with an
ich were worthy of a better cause.

ons [one reviewer wrote] Donald is forced to
approach. A Radical's election by a large vote
a safe seat. But when Moderates take office with
roduces the realm of psychology, that is, his
e congressman felt. . . . There is no shortage of
t, but there seems to be little sense in accumulat-
ad disregard it.[12]

ipressionistic example is a recent work by
and the American Mind from the Great
n (Cambridge, 1966), he argued the thesis
a between the religious divisions between
Awakening and New Light friends of it,
itical cleavage between friends and enemies
erpretation is supported not with quantita-
litative interpretations of thought and ex-
lies a double standard of inference and
e. He is often forced to argue that his his-
the opposite of what they said.
ned,

ings are seldom what they seem, but if we know
a man stands on, we need have no difficulty in
of reality. . . . The world he offers us has been
yond the lines of what men said; and what he
o far beyond, so wrenched from the context, and
il evidence, that his world, to this reviewer at
ntasy than of history.[13]

s a little on the harsh side, but I think it is
as so seriously overstrained his interpreta-
d certainly unintentional—double distortion
ite impossible to know how much credence
another scholar undertakes a more careful
em by means of a better method. Nothing

ience Quarterly 81 (1968): 334–36.
n and Mary Quarterly, 3d ser. 24 (1967): 454–59.

## FALLACIES OF GENERALIZATION 113

is more pathetic than so many years of labor utterly wasted and undone
by a procedural fallacy of this sort.

It would, of course, be a great mistake to assume that statistical
special pleading is a sign of fraud whenever it appears. It is extraor-
dinarily easy for a historian to distort his evidence in this way without
ever intending consciously to do so. A great English economic historian
of an older generation, Sir John Clapham, once observed, "It is very easy
to do this unawares. Thirty years ago I read and marked Arthur
Young's *Travels in France*, and taught from the marked passages. Five
years ago I went through it again, to find that whenever Young spoke
of a wretched Frenchman I had marked him, but that many of his
references to happy or prosperous Frenchmen remained unmarked."[14]
The same thing has happened in almost everybody's work.

The *fallacy of statistical impressionism* occurs whenever a his-
torian casts an imprecise, impressionistic interpretation into exact num-
bers. The result tends to be speciously specific or specifically specious.

An example of a historian who casts impressions into numbers is
Lee Benson, in *The Concept of Jacksonian Democracy: New York as
a Test Case*, 2d ed. (New York, 1964). Benson's book is both a polemi-
cal plea for quantification in history, and an intensive analysis of the
New York elections of 1844 as a case study in political ecology. It is,
I think, more successful as a manifesto than as a monograph, for its
major points are either inaccurate or unsubstantiated. The reader finds
much of the rhetoric of quantification in Benson's book but little of its
reality. *The Concept of Jacksonian Democracy* combines the worst of
both methodological worlds—history is researched as an art and written
as a science.

Chief among the theses of this controversial book is an argument
that there can be no clear and simple correlation between party affilia-
tion and economic wealth, in the New York elections of 1844 in par-
ticular, and American political history in general. Instead, Benson sug-
gests a six-part multivariate analysis of voting patterns in terms of pre-
vious voting behavior, economic groups, ethnocultural groups, religious
groups, residential groups, and regional groups.

Benson's thesis is asserted rather than proved. One looks in vain,
through 340 pages crowded with numbers, footnotes, and tables, for
any comprehensive and unequivocal attempt to calculate the correlation

14. Quoted in Edward P. Thompson, *The Making of the English Working Class* (New
York, 1964), p. 210.

114                                    EXPLANATION

of political affiliation with economic wealth. Instead, there are declarative sentences punctuated with impressionistic scraps of statistics such as the following:

> Perhaps the most dramatic way to illustrate the inaccuracy of traditional claims about voting behavior is to present the data for the two towns in the state that received the highest and lowest Democratic vote. Clarkstown in Rockland County was a "very prosperous" ($629) Hudson River town, but its 89.9% Democratic vote established it, by a considerable margin, as that party's banner unit. The second highest Democratic unit (83.9 per cent) was an extremely "poor" ($494), isolated interior town (Croghan in Lewis County). The lowest Democratic unit was Putnam, a "marginal" town ($339) in Washington County, where the Democratic vote was 18.5 per cent of the total.[15]

These impressionistic figures lend a sense of statistical authority to Benson's book, but little substance. Another inveterate historical quantifier has wisely observed that "to support an argument by a few examples, though it may be a persuasive rhetorical device, is not logically adequate. There are exceptions to most historical generalizations, and, if the citation of occasional instances were accepted as proof, it would be possible to prove almost anything."[16]

Though Benson asserts, or implies, that he systematically compared economic and political data throughout the state, he strangely omits anything in the way of a comprehensive statistical generalization which bears upon that critical question.

He comes close twice. There is only one table, out of many in the book, which displays the two variables side by side for any area of the state—a tabulation of towns in Delaware County. This table shows the average valuation of dwellings in eighteen towns, the percentage of the Democratic vote in sixteen of them, and their rank order in both. But there is nothing at the bottom of the table, in the way of a summary

---

15. P. 150. The dollar values refer to the average (assessed) value of dwellings per family.

16. William O. Aydelotte, "Quantification in History," *The American Historical Review* 71 (1966): 805. Another quantifier has commented directly on Benson's book, "Despite his concern for theoretical explication, Professor Benson's work sometimes falls short of the standards that many behavioural scientists consider essential. One searches the first edition of *The Concept of Jacksonian Democracy* in vain for any detailed discussion of the methods by which he selected his indicator precincts, or of the numbers of voters in his sample, or of correlations or significance tests underlying the party preference percentages which he ascribed to the various ethno-cultural groups living in New York during the 1830s and 1840s." Allan G. Bogue, "United States: The 'New' Political History," *Journal of Contemporary History* 3 (1968): 11. In the second edition, Benson added a descriptive methodological statement which appears to have satisfied Bogue. But an explicit description of a bad method does not thereby convert it into a good one. The fatal flaws remain.

EXPLANATION

conomic wealth. Instead, there are declara-
ith impressionistic scraps of statistics such

c way to illustrate the inaccuracy of traditional
ior is to present the data for the two towns in
highest and lowest Democratic vote. Clarkstown
a "very prosperous" ($629) Hudson River town,
c vote established it, by a considerable margin,
nit. The second highest Democratic unit (83.9
y "poor" ($494), isolated interior town (Croghan
west Democratic unit was Putnam, a "marginal"
gton County, where the Democratic vote was
ô

igures lend a sense of statistical authority
e substance. Another inveterate historical
ed that "to support an argument by a few
a persuasive rhetorical device, is not logi-
cceptions to most historical generalizations,
ional instances were accepted as proof, it
almost anything."[16]
s, or implies, that he systematically com-
al data throughout the state, he strangely
f a comprehensive statistical generalization
l question.

There is only one table, out of many in
two variables side by side for any area of
wns in Delaware County. This table shows
vellings in eighteen towns, the percentage
teen of them, and their rank order in both.
ottom of the table, in the way of a summary

r to the average (assessed) value of dwellings per

cation in History," *The American Historical Review*
has commented directly on Benson's book, "Despite
tion, Professor Benson's work sometimes falls short
ral scientists consider essential. One searches the first
*an Democracy* in vain for any detailed discussion of
is indicator precincts, or of the numbers of voters in
gnificance tests underlying the party preference per-
various ethno-cultural groups living in New York
G. Bogue, "United States: The 'New' Political His-
story 3 (1968): 11. In the second edition, Benson
l statement which appears to have satisfied Bogue.
method does not thereby convert it into a good one.

---

or a statistical generalization, and nothing in the text but statistical snippets.

I took the sixteen towns for which both economic and political data appear in the table and tried three experiments: First, a simple two-by-two table, in which the towns were equally divided on two axes: the eight most Democratic, the eight least Democratic, the eight most wealthy, and the eight least wealthy. The results were:

|  | 8 most wealthy | 8 least wealthy |
|---|---|---|
| 8 most Democratic | 2 | 6 |
| 8 least Democratic | 6 | 2 |

This appears to contradict Benson's thesis and also to undercut the impressionistic examples which he extracted and discussed in his text.

Next I averaged the wealth of the towns which the Democrats carried by more than 50 percent ($331) as against those in which they received less than that percentage ($414). The results once again contradicted Benson's assertion that "no significant relationship existed between wealth and voting in 1844." Finally, I calculated a Spearman rank correlation coefficient for the sixteen towns and got a positive correlation of .3, which leaves the issue in doubt. That marginal figure neither confirms nor refutes Benson's sweeping generalization but requires further evidence of the sort which he does not provide.[17]

A second piece of evidence which appears to bear directly on the issue of wealth and politics is Benson's analysis of a directory called *Wealth and Biography of the Wealthy Citizens of New York City, Comprising an Alphabetical Arrangement of Persons Estimated to Be Worth $100,000, and Upwards—With the Sums Appended to Each*

17. The disparity of results obtained by these three different statistical tests may serve to suggest the need for historians to study the mathematical assumptions embodied in the statistical tools at their command. Lancelot Hogben has remarked upon the "feverish concern of biologists, sociologists and civil servants to exploit the newest and most sophisticated statistical devices with little concern for their mathematical credentials or for the formal assumptions inherent therein." Historians are beginning to use the oldest and least sophisticated statistical techniques in precisely the same uncritical spirit. Lancelot Hogben, *Statistical Theory: The Relationship of Probability, Credibility and Error* (New York, n.d.) p. 13.

116                          *EXPLANATION*

*Name*, published by Moses Beach in 1845.[18] Benson examined a sample of a few names and concluded that Democrats and Whigs appeared in almost equal numbers. But another scholar has recently studied the whole list in a comprehensive fashion and discovered a very close and symmetrical correlation between wealth and Whiggery.[19]

Benson's methodological misdemeanors are not a mark of depravity. They are not a proof of the inherent inadequacy of quantification in history. The remedy is not less quantification but more. And Benson himself has, I think, done more than any other single individual to make possible more thorough and exact quantification in American political history. His work in the organization of the American Historical Association's program for the computer programing of political and social data, a program which is already sufficiently advanced to be useful and even indispensable to American political historians, is a giant step forward. But *The Concept of Jacksonian Democracy* was in some respects a step back.

᷽    The *fallacy of statistical nonsense* serves as a catchall category for a miscellany of statistical mumbo jumbo, all of which has one quality in common: it is, *in context*, literally meaningless. Sometimes it consists in a statistical generalization which may be accurate and important in some other context, but which is irrelevant to the problem at hand. A historian has argued, for example, that a measure of the effectiveness of Communism in the U.S.S.R. appears in the fact that "the number of doctors in Russia had increased from 1,380 in 1897 to 12,000 in 1935."[20] But the meaningful comparison for this problem is the increase in the number of doctors from 1917 to 1935. The Soviet regime has often received statistical credit for economic and social development at the end of the czarist period.

Another example of the same sort of error is from American political history, where one scholar attempted to measure the degree of party cohesion in the first session of the Second Congress by recording

18. Reprinted in Henry Wysham Lanier, *A Century of Banking in New York: 1822–1922* (New York, 1922), pp. 151–84.
19. Frank O. Gatell, "Money and Party in Jacksonian America: A Quantitative Look at New York's Men of Quality," *Political Science Quarterly* 82 (1967): 235–50. There are several signs of trouble in Gatell's essay, too. I compared the Beach list with other overlapping directories for Brooklyn and found that old established wealth tended to be more completely represented than new wealth, and wealthy citizens of English and Dutch descent more than Irish wealth, such as it was. This suggests that the Beach list is skewed toward Whiggish wealth, and that Gatell's conclusions require qualification. But they demonstrate a gross and serious inaccuracy in Benson's use of the Beach list.
20. Bernard Pares, *Russia* (New York, 1949), p. 137.

EXPLANATION

s Beach in 1845.[18] Benson examined a sample
uded that Democrats and Whigs appeared in
iut another scholar has recently studied the
isive fashion and discovered a very close and
tween wealth and Whiggery.[19]
ical misdemeanors are not a mark of depravity.
the inherent inadequacy of quantification in
ot less quantification but more. And Benson
more than any other single individual to make
nd exact quantification in American political
rganization of the American Historical Asso-
computer programing of political and social
already sufficiently advanced to be useful and
merican political historians, is a giant step
't of Jacksonian Democracy was in some re-

tatistical nonsense serves as a catchall category
al mumbo jumbo, all of which has one quality
xt, literally meaningless. Sometimes it consists
ion which may be accurate and important in
vhich is irrelevant to the problem at hand. A
example, that a measure of the effectiveness
S.R. appears in the fact that "the number of
icreased from 1,380 in 1897 to 12,000 in
ul comparison for this problem is the increase
from 1917 to 1935. The Soviet regime has
credit for economic and social development
riod.
the same sort of error is from American
ne scholar attempted to measure the degree
st session of the Second Congress by recording

n Lanier, A Century of Banking in New York: 1822–
1–84.
nd Party in Jacksonian America: A Quantitative Look
" Political Science Quarterly 82 (1967): 235–50. There
Gatell's essay, too. I compared the Beach list with other
oklyn and found that old established wealth tended to
than new wealth, and wealthy citizens of English and
wealth, such as it was. This suggests that the Beach list
lth, and that Gatell's conclusions require qualification.
d serious inaccuracy in Benson's use of the Beach list.
/ York, 1949), p. 137.

FALLACIES OF GENERALIZATION 117

the number of times the votes of each congressman agreed or disagreed
with the vote of James Madison. The figures are accurate, but they
are not an appropriate test of party regularity, for Madison himself was
something of a swing-voter at this time. Moreover, to categorize party
patterns in these terms is to permit only two patterns to emerge—a pat-
tern of consistent divergence from Madison's record and one of agree-
ment with it. It would exclude the discovery of multiparty patterns.[21]

The second general category of nonsensical statistical generaliza-
tions includes statements which float in an interpretative vacuum, with-
out an adequate control group as a reference point. Thus, David Donald
attempted a statistical analysis of abolitionist leadership and found that
the median age was twenty-nine, that 85 percent came from the North-
east, 60 percent from New England, and 30 percent from Massa-
chusetts; that there was a preponderance of Congregationalists and
Presbyterians and Quakers; that most were from respectable families,
neither rich nor poor; that few were immigrants; that few were born
in the city; and that few had any connection with industrial activity.
These statistical generalizations are not, however, weighed against
national norms, or the leadership of other movements, or any other
control. Without such a control, they are largely empty of meaning.[22]

The third general category of statistical nonsense consists in shift-
ing statistical bases as a correlation is run. James Sterling Young, in
The Washington Community, tried to prove that there was a pattern
of residential segregation in the District of Columbia during the Jeffer-
sonian era, with congressional legislators living in one community and
executive officers in another. But he compared legislative residences in
one period (1807, apparently) with executive residences in another
(1800-1828, apparently mostly toward the end of this period), and
both in turn with a control from a third period (1800). All of this was
at a time when Washington was being built, and residential patterns were
changing, and the changes cut against the author's thesis.[23]

Other examples of comparable errors appear in statistics text-
books, which also supply illustrations of a fourth category of statistical
nonsense, not much in evidence in historical writing—yet. But it is
one which is likely to become more common as quantification becomes
more routine. This fallacy of the fourth type consists in a shifted statis-

21. Noble Cunningham, The Jeffersonian Republicans: The Formation of Party Organi-
zation, 1789–1801 (Chapel Hill, N.C., 1957), pp. 22, 267–72.
22. David Donald, "Toward a Reconsideration of the Abolitionists," Lincoln Recon-
sidered (New York, 1956), pp. 19–36.
23. James Sterling Young, The Washington Community 1800–1828 (New York, 1966),
pp. 87, 69.

tical method, which has the same results as a shifted statistical base. It includes a variety of technical errors of various degrees of sophistication, in which medians, modes, and means are mixed up, or averages of any sort are confused with ranges of dispersion, and stupid, careless mistakes in which "natural" and "common" logarithms are mistaken for one another, or one unit of measurement is substituted for another.[24]

Historiographical examples have, however, already begun to appear. In Terry G. Jordan's *German Seed in Texas Soil: Immigrant Farmers in Nineteenth Century Texas* (Austin, 1966) there is an attempt to compare statistically the condition of German and Anglo-American farmers. But the author relies principally on averages, without applying information as to ranges and dispersions and medians, all of which are functional to his thesis.

❧   *Fallacies of statistical probability* are numerous, and sometimes very technical, and as yet rarely committed in historical scholarship. We might, however, briefly note two of them. The first is the error of assuming that the most probable distribution will occur, exactly, in any given instance. Abraham Kaplan writes,

> This point played an historic part in the Dreyfus trial, where the prosecution argued that Dreyfus' correspondence must be in code because the frequency distribution of the letters of the alphabet contained in the correspondence deviated from what is "normal" for the French language. The testimony of Poincaré for the defense that the most probable distribution is highly improbable was not very convincing, in spite of its being correct. (Possibly a contributing factor was that Poincaré had identified himself on the stand as the greatest living expert on probability, a tactical error which he later justified to his friends by pointing out that he was under oath at the time.)[25]

A second and related simple form of probability error is the familiar gambler's fallacy, which is the error of assuming that if a coin has come down heads one time, it is more likely to come down tails the next, because the probability (assuming the coin to be symmetrical) is .5 for heads and .5 for tails. But the "law of averages" does not work this way. The odds are always even in every single toss.

24. Darrell Huff, *How to Lie with Statistics* (New York, 1954); Ernst Wagemann, *Narrenspiegel der Statistik* (Bern, 1950); I. B. Cohen, "The Misuse of Statistics," *Journal of the American Statistical Association* 33 (1938): 657–74; W. Allen Wallis and Harry V. Roberts, *Statistics: A New Approach* (New York, 1956), chap. 3; Hans Zeisel, *Say It with Figures*, rev. 4th ed. (New York, 1957), passim; M. J. Moroney, *Facts From Figures*, rev. 3d ed. (Baltimore, 1956), passim.
25. Abraham Kaplan, *The Conduct of Inquiry* (San Francisco, 1964), p. 224.

s the same results as a shifted statistical base. echnical errors of various degrees of sophistica- modes, and means are mixed up, or averages l with ranges of dispersion, and stupid, careless ural" and "common" logarithms are mistaken unit of measurement is substituted for another.[24] xamples have, however, already begun to appear. rman Seed in Texas Soil: Immigrant Farmers in as (Austin, 1966) there is an attempt to com- dition of German and Anglo-American farmers. ncipally on averages, without applying informa- spersions and medians, all of which are func-

tatistical probability are numerous, and some- l as yet rarely committed in historical scholar- r, briefly note two of them. The first is the e most probable distribution will occur, exactly, braham Kaplan writes,

istoric part in the Dreyfus trial, where the prosecution orrespondence must be in code because the frequency ers of the alphabet contained in the correspondence "normal" for the French language. The testimony efense that the most probable distribution is highly ry convincing, in spite of its being correct. (Possibly as that Poincaré had identified himself on the stand xpert on probability, a tactical error which he later by pointing out that he was under oath at the

l simple form of probability error is the familiar is the error of assuming that if a coin has me, it is more likely to come down tails the lity (assuming the coin to be symmetrical) is ils. But the "law of averages" does not work lways even in every single toss.

with Statistics (New York, 1954); Ernst Wagemann. , 1950); J. B. Cohen, "The Misuse of Statistics," Journal ciation 33 (1938): 657–74; W. Allen Wallis and Harry pproach (New York, 1956), chap. 3; Hans Zeisel, Say ew York, 1957), passim; M. J. Moroney, Facts From 1956), passim. duct of Inquiry (San Francisco, 1964), p. 224.

ᔆ➤   The ecological fallacy is a false form of statistical inference which is common in quantitative research. Its popularity is sustained by the fact that it appears to be a shortcut to a significant statistical conclusion. It is a form of error which is more easily committed than characterized, and most clearly explained by an example.

W. S. Robinson, who discovered and named this fallacy, provides a good illustration. He attempted to estimate the statistical relationship between illiteracy and race (white-Negro), by three statistical methods. First, he correlated marginal percentages between Negroes and illiteracy in nine standard census regions of the United States. The result was a positive Pearson correlation coefficient of .946. Next, he correlated per- centages of Negroes and illiterates in the forty-eight states. This time he obtained a different estimate—a positive Pearson coefficient of .773. Finally, he attempted to run a correlation, not between ecologi- areas, but between individuals—white and Negro, literate and illiterate. The result was still a third figure: a low positive Pearson coefficient of .203. The ecological fallacy consists in a confusion of the first two ecological correlations with the third individual correlation.[26]

An individual correlation is one between discrete and indivisible objects—namely, people, in this case. An ecological correlation is between percentage figures which refer to classes of individuals—areal, or geographical or ecological classes. The ecological fallacy occurs when classes are used which do not coincide with the variable being measured. The degree of error is regressive, as the classes increase in number and diminish in size, and also in proportion with the degree of coincidence with the variable under investigation. Suppose, for instance, that General Sherman had his way, and Negroes were entirely segregated by region from whites in the United States. Suppose all Negroes lived in census region one, and all whites in regions two through ten. Then, an ecological correlation should yield the same results as an individual correlation.[26a] But not otherwise. It is possible, by the use of regression techniques, to derive individual correlations from ecological data.[27] But it is incorrect to use an ecological correlation itself as an inter- changeable substitute for an individual correlation. This point, im- portant as it is for sociologists, is still more important for historians who seek to use quantitative materials. If Robinson, in his example,

26. W. S. Robinson, "Ecological Correlations and the Behavior of Individuals," Ameri- can Sociological Review 15 (1950): 351–7; Leo Goodman, "Ecological Regression and the Behavior of Individuals," and "Some Alternatives to Ecological Correlation," in ibid. 18 (1953): 663–4; and American Journal of Sociology 64 (1959): 610–25. A bibliography of other discussions of this problem appears in Otis Dudley Duncan et al., Statistical Geography (Glencoe, 1961). 26a. if variances of the ten groups are similar. 27. Goodman, op. cit.

120    *EXPLANATION*

were concerned with race and literacy in 1840, he would not have been able to run an individual correlation directly. The only data available to him would have been aggregate census data. He would, therefore, have to use regression techniques on his data to obtain an answer.

The ecological fallacy is not well named, for precisely the same sort of error can be committed in the use of any kind of aggregate data. The ecological fallacy could appear, for example, in the analysis of generational as well as areal classes—in classes which are temporal rather than spatial in nature. Historians, therefore, have still another reason to be wary of this problem.

ॐ The *fallacy of false extrapolation* is a statistical series which is stretched beyond the breaking point. It occurs in a variety of forms. The most clear and simple is a generalization from a true series *A, B* to a false *A, B, C*. The average size of the American family was reported by the Census Bureau as 3.71 persons in 1940 and 3.54 persons in 1950. To extrapolate from these known quantities, on the assumption that the American family is shrinking at an arithmetical rate of 0.22 persons per decade, to the conclusion that the American family, in 2070, will consist of 0.90 persons, is absurd. The Census Bureau estimated that family size actually increased from 3.54 to 3.65 in the decade 1950–1960. To extrapolate from these figures on the assumption that families are growing in geometrical ratio (the increment, let us say, is doubling every decade) to the conclusion that the average American family in 2070 will include 228.82 persons is not merely absurd but inconceivable, in every sense of the word.

Many terrifying predictions of a great demographic Götterdämmerung lying just around the corner—not in 2070, but in 1970, or 1975, or 1980—are not absurd, but they may be equally fallacious. There is clear evidence that birth rates have been rising at a formidable rate. But there has been a good deal of loose talk about population explosions that fails to take into consideration the increase in contraception, the cumulative effect of education and affluence upon birth rates, and other countervailing phenomena. There *is* an ongoing crisis, but maybe not the incipient catastrophe which some of our Cassandras so confidently expect.

There was an eighteenth-century American clergyman, Rev. Ezra Stiles, who loved to weigh and measure things. He often talked of his findings with his many visitors, and sometimes he even weighed and measured them as well. But he outdid himself in 1760 with the following projection of the denominational demography of New England:

*EXPLANATION*

...e and literacy in 1840, he would not have been
...al correlation directly. The only data available
...n aggregate census data. He would, therefore,
...chniques on his data to obtain an answer.
...acy is not well named, for precisely the same
...mitted in the use of any kind of aggregate data.
...could appear, for example, in the analysis of
...areal classes—in classes which are temporal
...ature. Historians, therefore, have still another
...is problem.

...*false extrapolation* is a statistical series which
...breaking point. It occurs in a variety of forms.
...ple is a generalization from a true series *A, B*
...average size of the American family was re-
...reau as 3.71 persons in 1940 and 3.54 per-
...olate from these known quantities, on the as-
...can family is shrinking at an arithmetical rate
...le, to the conclusion that the American family,
...0.90 persons, is absurd. The Census Bureau
...e actually increased from 3.54 to 3.65 in the
...xtrapolate from these figures on the assump-
...wing in geometrical ratio (the increment, let
...decade) to the conclusion that the average
...0 will include 228.82 persons is not merely
...in every sense of the word.

...dictions of a great demographic Götterdäm-
...l the corner—not in 2070, but in 1970, or
...isurd, but they may be equally fallacious. There
...rates have been rising at a formidable rate. But
...of loose talk about population explosions that
...tion the increase in contraception, the cumula-
...l affluence upon birth rates, and other counter-
...e *is* an ongoing crisis, but maybe not the
...h some of our Cassandras so confidently ex-

...nth-century American clergyman, Rev. Ezra
...and measure things. He often talked of his
...sitors, and sometimes he even weighed and
...it he outdid himself in 1760 with the follow-
...inational demography of New England:

---

## FALLACIES OF GENERALIZATION          121

| A.D. | Episcopalians | Friends | Baptists | Congregationalists |
|------|---------------|---------|----------|--------------------|
| 1760 | 12,600  | 16,000  | 22,000  | 440,000 |
| 1785 | 23,200  | 32,000  | 44,000  | 880,000 |
| 1810 | 46,400  | 64,000  | 88,000  | 1,760,000 |
| 1835 | 92,800  | 128,000 | 176,000 | 3,520,000 |
| 1860 | 185,600 | 256,000 | 352,000 | 7 MILLIONS* |

* Quoted in Carl Bridenbaugh, *Mitre und Sceptre* (New York, 1962), p. 12.

Small wonder that this incorrigibly optimistic Congregational divine could plan a monument for himself with a sketch of the universe on one side and the Stiles family tree on the other! It is said that the only biblical injunction which New England Congregationalists consistently obeyed was the one which required them to increase and multiply—but not precisely according to Stiles's projections.[28]

The field of demography is littered with discarded extrapolations that seemed the soul of reason at the time they were made. The Negro population of the United States appeared to fall sharply from 1860 to 1880, which led many intelligent Americans to predict the imminent extinction of Negroes in this nation. A little later, others predicted from an inverse correlation between IQs and fertility rates that the Republic would soon be inhabited by a race of morons. Still others, from a differential in the reproductive rates of members of various religious groups, predicted that the United States would become a fief of the Pope. A satirical specimen of the fallacy of false extrapolation is supplied by Mark Twain, who wrote:

> The Mississippi between Cairo and New Orleans was twelve hundred and fifteen miles long one hundred and seventy-six years ago. It was eleven hundred and eighty after the cut-off of 1722. It was one thousand and forty after the American Bend cut-off. It has lost sixty-seven miles since. Consequently, its length is only nine hundred and seventy-three miles at present.
>
> Now, if I wanted to be one of those ponderous scientific people, and "let on" to prove what had occurred in the remote past by what had occurred in late years, what an opportunity is here! Geology never had such a chance, nor such exact data to argue from! Nor "development of species," either! Glacial epochs are great things, but they are vague—vague. Please observe: In the space of one hundred and seventy-six years the lower Mississippi has shortened itself two-hundred and forty-two miles. That is an average of a trifle over one mile and a third per year. Therefore, any calm person, who is not blind or idiotic, can see that in the Old Oölitic Silurian Period, just one million

28. The number of Congregational *churches* is thought to have increased from 465 in 1750 to 1,706 in 1850. But the number of Congregationalists seems to have increased in a smaller ratio even than this. See Edwin S. Gaustad, *Historical Atlas of Religion in America* (New York, 1962), pp. 62, 167, 168.

years ago next November, the lower Mississippi River was upward of one million three hundred thousand miles long, and stuck out over the Gulf of Mexico like a fishing-rod. And by the same token any person can see that seven hundred and forty-two years from now the Lower Mississippi will be only a mile and three-quarters long, and Cairo and New Orleans will have joined their streets together, and be plodding comfortably along under a single mayor and mutual board of aldermen. There is something fascinating about science. One gets such wholesale returns of conjecture out of such a trifling investment of fact.[29]

Another kind of false extrapolation occurs in the form of $a:b::A:B$, where $a$, $b$, and $A$ are known, and an unknown $B$ is falsely extrapolated. An example may appear in a group of ingenious essays by two naval historians, Michael Lewis and Lieutenant Commander D. W. Waters, R.N., on the argument of the Spanish Armada. The authors were especially interested in the number of long-range guns (culverins) carried by the great galleons of that mighty fleet. No direct evidence exists to answer this question. Lewis and Waters were compelled to operate by means of an extrapolation from three knowns to an unknown—from a known number of Spanish galleons ($a$) carrying a known number of culverins ($b$) to the unknown total number of culverins ($B$) carried by all the galleons in the fleet ($A$). But galleons came in many assorted sizes, and culverins, too. In the opinion of some learned students of this question, it is probable that Lewis and Waters, for all their care and ingenuity, overestimated the number of long guns in the Spanish fleet by this method.[30]

The *fallacy of false interpolation* is a form of overgeneralization, in which a line is inaccurately run between two known points in order to estimate the location of an unknown point in between. It is, in other words, a false estimate of an unknown $B$ from a known $A$ and $C$. There is no sure defense against this fallacy except full factual information. But there are two logical rules of thumb which, obvious though they may be, are often overlooked.

First, the accuracy of interpolations of unstable indices must necessarily vary inversely with the degree of their instability and with the number of known index points. A grossly unstable index ought to be interpolated with great caution and reluctance. Few indices are as unstable as the level of voter participation in a free and open polity. In early American presidential years, participation fluctuated wildly from one

29. Mark Twain, *Life on the Mississippi* (New York, 1917), pp. 155–56.
30. Michael Lewis, "Armada Guns: A Comparative Study of English and Spanish Armaments: Section V. The Guns of the Spanish Fleet, 1588," *The Mariner's Mirror* 29 (1943), 3–39; D. W. Waters, "The Elizabethan Navy and the Armada Campaign," *ibid.* 35 (1949), 90–138; cf. Garrett Mattingly, *The Armada* (Boston, 1959), p. 416 n.

*EXPLANATION*

miles, the lower Mississippi River was upward of one of thousand miles long, and small out over the Gulf sling-rail. And by the same token any person can see that forty-two years from now the Lower Mississippi and three-quarters long; and Cairo and New Orleans its streets together, and be prodding comfortably along it and mutual board of aldermen. There is something dense. One gets such wholesale returns of conjecture-investment of fact.

The extrapolation occurs in the form of *acb. A B*, known, and an unknown *B* is falsely extrapolated. as in a group of ingenious essays by two naval... and Lieutenant Commander D. W. Waters, of the Spanish Armada. The authors were experts of long-range guns (culverins) carried by mighty fleet. No direct evidence exists to answer Waters were compelled to operate by means of an knowns to an unknown—from a known number carrying a known number of culverins (*b*) to per of culverins (*B*) carried by all the galleons in same came in many assorted sizes, and culverins, some learned students of this question, it is probable for all their care and ingenuity, overestimated in the Spanish fleet by this method.

*False interpolation* is a form of overgeneralization—inaccurately run between two known points in the estimate of an unknown point in between. It is the estimate of an unknown *B* from a known *A* and case against this fallacy except full factual in the two logical rules of thumb which, obviously, often overlooked.

of interpolations of unstable indices must with the degree of their instability and with points. A greatly unstable index ought to be caution and reluctance. Few indices are as un-participation in a free and open polity. In all years, participation fluctuated wildly from one

*Mississippi* (New York, 1917), pp. 155–56.
A Comparative Study of English and Spanish Arma-the Spanish Fleet, 1588," *The Mariner's Mirror* 29
The Elizabethan Navy and the Armada Campaign," ibid., Mattingly, *The Armada* (Boston, 1959), p. 416 n.

election to another and from one state to the next. Moreover, the number of known index points is small. In New Hampshire, the percentage of adult males voting in three elections was:

| 1808 | 62.1% |
| 1812 | 75.4% |
| 1828 | 76.4% |

If anybody tried to interpolate the turnout in 1824, solely from these figures, he would be far off the mark. According to Richard McCormick, who made the estimates above, only 16.8 percent of New Hampshire's adult males came to the polls in 1824![31]

A second obvious rule of thumb is that an interpolation can be no stronger than its weaker pole. A cautionary example is an article by Professor George Rogers Taylor called "American Economic Growth before 1840: An Exploratory Essay" in *The Journal of Economic History* 24 (1964): 427–44.

Taylor's purpose was to develop a preliminary hypothesis, from scattered statistical snippets and impressionistic material, as to per capita growth rates in early America. He began with the work of another economist who studied the same problem by working backward from the period 1840–1959 where statistical evidence was comparatively good, and the per capita growth rate seems to have been something like 1⅝ percent per year. Could this rate apply to the period 1676–1840? The other economist, Raymond Goldsmith, did not think so, for it would require absurdly small levels of per capita income at the beginning of the period. Instead, Goldsmith suggested an extended average growth rate before 1840 of 0.6 percent per year, which never rose, in his opinion, in any fifty-year part of this early period to as much as one percent per year.

Taylor accepted much of this, but not the presumption of a steady low growth rate. Instead he hypothesized from a variety of demographic and economic materials that the per capita rate of growth in the period 1710–1775 was "relatively high for a preindustrial economy," perhaps as high as one percent, maybe even higher. From this conclusion he interpolated the additional conclusion that the *average* per capita growth rate in the period 1775–1840 approached zero. "Per capita income in 1840 was about the same or at least not substantially higher than in the early 1770's," he guessed.

This interpolation is logically tenable. If Taylor's estimates of

31. Richard P. McCormick, "New Perspectives on Jacksonian Politics," *American Historical Review* 65 (1960): 288–301.

124                              EXPLANATION

growth rates before 1775 and after 1840 are correct, then his interpolation of a zero-sum in the intervening period must be right, too. But if one of the guesses is wrong, then the interpolation collapses. Taylor's figures for the post-1840 period seem acceptable. But his estimates for the period 1710–1775 are derived from partial and contradictory evidence. A more open hypothesis would, in my judgment, be more serviceable to sustained research.[32]

       The *fallacy of the insidious generalization* is committed by a historian who swears up and down that he cannot and will not generalize upon his subject, and then proceeds to bootleg generalizations into his work, without recognizing their existence or controlling their content. An example is H. A. L. Fisher, an English academic historian who prefaced one of his books with the following assertion: "One intellectual excitement has, however, been denied me. Men wiser and more learned than I have discerned in history a plot, a rhythm, a predetermined pattern. These harmonies are concealed from me. I can see only . . . one great fact with respect to which, since it is unique, there can be no generalizations."[33]

This statement is followed by a considerable number of generalizations, some of which are quite as absurd as the disclaimer which preceded them. "The Athenian empire, the brilliant growth of two generations, shared the fate of every polity which rises by the repression of local liberties," Fisher wrote. Again: "It is the property of polytheism to be tolerant." And again: "Men once embarked on the ocean of political strife are apt to be carried further than they intended."[34]

One might note, in Fisher's prefatorial statement, a common confusion in the author's mind between generalizations concerning the whole of history and generalizations of a limited sort within history. A good many historians, I think, have condemned both of these things together.

The fallacy of the insidious generalization commonly occurs in a form even more insidious than Fisher's errors. Impressionistic historians, who bitterly inveigh against quantification and its dehumanizing tendencies, are quick to use the words "few," "some," "most," "many," "singular," "typical," "exceptional," "common," "customary," "normal," "regular," "recurrent," "periodic," "widespread," "often," and many others. These terms imply numbers, and numbers need counting. And

32. For a historiographical model of interpolation by a series of orderly inferences, see Willi Apel, *Gregorian Chant* (Bloomington, Ind., 1966), pp. 33, 507–15.
33. H. A. L. Fisher, *A History of Europe*, 3 vols. (London, 1935), 1:vii.
34. Ibid., 1:32, 45, 67.

5 and after 1840 are correct, then his interpo-
the intervening period must be right, too. But
rong, then the interpolation collapses. Taylor's
period seem acceptable. But his estimates for
are derived from partial and contradictory
hypothesis would, in my judgment, be more
research.[32]

*the insidious generalization* is committed by a
nd down that he cannot and will not generalize
en proceeds to bootleg generalizations into his
ig their existence or controlling their content.
.. Fisher, an English academic historian who
s with the following assertion: "One intellectual
r, been denied me. Men wiser and more
ned in history a plot, a rhythm, a predetermined
s are concealed from me. I can see only . . .
ct to which, since it is unique, there can be no

llowed by a considerable number of generaliza-
quite as absurd as the disclaimer which preceded
npire, the brilliant growth of two generations,
polity which rises by the repression of local
Again: "It is the property of polytheism to be
Men once embarked on the ocean of political
d further than they intended."[84]
Fisher's prefatorial statement, a common con-
d between generalizations concerning the whole
tions of a limited sort within history. A good
have condemned both of these things together.
nsidious generalization commonly occurs in a
than Fisher's errors. Impressionistic historians,
inst quantification and its dehumanizing tend-
: the words "few," "some," "most," "many,"
ceptional," "common," "customary," "normal,"
"periodic," "widespread," "often," and many
y numbers, and numbers need counting. And

del of interpolation by a series of orderly inferences, see
Bloomington, Ind., 1966), pp. 33, 507–15.
of Europe, 3 vols. (London, 1935), l:vii.

yet they are used without quantification, by scholars who believe that quantifying is no part of their job. The inaccuracy of much impressionistic history is an inevitable result. Other historians make statements in which even these words are implicit. The results are even worse. So common is this form of error that the reader can pick up almost any work of history from his shelves, turn to almost any page, and find an example.

&► The *fallacy of the double-reversing generalization* is the opposite of many errors in this chapter—a halting generalization rather than a hasty one, an understatement rather than an overstatement. It is a species of interpretative bet-hedging, which in an extreme form becomes no interpretation at all but a maze of mutual qualifications or a cunning balance of casuistical contradictions, or a trackless wilderness of pettifogging detail, or a slippery ooze of substantive (as well as semantical) shilly-shally.

A familiar example is Theodore Roosevelt's first presidential state paper, in which the author, with uncharacteristic restraint, tried to play things both ways on a number of controversial issues of the day. The most famous part of this document concerned public regulation of corporate enterprise—a passage which the inimitable Mr. Dooley took great pleasure in satirizing: "Th' trusts," says he, "are heejous monsthers built up be th' enlightened intherprise iv th' men that have done so much to advance progress in our beloved country," he says. "On wan hand I wud stamp thim undher fut; on th' other hand not so fast."

There are many comparable examples in historical scholarship. More than a few monographers have timidly advanced a tentative thesis in Chapter 1, only to withdraw it in Chapter 2 with an "on th' other hand not so fast." An example is Alfred F. Young's *The Democratic Republicans of New York: The Origins, 1763–1797* (Chapel Hill, N.C., 1967). This distinguished work possesses many great merits in the breadth and depth of its accurate and painstaking research. But it is more satisfactory in its parts than in the whole. The author's idea of truth, like Burke's idea of liberty, seems to be "a sort of middle" between interpretative extremes. There is, of course, no necessary fallacy in moderation. But Young's assertions are so thoroughly amended by strings of qualifications that the main point is neutralized, or obscured. And sometimes he declares unequivocally that $X$ was the case, only to declare unequivocally a little later that not-$X$ was the case.

What, for instance, was George Clinton's conception of the economic

126                              *EXPLANATION*

role of the state government? On page 56 Young characterizes it as "essentially negative." On page 570 he calls it essentially "positive" on the same questions.

What was the nature of the relationship between Federalist leaders and their constituents? We are informed on one page that "most Federalist support was uncoerced," but also that "to a considerable extent Federalist electoral strength continued to be a vote of economic dependents" (p. 569). A reconciliation is conceivable between these two statements, but none is supplied by the author.

What, precisely, was the degree of continuity and discontinuity between the political groups of 1788 and the parties of the 1790s? The author seems to stress elements of continuity, but there is no clear and conclusive estimate of this difficult problem. Instead the reader learns that "In the leadership of the Federalists, the continuities in New York politics from the Revolution through the 1790's were striking. . . . There were also discontinuities. . . . The leadership of the Republicans showed similar continuities and discontinuities . . ." (pp. 566–67).

The ambivalence of Young's interpretation of the impact of the French Revolution upon New York politics is captured in the tension between the beginning and the end of his essay on that question. The chapter is called "The Spirit of 1776 Rekindling." But the author concludes "it was not quite true of New York, as Jefferson said of the country as a whole, that 'all the old spirit of 1776 is rekindling.'" Nevertheless, he insists "a fire had indeed been lit," and this reader, at least, lost his way in billowing clouds of conceptual smoke (pp. 345–65).

A good deal of the confusion in Young's book is a consequence of impressionistic research and of his attempt to compress an analytical thesis into a narrative form; but much, I think, is substantive as well. The complaint is not that he took a middling position, but rather that his position tends to shift within an unstable range of middling possibilities.

Another example is Norman K. Risjord's *The Old Republicans: Southern Conservatism in the Age of Jefferson* (New York, 1965). A fair judgment upon this work is passed by Noble Cunningham:

> The author begins by picturing the old Republicans in traditional shades as a group who appeared in reaction to the surge of nationalism following the War of 1812, men who took to heart the compact theory of government and adhered to the "principles of 1798." Although this theme is later restated, it is so modified in other places as to raise the question of how well the author has thought through his interpretations. While stating as fact that the old Republicans appeared as a reaction to postwar nationalism, the author later writes that this "is generally assumed" but "only partially true." . . . Throughout the work, shifting emphasis and conflicting interpre-

nt? On page 56 Young characterizes it as
age 570 he calls it essentially "positive" on

f the relationship between Federalist leaders
are informed on one page that "most Fed-
ed," but also that "to a considerable extent
continued to be a vote of economic de-
onciliation is conceivable between these two
lied by the author.

e degree of continuity and discontinuity be-
of 1788 and the parties of the 1790s? The
ents of continuity, but there is no clear and
difficult problem. Instead the reader learns
e Federalists, the continuities in New York
through the 1790's were striking. . . . There
. The leadership of the Republicans showed
ontinuities . . ." (pp. 566–67).

oung's interpretation of the impact of the
ew York politics is captured in the tension
the end of his essay on that question. The
irit of 1776 Rekindling." But the author
true of New York, as Jefferson said of the
he old spirit of 1776 is rekindling.'" Never-
l indeed been lit," and this reader, at least,
ads of conceptual smoke (pp. 345–65).

fusion in Young's book is a consequence of
l of his attempt to compress an analytical
, but much, I think, is substantive as well.
e took a middling position, but rather that
ithin an unstable range of middling possi-

orman K. Risjord's *The Old Republicans:*
*e Age of Jefferson* (New York, 1965). A
is passed by Noble Cunningham:

turing the old Republicans in traditional shades
in reaction to the surge of nationalism following
took to heart the compact theory of government
iciples of 1798." Although this theme is later
other places as to raise the question of how well
rough his interpretations. While stating as fact
appeared as a reaction to postwar nationalism,
t this "is generally assumed" but "only partially
work, shifting emphasis and conflicting interpre-

---

tations leave no clear picture of the old Republicans or of Southern con-
servatism.[35]

⮌   The *fallacy of the overwhelming exception* is a generalization
which is a good deal less general than it appears to be. The authors of
*1066 and All That* assert, for instance, that "Magna Charta was there-
fore the chief cause of Democracy in England, and thus a *Good Thing*
for everyone (except the Common People)."[36]

A serious example appears in an essay by an American business
historian, Gordon C. Bjork, who argued the thesis that "the relatively
slow rate of population growth in the [American] seaport cities under
consideration for the period 1790 to 1825 must be blamed, in large
part, on the failure of foreign trade to expand." He contended that some-
thing called "trade gain per capita" fell from a base of 100 in 1790
to 30 in 1825—in Boston, New York, Philadelphia, and Baltimore.

Bjork's critical index of "trade gain per capita" is a complicated
thing, calculated from three other indices, all of which are incorrect.
But our business is merely with his estimates of the expansion of com-
merce in the cities. We discover that he omitted cotton from his calcula-
tions, though it was the most expansive domestic commodity of the
period and important even in the trade of ports as far north as Boston.
Moreover, he excluded re-exports, which other scholars have found to
account for much of the expansion of American commerce during the
period 1790–1807. Bjork justified his exclusions on the ground that
cotton and re-exports were not produced in the western hinterlands of
the seaport cities—which is irrelevant to any estimate of trade volume.
All four of these cities had southern hinterlands as well as western ones;
all of them were engaged both in the re-export business and in the
transshipment of cotton.

These exclusions are not readily apparent to a casual reader of
Bjork's paper. But they are vital to his interpretation. To make such
sweeping exclusions is to make nonsense of the subject.[37]

35. *American Historical Review* 71 (1966): 1062.
36. Walter C. Sellor and Robert J. Yeatman, *1066 and All That*, new ed. (London, 1965), p. 34.
37. Gordon C. Bjork, "Foreign Trade," in David Gilchrist, ed., *The Growth of the Sea-port Cities* (Charlottesville, 1967), pp. 54–61. The accuracy of Bjork's interpretation is diminished by other errors. A *weighted* average of the four seaport cities would show a different result from the one which he calculated. Moreover, Bjork appears to have inflated his population index, and his calculation of terms of trade contradicts, without explanation, the source which he cites: Douglass North's *The Economic Growth of the United States, 1790–1860* (Englewood Cliffs, N.J., 1961).

ᐧᐁ᐀   Positive rules for the construction of sound statistical generalization need not be discussed here. They are thoroughly explored in statistics texts. But there is something of another sort which needs to be said. The structure and function of generalization in history has been considerably confused by the errors of a reigning school of epistemologists, who hold that every explanation in history (and indeed everywhere else) must consist in referring the thing to be explained to a "general law" or "universal hypothesis" or "hypothesis of universal form." These three phrases, suitably shrouded in shudder-quotes, come from the classic argument for this interpretation by Carl G. Hempel. His thesis is:

> The explanation of the occurrence of an event of some specific kind $E$ at a certain place and time consists, as it is usually expressed, in indicating the causes or determining factors of $E$. Now the assertion that a set of events— say, of the kinds $C_1, C_2 \ldots, C_n$—have caused the event to be explained, amounts to the statement that, according to certain general laws, a set of events of the kinds mentioned is regularly accompanied by an event of kind $E$. Thus, the scientific explanation of the event in question consists of
> (1) a set of statements asserting the occurrence of certain events $C_1, \ldots C_n$ at certain times and places.
> (2) a set of universal hypotheses, such that
> (a) the statements of both groups are reasonably well-confirmed by empirical evidence,
> (b) from the two groups of statements the sentence asserting the occurrence of event $E$ can be logically deduced.

Hempel's criteria for a "general law" or "universal hypothesis" are rigorous. A law must be universally true in *all* cases where a certain complex of conditions is satisfied. And an explanation model must be "logically conclusive," in the literal sense that the conclusion must follow *necessarily* from the premises. The only complete explanation is an explanation which is "deduced by logical reasoning" in this way. An explanation is not complete unless "it might as well have functioned as a prediction."[38]

---

38. Hempel, "The Function of General Laws in History," as reprinted in Patrick Gardiner, ed., *Theories of History* (Glencoe, Ill., 1959), pp. 344–56. Hempel's classic article, published in 1942, was not, of course, the first statement of the "Hempelian model." The idea that explanation consists in showing that something obeys a law has been traced back to Berkeley, and probably appeared much earlier. (E. Meyerson, *De l'Explication dans les Sciences*, 2d ed. [Paris, 1927]). More recently it appeared in forms very close to Hempel's in Karl Popper's *Logik der Forschung* (Vienna [1934]), and in Morris Raphael Cohen, *Reason and Nature* (New York, 1931). It is called by many different names—the "regularity interpretation" (Patrick Gardiner, *The Nature of Historical Explanation*, p. 65); the "covering law model" (Willian Dray, *Laws and Explanation in History*, p. 1); and the "deductive model" (Michael Scriven, "Truisms as Grounds for Historical Explanations," *Theories of History*, p. 444.

## EXPLANATION

les for the construction of sound statistical generali-
scussed here. They are thoroughly explored in statis-
something of another sort which needs to be said.
nction of generalization in history has been con-
the errors of a reigning school of epistemologists,
explanation in history (and indeed everywhere
referring the thing to be explained to a "general
pothesis" or "hypothesis of universal form." These
shrouded in shudder-quotes, come from the classic
pretation by Carl G. Hempel. His thesis is:

the occurrence of an event of some specific kind $E$ at
time consists, as it is usually expressed, in indicating the
ng factors of $E$. Now the assertion that a set of events—
, $C_2$ . . . $C_n$—have caused the event to be explained,
ement that, according to certain general laws, a set of
mentioned is regularly accompanied by an event of
cientific explanation of the event in question consists of
nts asserting the occurrence of certain events $C_1, \ldots, C_n$
places.

al hypotheses, such that
ts of both groups are reasonably well-confirmed by
e,

groups of statements the sentence asserting the occur-
can be logically deduced.

a "general law" or "universal hypothesis" are
be universally true in *all* cases where a certain
is satisfied. And an explanation model must be
n the literal sense that the conclusion must follow
remises. The only complete explanation is an
deduced by logical reasoning" in this way. An
lete unless "it might as well have functioned as a

---

f General Laws in History," as reprinted in Patrick Gar-
(Glencoe, Ill., 1959), pp. 344–16. Hempel's classic article,
of course, the first statement of the "Hempelian model."
onsists in showing that something obeys a law has been
d, probably appeared much earlier. (E. Meyerson, *De
3d ed. (Paris, 1927)). More recently it appeared in forms
f Popper's *Logik der Forschung* (Vienna [1934]), and is
m and *Nature* (New York, 1931). It is called by many
rly interpretation" (Patrick Gardiner, *The Nature of
; the "covering law model" (William Dray, *Laws and Ex-
and the "deductive model" (Michael Scriven, "Truisms
lanations," *Theories of History*, p. 444.

---

But these conditions cannot be met in historical writing. Consider a whimsical example of a universal law which is presented by another philosopher, Morton White. "Let us assume that the statement 'Whenever Chinese eat, they eat with chopsticks' is true," he writes. But this statement, as it stands, is of course untrue, in a way which invalidates other alleged universal laws in history. First, Chinese have not always eaten with chopsticks. The earliest humanoid inhabitants of the Yellow River valley probably lapped up their dinners like dogs. Moreover, today's Chinese do not eat with chopsticks everywhere. It is unlikely that a well-mannered Mandarin, however loyal he may be to the ways of his ancestors, would eat with chopsticks at Maxim's. Most important, even when the use of chopsticks was at its peak in China, most Chinese did not use them some of the time (i.e., mourning periods), and some Chinese did not use them most of the time (i.e., fingerless Chinese). One must, therefore recast White's statement to read, "Within certain limits of time and space, Chinese tended to eat with chopsticks."

This statement differs from a universal law in two respects. First, it applies differentially through time within a closed temporal frame of reference. Second, it is a statistical statement. An explanation model which includes a temporalized statistical generalization statement of this sort cannot support the sort of deduction which the Hempelian model requires. A probability statement asserts that $C$ is sometimes followed by $E$, and sometimes not. Maybe $E$ happens 999 times out of 1,000, but if it doesn't happen once there can be no necessary and certain deduction

---

In revisions of his thesis, Hempel has stressed a second kind of covering law model, in which the *explanans* does not include a universal law, but rather a statement of statistical probability. This second model is more relevant to the explanations which historians (and natural scientists) actually make. And it is radically different, in its logical behavior, from the deductive model of explanation. But even with this solutory modification, serious problems remain. Hempel still seems to insist that all explanations must conform to one or the other of his models). (He would allow "explanation sketches" which are understood as incomplete statistical statements to be filled in by some future empiricist.) Now, if it is true that no historian (or natural scientist) can hope to find a universal law of the sort required by Hempel's first model, then it follows that all explanations in history (and in the natural sciences) must be statistical or proto-statistical in nature. And this, I think, is the quantitative fallacy, which returns to the Pythagorean error of thinking that all significant things are numbers.

Moreover Hempel seems to argue that only statements of very high ("close to 1") probability can be used in explanations. This is quite unsatisfactory. How close to 1? What criteria can there be? And what, precisely, is the logical relationship between an *explanandum* and an *explanans* which contains a statistical statement? Is it different from an explanation model which contains a narrative statement, or a moti-vational statement, or a group composition statement? I don't see how. In each of these types, the bond between an *explanans* and an *explanandum* must be presently understood in psychological and/or pragmatical terms, perhaps because it conforms to a logic we don't yet understand.

130                                    EXPLANATION

from the premises to the conclusion. This is true, I think, equally in the natural sciences, where universal laws are equally elusive. Albert Einstein wisely asserted that "As far as the laws of mathematics refer to reality they are not certain, and as far as they are certain they do not refer to reality."[39] The same thing might be said of Hempel's general laws.

Philosophers of history have recently squandered a good deal of time and effort in a vain attempt to adjust the Hempelian model to the plain fact that historians do not use universal laws in their work. A few have attempted to adjust the plain fact to the Hempelian model. Some extraordinarily ingenious arguments have been invented, but the enterprise is, at bottom, absurd. Analytical philosophers have failed, I think, to be sufficiently empirical in their own work. They have failed to give sufficient attention to historical thought as it actually happens. And they have erected a deductive standard which is so exalted that no mortal empiricist can ever begin to meet its requirements. One wishes that analytical philosophers might harken to the words of Robert Frost:

> As ever when philosophers are met,
> No matter where they stoutly mean to get,
> Nor what particulars they reason from,
> They are philosophers, and from old habit
> They end up in the universal whole
> As unoriginal as any rabbit.[39]

39. James R. Newman, ed., *The World of Mathematics*, 4 vols. (New York, 1956), 3:1646.

40. Robert Frost, "The Lesson for Today," *Complete Poems* (New York, 1965), p. 474. To this unkindness, analytical philosophers could conceivably reply with a poem which is not by Robert Frost. It is called "The Lesson for Yesterday."

> Historians, rather like primitive moles,
> Live purposeless lives in particular holes,
> Which they dig with their noses, or else with their toeses
> (A few have invented small shovels and hoeses).
> They're burrowing blindly in Byzantine tunnels
> Constructed like sinuous serpentine funnels;
> They're burrowing busily, back in the past:
> A steady regression to nowhere—fast.