**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

CASE NO. 0:22-cv-62225-RAR

TERRI D. COLE, Personal Representative of the Estate of WINFRED CROSBY,

Plaintiff,

v.

EATON AEROQUIP LLC, successor-by-merger to EATON AEROQUIP INC., f/k/a AEROQUIP CORP. and AEROQUIP-VICKERS INC.; PREMIX-MARBLETITE MANUFACTURING CO.; RAYTHEON TECHNOLOGIES CORPORATION f/k/a UNITED TECHNOLOGIES CORPORATION; and THE BOEING COMPANY,

Defendants.

# PLAINTIFF'S CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANTS THE BOEING COMPANY AND RTX CORPORATION, MOTIONS *IN LIMINE* AND MOTIONS TO EXCLUDE AND LIMIT THE OPINIONS OF PLAINTIFF'S EXPERT WITNESSES

Plaintiff, TERRI D. COLE, Personal Representative of the Estate of WINFRED L. CROSBY ("Plaintiff"), respectfully submits this Consolidated Opposition to Defendants The Boeing Company ("Boeing") and RTX Corporation ("RTX") (collectively "Defendants") *Daubert* Motions *In Limine* and Motions to Exclude and Limit the Opinions of Plaintiff's Expert Witnesses. (ECF Docs. 181, 183, 202, 205). In Opposition to these Motions, Plaintiff states:

## I. FACTUAL BACKGROUND

### A. Winfred Crosby's Exposure to Defendants' Asbestos-Containing Materials.

Winfred Crosby was diagnosed with mesothelioma in June 2021, which claimed his life in June 2023.Mr. Crosby served in the United States Air Force from 1960 until 1964. (***Exhibit A***—03/07/23 Depo. of W. Crosby, at 18:14-16, 26:17-19). During this time, he was exposed to asbestos. (Ex. A, at 28:11-17).

Specifically, Mr. Crosby performed engine maintenance and overhauls on B-52D aircraft McCoy Air Force Base in Orlando. (Ex. A, at 28:24-31; 31:5-32:4, 36:23-25). Each B-52 had eight J-57 engines. (Ex. A, at 34:3-36:11). Boeing manufactured the B-52 and Pratt & Whitney manufactured J-57 engines. (Ex. A, at 37:1-8; ***Exhibit C***—04/26/2023 Depo. of J. Estes, at 15:3-16:5). Mr. Crosby, and his crew, were responsible for disassembling and reassembling J-57 engines. (Ex. A, 37:13-40:4, 48:23-54:8, 55:9-14; Ex. C, at 16:6-19:13). Each J-57 engine was 12-15 feet long and 4 feet in diameter. (Ex. A, at 45:17-46:3). When disassembling J-57 engines, Mr. Crosby removed asbestos insulation and asbestos gaskets. (Ex. A, at 55:15-56:6).

Asbestos insulation on the J-57 engines—and the "pods" that housed the engines—came as blankets. (Ex. A, at 56:8-10, 56:23-57:3; ***Exhibit B***—03/09/23 Depo. of W. Crosby, at 52:16-63:14; Ex. C, at 19:14-29:4). While performing maintenance and overhaul on J-57 engines, Mr. Crosby removed asbestos-containing insulation blankets, sanded them, patched them, and replaced

them. (Ex. A, at 56:23-57:14). After being in service, the blankets would disintegrate. (Ex. A, at 58:21- 60:4, 60:8-11). Removing and replacing these asbestos blankets, particularly when they were overhead, created tremendous amounts of dust and debris. (Ex. A, at 60:12-62:12). Indeed, Mr. Crosby used an air hose to remove dust and debris generated during this work from the engine, which created "a dust storm." (Ex. A, at 62:13-67:11). Between 1960 and 1964, Mr. Crosby removed and/or replaced hundreds of asbestos-containing blankets on Pratt & Whitney J-57 engines on Boeing B-52 aircraft. (Ex. A, at 67:25-70:9).

Each Pratt & Whitney J-57 engine also contained hundreds of gaskets. (Ex. A, at 70:24-71:4). Asbestos gaskets were used to protect the engine, its components and attachments from heat. (Ex. A, at 71:20-74:11). He removed old gasket material with wire brushes and sandpaper. *Id*. Using sandpaper and a wire brush to remove old gasket material generated dust, which Mr. Crosby breathed. (Ex. A, at 74:13-75:23). Mr. Crosby removed asbestos gaskets in this fashion on hundreds of occasions. (Ex. A, at 76:2-77:6). To reassemble the engines, Mr. Crosby used asbestos-containing gasket material, supplied by Pratt & Whitney, which he cut with a knife. (Ex. A, at 78:23-80:5).

Mr. Crosby also used asbestos-containing adhesives on Pratt & Whitney J-57 engines. (Ex. A, at 80:7-86:14). After these adhesives were dried and cured, they would be sanded, which created dust. (Ex. A, at 80:7-86:14). Mr. Crosby was also exposed to asbestos from Adel clamps, which were insulated with asbestos and used to hold wires running through the engines. (Ex. A, at 88:21-90:8). Mr. Crosby removed or replaced hundreds of Adel clamps during his time in the Air Force, and this work created dust, which Mr. Crosby breathed. (Ex. A, at 90:14-95:16). Further, Mr. Crosby was exposed to asbestos from asbestos-containing fire sleeves used in the hot sections of the J-57 engine. (Ex. A, at 95:20-96:21).

**B. Dr. Gerald Markowitz, Ph.D.**

Distinguished Professor Markowitz's (his formal title) curriculum vitae and Affidavit demonstrate that he is eminently qualified to render an opinion on the state of art knowledge regarding information regarding the hazards of asbestos found in the scientific, medical, technical, and business literature dating back to the early 1900s. (***Exhibit D***—11/20/2023 Depo. of G. Markowitz; ***Exhibit D-2***—09/15/023 Decl. of G. Markowitz with Report; ***Exhibit D-3***—CV of G. Markowitz; *see also* ***Exhibit E***—10/17/2014 Affidavit of Professor Robert N. Proctor). He is one of the world's leading scholars, professors and historians of science with decades of research and publishing on deadly dust, including asbestos, and the interface of science, medicine, engineering, trade and industry practices; and, in particular, how large organizations including corporate entities and governmental bodies have and should react to risk information regarding the dangers of deadly dusts. (*See generally Exs. D-2—D-3*).[1] His published works have been acclaimed by preeminent scientific and medical journals, including the *New England Journal of Medicine*, the *Lancet* and, arguably the most prestigious scientific journal in the world, *Science*. *See generally Exs. D-2—D-3*).[2] Professor Markowitz lectures and teaches graduate classes on the history of occupational illnesses, including asbestos issues, both at City University of New York John Jay College and Graduate Center, as well as a guest lecturing at Columbia and other schools and conferences. (Ex. D-3). His testimony is routinely accepted by courts around the country. (*See, e.g.,* ***Exhibit D-4***—Testimony List).

**C. Dr. Arthur Frank, M.D.**

---

[1] *See also, e.g.,* ***Exhibit D-5***—Markowitz, Rosner, The Limits of Thresholds: Silica and the Politics of Science, 1935 to 1990, American Journal of Public Health, Public Health Then and Now section, February 1995, Vol. 85, No. 2.

[2] *See also* ***Exhibit D-6***—Book Reviews of Markowitz and Rosner's publishing on occupational health, and ***Exhibit D-7***—Markowitz & Rosner Letter to the Editor, American Journal of Industrial Medicine 34: 405-06 (1998) (regarding asbestos history implications of that published work).

Dr. Arthur Frank, MD, PHD, is an expert in the field of occupational medicine, epidemiology and public health. He received his medical degree from Mt. Sinai School of Medicine in 1972. (***Exhibit F***—12/11/2023 Depo. of A. Frank, M.D.; ***Exhibit F-2***—CV of A. Frank. M.D.). While in medical school, Dr. Frank began working with Dr. Irving Selikoff, head of Mt. Sinai's Environmental Sciences Laboratory and a world-recognized expert on the subject of asbestos. (Ex. F-2). In 1977, he was awarded a Ph.D. in biomedical sciences from City University of New York's Mt. Sinai Medical Center. (Ex. F-2).

Dr. Frank's work in the field of asbestos spans more than 40 years and continues. He is board-certified in internal and occupational medicine, is a tenured professor at Drexel University and holds numerous professorships at other universities and academic institutions. (Ex. F-2). Dr. Frank has also held numerous positions with the United States Public Health Service, NIH'sNational Cancer Institute, National Institute for Occupational Safety and Health, the EPA, Centers for Disease Control and the Occupational Safety and Health Administration, among others. (Ex. F-2). Dr. Frank is the recipient of many honors and awards for his works and is a frequent panel member and speaker on issues relating to asbestos domestically and internationally. (Ex. F-2). He has also authored myriad scientific and medical works, including numerous peer-reviewed literature on asbestos.[3]

Specifically related to this case and Mr. Crosby's exposures to asbestos attributable to Defendants, Dr. Frank relied on an exposure summary, all of Mr. Crosby's deposition testimony, the deposition testimony of James Estes, Mr. Crosby's death certificate (identifying mesothelioma as the cause of death), three reports from Dr. Colella (discussing radiographic evidence of Mr. Crosby's exposure to asbestos), the 11/28/23 Rebuttal Report of Dr. Colella, the 11/27/23 Rebuttal

---

[3] *Id.*

Report of Dr. Staggs, the 11/16/23 Supplemental Report of Kenneth Garza, CIH, and Mr. Crosby's medical and pathology records. (*See generally* Ex. F; ***Exhibit F-6***—03/09/22 Report of A. Frank, M.D.; ***Exhibit F-8***—9/15/23 Report of A. Frank, M.D.; *see also* ***Exhibit F-4***—12/20/16 Affidavit of A. Frank, M.D.). Notably—and contrary to Defendants' arguments regarding the alleged requirement of proving "dose" (which Plaintiff is not required to do)—Mr. Garza's Report contains qualitative *and quantitative* assessments of the asbestos exposures that Mr. Crosby suffered as a result of his work with Defendants' asbestos-containing products. (*See, e.g.,* ***Exhibit G***—11/16/23 Supp. Report of K. Garza, CIH, at pp. 68-74). His testimony is routinely accepted in courts around the country, including this District. *See, e.g., Waite v. AII Acquisition Corp.*, 194 F.Supp.3d 1298 (S.D. Fla. 2016); and ***Exhibit F-3***—Testimony List.

**D. Dr. Brent Staggs, M.D.**

Dr. Staggs is a practicing medical doctor, board-certified in Anatomic, Clinical and Hematology Pathology. (***Exhibit H***—12/05/2023 Depo. of Dr. Brent Staggs; ***Exhibit H-1***—CV of Dr. Brent Staggs; ***Exhibit H-2***—09/15/2023 Staggs Report). He is licensed to practice medicine in numerous states. (Ex. H-1). Dr. Staggs will offer opinions as to diagnosis, and both general and specific causation.

Dr. Staggs's opinions in this matter are set out in his case-specific report and, as is his regular practice, are based upon a weight of the evidence assessment of case-specific materials in light of the medical-scientific literature. (*See, e.g.,* Ex. H-2, p. 5 ¶ 7; ***Exhibit H-3***—11/27/23 Staggs Rebuttal Report; and ***Exhibit H-4***—05/31/2022 Staggs Report). Dr. Staggs reviewed Mr. Crosby's clinical history, medical records, radiology reports, pathology reports and Dr. Colella's radiology reports. (Ex. H-2, pp. 16-23). He examined Mr. Crosby's actual pathology tissue. (Ex. H-2, pp. 18-19). Dr. Staggs reviewed materials describing Mr. Crosby's asbestos exposure history,

including Mr. Crosby's deposition testimony, the deposition of James Estes, Mr. Crosby's Death Certificate, and the 11/16/23 Supp. Report of K. Garza. (Ex. H-2, at pp. 16-23; Ex. H-3).

Dr. Staggs concludes that Mr. Crosby had pleural malignant mesothelioma, and pleural plaques caused by what Dr. Staggs independently identifies, based upon his review of case-specific evidence, is Mr. Crosby's "significant history of asbestos exposure." (Ex. H-2, at pp. 23-24). He opines to a reasonable degree of medical certainty that Mr. Crosby's mesothelioma was caused by the "identified and substantial exposures to asbestos," including those reflected in the depositions describing his work as an aircraft mechanic. (Ex. H-2, at pp. 23-24). Dr. Staggs relies, *in part*, on the generally accepted medical and scientific fact that "[m]esothelioma is caused by the totality of asbestos exposures"—i.e. the cumulative exposure model. (Ex. H-2, at p. 24).[4] He explains that although "[i]t is well established that even brief or low exposures to asbestos can cause mesothelioma," in evaluating causation as to a given individual, he "do[es] not state that any contributor to the cumulative dose, no matter how small is a significant factor." (Ex. H-2, at p. 24). Rather, he "review[s], evaluate[s], and consider[s] the information available to [him] about [the] individual's identified exposures to asbestos…" Ex. H-2, at p. 24.

The medical-scientific literature and authorities upon which Dr. Staggs relies are set out in his April 15, 2016 Affidavit. (***Exhibit H-5***—4/15/16 Affidavit of B. Staggs, M.D). In assessing both general and specific causation, Dr. Staggs relies upon the well-accepted Bradford Hill criteria, as well as the work and methods of the International Agency for Research on Cancer ("IARC") regarding asbestos, including that all forms asbestos cause mesothelioma. (Ex. H-5, ¶¶ 4, 7). He relies upon the "generally accepted Helsinki Consensus Statements" relating specifically to

[4] As discussed below, the cumulative exposure model is not a taboo principle that renders an expert's opinion inherently unreliable, but rather a generally accepted reality. Problems occur when an expert relies *entirely* on cumulative exposure in the abstract—which is not the methodology employed here.

"confirming diseases and causation due to asbestos exposure." (Ex. H-5, ¶ 4). Dr. Staggs considers the totality of asbestos exposure, as well as the relative contribution of the exposures at issue, and he does not believe that any small amount of asbestos is a legal significant contributing factor. (Ex. H-2, at p. 24). Dr. Staggs concludes that Mr. Crosby's exposure to asbestos from Defendants, which was not small or insignificant but regular and frequent over a period of years, was significant to causing his mesothelioma. (*See, e.g.*, Ex. H-2, at pp. 23-24).Dr. Staggs's testimony is routinely permitted in courts across the country. *See, e.g.*, ***Exhibit H-6***—List of Testimony; ***Exhibit H-7***—01/07/2019 Order and Reasons in *Michel v. Ford Motor Company, et al.*, No. 18-4738 (E.D. La. 2019).

**E. Dr. Mark Colella, M.D.**

Dr. Colella is board-certified in diagnostic radiology and is a certified B-reader, which is a specialty for reading radiology to diagnose asbestos disease. (***Exhibit I***—12/08/2023 Depo. of Dr. Mark Colella; ***Exhibit I-1***—12/12/2023 Depo. of Dr. Mark Colella; ***Exhibit I-2***—CV of M. Colella, M.D.). Dr. Colella reviewed Mr. Crosby's medical records, Dr. Staggs's report, Mr. Garza's report, information regarding Mr. Crosby's exposure to asbestos and Mr. Crosby's Death Certificate, as well as the reports of Defendant's experts Drs. Churg and Roggli. (*See* Exs. I, I-1; ***Exhibit I-3***—3/13/23 Reports of M. Colella, M.D.; ***Exhibit I-4***—11/08/23 Rebuttal Report of M. Colella, M.D.). Most important to his opinions, Dr. Colella read and interpreted CT scans of Mr. Crosby's chest. (*See, e.g.,* Ex. I-1, at 22:19-26:17; Exs. I-3—I-4). Dr. Colella will testify here concerning certain aspects of diagnosis and limited aspects of causation, specifically that the CT scan is reflective of asbestos-related pleural mesothelioma in light of information concerning Mr. Crosby exposure history. (Ex. I-1, at 12:20-22, 15:8-14, 21:22-22:6, 57-65, 98; Exs. I-3—I-4).[5]

[5] *See also* ***Exhibit I-5***, Barbieri, et al., On the Diagnosis of Malignant Pleural Mesothelioma: A Necropsy-Based Study of 171 Cases (1997-2016), TUMORI J., 105(4), 304-311 (2019); ***Exhibit I-6***, Karam, et al.,

Although he will opine that Mr. Crosby's mesothelioma was caused by asbestos in general, Dr. Colella has not been asked to attribute causation or significance to any source or set of exposures, including Defendants. *See, e.g.,* Ex. I-1, at 10:15-17. Because his role is more limited than Plaintiff's other experts, Dr. Colella did not need to review other case materials.

**F. Dr. Arnold Brody, Ph.D.**

Dr. Arnold Brody is a cellular biologist. (***Exhibit J***—11/14/2022 Report of A Brody, Ph.D, at Exhibit A (CV)). He is a full professor in the Department of Pathology and Department of Environmental Health Sciences at Tulane University Medical Center, New Orleans, and the director of the Lung Biology Program at the Center for Bioenvironmental Research at Tulane University Medical Center. (Ex. J, at ¶¶ 1-6, Exhibit A). Dr. Brody is the author of over 100 articles in the area of pathogenesis of lung disease, and is an internationally acclaimed researcher in the field of asbestos and its effects on human lungs. (*See, e.g.*, Ex. J, at Exhibit A).

Dr. Brody testifies about lung anatomy and the associated asbestos-induced pathology and the causation and pathogenesis of asbestos-related disease. (*See generally* Ex. J). Dr. Brody is an expert on how asbestos affects the immune system. *Id.* He will testify as to how asbestos injures the lung and causes asbestosis, asbestos pleural disease, and cancer. *Id.* His testimony focuses on the cellular and sub-cellular aspects of the diseases in their earliest stage. *Id.* He will present slides of these pathogenic processes. (Ex. J, at Exhibit C). This testimony and evidence is necessary to give the jury a better understanding of the disease at issue in the trial and how asbestos exposure operates inside the human body. Dr. Brody has testified as an expert in numerous federal and state

---

Malignant Mesothelioma Versus Metastatic Carcinoma of the Pleura, IRAN J. RADIOL., 13(1), 1-6 (Jan. 2016); ***Exhibit I-7***, Kim, et al., Multidetector CT Findings and Differential Diagnoses of Malignant Pleural Mesothelioma and Metastatic Pleural Diseases in Korea, KOREAN J. RADIOL., 17(4), 545-553 (Aug. 2016); and ***Exhibit I-8***, Wong, et al., Mesothelioma Risk Among Those Exposed to Chrysotile Asbestos Only and Mixtures That Include Amphibole: A Case-Control Study in the USA, 1975-1980, OCCUP. ENVIRON. MED., 1-4 (2020).

courts throughout the United States, including in this District. *See, e.g., Waite, supra; see also* ***Exhibit J-1***— List of Testimony.

## II. LAW AND ARGUMENT

### A. General Causation is Not at Issue in this Case.

General causation cannot be disputed in this case. The Eleventh Circuit has delineated two categories of cases with respect to the *Daubert* analysis in cases involving toxic exposures. In asbestos cases, general causation is not at issue. *See Chapman v. Proctor & Gamble,* 766 F.3d 1296 (11th Cir. 2014) (internal quotations and citations omitted); *McCain v. Metabolife,* 401 F.3d 1233, 1239 (11th Cir. 2005); *accord Chapman*, 766 F.3d at 1303. "Asbestos is the only cause of mesothelioma established thus far." *Norfolk Western v. Ayers,* 538 U.S. 135, 142 n.4 (2003).

### B. The Causation Standard is Substantial Factor.

In a Florida asbestos case, "substantial factor causation" requires that a party prove that exposure to asbestos from a particular product or source was a partial or contributing cause of the injured party's injury. *See, e.g., Waite*, 194 F.Supp.3d at 1316; *Hendrix ex rel. G.P. v. Enenflo Co., Inc.*, 609 F.3d 1183, 1196 n.7 (11th Cir. 2010); *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So.2d 1015, 1018 (Fla. 1984); *Bobo v. Tennessee Valley Authority*, 855 F.3d 1294 (11th Cir. 2017); *see also* W. Page Keeton, PROSSER AND KEETON ON TORTS, § 41 at 267 (5th ed. 1984).

### C. Fed. R. Evid. 702 and the *Daubert* Standard.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Expert testimony is reliable if: (1) the expert is qualified to testify competently regarding the matters they intend to address ("qualifications"); (2) the methodology by which the expert reaches their conclusions is sufficiently reliable ("reliability"); and (3) the testimony assists the trier of fact to determine a fact in issue ("helpfulness"). *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d

548, 562 (11th Cir. 1998) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993).

An expert may be qualified by knowledge, skill, experience, training or education. *Waite*, 194 F.Supp.3d at 1304.The qualification standard for expert testimony is not stringent and, "so long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *Waite,* 194 F.Supp.3d at 1304 (citing *Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012); *Kilpatrick v. Breg, Inc.*, 2009 WL2058384, at *3 (S.D. Fla. 2009); *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 585 (N.D. Fla. 2009)). "An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Waite,* 194 F.Supp.3d at 1304.

When determining whether an expert's testimony is reliable, "the trial judge must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *United States v. Frazier*, 287 F.3d 1244, 1260 (11th Cir. 2004). Although *Daubert* identifies several factors that the courts *may* utilize to determine the reliability of expert testimony, the "factors are non-exhaustive, and the Eleventh Circuit has emphasized that alternative questions may be more probative in the context of determining reliability." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Daubert,* 509 U.S. at 592-593.

A trial court's gatekeeper role under *Daubert* "is not intended to replace the adversary system." *Waite,* 194 F.Supp.3d at 1305). An expert's testimony can be excluded altogether *only* if it "amount[s] to the sort of 'junk science' *Daubert* blocks." *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999). "[C]ross-examination, presentation of contrary

evidence, and careful instruction on the burden of proof" are the ordinary means to attack an opposing expert. *Daubert*, 509 U.S. at 596; *see also Waite,* 194 F.Supp.3d at 1305-1306. Further, the focus of the *Daubert* analysis is on principles and methodology, not conclusions. *Daubert*, 509 U.S. at 581; *see also Waite,* 194 F.Supp.3d at 1315; *In re Zantac (Ranitidine) Products Liability Litigation*, 644 F.Supp.3d 1075, 1188 (S.D. Fla. 2022); *Chapman*, 776 F.3d at 1305.

An expert's testimony is helpful to the trier of fact if the proffered testimony concerns matters that are beyond the understanding of the average lay person. *Waite,* 194 F.Supp.3d at 1305 A "fit" must exist between the offered opinion and the facts of the case. *Id.*

**D. Professor Markowitz's Opinions are Relevant, Admissible and Will Assist the Jury.**

Professor Markowitz is one of the most qualified individuals concerning the history of what was known over time about the dangers of asbestos and is widely viewed as one of the world's leading experts in the history of science, with a particular strength in occupational hazards and deadly dusts such as asbestos. Professor Markowitz's testimony will assist the jury in understanding what was historically known and knowable to Defendants throughout the time they manufactured, sold and distributed asbestos-containing materials. State of the art testimony has been permitted in this District. *Waite,* 194 F.Supp.3d at 1310-1312 (discussing Dr. Barry Castleman).

In a products liability action, a plaintiff bears the burden of proof to demonstrate that a defendant's conduct was unreasonable in light of historical information that was known or knowable to the defendant at the time the product was manufactured or the exposures occurred *See, e.g.*, *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1088 (5th Cir. 1973); *Witt v. Stryker Corp. of Michigan*, 648 F.Appx. 867, 871 (11th Cir. 2016); *see also Air and Liquid Systems Corp. v. DeVries*, 586 U.S. ---- (2019). This state of the art provides the jury with essential

information—what could and should a reasonable company have known about the potential dangers of their asbestos-containing products.

Yet, state of the art is far more than just a chronological stack of documents. It is a social interface describing and explaining how interdisciplinary scientific, engineering, medical, trade group, industrial and governmental information was presented, interacted with among the other above variables, and evolved over time. A stack of documents alone cannot provide the full context for what were foreseeable dangers and how to avoid such dangers.

History as a scholarly profession is the evidence-based art of constructing true and testable narratives of the past. It differs from ordinary "story telling" in that it is based on rigorous and testable evidence by virtue of its reliance on documentary proof. (*See generally* Ex. E). To claim that the practice of history is simply reading materials and telling people what they say is a reductionist argument. The academic and scholarly practice of history is an internationally recognized rigorous field of social science (like all recognized social science, e.g. economics and epidemiology), with accepted methodological approaches that are testable. (*See generally* Ex. E; *id.* at ¶¶ 7-9, 14-16, 19, 22).

Federal Rule of Evidence 1006 authorizes Plaintiff to summarize voluminous writings, recordings or photographs which cannot, as here, be conveniently examined in court and jury. It would take months (maybe years) for the jury to examine every single letter, note, article and publication reviewed and summarized by Professor Markowitz. As noted in *Waite*, "A jury could not possibly examine every single letter, note, article, and publication reviewed and analyzed by [the state of the art expert] in his more than four decades of practice and research. (194 F.Supp.3d, 1298, 1311). The *Waite* court further noted that, "Certainly, research such as that presented can serve the purpose of providing context and grounding scientific information integral to the

determination of this case." *Id.* at 1312.

Beyond bare, conclusory assertion, Defendants provide no evidence of an improper methodology.. Professor Markowitz followed generally accepted methodological practices, including a rigorous and thorough review of the historical peer review literature in a systematic way via Index Medicus (the most established historical method and material for locating scientific and medical article on any given subject, and one available to defendants throughout the entire history of the asbestos tragedy) and other similar library aids.[6] Professor Markowitz will discuss the development of the awareness of the hazards of asbestos in the scientific and technical community. Such testimony can be based only on reading the works of other people, *i.e.,* those works that comprise the "state of the art." *See, e.g. Grindstaff v. Coleman*, 681 F.2d 740 (11th Cir. 1982) (expert must be allowed to present opinion based on knowledge of historical events). His methodology is testable and has been tested – one can perform a similar search and find largely the same sets of materials. Courts around the country, professional historians, and public health experts all agree that a rigorous survey of the available literature is the critical aspects in historical methodology. Defendants' unsupported arguments to the contrary fail.

Defendants allege that Professor Markowitz has "cherry-picked" the available literature to support his opinions. However, Defendants provide no specific explanation for why they believe that Professor Markowitz's report, annotated chronology and his lifetime of work was performed using an inappropriate or inadequate methodology or a methodology not recognized in the field of history, nor that he is somehow using unreliable data in his analysis. Defendants also attack Professor Markowitz's reliance on state of the art evidence not specific to Defendants. This argument is logically circular: if Defendants had bothered to look into the hazards of asbestos in

[6] *See* ***Exhibit D-8***—Castleman book chapter excerpt on historical science and medical research methods including *Index Medicus* and sample pages from *Index Medicus*).

their products, evidence of such investigation specifically related to Defendants would exist. Defendants did not bother to do so and, therefore, Professor Markowitz cannot rely on evidence that does not exist.

Professor Markowitz is not a conduit for otherwise inadmissible hearsay. As an initial matter, the major documents upon which Professor Markowitz intends to rely have already survived relevancy, hearsay and other evidentiary objections in this Circuit. *See, e.g.*, *Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1498-1504 (11th Cir. 1985); *Jackson v. Johns-Manville Sales Corp.*, 750 F.2d 1314, 1319 (5th Cir. 1985), *cert. denied*, 478 U.S. 1022 (1986). An expert's opinion may be based on the expert's observations and examinations or on matters made known to the expert at or before the hearing that is of a type that reasonably may be relied upon by experts forming opinions on a particular subject. Fed. R. Evid. 703. The bases of an expert's opinion need not be admissible for the opinion to be admitted. Fed. R. Evid. 703. Further, an expert's opinion is not inadmissible simply because it embraces an ultimate issue. Fed. R. Evid. 704.

Finally, relevant evidence is admissible. *See* Fed. R. Evid. 401-402. Defendants have no basis to argue that probative, historical state of the art evidence that is part of Plaintiff's burden of proof in this case is irrelevant or unduly prejudicial. If evidence is relevant and otherwise admissible, the fact that it is prejudicial does not bar its admission. *See, e.g., Arch Specialty Insurance Company v. Balzebre,* 2013 WL12065533, at *3 (S.D. Fla. 2013) ("all relevant evidence is prejudicial"). The prejudicial effect of evidence only limits its introduction when its prejudicial effect "substantially outweighs" its probative value. *Id.; see also* Fed. R. Evid. 403. Defendants have not even attempted to argue, beyond conclusory statements, that the probative value of Professor Markowitz's testimony is substantially outweighed by any of factors contemplated by

Rule 403. Accordingly, Rule 403 does not provide a basis for excluding or limiting his testimony.

In sum, Professor Markowitz's credentials and experience set forth above and the exhibits hereto demonstrate that he is qualified to offer his proffered opinions in this case. Dr. Markowitz's specialized knowledge will assist the trier of fact to understand evidence essential to this case . His testimony assists the jury, and will provide context, for the vast amount of historical information that is beyond the common experience of the lay juror.

**E. Dr. Colella's Opinions Are Relevant, Admissible and Will Assist the Jury.**

Contrary to Defendants' implications, Dr. Colella will not offer any specific causation opinions as to individual Defendants—which is the only basis on which Defendants seek to exclude or limit him in this case. Neither will Dr. Colella offer any "single fiber," "each and every" or "cumulative exposure theory" opinions. Dr. Colella's testimony will be limited to certain aspects of diagnosis and limited aspects of general causation based on his review of CT scans of Mr. Crosby, specifically that the CT scan is indicative of asbestos-related pleural mesothelioma in light of information concerning Mr. Crosby's history of exposure to asbestos. Although he will opine that Mr. Crosby's mesothelioma was caused by asbestos in general, Dr. Colella has not been asked to attribute causation or significance to any source or set of exposures, including Defendants. As such, Defendants' motion on this issue is moot.

Additionally, as discussed in more detail below, Defendants attack Dr. Colella on "cumulative exposure theory," which he does not ascribe to and will not offer. Thus, Defendants' attack on Dr. Colella's methodology is also moot. Nevertheless, Dr. Colella's methodology is entirely appropriate for a diagnostic radiologist and certified B-reader: "[w]e look at the entirety of what the study [CT scans] includes. So from the highest cut to the lowest cut, we evaluate all of those structures that are presented on the scans and then we, through our training and experience,

surmise what is going on from the patient and be able to make a diagnosis." (Ex. I-1, at 22:19-26:17). "That's what we do as radiologists. . . distill down what is important, what is clinically relevant and then present that." (Ex. I-1, at 24:13-25:23). Dr. Colella's testimony will be particularly helpful to the jury in this case, where Defendants dispute Mr. Crosby's diagnosis.

### *F.* Drs. Frank, Staggs, and Brody's Opinions are Admissible.

As an initial matter, Defendants group Dr. Brody together with Drs. Frank and Staggs and refer to them (as well as Dr. Colella) as "Plaintiff's causation experts." However, as noted above, Dr. Brody is a cellular biologist and will opine *generally* about lung anatomy and the associated asbestos-induced pathology of asbestos-related disease. Dr. Brody will not offer specific causation testimony in this case, nor will he offer "cumulative exposure" legal causation testimony. Dr. Brody's opinions will aid the jury in understanding the disease process at issue and how asbestos exposure operates inside the human body.

#### ***1. Bradford Hill, the Helsinki Consensus and Weight of the Evidence are Established Reliable Methodologies for Assessing Causation***

Plaintiff's experts assessed Mr. Crosby's exposures and reached their conclusions using reliable, accepted methodologies. Indeed, at the first of this year, a federal court in Louisiana issued a thorough and carefully considered decision denying another asbestos defendant's *Daubert* motion to exclude Dr. Staggs' opinions on grounds mirroring those that Defendants assert here. (Ex. H-7). That court held, among other things, that the Bradford Hill and Helsinki Criteria employed there by Dr. Staggs (and by Dr. Frank as well here) are accepted and reliable methodologies. *Id*. at p. 7 ("experts have relied on these techniques in many asbestos cases to determine causation").

Plaintiff's experts also follow what is known as a weight-of-the-evidence approach—reviewing the literature as a whole and relying upon a substantial volume of positive studies—

which is widely accepted and has been routinely upheld. *See Milward v. Acuity Specialty Products Group, Inc.*, 639 F.3d 11 (1st Cir. 2011) (additionally holding that Bradford Hill is reliable methodology). As one court observed, the "fact that the role of judgment in the weight of the evidence approach is more readily apparent than it is in other methodologies does not make that approach any less scientific." *Harris v. CSX Transport, Inc.*, 753 S.E.2d 275, 289 (W.Va. 2013); *see also Alexander v. Honeywell Int'l., Inc.*, 2018 WL 4220628, *3 (N.D. Ohio 9/5/2018); and *Robertson v. Doug Ashly Bldg. Materials, Inc.*, 168 So.3d 556, 570 (La. App. 2014).

Plaintiff's experts use these accepted and reliable methodologies here. They reviewed case-specific materials and rely, *inter alia*, upon Plaintiff's expert industrial hygienist, Mr. Garza's, assessment of Mr. Crosby's exposure levels based on comparing case-specific information to reported level of exposure for similar tasks. In reaching their conclusions and opinions, Plaintiff's experts consider the specifics of Mr. Crosby's case, based on their actual review of information, in the context of the overall body of available literature. The fact that they exercise professional judgment as part of that process does not make their methodologies unreliable or arbitrary. *See Harris*, 753 S.E.2d at 289. Opinions, by their nature, require judgment.

The inclusion of this industrial hygiene assessment of Mr. Crosby's exposure places the causation opinions here solidly and unquestionably within the ambit of reliable and admissible. The fact that Mr. Garza did not perform a formal "dose reconstruction" (a theoretical numerically precise quantification of Mr. Crosby's actual lifetime exposure history) as Defendants intimate is required, does not render Plaintiff's expert causation evidence unreliable or inadmissible. Indeed, without actual contemporaneous monitoring data for the person in question or actual data from his actual workplace, a dose reconstruction is less accurate than Mr. Garza's methodology

here.[7]Indeed, Mr. Garza's methodology—upon which Drs. Frank, Staggs, Colella and Brody rely—is the typical and accepted method for assessing exposure levels in asbestos cases.

### *2. Plaintiff's Experts Do Not Hold the "Each and Every" or "Cumulative Exposure Theory" Opinions*

Defendants attack Drs. Frank, Staggs, Colella and Brody on "cumulative exposure theory"— this is a straw man argument. None of Plaintiff's experts hold this theory of legal causation. Plaintiff's experts do not treat "cumulative exposure" as a magic wand that makes every exposure substantial or significant without further inquiry. They undertake the necessary further inquiry and, indeed, expressly disavow the proposition that any exposure, no matter how small, is automatically significant.

Drs. Frank, Staggs, and Brody's opinions are in agreement with nearly the entirety of the medical and scientific communities worldwide that mesothelioma is a dose-response disease; and, therefore, an increase in dose (exposure to asbestos) increases an individual's risk of developing disease (e.g. mesothelioma). This is a medical and scientific fact. (*See, e.g.,* Ex. F-4, at ¶¶ 296, 300-301, 336, 360, 416-417, 420; Ex. H-5, at ¶¶ 5, 16; Ex. J, at ¶ 41). Plaintiff's experts will not, however, offer the legal opinion that each and every exposure to asbestos, no matter how slight, is a substantial contributing factor in causing Mr. Crosby's mesothelioma and death. Thus, Defendants have challenged an opinion that Plaintiff's experts do not hold.

This distinction—between medical significance and legal "substantial factor" causation—has long been recognized. The succinct and seminal description of this issue by the Pennsylvania Supreme Court in *Rost v. Ford Motor Co.* is helpful:

> [Defendant] has confused or conflated the "irrefutable scientific fact" that every exposure cumulatively contributes to the total dose (which in turn increases the likelihood of disease), with the legal question . . . as to whether particular exposures

[7] *See* Agency for Toxic Substances & Disease Registry, *Exposure-Dose Reconstruction Program (EDRP)*, June 28, 2010, http://www.atsdr.cdc.gov/edrp.

> to asbestos are "substantial factors" in causing the disease. It was certainly not this Court's intention . . . to preclude expert witnesses from informing juries about certain fundamental scientific facts necessary to a clear understanding of the causation process for mesothelioma, even if those facts do not themselves establish legal (substantial factor) causation.

*Rost v. Ford Motor Co.*, 151 A.3d 1032, 1045-47 (Penn. 2016).

Defendants also criticize Plaintiff's experts for their opinion that there is no safe level of asbestos exposure below which mesothelioma does not occur and pejoratively refer to this as "each and every" or "cumulative dose" evidence. Plaintiff's experts do not hold this "single fiber" opinion. However, the consensus opinion of the scientific and medical community, including WHO, IARC, the NCI, OSHA and EPA, is that there is no safe level of exposure to asbestos below which disease does not occur. (*See* Ex. F-4, at ¶¶ 11, 13-15, 71, 89-100, 236, 239-241, 273-276, 280, 303, 307, 405; Ex. H-5, at ¶ 8; Ex. J, ¶ 42).

In support of their arguments against cumulative exposure theory (to which Plaintiff's experts do not adhere), Defendants cite a litany of cases from other jurisdictions that are not binding, mischaracterized and, in any event, distinguishable from this case. Indeed, Defendants fail to cite the seminal and still controlling precedent of *Borel,* 493 F.2d at1083 and also *Bobo v. Tennessee Valley Auth.*, 855 F.3d 1294 (11th Cir. 2017), rejecting the same argument pressed by Defendants here. In light of practical considerations of length, Plaintiff must curtail her discussion of these cases and will only address some of them here. Nevertheless, the overarching theme of these decisions—and the decisions cited by Defendants[8]—is that an expert should consider the actual facts of the case, the actual exposures in the case and the nature and extent of such exposures before rendering an opinion regarding specific causation.[9] Plaintiff's experts have carefully done

[8] Plaintiff notes that many of the cases relied upon by Defendants allowed some testimony by the expert, but not particular pieces. There can be no reasonable dispute that the vast majority of Plaintiff's experts' testimony does not run afoul of any of the concerns raised in the cases cited by Defendants.

[9] *See, e.g., Wolfinger v. 20th Century Glove Corp.*, 68 A.3d 362 (Pa. Super. Ct. 2013); *Krik v. Crane Co.*,

this. Their opinions and testimony are entirely admissible.

WHEREFORE, Plaintiff respectfully requests that the Court Deny Defendants' *Daubert* Motions (ECF Doc. 181) and Motions to Exclude and Limit the testimony of Plaintiff's expert witnesses (ECF Doc. 183), including all joinders thereto (ECF Docs. 202, 205), and enter such further relief as the Court deems reasonable and just under the circumstances.

---

76 F.Supp. 3d 747 (N.D. Ill. 2014); *In re New York City Asbestos Litigation (Juni)*, 148 A.D.3d 233 (2017).

Dated: January 12, 2024

Respectfully submitted,

/s/ Rebecca S. Vinocur
REBECCA S. VINOCUR
Florida Bar No.: 529915
**REBCECC S. VINCOCUR, P.A.**
5915 Ponce De Leon Blvd, Ste. 14
Coral Gables, Florida 33146-2435
Tel. 786-691-1282
Fax 786-691-1280
rvinocur@rsv-law.com

and

/s/Michael K. Hibey
Michael K. Hibey
*Admitted Pro Hac Vice*
Simmons Hanly Conroy
One Court Street
Alton, IL 62002
Tel: (618) 259-2222
Fax: (618) 259-2251
mhibey@simmonsfirm.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 12, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will generate Notices of Electronic Filing to All Counsel of Record.

/s/ Rebecca S. Vinocur
REBECCA S. VINOCUR
Florida Bar No.: 529915
**REBCECC S. VINCOCUR, P.A.**
5915 Ponce De Leon Blvd, Ste. 14
Coral Gables, Florida 33146-2435
Tel. 786-691-1282
Fax 786-691-1280
rvinocur@rsv-law.com