# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

CASE NO. 0:22-cv-62225-RAR

TERRI D. COLE, Personal Representative of
the Estate of WINFRED CROSBY,

     Plaintiff,

v.

RAYTHEON TECHNOLOGIES
CORPORATION f/k/a UNITED
TECHNOLOGIES CORPORATION,

     Defendant.

**PLAINTIFF'S MOTION FOR RELIEF UNDER FED. R. CIV. P. 26 AND 37
WITH INCORPORATED MEMORANDUM IN SUPPORT**

## I.      INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff respectfully requests that this Court enter Rule 26(g)(3) and 37(b)-(c) remedies against Defendant RTX Corporation ("RTX"). Plaintiff, through her own efforts, has discovered that RTX is withholding and has failed to disclose sworn statements and deposition testimony of its Rule 30(b)(6) corporate representative witness, John C. Sumner, which discuss and make binding admissions regarding the aircraft engine at issue in this case, the asbestos-containing materials therein, and RTX's "government contractor" affirmative defense on which it has moved for summary judgment in this case.[1]

As this Court noted on December 21, 2023, when it ordered RTX to produce these documents, "*declarations by corporate reps clearly are* [relevant and proportional]"—*i.e.*, discoverable.) [Rec. Doc. 221, at 58:19-59:2 (emphasis added)]. Further, although Plaintiff has been able to locate and identify *some* of the information that RTX should have produced in discovery—but did not—Plaintiff cannot identify what additional documents and information RTX has withheld as RTX alone has knowledge of the universe of information that RTX has kept from Plaintiff.

Plaintiff must now oppose RTX's motion for summary judgment premised on its "government contractor" affirmative defense,[2] fully knowing that RTX has withheld relevant and discoverable information – information that the Court's Order recognized Plaintiff should have the

---

[1]      Plaintiff has separately moved to strike Mr. Sumner's Declaration in support of RTX's Motion for Summary Judgment in this case and all corresponding statements of fact allegedly supported thereby. [*See* Rec. Docs. 178, 179, 179-3, 179-4, 248]. The instant *Motion* is in addition to Plaintiff's *Motion to Strike* Mr. Sumner's Declaration, [Rec. Doc. 248], and based specifically on RTX's failure to produce highly relevant documents, proportional to the needs of the case and in direction violation of this Court's December 22, 2023 Order. [Rec. Doc. 168.]

[2]      *See Boyle v. United Techs. Corp.,* 487 U.S. 500 (1988); *In re 3M Combat Arms Earplug Products Liability Litigation*, 474 F.Supp.3d 1231, 1243 (N.D. Fla. 2020).

benefit of in advance of having to oppose RTX's summary judgment motion. [*See* Rec. Doc. 168].

Fed. R. Civ. P. 26(g)(3) and 37 provides remedies for this type of prejudice and violation of a

party's obligations to comply with the rules governing discovery and orders issued by this Court.

Plaintiff requests that this Court impose sanctions on RTX in any and all forms the Court deems

reasonable and just under the circumstances including, at a minimum, that the following facts be

deemed conclusively established for purposes of this case:

    a. The Pratt & Whitney[3] J-57 engines that Winfred Crosby and Jimmy Estes worked with and around contained asbestos at all times leading up to when Mr. Crosby first commenced his maintenance and repair work and remained asbestos-containing throughout the entire time that Mr. Crosby performed work on them;

    b. Pratt & Whitney specified the use of asbestos in the J-57 engines that Mr. Crosby serviced, maintained and repaired;

    c. Pratt & Whitney's specification of asbestos-containing components in and for the J-57 engine, including but not limited to asbestos-containing Min-K insulation blankets and heat shields;

    d. Pratt & Whitney designed its J-57 engines to outlast the life of their asbestos-containing components, which degraded as a result of the intended operation of the engines and required routine removal and in-kind replacement as designed by Pratt & Whitney;

    e. Pratt & Whitney's overhaul manuals instructed those working with its J-57 engines to manipulate and disturb the engines' asbestos-containing components in a way that released dust;

    f. Pratt & Whitney failed to provide any warnings concerning the asbestos hazards attendant to work performed on any of its engines, including the J-57, during the time period at issue;

    g. Pratt & Whitney failed to perform any tests to ascertain asbestos hazards attendant to work performed on any of its engines, including the J-57, during the time period at issue;

    h. Pratt & Whitney manufactured, sold and supplied a commercial equivalent of the J-57

---

[3] It is uncontested that RTX is the successor to the Pratt & Whitney liabilities at issue in this case. Similarly, Defendant has undergone name changes and was at prior times named United Technologies Corporation ("UTC") such that sworn statements and testimony by UTC are statements of RTX and constitute binding admissions.

engine that, like the J-57 engine, contained asbestos-containing components specified by Pratt & Whitney;

i.   The J-57 engines that Pratt & Whitney sold to its commercial and government contractors were identical as to the asbestos-containing components specified by Pratt & Whitney therein (i.e., identical in design and operation);

j.   Pratt & Whitney had actual knowledge of the hazards of asbestos encountered during the service, maintenance and repair of its J-57 engine throughout the time period at issue in this case; and,

e.   The jury be informed that (1) RTX withheld evidence in discovery and (2) the jury must presume that the information withheld by RTX was unfavorable to it.

Plaintiff does not bring this *Motion* lightly and, in fact, met and conferred with RTX as recently as February 15, 2024, in an attempt to allow RTX to rectify these issues. Nevertheless, RTX maintains its recalcitrant position that its responses are "accurate and complete" and that this *Motion* is allegedly "being filed in bad faith" despite the incontrovertible fact that RTX has withheld responsive documents that this Court ordered RTX to turn over. In support of this *Motion*, Plaintiff states:

## II.   <u>FACTS</u>

RTX made its initial disclosure on January 27, 2023. ***Exhibit A***, 01/27/2023 RTX Initial Disclosure. On June 21, 2023, RTX provided responses to Plaintiff's Requests for Production which, among other documents, seeks "All statements (as that term is used in Fed. R. Civ. P. 26(b)(3)(c) which were previously made by you and any of your present or former directors, officers, or employees, concerning the action or its subject matter."[4] ***Exhibit B***, relevant portion of

---

[4]   *Previous Statement.* Any party or other person may, on request and without the required showing, obtain the person's own previous statement about the action or its subject matter. If the request is refused, the person may move for a court order, and Rule 37(a)(5) applies to the award of expenses. A previous statement is either:
(i) a written statement that the person has signed or otherwise adopted or approved; or
(ii) a contemporaneous stenographic, mechanical, electrical, or other recording—or a transcription of it—that recites substantially verbatim the person's oral statement.
Fed. R. Civ. P. 26(b)(3)(C).

06/21/2023 Raytheon Technologies Corporation's Responses to Plaintiff's Interrogatories and Requests for Production of Documents, at pp. 15-20, at Request for Production Nos. 1-6.

On September 14, 2023, Plaintiff served RTX with a Notice of Deposition for its Fed. R. Civ. P. 30(b)(6) corporate representative witness, John Sumner. After repeated meet-and-confer efforts, the Notice of Deposition was amended four times. However, all four versions of the Notice of Deposition required that the deponents produce "[a]ll sworn, signed or substantially verbatim statements that reflect, evidence or embody information concerning the [information sought in Plaintiff's written discovery to RTX]." *See, e.g.*, **Exhibit C**, relevant portion of 11/29/2023 Plaintiff's Fourth Amended Notice of Videotaped Deposition of Defendant Raytheon Technologies Corporation, at ¶ 4.

On November 16, 2023, RTX served its responses to Plaintiff's First Supplemental Request for Production of Documents which, among other documents, seek "All documents comprising any written statements . . . that pertain to . . . products [Winfred Crosby] worked with . . . and / or the allegation sin this lawsuit." *See, e.g., **Exhibit D***, relevant portion of 11/16/2023 RTX Corp. Responses to Plaintiff's First Supplemental Request for Production of Documents, at Nos. 1-4, 18-25.

In compliance with this Court's Discovery Procedures Order, [Rec. Doc. 41], Plaintiff initiated a Notice of Discovery Dispute as to RTX on December 5, 2023. [Rec. Doc. 124].  The Court set a Discovery Status Conference for December 8, the conference was held and a subsequent Discovery Hearing was scheduled for December 21. [Rec. Docs. 126, 130, 133, 136-137, 142-146, 150-155, 157-168].  Also on December 8, RTX provided supplemental responses to Plaintiff's First Supplemental Request for Production of Documents on December 8, 2023. *See,*

*e.g.*, **Exhibit E**, relevant portion of 12/08/2023 RTX Corp. Responses to Plaintiff's First Supplemental Request for Production of Documents, at Nos. 1-4, 18-25. [Rec. Doc. 94]**.** Supplemental Requests for Production 1, 3 and 18-25 specifically call for documents such as sworn statements, written statements, declarations, and affidavits related to the J-57 engine. [*See* Rec. Doc. 150, at pp. 1-4, 22-31]. RTX responded to these requests with objections, by directing Plaintiff to RTX's expert witness reports, documents produced in discovery (which did not include prior testimony and sworn statements from Mr. Sumner), and the deposition of James Estes, or affirmatively stating that "Defendant [ ] is currently unaware of any documents responsive to this request." [Rec. Doc. 150, at pp. 1-4, 22-31].

On December 21, 2023, this Court held a Discovery Hearing "on a panoply of different issues," including Plaintiff's motions to compel RTX to provide supplemental responses to written discovery. [Rec. Doc. 221, at 4:12-13, 5:5-11]. During the hearing, Plaintiff's counsel raised her concern that:

> In these cases we often find ourselves in a situation, where we do not ask this type of request [Supp. RFP No. 1], that we have either affidavits sprung on us at the last minute or we have witnesses coming in to testify that were not previously disclosed, and it's the party's seeking the information obligation to propound the discovery under the rules. This request is one that we craft and we want to ensure is propounded so that we are not surprised.

[Rec. Doc. 221, at 29:14-16, 40:2-9]. In granting, in part, Plaintiff's motion to compel RTX to provide a supplemental response to Plaintiff's First Supplemental Request for Production No. 1, this Court stated:

> I am going to grant the motion as to No. 1, that defendant must produce written statements regarding the J-57 engine reflecting or regarding the presence of or hazards of asbestos in the J-57 engine . . . I don't think briefs filed by attorneys are really anything that is relevant or proportional here, *but declarations by corporate reps clearly are*.

[Rec. Doc. 221, at 54:14-19, 58:19-59:2 (emphasis added), 75:18-24, 76:16-20,153:2-9]. Further, on December 21, Plaintiff's counsel stated that it was Plaintiff's goal to "ensure that we are aware of any evidence that may be presented at trial on these issues; in particular, impeachment-type things or things of that nature." [Rec. Doc. 221, at 39:22-40:1]. Further:

> *I just say this in the interest of wanting to get to the merits rather than point to the court and be in front of the court on a sanctions issue -- if they were to remove the objections and respond as they did, it would be an inaccurate—not just misleading but inaccurate – statement that would have been submitted and signed to by counsel in this case. . .*

> [I]n our independent review and research, we have identified declarations by RTX's corporate representative that addresses the products Mr. Crosby worked with. That being the engine at issue. . . RTX did not produce to us, despite us entering into a protective order and ITAR agreement in this case, a deposition of its own corporate representative testifying about the very engine Mr. Crosby worked with.

> That falls squarely within a document that would be responsive to request No. 1, your Honor, but is neither identified in RTX's written response nor produced in this case.

[Rec. Doc. 221, at 40:18-41:12 (emphasis added)]. RTX's counsel stood before this Court and affirmed the accuracy and completeness of its discovery responses:

> MR. REDDIN: [W]e looked for the written statements from the other individuals from Mr. Crosby. We added Mr. Estes. We've had the reports of the experts. We believe those are the documents that are responsive to this request [No. 1]. [Rec Doc. 221, at 44:14-45:3];
>
> …
>
> MR. REDDIN: It is our belief that we have turned over every single thing that would be responsive at this point [to No. 1]. [Rec. Doc. 221, at 48:19-49:5];
>
> …
>
> THE COURT: Are there any documents [responsive to No. 3] that you're aware of? MR. REDDIN: No, your Honor. [Rec. Doc. 221, at 61:17-62:8];
>
> …
>
> MS. IREL: [W]e have already produced anything that is relevant [to No. 18]. [Rec. Doc., at 107:20-22];

…

> MR. REDDIN: We don't want to lead the court afoul, or plaintiffs, and we were just kind of covering that basis. At this point we do believe we have produced everything [responsive to No. 19]. [Rec. Doc. 221, at 110:8-11].

This Court ordered RTX to supplement its production on requests 1, 3, and 18-25, which call for sworn statements, including prior deposition testimony, provided by Mr. Sumner. [Rec. Doc. 168, at ¶¶ 4(a)(i)-(ii), (vii)-(ix); *see also, e.g.,* Rec. Doc. 150]. Further, this Court's Order embraced RTX's representations. [*See* Rec. Doc. 168, at ¶¶ 4(a)(ii) ("RTX must amend its response to clarify that there are no further responsive documents for this request"), (viii) ("amend their responses to reflect it has produced all responsive documents")].

During the December 21 hearing, Plaintiff informed RTX and this Court that Plaintiff had unilaterally discovered at least one prior sworn statement from Mr. Sumner that RTX had neither identified, nor produced in this case. [Rec. Doc. 221, at 40:18-41:12]. Between the hearing and the filing of this *Motion*, Plaintiff has continued to attempt to discover prior sworn statements and testimony by Mr. Sumner and / or RTX. Plaintiff has discovered two (2) prior cases against RTX, which involved Pratt & Whitney J-57 engines: *Burke v. Waco, Inc., et al.*, No. CL13-01989F-15 (TF) (Newport News, Virginia) and *Brown v. CBS Corporation, et al.*, No. 3:12-cv-01495 (D. Conn.). In connection with these cases, Plaintiff has discovered depositions, responses to written discovery and sworn statements provided by John Sumner regarding J-57 engines that were neither identified, nor produced in this case.

In *Burke*—in **<u>2014</u>**—for example, Mr. Sumner testified regarding numerous issues relevant to this case, including sworn testimony inconsistent with sworn statements he provided in this case:

- Asbestos-containing components incorporated into the J-57 engine, including asbestos

gaskets, clamps, cement, wiring, and Min-K blanketed heat shields (which contradicts Mr. Sumner's testimony in this case) (*See* pp. 56:1-4, 56:10-57:12, 58:11-14, 66:20-67:16);

- Instructions pertaining to handling and manipulating of asbestos-containing components contained in the overhaul manuals for the J-57 engine (*See* pp. 34:24-35:6, 43:19-45:25; 46:12-47:15, 47:18-50:15, 52:2-55:19);

- RTX's failure to provide warnings regarding the hazards of asbestos in its overhaul manuals for the J-57 engine (*See* pp. 27:19-28:1);

- RTX's warnings regarding hazards of certain non-asbestos products contained within its J-57 overhaul manuals and the ability RTX had to warn about hazards attendant to the J-57 engine (*See* pp. 28:7-23, 32:1-8, 34:3-21, 35:23-36:25, 39:17-43:16);

- Mr. Sumner's lack of knowledge as to who authored the overhaul manuals for the J-57 engine (*See* p. 39:9-14, 50:21-51:4, 51:14-19);

- RTX's document retention and on-site library containing journals and manuals (*See* pp. 60:12-62:7);

- RTX's Health and Safety Department and internal newsletters it authored (*See* pp.62:9-63:17);

- RTX had the capacity and ability to test the asbestos-containing component on its J-57 engines but never tested them for fiber release; (*See* pp. 70:16-74:18, 76:7-77:3);

- RTX's failure to warn or implement any safety procedure regarding the handling or removal of any asbestos containing material on the J-57 engine prior to 1980 (*See* pp. 27:19-28:1, 77:4-12);

- RTX's J-57 engine had a commercial application from the early nineteen-fifties until the mid-nineteen-seventies.  (*See* pp. 75:23-76:6)

- RTX's commercial equivalent to the J-57 engine which is "almost identical"– JT3 (*See* pp. 93:10-94:7);

- RTX designed the J-57 engine (*See* pp. 75:23-76:6); and,

- Mr. Sumner had no responsibility for dealing with the Navy or the Air Force with respect to asbestos-containing parts. (*See* p.104:4-7).

*See* ***Exhibit F***—Deposition of J. Sumner dated 6/18/14 (and compare to ***ECF Doc. 179-3***, J. Sumner Declaration dated 12/19/23 withheld by RTX until 12/29/23 when it filed its Motion for Summary Judgment); *see also* ***ECF Doc. 248***, Plaintiff's Motion to Strike Declaration of John

Sumner Submitted in Support of Defendant RTX Corporation's Motions for Summary Judgment, Or for Alternative Relief.  Similarly, RTX's designated declarant in the *Burke* case provided sworn answers to interrogatories identifying asbestos-containing products utilized by Pratt & Whitney in its jet engines, to include the J-57 engine – an engine at issue in *Burke*.[5]

The examples continue. Mr. Sumner, in his role as RTX's 30(b)(6) designee, also executed a declaration that RTX attached in support of the motion for summary judgment it filed in *Brown, supra*. The declaration addresses not only the J-57 engine in the very years at issue in this case, but also claims and defenses RTX asserts in this case.  (*See* ***Exhibit H-1***—Declaration of John Sumner dated 04/05/2015; *see also* ***Exhibit H-2***—Excerpt of Defendant's Statement of Material Facts in Support of Summary Judgment at ¶¶ 81-85 (confirming J-57 engines in the early 1960s being at issue).[6]  This declaration, like the others that RTX failed to turn over, illustrates a knowing and willful violation of the Court's Order.

Pursuant to this Court's Order, RTX supplemented its responses to Plaintiff's requests on January 12, 2024, and, yet again, failed to identify or produce any prior sworn statements by Mr. Sumner or a RTX Rule 30(b)(6) witness relating to the aircraft and / or aircraft engine at issue, including the sworn statements Plaintiff's counsel had unilaterally discovered. *See* ***Exhibit I***— relevant portion of 01/12/2024 RTX Corporation's Further Amended and Supplemental Responses to Plaintiff's First Supplemental Request for Production of Documents. When Plaintiff met and conferred with RTX regarding its failure to produce prior sworn statements and testimony, RTX indicated that its responses were complete and accurate.

---

[5]     *See also* ***Exhibit G*** – RTX's Answer to Interrogatory No. 6 (and compare to RTX's discovery responses in the instant case).

[6]     In *Brown*, Mr. Sumner also provided another declaration dated April 24, 2015 (*see* **Exhibit H-3**), as well as sworn testimony dated March 19, 2015 addressing the J-57 engine – neither of which were identified nor produced by RTX in this case.

### III.    LAW AND ARGUMENT

The basic purpose of the federal rules, particularly those concerning discovery and disclosure, is to eliminate trial by ambush. *Taylor v. Mentor Worldwide LLC*, 940 F.3d 582, 606-615 (11th Cir. 2019) (Tjoflat, J. dissenting) (quotations omitted). *See also Hickman v. Taylor*, 329 U.S. 495, 501 (1947). "This regime—the pretrial disclosure requirements, duty to supplement, and serious penalties for failure to follow the rules—is consonant with the federal courts' desire to make a trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent." *Taylor*, 940 F.3d at 615 (quotations omitted)*; see also Wammock v. Celotex Corp.*, 793 F.2d 1518, 1527 (11th Cir. 1986). "Strict adherence to discovery rules [is] necessary to prohibit not only trial by ambush, but discovery gaming wherein a party holds back evidence…" *Incardone v. Royal Carriben Cruises, Ltd.*, 2019 WL 2709810, *9 (S.D. Fla. 2019).

In addition to the Court's inherent authority to punish bad faith conduct, Fed. R. Civ. P. 37(b)(2)(A)[7] permits this Court to "issue further just orders" when a party fails to obey a discovery order, including:

    (i)     directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

    (ii)    prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

    (iii)   striking pleadings in whole or in part;

---

[7] Plaintiff also notes that, because RTX has neither identified nor produced any prior sworn statements or deposition testimony responsive to Plaintiff's discovery requests in this case (including those unilaterally discovered by Plaintiff), Fed. R. Civ. P. 37(c) provides remedies for this failure to disclose:  the Court (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)—(vi). "[A]n evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4).

(iv)     staying further proceedings until the order is obeyed;
(v)      dismissing the action or proceeding in whole or in part;
(vi)     rendering a default judgment against the disobedient party; or
(vii)    treating as contempt of court the failure to obey any order except an order
         to submit to a physical or mental examination.

*Securities and Exchange Commission v. Complete Business Solutions Group, Inc.*, 2021 WL
4991303, at *6 (S.D. Fla. 10/20/2021) (Hon. Bruce Reinhart presiding); *see also Organo Gold
Int'l, Inc. v. Aussie Rules Marine Services, Ltd.*, 2019 WL 7371831, at *3 (S.D. Fla.
9/20/2019)(Hon. Bruce Reinhart presiding) ("[U]nder Rule 37(b), the Court may impose
substantive sanctions when a party does not obey a Court order to provide discovery."). Rule 37
sanctions "are intended to: (1) compensate the court and other parties for the added expense caused
by discovery abuses; (2) compel discovery; (3) deter others from engaging in similar conduct; and
(4) penalize the offending party or attorney." *Organo Gold*, 2019 WL7371831, at *3 (citing
*Steward v. Int'l Longshoreman's Ass'n, Local No. 1408*, 306 Fed.Appx. 527, 529 (11th Cir. 2009)).
District courts possess wide discretion over the discovery process and when discovery sanctions
are appropriate. *Organo Gold*, 2019 WL7371831, at *3.

"Once the moving party makes a *prima facie* showing of a discovery violation, the non-
movant must show that it was impossible to comply with the relevant court order(s) to avoid
sanctions." *Ferrier v. Q Link Wireless LLC*, 2019 WL 5260265, at *2 (S.D. Fla. 8/2/2019) (Hon.
Barry S. Seltzer presiding) (quoting *Costa v. Datapro, Inc.*, 2011 WL 7318760, at *6 (S.D. Fla.
8/5/2011) (citing *In re Chase & Sandborn Corp.*, 872 F.2d 397, 400 (11th Cir. 1989))); *Ferrier v.
Q Link Wireless LLC*, 2019 WL 5260123 (S.D. Fla. 8/21/2019) (Hon. Rodolfo Ruiz presiding)
(affirming and adopting report and recommendation of Judge Seltzer).

Additionally, pursuant to Fed. R. Civ. P. 26(g), every Rule 26 disclosure and response to
discovery must be signed by an attorney of record to certify, "that to the best of the person's

knowledge, information, and belief formed after a reasonable inquiry (A) with respect to a disclosure, it is complete and correct as of the time it is made; and (B) with respect to a discovery request, response, or objection, it is: (i) consistent with these rules . . .." "If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both." Fed. R. Civ. P. 26(g)(3).

As set forth above, it is clear that RTX has withheld information that this Court compelled – information that is not only directly responsive to Plaintiff's discovery requests and highly relevant to Plaintiff's claims, but which also refutes the affirmative defenses RTX asserts in this case. Sanctions are both appropriate and required to remedy the prejudice resulting from RTX's conduct. As such, in accordance Fed. R. Civ. P. 26(g) and 37(b), Plaintiff requests that this Court "issue further just orders" and / or enter a remedy for RTX's failure to comply with the Court's Order dated December 22, 2023.

## IV.   <u>CONCLUSION & PRAYER</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an Order imposing sanctions on RTX in any and all forms the Court deems reasonable and just under the circumstances, including that the following facts are deemed conclusively established for purposes of this case:

a.   The Pratt & Whitney J-57 engines that Winfred Crosby and Jimmy Estes worked with and around contained asbestos at all times leading up to when Mr. Crosby first commenced his maintenance and repair work and remained asbestos-containing throughout the entire time that Mr. Crosby performed work on them;

b.   Pratt & Whitney specified the use of asbestos in the J-57 engines that Mr. Crosby serviced, maintained and repaired;

c.   Pratt & Whitney's specification of asbestos-containing components in and for the J-57 engine, including but not limited to asbestos-containing Min-K insulation blankets and

heat shields;

d.   Pratt & Whitney designed its J-57 engines to outlast the life of their asbestos-containing components, which degraded as a result of the intended operation of the engines and required routine removal and in-kind replacement as designed by Pratt & Whitney;

e.   Pratt & Whitney's overhaul manuals instructed those working with its J-57 engines to manipulate and disturb the engines' asbestos-containing components in a way that released dust;

f.   Pratt & Whitney failed to provide any warnings concerning the asbestos hazards attendant to work performed on any of its engines, including the J-57, during the time period at issue;

g.   Pratt & Whitney failed to perform any tests to ascertain asbestos hazards attendant to work performed on any of its engines, including the J-57, during the time period at issue;

h.   Pratt & Whitney manufactured, sold and supplied a commercial equivalent of the J-57 engine that, like the J-57 engine, contained asbestos-containing components specified by Pratt & Whitney;

i.   The J-57 engines that Pratt & Whitney sold to its commercial and government contractors were identical as to the asbestos-containing components specified by Pratt & Whitney therein (i.e., identical in design and operation);

j.   Pratt & Whitney had actual knowledge of the hazards of asbestos encountered during the service, maintenance and repair of its J-57 engine throughout the time period at issue in this case; and

k.   The jury be informed that (1) RTX withheld evidence in discovery and (2) the jury must presume that the information withheld by RTX was unfavorable to it.

Plaintiff further requests that the Court enter all such other and further relief as it deems reasonable and just under the circumstances.

Dated: <u>February 23, 2024</u>                    Respectfully submitted,

<u>/s/ Rebecca S. Vinocur</u>
REBECCA S. VINOCUR
Florida Bar No.: 529915
**REBECCA S. VINOCUR, P.A.**
5915 Ponce De Leon Blvd, Ste. 14

Coral Gables, Florida 33146-2435
Tel: 786-691-1282
Fax: 786-691-1280
rvinocur@rsv-law.com

and

*/s/Michael K. Hibey*
Michael K. Hibey
*Admitted Pro Hac Vice*
Simmons Hanly Conroy
One Court Street
Alton, IL 62002
Tel: (618) 259-2222
Fax: (618) 259-2251
mhibey@simmonsfirm.com

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF GOOD FAITH CONFERENCE</u>

Pursuant to Local Rule 7.1(a)(3)(A), the undersigned counsel hereby certifies that, as part of Plaintiff's good faith efforts to resolve the issues raised in this motion, Plaintiff's counsel conferred, both telephonically and via email, with counsel for RTX Corporation, the only party affected by the relief sought in this motion, and RTX Corporation objects such that the parties were unable to resolve same.

*/s/ Rebecca S. Vinocur*
Rebecca S. Vinocur

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 23, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will generate Notices of Electronic filing to All Counsel of Record.

*/s/ Rebecca S. Vinocur*
Rebecca S. Vin=

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| WINFRED L. CROSBY and ANITA J. CROSBY,<br><br>     Plaintiffs,<br><br>  v.<br><br>BASF CORPORATION, et al.,<br><br>     Defendants, | Case No.: 0:22-cv-62225-RKA |

**DEFENDANT RAYTHEON TECHNOLOGIES CORPORATION'S
INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(a)(1)**

Defendant, Raytheon Technologies Corporation, formerly known as United Technologies Corporation ("RTC" or "Defendant"), hereby makes its initial disclosures under Rule 26(a)(1) of the Federal Rules of Civil Procedure.

**PRELIMINARY STATEMENT**

These disclosures are made without waiving any claims of attorney-client privilege, work product doctrine, or other applicable privilege, government directives, or basis for non-disclosure, including without limitation, RTC's right to protect from disclosure confidential, proprietary, or trade secret information. Furthermore, it is impossible at this time for RTC to be fully aware of each person, document, or thing that it may use in the defense of this case. All of the responses contained herein are based only upon such information and documents that are presently available to or specifically known to RTC. It is anticipated that further discovery, independent investigation, legal research and analysis will supply additional facts, add meaning to any known facts, as well as establish entirely new factual conclusions and legal contentions which may lead to additions to, changes and variations from, the contentions and statements contained herein. Therefore, RTC reserves the right to modify, amend, or supplement these disclosures as further investigation, information, discovery, and developments in this lawsuit may warrant.

1629654.1

Subject to the above qualifications, RTC provides the following Initial Disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure:

A.   **WITNESSES – Fed. R. Civ. P. 26(a)(1)(A)(i)**

RTC is currently unaware of any non-impeachment witnesses other than the witnesses that will be, or have been, identified by Plaintiff in his initial disclosures and/or discovery responses. RTC reserves the right to call any current or former employees of RTC, including, but not limited to, Judy M. Harvey and John C. Sumner, who may be able to provide relevant testimony regarding any of RTC's aviation engines that are established to be at issue, as well as environmental health and safety information that could have a bearing on this case. RTC reserves the right to call any witness as necessary for the purpose of rebuttal or impeachment, and to name such other witnesses as may become known during the course of discovery. RTC will disclose its expert witnesses in accordance with the applicable rules and/or pretrial Orders relating to such disclosures.

Further, RTC identifies the following fact witnesses who may have discoverable information regarding Plaintiff's alleged exposures and claimed damages:

1.   Any witness listed by Plaintiff and not objected to by RTC.

2.   Plaintiff's treating physicians, including all medical providers identified by Plaintiff, and all other medical providers related to the care and treatment of Plaintiff for any and all times.

3.   Any representative of any company, manufacturer, supplier, or distributor who the Plaintiff alleges manufactured, supplied, distributed, or sold any product to which the Plaintiff was allegedly exposed.

4.   Corporate representatives, co-workers, employees, supervisors or managers of each corporation, employer, or work site identified by the Plaintiff in his work history or responses to discovery

5.      RTC reserves the right to call or cross-examine any witness called by the Plaintiff, or any other Defendant, any witness called for the purpose of laying predicate as to the admissibility of a particular matter and any witness who may be used for rebuttal whose presence cannot reasonably be anticipated by RTC at the time of the filing of this Disclosure.

6.      Anyone identified by the Plaintiff or co-workers in depositions or other discovery.

7.      Any witness identified or disclosed in any party's disclosure statements or discovery responses and not objected to by RTC.

8.      Custodians of all medical records.

9.      Any records custodians from the Social Security Administration or the Bureau of Worker's Compensation, necessary to authenticate records.

**B.**      Discovery is ongoing and RTC reserves the right to supplement this Disclosure in accordance with Fed. R. Civ. Pro. 26(e).**DOCUMENTS – Fed. R. Civ. P. 26(a)(1)(A)(ii)**

The exact nature of Plaintiff's claims and allegations against RTC is currently unknown. Depending on the products or equipment for which product identification and exposure evidence is produced in this case, RTC may use in support of its defenses various aircraft documents, including but not limited to U.S. military specifications for the design, manufacture, and supply of equipment to the U.S. military.  Based upon the limited information available from Plaintiff's complaint, the following are documents in RTC's possession, custody, or control that may be used to support RTC's defenses in this matter:

|   | __Type__ | __Title__ | __Export-Controlled__ |
|---|---|---|---|
| 1 | Jet Engine Study | <u>Assessment of Potential Asbestos Exposures From Jet Engine Overhaul Work</u>, Steven P. Mlynarek, Ph.D., C.I.H., Q.E.P., May 9, 2007. | No |

| | **Type** | **Title** | **Export-Controlled** |
|---|---|---|---|
| 2 | Jet Engine Study | Published version of May 9, 2007 Report by Steven P. Mlynarek, Ph.D., C.I.H., Q.E.P. "Assessment of Potential Asbestos Exposures from Airplane Jet Engine Overhaul and Service Work" | No |
| 3 | MIL-E-5007A | Engines, Aircraft, Turbojet, General Specifications For | No |
| 4 | MIL-E-5007B | Engines, Aircraft, Turbojet, General Specifications For | No |
| 5 | MIL-E-5007C | Engines, Aircraft, Turbojet and Turbofan, General Specifications For | No |
| 6 | MIL-E-5007C Amend. 1 | Engines, Aircraft, Turbojet and Turbofan, General Specifications For - Amendment -1 | No |
| 7 | MIL-E-5007D | Engines, Aircraft, Turbojet and Turbofan, General Specifications For | No |
| 8 | MIL-E-5008A | Engines, Aircraft, Turbojet, Model Specifications For (Outline and Instructions for Preparation) | No |
| 9 | MIL-E-5008B | Engines, Aircraft, Turbojet, Model Specifications For (Outline and Instructions for Preparation) | No |
| 10 | MIL-E-5009A | Engines, Aircraft, Turbojet, Qualification Tests For | No |
| 11 | MIL-E-5009B | Engines, Aircraft, Turbojet, Qualification Tests For | No |
| 12 | MIL-E-5009C | Engines, Aircraft, Turbojet and Turbofan, Tests For | No |
| 13 | MIL-E-5010A | Engines, Aircraft, Turbojet, Acceptance Test For | No |
| 14 | Correspondence | PWA to AMC Re Qualification of J57-P-7 Engine | No |
| 15 | Correspondence | PWA to BuAer Re Qualification of J57-P-8 Engines | No |
| 16 | Correspondence | PWA to AMC Re 150-Hour Qualification Test on J57-P-1 Engine | No |
| 17 | Correspondence | PWA to BuAer Re 150-Hour Qualification Test on J57-P-1 Engine | No |
| 18 | Correspondence | USAF to PWA Re 150-Hour Qualification Test on J57-P-1 Engine | No |
| 19 | Correspondence | PWA to BuAer re: J57 Model Specification Revisions | No |
| 20 | ANA-BUL-143a | Army-Navy Aeronautical Bulletin – Specifications and Standards; Use Of | No |
| 21 | ANA-BUL-143b | Army-Navy Aeronautical Bulletin – Specifications and Standards; Use Of | No |
| 22 | ANA-BUL-143c | Army-Navy Aeronautical Bulletin – Specifications and Standards; Use Of | No |
| 23 | Military Standard Drawings Index | Numerical List – U.S. Air Force and Air Force-Navy Aeronautical Standard Drawings | No |
| 24 | MIL-G-7021 (incl. AN-G-171) | Gaskets and Sheet; Fuel, Lubricant, Coolant and Temperature Resistant | No |
| 25 | MIL-A-7021A | Asbestos Sheet, Compressed, For Fuel, Lubricant, Coolant, Water, and High Temperature Resistant Gaskets | No |
| 26 | MIL-A-7021B | Asbestos Sheet, Compressed, For Fuel, Lubricant, Coolant, Water, and High Temperature Resistant Gaskets | No |

|  | **Type** | **Title** | **Export-Controlled** |
|---|---|---|---|
| 27 | MIL-A-7021B<br><br>(Amend. 1) | Asbestos Sheet, Compressed, For Fuel, Lubricant, Coolant, Water, and High Temperature Resistant Gaskets | No |
| 28 | MIL-A-7021C | Asbestos Sheet, Compressed, For Fuel, Lubricant, Coolant, Water, and High Temperature Resistant Gaskets | No |
| 29 | AMS3839 | Fabric, Wire Reinforced Asbestos | No |
| 30 | AN900 | Gasket – Copper – Asbestos | No |
| 31 | MS35769 | Gasket – Copper – Asbestos | No |
| 32 | AN4045 | Gasket - Type 1 C9 KV Engine Accessory Drive | No |
| 33 | AN123020 | Gasket, Aluminum-Asbestos, Annular | No |
| 34 | MS9134 | Asbestos Gasket, Engine Accessory Drive | No |
| 35 | MS9136 | Asbestos Gasket, Engine Accessory Drive | No |
| 36 | MS9137 | Asbestos Gasket, Engine Accessory Drive | No |
| 37 | MS9139 | Asbestos Gasket, Engine Accessory Drive | No |
| 38 | MS9377 | Asbestos Gasket, Engine Accessory Drive | No |
| 39 | Correspondence | PWA to BuAer Listing AN, MS, and AS Equivalents to PWA Parts | No |
| 40 | MS9514 | Cushion, Loop Clamp, Fabric, Wire Reinforced Asbestos | No |
| 41 | MS9515 | Cushion, Loop Clamp, Fabric, Wire Reinforced Asbestos | No |
| 42 | MS9825 | Clamp, Loop-Cushioned, Joggled, Corrosion Resisting Steel, .205 Hole | No |
| 43 | MS9826 | Clamp, Loop-Cushioned, Joggled, Corrosion Resisting Steel, .265 Hole | No |
| 44 | MS33666 | Packing, Preformed - Aeronautic, Elastomeric, Range of Sizes | No |
| 45 | MS33666 Rev. A | Packing, Preformed - Aeronautic, Elastomeric, Range of Sizes - Revision A | No |
| 46 | MS33666 Rev. C | Packing, Preformed - Aeronautic, Elastomeric, Range of Sizes - Revision C | No |
| 47 | ANA-BUL-182c | Air Force-Navy Aeronautical Bulletin - Material Changes and Substitutions: Aircraft Engine Parts (Production Contracts) | No |
| 48 | ANA-BUL-182c Notice 1 | Air Force-Navy Aeronautical Bulletin - Material Changes and Substitutions: Aircraft Engine Parts (Production Contracts) - Notice -1 | No |
| 49 | ANA-BUL-343K | Air Force-Navy Aeronautical Bulletin – Specifications and Standards Applicable to Aircraft Engines and Propellers, Use of | No |
| 50 | MIL-BUL-343 | Military Bulletin - Documents Applicable to Aircraft Engines and Propellers, Use Of | No |
| 51 | MIL-BUL-343A | Military Bulletin - Documents Applicable to Aircraft Engines and Propellers, Use Of | No |
| 52 | MIL-W-25038A | Military Specification – Wire, Electrical, High Temperature and Fire Resistant | No |
| 53 | MIL-W-25038B | Military Specification – Wire, Electrical, High Temperature and Fire Resistant, Aircraft | No |

| | **Type** | **Title** | **Export-Controlled** |
|---|---|---|---|
| 54 | MIL-W-25038B (Amend. 1) | Military Specification – Wire, Electrical, High Temperature and Fire Resistant, Aircraft | No |
| 55 | MIL-W-25038C | Military Specification – Wire, Electrical, High Temperature and Fire Resistant, Aircraft | No |
| 56 | MIL-W-25038D | Military Specification – Wire, Electrical, High Temperature and Fire Resistant, Aircraft | No |
| 57 | Correspondence | PWA to BuAer and Air Materiel Command Re: Conference to Provision Pratt & Whitney J57-P-1 Engine, Engine Container and Accessories | No |
| 58 | ANA-BUL-423a | Air Force-Navy Aeronautical Bulletin - Engines: Aircraft, Vendor Substantiation Tests For | No |
| 59 | ANA-BUL-423a Notice 1 | Air Force-Navy Aeronautical Bulletin - Engines: Aircraft, Vendor Substantiation Tests For | No |
| 60 | MIL-STD-1529 | Military Standard – Vendor Substantiation for Aerospace Propulsion Systems | No |
| 61 | MIL-STD-1529 Notice 1 | Military Standard – Vendor Substantiation for Aerospace Propulsion System Items | No |
| 62 | ANA-BUL-445 | Air Force-Navy Aeronautical Bulletin - Engineering Changes to Weapons, Systems, Equipment and Facilities | No |
| 63 | ANA-BUL-445 Supp. 1 | Bureau of Naval Weapons - Supplement No. 1 to ANA Bulletin 445 | No |
| 64 | ANA-BUL-445 Supp. 2 | Bureau of Naval Weapons - Supplement No. 2 to ANA Bulletin 445 | No |
| 65 | ANA-BUL-445 Notice 2 | Air Force-Navy Aeronautical Bulletin - Engineering Changes to Weapons, Systems, Equipment and Facilities - Notice -2 | No |
| 66 | ECP and Related Correspondence | PWA Engineering Change Proposal 54891 | No |
| 67 | ECP and Related Correspondence | PWA Engineering Change Proposal 54905 | No |
| 68 | ECP and Related Correspondence | PWA Engineering Change Proposal 54230 | No |
| 69 | Correspondence and Engineering Change Proposal | Bureau of Aeronautics Engine Change No. 50997 and 50997-B for J57 Engines Approval Letter, March 8, 1954 | No |
| 70 | Correspondence | Department of the Navy Bureau of Aeronautics Review of Pratt & Whitney Specification No. N-1700 Covering the Model J57-P-10 Model Engine, December 29, 1954 | Yes |
| 71 | Jet Engine Bulletin | Department of the Navy Bureau of Aeronautics Pratt & Whitney J57 Turbo-Jet Engine Bulletin No. 169, September 19, 1955 | Yes |
| 72 | Change Order | Change Order No. 2 to Air Force Contract AF 33 (038)-9505 | No |
| 73 | Correspondence | AMC to BuAer Re: Diversion of J57 Capacity by PWA | No |

| | **Type** | **Title** | **Export-Controlled** |
|---|---|---|---|
| 74 | Progress Report | Monthly Progress Report No. 40 (J75 Development) - Air Force Contract AF 33 (600)-22940, Supplemental Agreement No. 5 | Yes |
| 75 | Progress Report | Monthly Progress Report No. 41 on J75 Engine Development (Air Force) | Yes |
| 76 | Contract | Air Force Contract AF 33 (038)-9505 | No |
| 77 | Contract | Air Force Contract AF 33 (600)-5839 | Yes |
| 78 | Contract | Air Force Contract AF 18 (600)-126 | Yes |
| 79 | Correspondence & Contract | Air Force Contract No. AF 33 (038)-20569 (Turbine Disk and Bucket Cooling Investigation) Correspondence and Encl. Contract | Yes |
| 80 | Correspondence | Research and Advanced Development Proposals | Yes |
| 81 | Contract | Supplemental Agreement No. 3 to Air Force Contract AF 33(038)-9505 | No |
| 82 | Contract | Supplemental Agreement No. 4 to Air Force Contract AF 33(038)-9505 | Yes |
| 83 | Contract | Navy Contract 57-235-f for Continued Development of J57 Aircraft Engines | No |
| 84 | Correspondence | Quotation Covering Second Phase of a Research Program to Develop Higher Thrust Per Unit Frontal Area on Future Models of the XJ57 Engine (Contract W33 (038) - no-18662 - Inquiry 48464) | Yes |
| 85 | Correspondence | PWA to BuAer Submitting Subcontractor Forms | No |
| 86 | Correspondence | PWA to AMC Re Standardization of J57 Engines for F-102 and F4D Aircraft – Preliminary Report | No |
| 87 | Correspondence | PWA to BuAer Re Progress Payments under PWA Contracts | No |
| 88 | Correspondence | BuAer Request  for J57 Engine Data Release | No |
| 89 | Correspondence | Proposal for Continued Development of J75 Engine (Air Force) | Yes |
| 90 | Memo | Army Testing of Simplex Oil Seal Rings | No |
| 91 | Installation Engineering Report | Installation Engineering Report - Summary of Work Done - Conclusions - Essential results of tests | Yes |
| 92 | Installation Engineering Report | Installation Engineering Report - Summary of Work Done - Results of Test | Yes |
| 93 | Engine Bulletin | General Gas Turbine Engine Bulletin No. 34, Revision A | No |
| 94 | Correspondence | VSX Engine Pre-Bidders Conference | No |
| 95 | Correspondence | VSX Timing | No |
| 96 | Correspondence | VSX Powerplant Bidders' Briefing | No |
| 97 | Correspondence | Supplement to 3-10-1966 Corr. Re: VSX Bid | No |
| 98 | Correspondence | Mission Requirements and Specification for VSX Bid | No |
| 99 | Correspondence | VSX Engine Bid Specification Revisions | No |
| 100 | Correspondence | VSX Engine RFP | No |
| 101 | Correspondence | JTF-10-15 Availability (Up-rated TF30-P-8) | No |
| 102 | Correspondence | VSX, Why We Lost | No |
| 103 | Correspondence | JTF10A-15 Situation | No |

| | **Type** | **Title** | **Export-Controlled** |
|---|---|---|---|
| 104 | Correspondence | Letter to Major General Frank Rouse, Commander, San Antonio Air Material Area Subject: Competitive Procurement of Critical Engine Parts | No |
| 105 | Correspondence | Letter to Major General Frank Rouse, Commander, San Antonio Air Material Area Subject: Competitive Procurement of Critical Engine Parts | No |
| 106 | Department of the Air Force, Correspondence | Letter from Major General Frank Rouse to P&WA | No |
| 107 | Engineering Change in Design | Development (Class 1B) Engineering Change in Design - Change No. 184638 | No |
| 108 | Engineering Change in Design | Development (Class 1B) Engineering Change in Design - Change No. 180716 | No |
| 109 | Engineering Change in Design | Development (Class 1B) Engineering Change in Design - Change No. 184260 | No |
| 110 | Engineering Change in Design | Manufacturing Class II, Engineering Change in Design, Pratt & Whitney Aircraft, East Hartford, CT - Change No. 252959 | No |
| 111 | Engineering Change in Design | Development (Class II) Engineering Change in Design - Change No. 193599 | No |
| 112 | Engineering Change in Design | Development (Class II) Engineering Change in Design - Change No. 250795 | No |
| 113 | Engineering Change in Design | Manufacturing (Class II) Engineering Change in Design – Change No. 252961 | No |
| 114 | Correspondence | RTC Letter to Naval Air Technical Services Facility | No |
| 115 | MIL-M-81203A | Military Specification – Manuals, Technical; In-Process Reviews, Validation and Verification, Support Of | No |
| 116 | MIL-M-81203A, Notice 1 | Military Specification – Manuals, Technical; In-Process Reviews, Validation and Verification, Support Of | No |
| 117 | MIL-H-5473A | Military Specification – Handbooks; Maintenance Instructions (Aircraft) | No |
| 118 | MIL-H-5474A | Military Specification – Handbooks and Breakdowns; General Preparation of | No |
| 119 | MIL-H-5474B | Military Specification – Technical Manuals: General Requirements for Preparation of | |
| 120 | Manual | Handbook of Instructions for Airplane Designers, Vol. I, Materiel Command U.S. Army Air Forces, July 1, 1936 | No |
| 121 | Manual | Handbook of Instructions for Airplane Designers, Vol. II, Materiel Command U.S. Army Air Forces, July 1, 1936 | No |
| 122 | Manual | Army Air Forces Manual No. 30, "Ground Safety Rules, a Manual of Safe Rules and Practices for Army Forces Personnel, July 1944 | No |

|  | Type | Title | Export-Controlled |
|---|---|---|---|
| 123 | Manual | Department of the Air Force, "Ground Safety Accident Prevention Handbook for Air Force Personnel (AFM 32-3)," June 1949 | No |
| 124 | Technical Bulletin | TLVs for Toxic Chemicals - USAF Pamphlet 161-2-1 | No |
| 125 | Technical Bulletin | Respiratory Protection Program - USAF TB MED 223 | No |
| 126 | Manual | Preventative Medicine and Occupational Health Program - USAF 160-25 | No |
| 127 | Pamphlet | Bibliography on Industrial Medicine and Occupational Health - USAF 160-6-5 | No |
| 128 | Technical Bulletin | Medical Service - Precautions Toxic Agents - USAF Regulation 160-118 | No |
| 129 | Correspondence | USN Correspondence Re Hazards of Asbestos and Control (3-26-1969) | No |
| 130 | Correspondence | USN Labeling Program for Hazardous Materials | No |
| 131 | Notice | Hazardous Materials Item List - Naval Supply | No |
| 132 | Report | Fleischer Drinker Health Survey Pipecovering in Navy Vessels | No |
| 133 | Technical Order | OPNAV Control of Asbestos Exposure to Naval Personnel | No |
| 134 | Memorandum | Occupational Health Issues for POM-80 (6-09-1977) | No |
| 135 | Correspondence | Twenty Enlisted Rates at Greatest Risk of Asbestos-Related Diseases | No |
| 136 | Technical Order | NAVSEA 5100.2A - Asbestos Elimination Personnel Protection Program | No |
| 137 | Correspondence | AFOSH Standards 161-4 and 161-5 - Exposure to Asbestos | No |
| 138 | Pamphlet | Exposure to Asbestos - War Related Illness Study Center | No |
| 139 | Report | Report No. NADC-81080-80 – Replacement of Asbestos Aboard Naval Aircraft, Aircraft and Crew Systems Directorate, Naval Air Development Center, November 10, 1981 | No |
| 140 | Manual | Aircraft Mechanic – Reciprocating Engine, Vol. 1 | No |
| 141 | Manual | Aircraft Mechanic – Reciprocating Engine,  Vol. 5 | No |

If, upon further discovery, RTC ascertains the identity of other documents in its possession, custody, or control that may be used to support its defenses, other than for impeachment purposes only, RTC reserves the right to amend these disclosures to include such documents barring any privileges, government directives, or other restrictions against their disclosure.  RTC will make available export-controlled documents only after interested parties have entered into an appropriate protective order and meet the requirements for receipt of export-controlled documents.

Furthermore, and subject to the foregoing, below please find categories of documents and tangible items which RTC may rely upon at trial:

1.      All of Plaintiff's medical records. These documents are equally available to Plaintiff. Copies of these documents will be made available upon request.

2.      All of Plaintiff's employment records. These documents are equally available to Plaintiff. Copies of these documents will be made available upon request.

3.      Any documents identified and/or produced by any other party as a part of its pleadings and/or discovery responses

4.      Any documents identified and/or produced by any other party as a part of its Rule 26(a)(1) or Rule (26)(a)(2) Disclosures.

5.      All statements made by Plaintiff.

6.      All documents received pursuant to subpoena and/or authorization.

7.      Deposition transcripts taken in this action and all exhibits incorporated.

8.      Any exhibits identified in Plaintiff's or any other party's witness and exhibit lists, and those items identified in the depositions, answers or interrogatories, responses to requests for production, or responses to requests for admissions and other matters of record in this action.

9.      Any documents listed in the witness and exhibit lists of any other party.

10.     Expert witness resumes or curriculum vitae.

11.     All documents prepared by or relied upon by any expert witness endorsed by and of the parties to testify in this action.

12.     Diagrams or other demonstrative exhibits prepared by witnesses in aid of their testimony at time of trial.

13.     All exhibits identified by any other party to this action, including any party that has settled or been dismissed prior to trial.

14.     All documents, photographs, videos or other demonstrative aides used by Plaintiff or other parties.

15.     All exhibits necessary for rebuttal or impeachment purposes.

Discovery is ongoing and RTC reserves the right to supplement this Disclosure in accordance with Fed. R. Civ. Pro. 26(e).

C.     **COMPUTATION OF DAMAGES – Fed. R. Civ. P. 26(a)(1)(A)(iii)**

At this time, RTC is not asserting an affirmative claim for damages against plaintiffs and therefore does not provide a computation of damages.

D.     **INSURANCE AGREEMENTS – Fed. R. Civ. P. 26(a)(1)(A)(iv)**

RTC has sufficient insurance coverage issued through the London market with Global Aerospace as the lead underwriter should liability be adjudicated against it.

Dated: January 27, 2023

Respectfully submitted,

BICE COLE LAW FIRM, P.L.

/s/ *Melanie Chung-Tims*
Susan J. Cole, B.C.S., FBN: 270474
Melanie Chung-Tims, FBN: 27603
Amanda Cachaldora, FBN: 060907
999 Ponce de Leon Blvd., Ste. 910
Coral Gables, Florida 33134
(305) 444-1225 telephone
(305) 446-1598 facsimile
cole@bicecolelaw.com
chungtims@bicelcolelaw.com
cachaldora@bicecolelaw.com
AsbestosService@bicecolelaw.com

*Counsel for Raytheon Technologies Corporation*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certified that on this 27th day of January 2023, a true and correct copy of the foregoing has been electronically served via email on all Counsel of Record.

*<u>/s/ Melanie Chung-Tims</u>*

# Exhibit B

E-SERVICE

70233852
Jun 21 2023
03:34PM

File & ServeXpress

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

WINFRED L. CROSBY and ANITA J.
CROSBY,

                                    CASE NO: 0:22-cv-62225-RKA

      Plaintiffs,

v.

BASF CORPORATION, et al.,

      Defendants.

_____/

### DEFENDANT RAYTHEON TECHNOLOGIES CORPORATION, F/K/A UNITED TECHNOLOGIES CORPORATION'S NOTICE OF SERVING RESPONSES TO PLAINTIFF'S INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

      Defendant, Raytheon Technologies Corporation f/k/a United Technologies Corporation, by and through undersigned counsel, pursuant to Fed. R. Civ. P. 33 and 34, gives notice that Defendant's Responses to Plaintiff's Interrogatories and Request for Production of Documents have been served on all counsel of record.

### CERTIFICATE OF SERVICE

      WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via Electronic Mail, to all counsel of record, this 21st day of June 2023.

                         **LUKS, SANTANIELLO,**
                         **PETRILLO, COHEN & PETERFRIEND**
                         *Attorneys for Defendant Raytheon Technologies Corporation f/k/a United Technologies Corporation*
                         150 West Flagler Street - 26th Floor
                         Miami, FL  33130
                         Telephone:  (305) 377-8900
                         Facsimile:   (305) 377-8901

                         By:  _/s/ Stuart Cohen_ _____

1643702.1

Stuart L. Cohen
scohen@insurancedefense.net
Florida Bar No. 0927066
John C. Reddin
Florida Bar No.: 1025086
jreddin@insurancedefense.net

<u>**ANSWERS TO PLAINTIFF'S INTERROGATORIES**</u>

<u>**Interrogatory No. 1**</u>: State the name, address, job title, length of time employed by Defendant, and a year-by-year list of all other positions, titles, or jobs held when working for Defendant of each person who has supplied any information used in answering these interrogatories.

    <u>**ANSWER:**</u>

    These answers were prepared by counsel and the phraseology of the answers is that of counsel. Since these interrogatories are directed to a corporation, these answers do not constitute, nor are they derived from, the personal knowledge of any single individual, but include record information, knowledge obtained that cannot be attributed to any single individual, recollection of employees and general knowledge of the person who has verified these responses and other persons. The answers were prepared with the assistance of counsel's advice and recommendations, and reviewed and confirmed by the undersigned verifying individual, John C. Sumner, a former Pratt & Whitney employee.

    Mr. Sumner had many roles and duties during his employment with Pratt & Whitney from 1965 until his retirement in 2001. He started at Pratt & Whitney as an experimental test engineer and retired as a manager of customer technical service. Over the course of his career, he was involved with contracts, participated in the repair and maintenance of engines, supervised personnel, investigated aircraft accidents, worked with various commercial aircraft operators and government agencies, and assisted with the development of aviation engine products and components. Following his retirement, Mr. Sumner has continued to work for Pratt & Whitney as a consultant-contractor, primarily in locating and reviewing records related to engine design and production.

<u>**Interrogatory No. 2:**</u> If you contend that you are not the proper party to answer and defend against Plaintiffs' allegations that your products injured Plaintiff Winfred Crosby, state the facts concerning such contention.

    <u>**ANSWER:**</u>

    To the extent that the "products" at issue are Pratt & Whitney aviation engines, Defendant makes no such contention.  Defendant does contend that Plaintiff was not injured as a result of work performed on any Pratt & Whitney engine.

<u>**Interrogatory No. 3:**</u>  Identify all persons who are likely to have personal knowledge of any fact alleged in the complaint or in your answer to the complaint and state the subject matter of the personal knowledge possessed by each such person.

    <u>**ANSWER:**</u>

    <u>OBJECTION</u>. Defendant objects that this request is vague, ambiguous and unreasonably over broad.  Defendant also objects to this request to the extent that it seeks information protected by attorney-client privilege and/or the attorney work product doctrine and/or seeks the premature disclosure of expert witness information.

Subject to and without waiving the objections, Defendant responds as follows: In addition to Plaintiff and individuals identified by and/or on behalf of Plaintiff, Defendant identifies John C. Sumner, who will testify as to the design and maintenance and repair of Pratt & Whitney J57 military turbojet aviation engines, and Judy M. Harvey, who will testify as to Defendant's environmental health and safety programs and historical knowledge of the potential hazards of asbestos. Defendant additionally identifies Stephen Mlynarek, Ph.D., who performed an assessment in 2006 regarding the potential release of asbestos fibers during overhaul and maintenance work on Pratt & Whitney jet aviation engines. Dr. Mlynarek prepared a written report, dated May 9, 2007. The results showed overhaul and maintenance work on the engines generated release of chrysotile fibers at or below ambient levels. Copies of the report have previously been provided to Plaintiff's counsel. Defendant will likely retain consultants and experts that might have information relevant to this request.  Defendant reserves its right to amend or supplement this response as discovery and investigation into this matter continue.

**Interrogatory No. 4**: Identify any and all individuals/witnesses that you are aware of that have provided any sworn statements, including declarations, affidavits, testimony or for which there exists substantially verbatim transcriptions of statements concerning Plaintiff Winfred Crosby, his family, any co-workers, the locations he worked at, products he worked with, where he lived and/or the allegations in this lawsuit and identify each document concerning such statement.

**ANSWER:**

OBJECTION. This request is compound, vague and ambiguous, unduly burdensome, oppressive, and harassing. Defendant additionally objects to this request to the extent it seeks the premature disclosure of expert witness information.

Subject to and without waiving the objections, Defendant identifies Plaintiff's deposition and the deposition of Jimmy Estes.

**Interrogatory No. 5**: For each witness you have retained or specially employed to provide expert testimony in this case, or employed by you whose duties regularly involve giving expert testimony and whom you expect to testify at trial, provide a complete statement of the opinions to be expressed and the basis and reasons therefore.

**ANSWER:**

OBJECTION. Defendant objects to this request to the extent it seeks the premature disclosure of expert witness information. Defendant will provide the requested information during the normal course of expert witness discovery in this matter.

**Interrogatory No. 6:**  For each expert you have retained and intend to call at trial, state by year from 2000 to the present, the total amount of money paid by you or any attorney or agent acting on your behalf to the expert (or any employer of the expert) and identify the custodian of the tax records (e.g. IRS Form W-2 or Form 1099) that reflect or evidence such.

4

**ANSWER:**

OBJECTION. This request is compound, vague and ambiguous, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects to this request to the extent it seeks the premature disclosure of expert witness information.

**Interrogatory No. 7:** Describe all steps taken by you to preserve documents concerning the design, manufacture and/or engineering of your products / equipment, including all changes to same, your use/sale of equipment and/or asbestos-containing products, asbestos-related testing, exposure levels (whether on your premises, during the manufacturing process, when servicing your aircraft / engines or otherwise), knowledge of the hazards of asbestos, claims your equipment could not operate safely or as designed without asbestos-containing components, your employees' asbestos-related injuries/disease, and any other subject matters relevant to the claims and defenses in this case. A complete response to this request will include a detailed description, by date, when and how you first preserved, collected and/or assembled your documents and all subsequent actions to identify, collect, preserve and assemble said documents, to include when, how, why and where the documents were preserved, if any documents that once existed no longer were in existence and the identity of all individuals who were involved in any manner with the manner, method and means by which the documents were preserved.

**ANSWER:**

OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request in that it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure.

**Interrogatory No. 8:** If you have knowledge of any person carrying on an insurance business that might be liable to satisfy part or all of a judgment that might be entered in this action or to indemnify or reimburse the payments made to satisfy the judgment, identify that person and state the applicable policy limits of any insurance agreement under which the person might be liable.

**ANSWER:**

OBJECTION.  This request is compound, vague, ambiguous and overly broad, unduly burdensome and oppressive. Defendant additionally objects to this request to the extent that it is irrelevant and unlikely to lead to the discovery of admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure.

Subject to and without waiving said objections, Defendant states it has assets sufficient to cover the claims made by Plaintiff in this matter.

**Interrogatory No. 9:**   Identify with specificity any arbitration proceedings, lawsuits, declaratory judgment actions, or any other proceedings initiated by you or any of your insurers at any time for reimbursement and/or coverage determinations/disputes regarding any legal fees, costs, expenses, and or judgment(s) concerning and/or arising from any asbestos-related claim(s) or lawsuit(s) filed against you.

**ANSWER:**

None.

**Interrogatory No. 10:**  Identify and describe with specificity (defined above) each and every piece of equipment and / or asbestos-containing material that you manufactured, sold, distributed, specified and / or installed that was used in/on any of the aircraft and / or aircraft engines at issue.

**ANSWER:**

OBJECTION. This request is vague and ambiguous, compound, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks information outside of the products of Defendant allegedly at issue and outside of the relevant time period. Defendant further objects on the basis that this interrogatory seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure.  Defendant further objects to this interrogatory to the extent that it seeks technical data and other information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations.  Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place. Defendant further objects to the definitions for "equipment," "asbestos-containing material," "aircraft at issue," and "aircraft engines at issue" as being compound, vague and ambiguous and/or overly broad.

Subject to and without waiving the objections, Defendant responds that, pursuant to a contract with the U.S. Government and under its supervision and control, Defendant designed and manufactured the Pratt & Whitney J57-P-19W military turbojet engines supplied to the U.S. Air Force to power the Boeing B-52D Stratofortress combat aircraft assigned to McCoy Air Force Base from 1960-1964. During the relevant time period,

pursuant to reasonably precise specifications created and/or approved by the U.S. Government, the engines utilized a limited number of chrysotile-containing gaskets for mounting accessories on the engines, and a limited number of cushioned loop clamps that contained chrysotile asbestos to secure external plumbing and wiring on the engines. Many of the gaskets and clamps on the engines never contained asbestos. The foregoing engines never utilized any asbestos-containing hoses or firesleeves, or heat shields with asbestos-containing insulation or blanket material. At his deposition, Plaintiff testified to applying asbestos-containing sheet adhesives for the installation of gaskets on Pratt & Whitney engines. However, this is not an appropriate, safe or foreseeable use for sheet adhesive material or a practice recommended or specified by Pratt & Whitney. In fact, Pratt & Whitney in its manuals instructs in the use of lubricants, such as Gredag, to ensure that gaskets do not adhere to engine mounting surfaces and can be removed easily during replacement.

The above-listed components were manufactured by entities other than Defendant and were used in specialized applications by highly trained and experienced U.S. military personnel. The chrysotile utilized in the components was encapsulated in a non-friable substance, such as Teflon. Due to the passage of time, Defendant is unable to identify the manufacturers or brand names of the above components in the Pratt & Whitney J57-P-19W military engines when shipped for use in the B-52D aircraft at issue. Replacement parts for these components were available through Defendant but also could be purchased directly from the part manufacturer or a third-party vendor.

During all aspects of its design and manufacture of the J57-P-19W military aircraft engines supplied to the U.S. Air Force, Pratt & Whitney performed its work under the immediate oversight of the U.S. military. The U.S. military reviewed and approved or rejected engineering and design proposals from Pratt & Whitney for these engines. This oversight and approval process was exercised through contract documents, design and construction drawings, written specifications, and personal oversight of Pratt & Whitney's work by military engineers, military inspectors and military specialists who were resident on-site at Pratt & Whitney. No aspect of the development, manufacture, and testing of the J57-P-19W engines intended for use by the Air Force escaped this close supervision and oversight. The U.S. military and its engineers engaged in a thorough review of the drawings, schematics, model specifications, and engineering data and had to approve the drawings before production of the engines would be allowed to commence. The U.S. military was fully aware of all the materials used in Pratt & Whitney J57-P-19W aircraft engines, including the above-identified chrysotile-containing gaskets and clamps, and the use of these components was either mandated by the U.S. military or was reviewed and approved by the U.S. military and its engineers.

**Interrogatory No. 11:** Identify and describe with specificity (defined above) each and every piece of equipment and / or asbestos-containing materials that was/were approved for use and/or inclusion on any of the aircraft and /or aircraft engines at issue.

**ANSWER:**

Please see <u>OBJECTION</u> and <u>Response to Interrogatory No. 10</u>, above, which are incorporated herein by reference.

**Interrogatory No. 12:**  By entity, identify and describe with specificity (defined above) each and every piece of equipment and / or asbestos-containing material that you manufactured, sold, distributed, specified  and/ or supplied to the respective entities at issue (as defined above) at any time prior to the end of the year 1965.

**ANSWER:**

Please see OBJECTION and Response to Interrogatory No. 10, above, which are incorporated herein by reference.

**Interrogatory No. 13:**  State whether you manufactured, sold, distributed, specified and/or installed any replacement parts for any aircraft and / or aircraft engines at issue and, if so, identify and describe with particularity (as defined above) each such replacement part.

**ANSWER:**

Please see OBJECTION and Response to Interrogatory No. 10, above, which are incorporated herein by reference.

**Interrogatory No. 14:**  For each product that is the subject of Interrogatory Nos. 9-13 (sic), set forth with particularity all information concerning the amount (units/volume) of said product that was sold to each entity at issue by month/year.

**ANSWER:**

The first delivery of Pratt & Whitney J57-P-19W military turbojet engines for use in Boeing B-52D aircraft occurred in 1956. In all, 547 J57-P-19W engines were accepted by the U.S. Air Force for use in its Boeing B-52D aircraft. It is currently unknown when Pratt & Whitney last shipped the J57-P-19W, but production of the J57 family of engines for the U.S. Air Force ceased in 1964. Due to the passage of time, Defendant has no record of the supply of replacement parts to the U.S. Air Force from 1960-1964, if any, and many replacement parts, such as gaskets and clamps, were procured by the U.S. Government directly from the manufacturer that the U.S. Government approved and qualified for that purpose.

**Interrogatory No. 15:**  For each product that is the subject of Interrogatory Nos. 9-13 (sic), set forth with particularity all information concerning the amount (units/volume) of said product that was sold by month/year nationally, as well is in the State of Florida (to include by specific retail store within the State of Florida).

**ANSWER:**

Please see Response to Interrogatory No. 14, above. Defendant is currently unaware of any J57-P-19W-powered B-52D aircraft ever having been assigned to air bases in the State of Florida or of any shipments of J57-P-19W engines to locations in Florida.

**Interrogatory No. 16:**  If you claim that there were suitable asbestos-free alternatives that could be used in place of the asbestos-containing material(s) contained in the equipment / asbestos- containing products that are the subject of Interrogatory Nos. 9-13, identify each

8

such alternative by year, the manufacturer/source, and the specification and/or other means by which you identified any asbestos-free alternative as an option for use in / on your equipment.

**ANSWER:**

OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks information outside of the relevant time period. Defendant further objects to the use of the term, "suitable," as it is vague and ambiguous.

Subject to and without waiving the objections, None.

**Interrogatory No. 17:**  If you contend that there was no suitable asbestos-free version of any of the products / material that are the subject of Interrogatory Nos. 9-13 (sic) prior to the end of the year 1965, provide a detailed explanation of your consideration and exploration of the use of asbestos-free alternatives versus asbestos-containing products, to include providing the facts that you claim support your contention and the identity of all documents concerning same.

**ANSWER:**

OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks information outside of the relevant time period. Defendant further objects to the use of the term, "suitable," as it is vague and ambiguous.

**Interrogatory No. 18:**   For each piece of equipment and/or replacement part described in Interrogatory Nos. 9-13 (sic), set forth in detail your recommendations and/or specifications   for maintenance, overhaul, service and/or other repair and why such maintenance, overhaul, service and/or other  repair was recommended/specified and/or necessary.  A complete  response  will include the following type of information: how each such product / material was to be maintained, overhauled and repaired or was recommended to be overhauled or repaired and how any asbestos- containing material(s) would be used, handled, applied, re-applied, removed or otherwise disturbed in the course of such maintenance, overhaul and / repair.

**ANSWER:**

OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks information outside of the relevant time period. Defendant further objects to this interrogatory to the extent that it seeks technical data and other information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders

9

administered by the Treasury Department's Office of Foreign Assets Control Regulations. Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

**Interrogatory No. 19:**   Describe with particularity all writings, publications, communications, literature, or other writings that were placed on, accompanied or pertain in any manner to the products / materials described in Interrogatory Nos. 9-13 (sic) (including but not limited to operating instructions, manuals, brochures, catalogs, or other printed materials (whether provided at the time of sale/delivery or subsequently) and state whether you provided in such materials warnings or cautions of any type concerning any dangers/potential dangers of any type associated with the product / material and/or asbestos-containing materials/products.

**ANSWER:**

OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks information outside of the relevant time period and subject matter for this litigation. Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request. Defendant further objects to the use of the term, "dangers/potential dangers of any type" and the definition for "asbestos-containing materials" and "asbestos containing products" as they are vague and ambiguous and/or compound.

Subject to and without waiving the objections, Defendant states that numerous warnings relating to potential hazards from the operation and maintenance, repair, and overhaul of Pratt & Whitney J57-P-19W military engines were written, published, and/or approved by the U.S. military for placement into Air Force manuals for the engines. During the relevant time period, none of these warnings pertained to the use or handling of the chrysotile-containing components identified in Response to Interrogatory No. 10, as the U.S. Air Force, which had its own sophisticated and robust health and safety program, and the international medical and scientific community did not identify or suspect any hazard associated with work involving these products with respect to the maintenance and repair of aviation engines that powered U.S. combat aircraft.

**Interrogatory No. 20:**  If you claim that any government agency, specifically including but not limited to the United States Air Force, prohibited you from providing any warnings/cautions concerning health hazards and/or the hazards of asbestos (or potential hazards of same), set forth the material facts supporting your contention.

**ANSWER:**

OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks information outside of the relevant time period and subject matter for this litigation. Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request. Defendant further objects to the use of the term, "dangers/potential dangers of any type" and the definition for "asbestos-containing materials" and "asbestos containing products" as they are vague and ambiguous and/or compound.

Subject to and without waiving the objections, the U.S. Government controlled the content of any/all warnings and labels on packaging materials and in manuals related to aviation engines and any replacement parts.   Numerous warnings relating to potential hazards from the operation and maintenance, repair, and overhaul of Pratt & Whitney J57-P-19W military engines were written, published, and/or approved by the U.S. military for placement into Air Force manuals for the engines. During the relevant time period, none of these warnings pertained to the use or handling of the chrysotile-containing components identified in Response to Interrogatory No. 10, as the U.S. Air Force, which had its own sophisticated and robust health and safety program, and the international medical and scientific community did not identify or suspect any hazard associated with work involving these products with respect to the maintenance and repair of aviation engines that powered U.S. combat aircraft..

**Interrogatory No. 21:** Describe each and every way in which you contend that the federal government (including any officer, agent, agency or department thereof) directed, participated in, and/or otherwise influenced the design of any and/or all materials, products and equipment as described in Interrogatory Nos. 9-13, including but not limited to the use of asbestos.

**ANSWER:**

Pursuant to its contract with the U.S. Government, Pratt & Whitney performed all aspects of its design and manufacture of the J57-P-19W military aircraft engines supplied to the U.S. Air Force, under the immediate oversight of the U.S. military. The U.S. military reviewed and approved or rejected engineering and design proposals from Pratt & Whitney for these engines. This oversight and approval process was exercised through contract documents, design and construction drawings, written specifications, and personal oversight of Pratt & Whitney's work by military engineers, military inspectors and military specialists who were resident on-site at Pratt & Whitney. No aspect of the development, manufacture, and testing of the J57-P-19W engines intended for use by the Air Force escaped this close supervision and oversight. The U.S. military and its engineers engaged in a thorough review of the drawings, schematics, model specifications, and engineering data and had to approve the drawings before production of the engines could commence. The U.S. military was fully aware of all the materials used in Pratt & Whitney J57-P-19W aircraft engines, including the above-identified chrysotile-containing gaskets and clamps, and the use of these components was either mandated by the U.S. military or was reviewed and approved by the U.S. military and its engineers.  For many component parts, including gaskets and clamps, the U.S.

military approved and provided detailed specifications for standardized parts that it required, by contract, to be used in the design of the engine and provided a qualified products list where such component parts could be obtained from pre-qualified manufacturers and suppliers.

**Interrogatory No. 22**: State whether, at any time, you or any person on your behalf conducted any test, study or other analysis concerning possible safety or health hazards of your asbestos- containing products or of any substantially similar product and, if so, describe the nature and results of each test, study, or analysis, state when it was performed, identify each person who performed it, and identify each document that refers to it.

**ANSWER:**

An assessment was performed by Dr. Steven Mlynarek, Ph.D., in 2006 regarding the potential release of asbestos fibers during overhaul and maintenance work on Pratt & Whitney jet aviation engines.  Dr. Mlynarek prepared a written report, dated May 9, 2007.  The results showed overhaul and maintenance work on the engines generated release of chrysotile fibers at or below ambient levels.  Copies of the full and published versions of the report have previously been provided to Plaintiff's counsel.

**Interrogatory No. 23**:  Identify any and all information concerning the hazards and/or health effects of asbestos—regardless of whether you agree with the substance of the same—which you received or of which you are aware, including the time and manner at/in which you became aware of the same.

**ANSWER**:

OBJECTION. This request assumes facts and is vague and ambiguous, compound, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks information outside of the products of Defendant allegedly at issue and outside of the relevant time period. Defendant further objects to the use of the term, "hazards and/or health effects of asbestos," as it is vague and ambiguous.

Subject to and without waiving the objections, Defendant responds as follows: As it relates to Pratt & Whitney's awareness of potential asbestos-related hazards, the scientific and medical body of knowledge relevant to this interrogatory has undergone continual evolution from the early part of the 1900's until present day.  The specifics of exactly when and how Pratt & Whitney acquired such knowledge or awareness are not reasonably ascertainable, but it is probable that it came from the media, government publications or other public documents, reports, studies and journals.

In the 1950s, the Walsh-Healey Act required government contractors, like Pratt & Whitney, to keep asbestos dust levels below 5 mppcf.  Pratt & Whitney would have been aware of the Walsh-Healey Act requirements and has found no information or evidence to suggest it was ever out of compliance with those requirements.

Although the precise first date is not known, based on the currently available information Pratt and Whitney knows that it was conducting air monitoring for asbestos by 1959 and understood that asbestosis was being linked to some occupations involving certain

types of asbestos and certain types of products, such as miners and millers of asbestos. During this same timeframe, Pratt & Whitney understood that the ACGIH had studied this issue and published levels of occupational exposure to asbestos that would not result in disease.

Pratt & Whitney does not know the exact year or date when it first learned of the potential for exposure to asbestos to cause lung cancer or mesothelioma. Pratt & Whitney has determined that it received documents in 1968 that address the potential for both lung cancer and mesothelioma in certain trades working with certain fiber types. With respect to lung cancer, Pratt & Whitney understands there was some discussion of a potential association in certain high dust occupations, such as those involving textile workers, that began in the middle part of the 1950's. With respect to mesothelioma, Pratt & Whitney is aware that there was some discussion in the early 1960's of the potential for mesothelioma in individuals exposed to high doses of certain fiber types. Studies appeared in the literature in the latter part of the 1960s suggesting a link between mesothelioma and certain occupations, like thermal insulators, and types of asbestos, like amphibole asbestos.

**Interrogatory No. 24:**  Set forth the factual basis for any defenses or claims (including but not limited to *Fabre* claims, theories of alternative causation, claims of misidentification, sophisticated user / intermediary, misuse, contributory negligence etc.) you have asserted or intend to assert in in this case, and identify all documents, including transcripts and other documents, that you claim support each such defense or claim.

**ANSWER:**

OBJECTION. This request is vague and ambiguous, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request in that it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes. Defendant further objects to this request to the extent it seeks the premature disclosure of expert witness information. Defendant further objects on the basis that this interrogatory seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to this interrogatory to the extent that it seeks technical data and other information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations. Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

Subject to and without waiving the objections, Defendant responds that it has denied all of the charging allegations contained in Plaintiff's Complaint and the allegations of general damage and injuries sustained in this matter.  Defendant denies that it is responsible for any act or omission that may have caused or contributed to Plaintiff's claimed injuries or damages in this action. Defendant further states with respect to all of its affirmative defenses as follows:

To the best of its knowledge, and after good faith effort and reasonable inquiry, Plaintiff has no witnesses, documents, or admissible evidence to show that he inhaled any asbestos fibers released from an asbestos-containing component made or supplied by Defendant.  Moreover, Defendant did not own, operate, manage, maintain or control the premises, products or activities of Plaintiff or his employers, or any of the co-defendants; Defendant was not an agent or employee of any of the co-defendants.  Defendant did not design, manufacture, sell, market or place into the stream of commerce any products which caused or contributed to the injuries alleged by Plaintiff.  Defendant breached no warranties. Defendant was not negligent in any fashion.  Discovery to date has established that Plaintiff cannot identify any admissible evidence that establishes that Defendant manufactured or supplied any equipment or products to any employer or location that released fibers which substantially increased his risk of contracting mesothelioma.  Defendant denies that Plaintiff has an asbestos-related injury, and denies that it caused or contributed to his alleged injury, which will be established through expert opinion based on the relevant industrial hygiene, epidemiological, and medical science.  If Plaintiff's alleged injury is attributable to an asbestos-related illness, which Defendant disputes, it was not caused by this Defendant. Defendant further states that Plaintiff admitted in responses to written discovery and through his deposition and the deposition of Jimmy Estes that he was "exposed" to asbestos attributable to products for which this Defendant is not liable.  Defendant also believes that the evidence will show that Plaintiff and the U.S. Air Force were sophisticated users or purchasers with respect to asbestos-containing products, and if there was any duty to warn (which Defendant disputes), Plaintiff and the U.S. Air Force failed to follow warnings, would not have followed warnings, assumed the risk, and failed to mitigate any harm. Defendant's products were not the cause or a significant or substantial factor in causing or contributing to any injury to Plaintiff. Defendant is immune from prosecution for the allegations against it as a military contractor under the *Boyle* case and has established that it has met all three prongs of the analysis and law set forth by the U.S. Supreme court in the *Boyle* case as set forth above and herein in these responses.

Defendant has made a diligent search and a reasonable inquiry in an effort to comply with this interrogatory. Defendant is currently unaware of any responsive documents other than discovery produced in this case such as written discovery responses, medical, employment, and military records, and testimony by or on behalf of Plaintiff in this lawsuit, the written discovery responses of Defendant in this lawsuit, the depositions of John C. Sumner and Judy M. Harvey in *Lorna M. Walek, individually and as successor-in-interest to John J. Finazzo, et al. v. 3M Company, et al.*, and the engine study performed by Steven Mlynarek, Ph.D., a copy of the report for which has previously been provided to Plaintiff's counsel.

Defendant's investigation is ongoing, and Defendant reserves the right to amend and/or supplement this response in the future.

**Interrogatory No. 25:**  State when you first became aware of any lawsuit or other claim based upon an allegation that a defect in the type of equipment and/or asbestos-containing

products/materials you manufactured, sold, distributed or supplied was a cause of any personal injury, death, or property damage and identify the date and location of the incident involved in the lawsuit or claim, the product(s) involved and the nature of the defect alleged; the parties to the lawsuit or claim, and, if a lawsuit, the court, case caption, and docket number.  This request is not limited to only those claim(s)/lawsuit(s) that you were named as a direct defendant.

<u>**ANSWER**</u>:

<u>OBJECTION</u>. This request is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks information outside of the products of Defendant allegedly at issue and outside of the relevant time period. Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request.

Subject to and without waiving the objections, as to asbestos-related personal injury lawsuits, Defendant currently believes it first received notice of a claimed injury related to a Pratt & Whitney aviation engine component on October 21, 1998, in the James Ramirez matter, Alameda County Superior Court Case No. 803256-6.  Plaintiff was represented by Kazan, McLain, Edises, Simon and Abrams, 171 Twelfth Street, Oakland, California 94607.

Defendant's investigation is ongoing, and Defendant reserves the right to amend and/or supplement this response in the future.

## <u>RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS</u>

<u>**Request for Production No. 1:**</u> Produce any and all documents referred to or identified in your Answers to Interrogatories (providing a privilege log if necessary).  These documents are to be produced by group and labeled to correspond to the interrogatory response in which they are identified.

<u>**RESPONSE**</u>:

<u>OBJECTION</u>. This request is vague and ambiguous, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request in that it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes.  Defendant further objects to this request to the extent it seeks the premature disclosure of expert witness documents and/or information. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export

15

Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations. Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

Subject to and without waiving the objections, Defendant refers to pleadings and discovery produced on all parties in this case and responds that a copies of the full report and published version for the engine study performed by Steven Mlynarek, Ph.D., have previously been produced to Plaintiff's counsel. Additionally, please see documents produced by Defendant.

Defendant is prohibited from producing copies of manuals or parts catalogs in its possession for Pratt & Whitney J57-P-19W engines since these documents are the property of the U.S. Air Force and cannot be disseminated without its express permission.

**Request for Production No. 2:** Produce any and all documents which support any statement or claim made in your Answers to Interrogatories (providing a privilege log if necessary). These documents are to be produced by group and labeled to correspond to the interrogatory response in which they are identified.

**RESPONSE:**

OBJECTION. This request is vague and ambiguous, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request in that it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes. Defendant further objects to this request to the extent it seeks the premature disclosure of expert witness documents and/or information. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations. Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

Subject to and without waiving the objections, please see documents produced by Defendant.

16

Defendant is prohibited from producing copies of manuals or parts catalogs in its possession for Pratt & Whitney J57-P-19W engines since these documents are the property of the U.S. Air Force and cannot be disseminated without its express permission.

**Request for Production No. 3:** Produce any and all documents reviewed and analyzed to confirm or verify your Answers to Interrogatories (providing a privilege log if necessary). These documents are to be produced by group and labeled to correspond to the interrogatory response in which they are identified.

**RESPONSE:**

OBJECTION. This request is vague and ambiguous, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request in that it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes.  Defendant further objects to this request to the extent it seeks the premature disclosure of expert witness documents and/or information. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations.  Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

Subject to and without waiving the objections, please see documents produced by Defendant.

Defendant is prohibited from producing copies of manuals or parts catalogs in its possession for Pratt & Whitney J57-P-19W engines since these documents are the property of the U.S. Air Force and cannot be disseminated without its express permission.

**Request for Production No. 4:** Produce all documents used, relied upon or referred to in responding to the foregoing Answers to Interrogatories (providing a privilege log if necessary). These documents are to be produced by group and labeled to correspond to the interrogatory response in which they are identified.

**RESPONSE:**

OBJECTION. This request is vague and ambiguous, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request in that it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney

work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes.  Defendant further objects to this request to the extent it seeks the premature disclosure of expert witness documents and/or information. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations.  Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

Subject to and without waiving the objections, please see documents produced by Defendant.

Defendant is prohibited from producing copies of manuals or parts catalogs in its possession for Pratt & Whitney J57-P-19W engines since these documents are the property of the U.S. Air Force and cannot be disseminated without its express permission.

**Request for Production No. 4:** Produce all documents that are the subject of or otherwise concern in any manner the foregoing interrogatories (providing a privilege log if necessary).  These documents are to be produced by group and labeled to correspond to the interrogatory response in which they are identified.

**RESPONSE:**

[DUPLICATE NUMBERING OF REQUEST IN ORIGINAL]

OBJECTION. This request is vague and ambiguous, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request in that it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes.  Defendant further objects to this request to the extent it seeks the premature disclosure of expert witness documents and/or information. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations.  Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt &

18

Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

Subject to and without waiving the objections, please see documents produced by Defendant.

Defendant is prohibited from producing copies of manuals or parts catalogs in its possession for Pratt & Whitney J57-P-19W engines since these documents are the property of the U.S. Air Force and cannot be disseminated without its express permission.

**Request for Production No. 5:** All statements (as that term is used in Fed. R. Civ. P. 26(b)(3)(C)) which were previously made by you and any of your present or former directors, officers, or employees, concerning the action or its subject matter.

**RESPONSE:**

OBJECTION. This request is vague and ambiguous, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request in that it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes. Defendant further objects to this request to the extent it seeks the premature disclosure of expert witness documents and/or information. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations. Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

**Request for Production No. 6:** All documents (including, but not limited to, fee agreements, reports, and correspondence) provided to, received from, or prepared by each witness identified by you in connection with the disclosures required by Fed. R. Civ. P. 26(a)(2)(A).

**RESPONSE:**

OBJECTION. This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request in that it seeks information and/or documents protected from disclosure by the

attorney-client privilege and/or the attorney work product doctrine and/or seeks the premature disclosure of expert witness documents and/or information. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure.

Subject to and without waiving the objections, Defendant responds that it will produce the requested materials during the normal course of expert witness discovery in this matter.

**Request for Production No. 7:** All documents concerning any agreement, formal or informal, pursuant to which the liability of any person or any entity for damage arising out of the occurrence which is the subject matter of this lawsuit has been limited, reduced, or released in any manner. This request includes all agreements by one party or person to indemnify another party or person for claims asserted in this litigation.

**RESPONSE:**

OBJECTION. This request assumes facts and is vague and ambiguous, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request in that it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to the use of the term, "occurrence," as it is vague and ambiguous.

Subject to and without waiving the objections, Defendant responds that it is currently unware of any such agreement.

**Request for Production No. 8:** All insurance policies under which a person carrying on an insurance business might be liable to pay to you or on your behalf all or part of the damages sought in this action.

**RESPONSE:**

OBJECTION.  This request assumes facts and is vague, ambiguous and overly broad, unduly burdensome and oppressive. Defendant additionally objects to this request to the extent that it is irrelevant and unlikely to lead to the discovery of admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure.

Subject to and without waiving said objections, Defendant states it has sufficient assets to cover the claims made by Plaintiff in this matter.

**Request for Production No. 9:** All documents received from or provided to any other party to this action or received from any third-party since the filing of the Complaint,

whether provided informally or in response to a formal request.  All documents referred to in the Complaint and
other pleadings, as the word "pleadings" is defined in Fed. R. Civ. P. 7(a).

**RESPONSE:**

OBJECTION. This request is compound, vague and ambiguous, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request in that it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure.

Subject to and without waiving the objections, Defendant responds that it is currently unware of any responsive documents.

**Request for Production No. 10:** All documents concerning any lawsuits and/or other actions (*e.g.*, workers compensation proceedings) in which asbestos-related injuries were alleged that you had knowledge of and/or were informed of between 1955 and 1990.  A complete response to this request would include all documents relating to information you received from others, such as but not limited to individuals alleging asbestos-related injuries, fellow industry members, entities that manufactured and/or otherwise supplied you with products you sold and/or rebranded etc.

**RESPONSE:**

OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period. Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request. Defendant additionally objects to this request in that it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure.

Subject to and without waiving the objections, as to asbestos-related personal injury lawsuits, Defendant is currently unaware of any responsive documents from prior to 1990.

**Request for Production No. 11:** All documents of any nature whatsoever, including, but not limited to, purchase orders, invoices, contracts, shipping records, accounting records, order books, account books, contract books, drawings inventory records, specification standards, engineering standards, or sales and/or supplies ledgers of you, any predecessor or

related entity, which relate to the supply of any products, including, but not limited to, any and all products/equipment that are the subject of the foregoing interrogatories.

    **RESPONSE:**

    OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period.  Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request.  Defendant additionally objects to this request to the extent that it seeks documents and/or information protected by attorney-client privilege and/or the attorney work product doctrine.  Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations.  Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

**Request for Production No. 12:** Any and all documents referring to, relating to, and/or comprising communications to/from you and the United States Air Force and/or any entity involved in the construction of Air Force aircraft or equipment for Air Force aircraft concerning the design, manufacture, specification, function, operation, delivery and/or shipment of Air Force aircraft and / or equipment/products used in/on Air Force aircraft.

    **RESPONSE**:

    OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period.  Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request. Defendant additionally objects to this request to the extent that it seeks documents and/or information protected by attorney-client privilege and/or the attorney work product doctrine.

Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations. Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

**Request for Production No. 13:** Any and all parts, operation, repair, maintenance, service, or similar manuals, instruction books, engineering diagrams, correspondence, or other documents relating to the products/equipment that are the subject of the foregoing interrogatories.

      **RESPONSE**:

      OBJECTION.  This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period.  Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request.  Defendant additionally objects to this request to the extent that it seeks documents and/or information protected by attorney-client privilege and/or the attorney work product doctrine.  Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations.  Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession

relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

**Request for Production No. 14:** Any and all parts, operation, repair, maintenance, service, or similar manuals, instruction books, engineering diagrams, correspondence, or other documents relating to the products/equipment that you supplied to the commercial market.

 **RESPONSE**:

  OBJECTION.  This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period.  Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request.  Defendant additionally objects to this request to the extent that it seeks documents and/or information protected by attorney-client privilege and/or the attorney work product doctrine.  Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure.

**Request for Production No. 15:**  All documents relating to the purchase of component parts containing asbestos-containing materials manufactured by others and utilized in or on Defendant's equipment, including, but not limited to, purchase orders, requisitions, shipping receipts, canceled checks, ledgers, approved invoices, and the like with respect to products/equipment that are the subject of the foregoing interrogatories.

 **RESPONSE**:

  OBJECTION.  This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period.  Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request.  Defendant additionally objects to this request to the extent that it seeks documents and/or information protected by attorney-client privilege and/or the attorney work product doctrine.  Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure.

  Subject to and without waiving the objections, Defendant responds that it is currently unaware of any responsive documents for the J57-P-19W components identified in Response to Interrogatory No. 10 during or prior to the relevant time period.

**Request for Production No. 16:** All documents which identify the manufacturer(s) and source(s) or supplier(s) of asbestos and/or asbestos-containing materials present in, incorporated in, applied to, utilized in or added to any and all equipment/products that are the subject of the foregoing interrogatories.

    **RESPONSE**:

    OBJECTION.  This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period.  Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request.  Defendant additionally objects to this request to the extent that it seeks documents and/or information protected by attorney-client privilege and/or the attorney work product doctrine.  Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure.

    Subject to and without waiving the objections, Defendant responds that it is currently unaware of any responsive documents for the J57-P-19W components identified in Response to Interrogatory No. 10 during or prior to the relevant time period.

**Request for Production No. 17:**  All agreements, correspondence, or communications between you and the manufacturer(s) and/or supplier(s) of the asbestos and/or asbestos-containing materials present in, incorporated in, applied to, utilized in or added to the equipment/products that are the subject of the foregoing interrogatories.

    **RESPONSE**:

    OBJECTION.  This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period.  Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request.  Defendant additionally objects to this request to the extent that it seeks documents and/or information protected by attorney-client privilege and/or the attorney work product doctrine.  Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure.

    Subject to and without waiving the objections, Defendant responds that it is currently unaware of any responsive documents for the J57-P-19W components identified in Response to Interrogatory No. 10 during or prior to the relevant time period.

**Request for Production No. 18:**   All salesmen's logs, sales invoices, specifications, purchase orders, shipping logs, packing logs, bills of lading, distributor documents or other similar documents relating to the supply of asbestos-containing replacement parts for use in the manufacture, construction, installation or maintenance of your equipment for use and/or installation in/on the aircraft at issue.

**RESPONSE**:

OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period.  Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request. Defendant additionally objects to this request to the extent that it seeks documents and/or information protected by attorney-client privilege and/or the attorney work product doctrine. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to the definition of "aircraft at issue" as it is vague and ambiguous and overly broad.

Subject to and without waiving the objections, Defendant responds that it is currently unaware of any responsive documents for the J57-P-19W components identified in Response to Interrogatory No. 10 during or prior to the relevant time period.

**Request for Production No. 19:**   All salesmen's logs, sales invoices, specifications, purchase orders, shipping logs, packing logs, bills of lading, distributor documents or other similar documents relating to the supply of asbestos-containing replacement parts for use in the manufacture, construction, installation or maintenance of equipment you supplied to the United States Air Force and/or any of the worksites at issue.

**RESPONSE**:

OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period.  Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request. Defendant additionally objects to this request to the extent that it seeks documents and/or information protected by attorney-client privilege and/or the attorney work product doctrine. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense

26

Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations. Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

Subject to and without waiving the objections, Defendant responds that it is currently unaware of any responsive documents for the J57-P-19W components identified in Response to Interrogatory No. 10 during or prior to the relevant time period.

**Request for Production No. 20:**   All specifications and other documents that suggest, identify, or contain a designation for any type of asbestos-containing materials to be used in the manufacture and/or construction of any piece of equipment and any replacement parts thereto that are the subject of the foregoing interrogatories.

**RESPONSE**:

OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period.  Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request. Defendant additionally objects to this request to the extent that it seeks documents and/or information protected by attorney-client privilege and/or the attorney work product doctrine. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations. Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

**Request for Production No. 21:**  All revisions, amendments and/or subsequent iterations of any specifications that identified, or contained a designation for any type of asbestos-containing materials to be used in the manufacture and/or construction of any piece of equipment and any replacement parts thereto that are the subject of the foregoing interrogatories. This request includes any revisions, amendment and/or subsequent iterations that continued to include asbestos- containing materials or which reflect or call for use of an asbestos-free alternative.

RESPONSE:

OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period.  Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request. Defendant additionally objects to this request to the extent that it seeks documents and/or information protected by attorney-client privilege and/or the attorney work product doctrine. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations. Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

**Request for Production No. 22:**  All drawings and/or design or engineering documents that identify, or contain a designation for any type of asbestos-containing materials to be used in the manufacture and/or construction of any piece of equipment and any replacement parts thereto that are the subject of the foregoing interrogatories.

RESPONSE:

OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period.  Such overbroad and

burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request. Defendant additionally objects to this request to the extent that it seeks documents and/or information protected by attorney-client privilege and/or the attorney work product doctrine. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations. Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

**Request for Production No. 23:**  All revisions, amendments and/or subsequent iterations of any drawings and/or design or engineering documents that identified, or contained a designation for any type of asbestos-containing materials to be used in the manufacture and/or construction of any piece of equipment and any replacement parts thereto that are the subject of the foregoing interrogatories. This request includes and revisions, amendment and/or subsequent iterations that continued to include asbestos-containing materials or which reflect or call for use of an asbestos- free alternative.

**RESPONSE**:

OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period. Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request. Defendant additionally objects to this request to the extent that it seeks documents and/or information protected by attorney-client privilege and/or the attorney work product doctrine. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration

Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations. Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

**Request for Production No. 24:**  All documents pertaining to or comprising indices, keys, parts lists and/or descriptions of materials, products and/or other components used in your equipment / products that are identified on drawings or in other documents by numbers, codes or other designations.

**RESPONSE**:

OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period.  Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request. Defendant additionally objects to this request to the extent that it seeks documents and/or information protected by attorney-client privilege and/or the attorney work product doctrine. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations. Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

**Request for Production No. 25:**  All documents relating to the maintenance, removal and replacement of asbestos-containing materials or component parts pertaining to your equipment/products.

**RESPONSE**:

OBJECTION.  This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period.  Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request.  Defendant additionally objects to this request to the extent that it seeks documents and/or information protected by attorney-client privilege and/or the attorney work product doctrine.  Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations.  Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

**Request for Production No. 26:** All material safety data sheets in any form (draft and final versions) concerning your products/equipment that you provided or which were provided on your behalf at any time through 1995.

**RESPONSE**:

OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period.  Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request. Defendant additionally objects to this request to the extent that it seeks documents and/or information protected by attorney-client privilege and/or the attorney work product doctrine. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control

Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations. Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

Subject to and without waiving the objections, Defendant responds that it is currently unaware of any responsive documents for the J57-P-19W components identified in Response to Interrogatory No. 10 during or prior to the relevant time period.

**Request for Production No. 27:** If you have ever provided any warnings or advisements to any individuals or entities that you sold or otherwise provided your equipment/products to concerning the potential hazards of asbestos from work with and/or around your equipment/products, please produce all documents concerning any such warnings or advisements.

**RESPONSE**:

OBJECTION.  This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period.  Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request. Defendant further objects to this request to the extent it assumes there was a duty to warn. Defendant additionally objects to this request to the extent that it seeks documents and/or information protected by attorney-client privilege and/or the attorney work product doctrine.  Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to this request to the extent that it seeks technical documents or related information which may be confidential pursuant to U.S. Department of Defense Directive 5230.25 and which may be subject to the export- and import-control laws and regulations of the United States, including but not limited to the U.S. Arms Export Control Act, the International Traffic in Arms Regulations ("ITAR"), the Export Administration Act, the U.S. Export Administration Regulations and/or any regulations and orders administered by the Treasury Department's Office of Foreign Assets Control Regulations.  Pursuant to the foregoing DOD directive and export control laws and regulations, Defendant is unable to disclose any restricted technical documents or related information in its possession that relate to Pratt & Whitney aviation engines designed and/or manufactured for the U.S. military without express permission from the U.S. government to do so, and Defendant cannot disclose any other export-controlled technical data or documents in its possession relating to Pratt & Whitney military aviation engines without an appropriate protective order in place.

Subject to and without waiving the objections, Defendant responds that it is currently unaware of any responsive documents for the J57-P-19W components identified in <u>Response to Interrogatory No. 10</u> during or prior to the relevant time period.

**<u>Request for Production No. 28:</u>**   All documents relating to tests conducted by you concerning the release of asbestos fibers associated with the installation, removal, cutting, sawing, abrading, maintenance, replacement or otherwise working with asbestos-containing materials used in the manufacture, construction, installation and/or maintenance of your equipment.

**<u>RESPONSE</u>**:

OBJECTION. This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period.  Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request. Defendant further objects to the use of the term, "release of asbestos fibers," as it is vague and ambiguous.

Copies of the full and published versions of the report for Dr. Mlynarek's engine study have previously been provided to Plaintiff's counsel.

**<u>Request for Production No. 29:</u>** All documents referring to, relating to, and / or reflecting Defendant's complete corporate history, including its ownership, sale, acquisition, divestiture, and any mergers, acquisitions, consolidations, or other similar events involving Defendant at any time during its history.

**<u>RESPONSE</u>**:

OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period. Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request. Defendant additionally objects to this request in that it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant is a publicly traded company and, therefore, Defendant further objects to this request to the extent that it seeks documents that are part of the public domain and, therefore, equally available to Plaintiff.

33

**Request for Production No. 30:** For each of the entities at issue, produce all documents concerning your relationship with each entity. This includes but is not limited to when and how your relationship with each such entity began and ended, when you first contracted to conduct business with and/or obtained from / supplied product to from each entity, meetings, visits or other communications you had with each entity during which product design and/or asbestos was discussed or information concerning same was provided, to include by date, each such meeting, visit or other communication, the content of the discussions or information provided during each meeting, visit or other communication. This request further encompasses all asbestos-related communications, such as but not limited to correspondence, sales reports, call reports, literature, publications, warnings, your asbestos policy/ies (whether formal or informal), communications concerning the design/engineering of your products & their packaging and any changes to same, claims or allegations of asbestos-related injuries, and hazards or potential hazards of asbestos etc.

**RESPONSE**:

OBJECTION.  This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period. Such overbroad and burdensome inquiries are clearly beyond the scope of permissible discovery and this request should be tailored to the specific facts of this case, as known to date, to avoid the undue burden and prejudice in requiring a response to such an unnecessarily overly broad request. Defendant additionally objects to this request in that it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant is a publicly traded company and, therefore, Defendant further objects to this request to the extent that it seeks documents that are part of the public domain and, therefore, equally available to Plaintiff.

## VERIFICATION

I, John C. Sumner, declare as follows:

I am authorized to make this verification for and on behalf of Defendant RAYTHEON TECHNOLOGIES CORPORATION, formerly known as UNITED TECHNOLOGIES CORPORATION ("RTC"), and I make this verification for that reason.

The information set forth in DEFENDANT RAYTHEON TECHNOLOGIES CORPORATION'S RESPONSES TO PLAINTIFFS' INTERROGATORIES (the "Responses") was gathered and collected by persons with knowledge of RTC's various records and files which are kept by RTC in the regular and ordinary course of its business. The persons who have gathered and collected this material have reported to me that the Responses truly and correctly reflect the information gathered and the contents of said records and files. Accordingly, I state that the Responses are true and correct according to my knowledge, RTC's records and files and the information transmitted to me as described above.

I declare under penalty of perjury under the laws of the State of Connecticut that the foregoing is true and correct and that this Verification was executed on June _15_, 2023, at Granby, Connecticut.

John C. Sumner, Declarant

# Exhibit C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

TERRI D. COLE,
Personal Representative                                    CASE NO. 0:22-cv-62225-RKA
of the Estate of WINFRED L. CROSBY,

       Plaintiff,

vs.

BASF CORPORATION, *et. al.*,

       Defendants,

_____

**PLAINTIFF'S FOURTH AMENDED NOTICE OF VIDEOTAPED DEPOSITION**
**OF DEFENDANT RAYTHEON TECHNOLOGIES CORPORATION, F/K/A UNITED**
**TECHNOLOGIES CORPORATION**
**(Date Change Only)**

      PLEASE TAKE NOTICE that Plaintiff, Terri D. Cole, Personal Representative of the

Estate of Winfred L. Crosby, by and through her undersigned counsel, and pursuant to Fed. R. Civ.

P. 30, the Local Rules of this Court and other applicable rules and statutes, will take the

videotaped/audiovisual deposition upon oral examination of the 30(b)(6) designee(s) of Raytheon

Technologies Corporation, f/k/a United Technologies Corporation ("Raytheon" or "Defendant")

on December 5, 2023, commencing at 10:00 a.m. (ET) before Paszkiewicz Court Reporting or

another officer appointed or designated under Rule 28.  The deposition will take place via

Zoom/remote means through the following link:

Join Zoom Meeting
https://us06web.zoom.us/j/87128456899?pwd=VMDdFoFhgmuEj4orwiEg8A9kqO2Dsc.1

Meeting ID: 871 2845 6899
Passcode: 425053

Dial by your location
877 853 5247 US Toll-free

- 1 -

The deponent is required to appear on the appointed date and time and the deposition will be recorded by audio, audiovisual and stenographic means, continuing from day-to-day until complete.

PLEASE TAKE NOTICE that this Notice of Deposition requires the deponent(s) to testify about all information known or reasonably available to Defendant regarding matters relevant to this this action, including but not limited to the topics set forth in the attached "Schedule/Attachment A."  PLEASE TAKE FURTHER NOTICE that Defendant is to produce the documents, items and things requested in "Schedule/Attachment B," attached hereto and incorporated herein with this Notice of Deposition.

Plaintiff reserves the right to use this videotaped deposition at trial in the above-captioned matter in lieu of live trial testimony, or in addition to live trial testimony, and/or for any purpose permitted under the Federal Rules of Civil Procedure and Rules of Evidence.

Respectfully submitted,

*/s/ Rebecca S. Vinocur*
**Rebecca S. Vinocur**
Florida Bar No. 0529915
Rebecca S. Vinocur, P.A.
5915 Ponce de Leon Blvd., Suite 14
Coral Gables, FL 33146
Telephone: (786) 691-1282
Facsimile: (786) 691-1283
Email: rvinocur@rsv-law.com
**Attorneys for Plaintiff**

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of November 2023, I served a copy of the foregoing pleading on all known counsel to this proceeding, by electronic transmission, facsimile, and/or mailing the same by United States mail, properly addressed, and first-class postage prepaid.

*/s/ Rebecca S. Vinocur*
Rebecca S. Vinocur

### *SCHEDULE/ATTACHMENT A*

### AREAS OF INQUIRY

Plaintiff makes the following designation of matters on which examination is requested:

1.      The information requested in the Interrogatories and Request for Production of Documents served by Plaintiff in this case, attached as "Exhibit 1" hereto.

### *SCHEDULE/ATTACHMENT B*

### REQUEST FOR PRODUCTION OF DOCUMENTS

1.  All documents referring to, relating to and / or reflecting the information that is the subject of Area of Inquiry No. 1 above.

2.  All documents requested in the Requests for Production served by Plaintiff in this case, attached as "Exhibit 1" hereto.

3.  Any documents used to refresh the recollection of the designated witness and/or to prepare that person to testify.  This includes any and all documents or testimony that the deponent has ever reviewed concerning the areas of inquiry listed herein, including but not limited to any indices, lists, spreadsheets or other type of document whether maintained in excel, hard-copy, electronic format or in any other format via any means.

4.  All sworn, signed or substantially verbatim statements that reflect, evidence or embody information concerning the Areas of Inquiry above.

5.  The deponent's resume/curriculum vitae.

6.  All documents regarding the authenticity of any business records and/or other documents produced by Defendant in this case and/or in other asbestos litigation.

7.  All deposition/trial transcripts of any corporate representatives of Defendant taken in connection with asbestos litigation and/or matters relating to asbestos-related injury.

8.  All deposition/trial transcripts of any of Defendant's current/former employees or agents taken in connection with asbestos litigation and/or matters relating to asbestos-related injury.

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

TERRI D. COLE,
Personal Representative of
The Estate of Winfred L. Crosby,

                                          CASE NO: 0:22-cv-62225-RKA

       Plaintiffs,

v.

BASF CORPORATION, et al.,

       Defendants.

_____/

**DEFENDANT RTX CORPORATION F/K/A UNITED TECHNOLOGIES
CORPORATION'S NOTICE OF SERVING RESPONSES TO PLAINTIFF'S FIRST
SUPPLEMENTAL REQUEST FOR PRODUCTION OF DOCUMENTS**

Defendant, RTX Corporation f/k/a United Technologies Corporation ("RTX" or "Defendant"), by and through undersigned counsel, pursuant to Fed. R. Civ. P. 33 and 34, gives notice that Defendant's Responses to Plaintiff's Supplemental Request for Production of Documents have been served on all counsel of record.

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via Electronic Mail, to all counsel of record, this 16th day of November, 2023.

                                         **LUKS, SANTANIELLO,
PETRILLO, COHEN & PETERFRIEND**
*Attorneys for Defendant Raytheon Technologies Corporation f/k/a United Technologies Corporation*
150 West Flagler Street - 26th Floor
Miami, FL  33130
Telephone:  (305) 377-8900
Facsimile:  (305) 377-8901

By:  _/s/ Stuart Cohen_

1

Stuart L. Cohen
scohen@insurancedefense.net
Florida Bar No. 0927066
John C. Reddin
Florida Bar No.: 1025086
jreddin@insurancedefense.net

<u>**RESPONSES TO PLAINTIFF'S FIRST SUPPLEMENTAL REQUEST FOR PRODUCTION OF DOCUMENTS**</u>

<u>**Supplemental Request for Production No. 1**</u>: All documents comprising any written statements by individuals other than Winfred Crosby that pertain to him, his family, any co-workers, the locations he worked at, products he worked with, where he lived and/or the allegations in this lawsuit.

    <u>**RESPONSE:**</u>

    <u>OBJECTION</u>. This request is compound, vague and ambiguous, overly broad, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. There has been no attempt to limit the scope of this request to the subject matter of this litigation or to a relevant time period. Defendant additionally objects to this request as it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes. Defendant further objects to this request to the extent it seeks the premature disclosure of expert witness documents and/or information.

<u>**Supplemental Request for Production No. 2:**</u> All documents reflecting the identity of persons you believe to have knowledge of the facts alleged in the Complaint in this case, your Answer and / or any affirmative defenses asserted by you, including but not limited to declarations, affidavits, interview notes, names and contact information.

    <u>**RESPONSE:**</u>

    <u>OBJECTION</u>. This request is compound, vague and ambiguous, overly broad, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request as it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes. Defendant further objects to this request to the extent it seeks the premature disclosure of expert witness documents and/or information.

    Subject to and without waiving the objections, Defendant is not aware of any documents other than those identified and/or produced in this case.

<u>**Supplemental Request for Production No. 3:**</u>  All documents concerning communications you or your counsel have had with any persons you believe to have knowledge of the facts alleged in the Complaint in this case, your Answer and / or any affirmative defenses asserted by you.

    <u>**RESPONSE:**</u>

    <u>OBJECTION</u>. This request is vague and ambiguous, overly broad, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request as it seeks

information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes. Defendant further objects to this request to the extent it seeks the premature disclosure of expert witness documents and/or information.

**Supplemental Request for Production No. 4**: Produce all documents you contend support the affirmative defenses you have raised in this case.

>    **RESPONSE**:

>    OBJECTION. This request is vague and ambiguous, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request in that it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes. Defendant further objects to this request to the extent it seeks the premature disclosure of expert witness documents and/or information. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure.

>    Subject to and without waiving the objections, Defendant states it is currently unaware of any responsive documents other than those identified and/or produced in this case.

>    Defendant's investigation is ongoing and Defendant reserves the right to amend and/or supplement this response in the future.

**Supplemental Request for Production No. 5**: For each expert you have retained and intend to call at trial, produce all invoices paid by you or any attorney or agent acting on your behalf to said expert (or any employer of the expert) between 2000 and the present date.

>    **RESPONSE**:

>    OBJECTION. This request is vague and ambiguous, overly broad, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects to this request to the extent it seeks the premature disclosure of expert witness documents and/or information.

**Supplemental Request for Production No. 6:**   All sworn statements made by you in connection with the first 20 asbestos-related personal injury lawsuits asserted against you and / or any of your predecessors / related entities. This includes but is not limited to any answers to interrogatories, affidavits, declarations, and trial/deposition testimony.

>    **RESPONSE**:

>    OBJECTION. This request assumes facts and is compound, vague and ambiguous, overly broad, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. There has been no attempt to limit

U.S. Air Force and that cannot be disseminated without its express permission. Defendant further objects to the definitions of the terms, "asbestos-containing products" and "aircraft engines at issue," used in this discovery as they are compound and/or vague and ambiguous.

**Supplemental Request for Production No. 18:**   If you claim that any government agency, specifically including but not limited to the United States Air Force, prohibited you from providing any warnings/cautions concerning health hazards and/or the hazards of asbestos (or potential hazards of same), produce all documents that support your claim.

   **RESPONSE:**

   OBJECTION. This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period. Defendant further objects to this request on the basis that it assumes there was a basis or a duty or obligation to provide any such warnings by Pratt & Whitney. Defendant further objects to the definitions of the terms, "health hazards" and "hazards of asbestos," used in this discovery as they are compound and vague and ambiguous.

**Supplemental Request for Production No. 19:**  If you contend that the federal government (including any officer, agent, agency or department thereof) directed, participated in, and/or otherwise influenced the design of any and/or all materials, products and equipment at issue in this case, produce all documents that support your claim.

   **RESPONSE:**

   OBJECTION. This request is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to the use of the term, "materials, products and equipment at issue," as it is compound and vague and ambiguous.

   Subject to and without waiving the objections, please see documents previously produced by Defendant in this matter.

   Defendant's investigation is ongoing and Defendant reserves the right to supplement this response in the future.

**Supplemental Request for Production No. 20:**   All documents concerning your communications with the U.S. government, specially including but not limited to the United States Air Force, concerning the aircraft issue.

   **RESPONSE:**

OBJECTION. This request is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to the definition of the term, "aircraft at issue," used in this discovery as it is vague and ambiguous.

Subject to and without waiving the objections, please see documents previously produced by Defendant in this matter.

Defendant's investigation is ongoing and Defendant reserves the right to supplement this response in the future.

**Supplemental Request for Production No. 21:** All documents concerning your communications with the U.S. government, specifically including but not limited to the United States Air Force, concerning the aircraft engines at issue.

**RESPONSE:**

OBJECTION. This request is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to the definition of the term, "aircraft engines at issue," used in this discovery as it is vague and ambiguous.

Subject to and without waiving the objections, please see documents previously produced by Defendant in this matter.

Defendant's investigation is ongoing and Defendant reserves the right to supplement this response in the future.

**Supplemental Request for Production No. 22:** All documents concerning the specification of asbestos-containing materials in/on the aircraft at issue.

**RESPONSE:**

OBJECTION. This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant additionally objects to this request to the extent it seeks documents that are the property of the U.S. Air Force and that cannot be disseminated without its express permission. Defendant further objects to the definitions of the terms, "asbestos-containing materials" and "aircraft at issue," used in this discovery as they are compound and/or vague and ambiguous.

Subject to and without waiving the objections, Defendant states that it did not design, manufacture, or supply the Boeing B-52D aircraft at issue in this matter or any of the airframe components used in the manufacture of these aircraft and, therefore, beyond what has been identified or produced in this case, is unaware of any documents responsive to this request.

**Supplemental Request for Production No. 23**   All documents concerning the specification of asbestos-containing materials in/on the aircraft engines at issue.

**RESPONSE:**

OBJECTION. This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant additionally objects to this request to the extent it seeks documents that are the property of the U.S. Air Force and that cannot be disseminated without its express permission. Defendant further objects to the definitions of the terms, "asbestos-containing materials" and "aircraft engines at issue," used in this discovery as they are compound and/or vague and ambiguous.

Subject to and without waiving the objections, please see documents previously produced by Defendant in this matter.

Defendant's investigation is ongoing and Defendant reserves the right to supplement this response in the future.

**Supplemental Request for Production No. 24:**   All documents concerning the use of asbestos-containing materials in/on the aircraft at issue.

**RESPONSE:**

OBJECTION. This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant additionally objects to this request to the extent it seeks documents that are the property of the U.S. Air Force and that cannot be disseminated without its express permission. Defendant further objects to the definitions of the terms, "asbestos-containing materials" and "aircraft at issue," used in this discovery as they are compound and/or vague and ambiguous.

Subject to and without waiving the objections, Defendant states that it did not design, manufacture, or supply the Boeing B-52D aircraft at issue in this matter or any of the airframe components used in the manufacture of these aircraft and, therefore, is unaware of any documents responsive to this request.

**Supplemental Request for Production No. 25:**   All documents concerning the use of asbestos-containing materials in/on the aircraft engines at issue.

**RESPONSE:**

OBJECTION. This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant additionally objects to this request to the extent it seeks documents that are the property of the U.S. Air Force and that cannot be disseminated without its express permission. Defendant further objects to the definitions of the terms, "asbestos-containing materials" and "aircraft engines at issue," used in this discovery as they are compound and/or vague and ambiguous.

Subject to and without waiving the objections, please see documents previously produced by Defendant in this matter.

Defendant's investigation is ongoing and Defendant reserves the right to supplement this response in the future.

**Supplemental Request for Production No. 26:** All parts, operation, repair, maintenance, service, or similar manuals, instruction books, engineering diagrams, correspondence, or other documents in any way pertaining to asbestos-containing materials used in / on the aircraft at issue.

**RESPONSE:**

OBJECTION. This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant additionally objects to this request to the extent it seeks documents that are the property of the U.S. Air Force and that cannot be disseminated without its express permission. Defendant further objects to the definitions of the terms, "asbestos-containing materials" and "aircraft at issue," used in this discovery as they are compound and/or vague and ambiguous.

**Supplemental Request for Production No. 27:** All parts, operation, repair, maintenance, service, or similar manuals, instruction books, engineering diagrams, correspondence, or other documents in any way pertaining to asbestos-containing materials used in / on the aircraft engines at issue.

**RESPONSE:**

OBJECTION. This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant additionally objects to this request

## VERIFICATION

I, John C. Sumner, declare as follows:

I am authorized to make this verification for and on behalf of Defendant RTX CORPORATION, formerly known as UNITED TECHNOLOGIES CORPORATION ("RTX"), and I make this verification for that reason.

The information set forth in DEFENDANT RTX CORPORATION'S RESPONSES TO PLAINTIFFS' FIRST SUPPLEMENTAL REQUEST FOR PRODUCTION (the "Responses") was gathered and collected by persons with knowledge of RTX's various records and files which are kept by RTX in the regular and ordinary course of its business. The persons who have gathered and collected this material have reported to me that the Responses truly and correctly reflect the information gathered and the contents of said records and files. Accordingly, I state that the Responses are true and correct according to my knowledge, RTX's records and files and the information transmitted to me as described above.

I declare under penalty of perjury under the laws of the State of Connecticut that the foregoing is true and correct and that this Verification was executed on November _14_ , 2023, at Granby, Connecticut.

_____
John C. Sumner, Declarant

1654520.1                                   18

# Exhibit E

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

TERRI D. COLE,
Personal Representative of
The Estate of Winfred L. Crosby,

                                       CASE NO: 0:22-cv-62225-RKA

     Plaintiffs,

v.

BASF CORPORATION, et al.,

     Defendants.

_____/

## DEFENDANT RTX CORPORATION F/K/A UNITED TECHNOLOGIES CORPORATION'S NOTICE OF SERVING RESPONSES TO PLAINTIFF'S FIRST SUPPLEMENTAL REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant, RTX Corporation f/k/a United Technologies Corporation ("RTX" or "Defendant"), by and through undersigned counsel, pursuant to Fed. R. Civ. P. 33 and 34, gives notice that Defendant's Responses to Plaintiff's Supplemental Request for Production of Documents have been served on all counsel of record.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via Electronic Mail, to all counsel of record, this 8th day of December 2023.

                        **LUKS, SANTANIELLO,**
                        **PETRILLO, COHEN & PETERFRIEND**
                        *Attorneys for Defendant Raytheon Technologies Corporation f/k/a United Technologies Corporation*
                        150 West Flagler Street - 26th Floor
                        Miami, FL  33130
                        Telephone:  (305) 377-8900
                        Facsimile:   (305) 377-8901

                        By:  _/s/ Stuart Cohen_____

Stuart L. Cohen
scohen@insurancedefense.net
Florida Bar No. 0927066
John C. Reddin
Florida Bar No.: 1025086
jreddin@insurancedefense.net

<u>**RESPONSES TO PLAINTIFF'S FIRST SUPPLEMENTAL REQUEST FOR
PRODUCTION OF DOCUMENTS**</u>

<u>**Supplemental Request for Production No. 1**</u>: All documents comprising any written statements by individuals other than Winfred Crosby that pertain to him, his family, any co-workers, the locations he worked at, products he worked with, where he lived and/or the allegations in this lawsuit.

<u>**RESPONSE:**</u>

OBJECTION. This request is compound, vague and ambiguous, overly broad, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. There has been no attempt to limit the scope of this request to the subject matter of this litigation or to a relevant time period. Defendant additionally objects to this request as it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes.

Subject to and without waiving the objections, other than the reports of Defendant's expert witnesses, which have been produced to Plaintiff, and the transcript for the deposition of Decedent's coworker, James Estes, Defendant responds that it is currently unaware of any documents responsive to this request.

<u>**Supplemental Request for Production No. 2:**</u> All documents reflecting the identity of persons you believe to have knowledge of the facts alleged in the Complaint in this case, your Answer and / or any affirmative defenses asserted by you, including but not limited to declarations, affidavits, interview notes, names and contact information.

<u>**RESPONSE:**</u>

OBJECTION. This request is compound, vague and ambiguous, overly broad, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request as it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes.

Subject to and without waiving the objections, Defendant is not aware of any documents other than those identified and/or produced in this case, including Defendant's List of Expert Witnesses and its Rule 26 initial disclosures.

<u>**Supplemental Request for Production No. 3:**</u>  All documents concerning communications you or your counsel have had with any persons you believe to have knowledge of the facts alleged in the Complaint in this case, your Answer and / or any affirmative defenses asserted by you.

**RESPONSE:**

OBJECTION. This request is vague and ambiguous, overly broad, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request as it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes.

Subject to and without waiving the objections, please see the reports of Defendant's expert witnesses, which have been produced to Plaintiff's counsel.

**Supplemental Request for Production No. 4**: Produce all documents you contend support the affirmative defenses you have raised in this case.

**RESPONSE:**

OBJECTION. This request is vague and ambiguous, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request in that it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes. Defendant further objects to this request to the extent it seeks the premature disclosure of expert witness documents and/or information. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure.

Subject to and without waiving the objections, Defendant states it is currently unaware of any responsive documents other than those identified and/or produced in this case.

Defendant's investigation is ongoing and Defendant reserves the right to amend and/or supplement this response in the future.

**Supplemental Request for Production No. 5**: For each expert you have retained and intend to call at trial, produce all invoices paid by you or any attorney or agent acting on your behalf to said expert (or any employer of the expert) between 2000 and the present date.

**RESPONSE:**

OBJECTION. This request is vague and ambiguous, overly broad, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence.

Subject to and without waiving the objections, please see Defendant's List of Expert Witnesses.

**Supplemental Request for Production No. 18:**    If you claim that any government agency, specifically including but not limited to the United States Air Force, prohibited you from providing any warnings/cautions concerning health hazards and/or the hazards of asbestos (or potential hazards of same), produce all documents that support your claim.

**RESPONSE:**

OBJECTION. This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period. Defendant further objects to this request on the basis that it assumes there was a basis or a duty or obligation to provide any such warnings by Pratt & Whitney. Defendant further objects to the definitions of the terms, "health hazards" and "hazards of asbestos," used in this discovery as they are compound and vague and ambiguous.

**Supplemental Request for Production No. 19:**  If you contend that the federal government (including any officer, agent, agency or department thereof) directed, participated in, and/or otherwise influenced the design of any and/or all materials, products and equipment at issue in this case, produce all documents that support your claim.

**RESPONSE:**

OBJECTION. This request is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence.

Subject to and without waiving the objections, as to the Pratt & Whitney J57-P-19W and J57-P-29WA military engines at issue, please see documents previously produced by Defendant in this matter.

Defendant's investigation is ongoing and Defendant reserves the right to supplement this response in the future.

**Supplemental Request for Production No. 20:**    All documents concerning your communications with the U.S. government, specially including but not limited to the United States Air Force, concerning the aircraft issue.

**RESPONSE:**

OBJECTION. This request is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to the definition of the term, "aircraft at issue," used in this discovery as it is vague and ambiguous.

Subject to and without waiving the objections, please see documents previously produced by Defendant in this matter.

Defendant's investigation is ongoing and Defendant reserves the right to supplement this response in the future.

**Supplemental Request for Production No. 21:** All documents concerning your communications with the U.S. government, specifically including but not limited to the United States Air Force, concerning the aircraft engines at issue.

**RESPONSE:**

OBJECTION. This request is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence.

Subject to and without waiving the objections, as to the Pratt & Whitney J57-P-19W and J57-P-29WA military engines at issue, please see documents previously produced by Defendant in this matter.

Defendant's investigation is ongoing and Defendant reserves the right to supplement this response in the future.

**Supplemental Request for Production No. 22:** All documents concerning the specification of asbestos-containing materials in/on the aircraft at issue.

**RESPONSE:**

OBJECTION. This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant additionally objects to this request to the extent it seeks documents that are the property of the U.S. Air Force and that cannot be disseminated without its express permission. Defendant further objects to the definitions of the terms, "asbestos-containing materials" and "aircraft at issue," used in this discovery as they are compound and/or vague and ambiguous.

Subject to and without waiving the objections, Defendant states that it did not design, manufacture, or supply the Boeing B-52D aircraft at issue in this matter or any of the airframe components used in the manufacture of these aircraft and, therefore, beyond what has been identified or produced in this case, is unaware of any documents responsive to this request.

**Supplemental Request for Production No. 23** All documents concerning the specification of asbestos-containing materials in/on the aircraft engines at issue.

**RESPONSE:**

OBJECTION. This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant additionally objects to this request to the extent it seeks documents that are the property of the U.S. Air Force and that cannot be disseminated without its express permission. Defendant further objects to the definitions of the terms, "asbestos-containing materials" and "aircraft engines at issue," used in this discovery as they are compound and/or vague and ambiguous.

Subject to and without waiving the objections, please see documents previously produced by Defendant in this matter.

Defendant's investigation is ongoing and Defendant reserves the right to supplement this response in the future.

**Supplemental Request for Production No. 24:**   All documents concerning the use of asbestos-containing materials in/on the aircraft at issue.

**RESPONSE:**

OBJECTION. This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant additionally objects to this request to the extent it seeks documents that are the property of the U.S. Air Force and that cannot be disseminated without its express permission. Defendant further objects to the definitions of the terms, "asbestos-containing materials" and "aircraft at issue," used in this discovery as they are compound and/or vague and ambiguous.

Subject to and without waiving the objections, Defendant states that it did not design, manufacture, or supply the Boeing B-52D aircraft at issue in this matter or any of the airframe components used in the manufacture of these aircraft and, therefore, is unaware of any documents responsive to this request.

**Supplemental Request for Production No. 25:**  All documents concerning the use of asbestos-containing materials in/on the aircraft engines at issue.

**RESPONSE:**

OBJECTION. This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant additionally objects to this request to the extent it seeks documents that are the property of the U.S. Air Force and that cannot be

disseminated without its express permission. Defendant further objects to the definitions of the terms, "asbestos-containing materials" and "aircraft engines at issue," used in this discovery as they are compound and/or vague and ambiguous.

Subject to and without waiving the objections, please see documents previously produced by Defendant in this matter.

Defendant's investigation is ongoing and Defendant reserves the right to supplement this response in the future.

**Supplemental Request for Production No. 26:** All parts, operation, repair, maintenance, service, or similar manuals, instruction books, engineering diagrams, correspondence, or other documents in any way pertaining to asbestos-containing materials used in / on the aircraft at issue.

**RESPONSE:**

OBJECTION. This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant additionally objects to this request to the extent it seeks documents that are the property of the U.S. Air Force and that cannot be disseminated without its express permission. Defendant further objects to the definitions of the terms, "asbestos-containing materials" and "aircraft at issue," used in this discovery as they are compound and/or vague and ambiguous.

**Supplemental Request for Production No. 27:** All parts, operation, repair, maintenance, service, or similar manuals, instruction books, engineering diagrams, correspondence, or other documents in any way pertaining to asbestos-containing materials used in / on the aircraft engines at issue.

**RESPONSE:**

OBJECTION. This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence.

As to the Pratt & Whitney engines used to power the Boeing B-52D aircraft at issue, please see the documents produced by Defendant in this case. Defendant is prohibited from producing Illustrated Parts Breakdowns or manuals for the Pratt & Whitney J57 engines at issue since these documents are the property of the U.S. Air Force and cannot be disseminated without its express permission.

**Supplemental Request for Production No. 28:** All documents concerning the sale of your asbestos-containing materials/product to the worksites at issue.

**RESPONSE:**

# Exhibit F

VIRGINIA:   IN THE CIRCUIT COURT FOR THE

CITY OF NEWPORT NEWS


HOWARD D. BURKE AND PATRICIA )

L. BURKE,                    )

       Plaintiffs,          ) Case No.:

                       ) CL13-01989F-15(TF)

VS                           )

                       )

WACO, INC., ET AL,           )

       Defendants.



           VIDEOTAPED

           DEPOSITION OF:  John Sumner

           DATE:           June 18, 2014

           HELD AT:        Hartford Marriott

                      200 Columbus Boulevard

                      Hartford, Connecticut



           Reporter:  Wendy Allen, RMR, CRR, LSR #00221

Page 2

```
 1
     APPEARANCES:
 2

 3    Representing the Plaintiffs:

 4        Patten, Wornom, Hatten & Diamonstein, L.C.
          Suite 300
 5        12350 Jefferson Avenue
          Newport News, Virginia  23602
 6        By:  Robert R. Hatten, Esq.
               Gary M. DiMuzio, Esq.
 7

 8    Representing the Defendants:

 9        Willcox & Savage, P.C.
          Wells Fargo Center
10        440 Monticello Avenue, Ste 2200
          Norfolk, Virginia  23510
11        By:  Kevin P. Green, Esq.

12

          Tucker Ellis, LLP
13        515 South Flower Street
          Forty Second Floor
14        Los Angeles, California  90071-2223
          By:  Nathan T. Newman, Esq.
15             Curtis Isler, Esq.

16

17

18

19

20

21

22

23

24

25
```

1                          INDEX

2

3   WITNESS:                                    PAGE:

4   John Sumner
         Direct Examination by Mr. Hatten         6
5

6

7   EXHIBITS:                                   PAGE:

8    Exhibit 1, Notice of Deposition           4
     Exhibit 2, correspondence from Johns      28
9    Manville
     Exhibit 3, J57 overhaul instruction manual  28
10   dated September 1, 1970
     Exhibit 4, J57 overhaul instruction manual  58
11   for 1965
     Exhibit 5, document dated July 18, 1972,   59
12   relating to heatshields
     Exhibit 6, Answers to Interrogatories      86
13   Exhibit 7, Pratt & Whitney patent dated    97
     July 19, 1988
14   Exhibit 8, United States patent 4,758,028  100
     Exhibit 9                                  100
15

16   (Exhibits retained by Attorney Hatten)

17

18

19

20

21

22

23

24

25

Page 4

1    (Exhibit 1, Notice of Deposition, marked for

2    identification)

3

4              THE VIDEOGRAPHER:  We are now on the

5    record.  This is the videotaped deposition of John C.

6    Sumner.  Today's date is June 18th, and the time is

7    10:13 a.m.

8              This is the case of Howard and Patricia

9    Burke versus Waco, Inc., et al.  The case number is

10   CL-13-01989 F.  This deposition is being held at 200

11   Columbus Boulevard in Hartford, Connecticut.

12             My name is Michael Lourio, the

13   videographer associated with Pohlman USA Court

14   Reporting, located at 10 South Broadway, Suite 1400,

15   St. Louis, Missouri.  The court reporter today is

16   Wendy Allen, also for Pohlman USA Court Reporting.

17             Counsel, would you please state your

18   appearances, and the court reporter please administer

19   the oath.

20             MR. HATTEN:  My name is Robert R. Hatten,

21   and I am counsel for the plaintiff, Howard Burke, and

22   his wife, Patricia, in this action.  I'm a partner at

23   the law firm of Patten, Wornom, Hatten & Diamonstein

24   in Newport News, Virginia.  We represent the

25   plaintiff.

1            MR. DiMUZIO:  I'm Gary DiMuzio, also

2      representing the plaintiff, also at Patten, Wornom,

3      Hatten & Diamonstein.

4            MR. GREENE:  I am Kevin Greene of

5      Willcox & Savage in Norfolk, Virginia on behalf of

6      United Technologies Corporation.

7            MR. NEWMAN:  Nathan Newman, Tucker Ellis,

8      on behalf of United Technologies Corporation.

9            MR. ISLER:  Curt Isler from Tucker Ellis.

10     I am not admitted in Virginia, I'm not appearing in

11     the action, but I am an interested observer.

12

13            John Sumner, Deponent, having been first duly

14            sworn by Wendy Allen, RMR, CRR, a Notary

15            Public in and for the State of Connecticut,

16            was examined and testified as follows:

17

18            MR. HATTEN:  I've got one question to ask

19     in the beginning.  Are there other parties who are

20     going to call in?

21            MR. DiMUZIO:  No.

22            MR. HATTEN:  To your knowledge?  Okay.

23

24

25

1             DIRECT EXAMINATION BY MR. HATTEN:

2

3      Q    Good morning.

4      **A    Good morning.**

5      Q    Would you please state your full name and

6  address?

7      **A    It's John C. Sumner, S-U-M-N-E-R.  My address**

8  **is 40 Haven Drive in Granby, Connecticut.**

9      Q    Mr. Sumner, would you recite for me your

10 employment history?

11     **A    I started -- since graduating from school?**

12     Q    Yes.

13     **A    After college I started directly with Pratt &**

14 **Whitney in East Hartford.**

15     Q    What was your training in college?

16     **A    I have a Bachelor of Science in mechanical**

17 **engineering, and also an MBA.**

18     Q    In mechanical engineering?  No, MBA.

19     **A    MBA.**

20     Q    Business administration?

21     **A    Business administration, yes.**

22     Q    Okay, continue.

23     **A    Would you like the details of the employment**

24 **history?**

25     Q    Just tell me generally what your job duties

1    have been, what departments, and so forth, that you've

2    been assigned to over the years, beginning with your

3    first employment, and what year was that?

4        A     That was 1965.

5        Q     Okay.

6        A     And I started in the engineering department at

7    Pratt & Whitney, a couple of different groups within

8    the engineering department.  I spent some time in

9    financial, financial department.  And from there I

10   went to the product service, customer service

11   organization, and I remained there until I retired in

12   2001.

13       Q     And when you were in engineering, what was

14   your point of focus in that job?

15       A     Initially it was in a fuels and lubricants

16   group, to test oils used in jet engines.  Later on I

17   went into the test group, experimental test

18   engineering, and I had the responsibility for testing

19   jet engines for performance and endurance, and new

20   part evaluation.  That was the extent of my

21   engineering department involvement.

22       Q     What years were that, '65 to?

23       A     1965 to about -- 1968 was the fuels and

24   lubricants.  From there I went into test until

25   approximately 1972.  I may be off a little on these

Page 8

1    dates.  From there I went into financial group for

2    just two or three years, and then from then on it was

3    all customer service.

4        Q    So customer service began in the late

5    seventies?

6        A    Yes.

7        Q    And continued until when?

8        A    Until 2001.

9        Q    And what happened at that time?

10       A    I retired.

11       Q    Okay.  Subsequent to your retirement, have you

12   served as a consultant or worked for the company in

13   any way?

14       A    I have served as a consultant for Tucker Ellis

15   on behalf of Pratt & Whitney, UTC.

16       Q    Who pays you for your time, the law firm or

17   Pratt & Whitney?

18       A    The law firm.

19       Q    And for how long have you been working as a

20   consultant for the law firm?

21       A    Since 2001.

22       Q    And approximately -- well, how are you paid?

23       A    I submit an invoice every month when there's

24   activity, and they pay me directly by check.

25       Q    And can you give me some estimate of the

Page 9

1  approximate earnings that you made over this period of

2  time, 2001 until 2014?  Let's begin with 2013.

3  Approximately how much were you paid in that year?

4      **A    About $6,000.**

5      Q    How about -- what was the highest amount in

6  any particular year that you've earned?

7      **A    The highest amount was early on, strictly an**

8  **estimate, I don't have a hard number, but it's in the**

9  **vicinity of 70 or $80,000, in that ballpark.**

10     Q    And what do you think has been the average

11  annual amount over the past 12 or 13 years that you

12  have made?

13     **A    Since most years were down around five, six,**

14  **$7,000, I would estimate it would be down around**

15  **$10,000, possibly.**

16     Q    What's your hourly rate?

17     **A    $100.**

18     Q    And for the year 2014, approximately how much

19  have you billed the law firm?

20     **A    To date?**

21     Q    Yes.

22     **A    Approximately $5,000.**

23     Q    And that would represent about 50 hours,

24  then --

25     **A    Yes.**

1    Q    -- is that correct?

2         All right.  Have you given testimony in the

3    past concerning Pratt & Whitney?

4    **A    Yes, I have.**

5    Q    And what were the circumstances of that prior

6    testimony?

7              MR. GREENE:  Object to the form.

8              THE WITNESS:  You're referring to the

9    subject matter?

10   BY MR. HATTEN:

11   Q    Yes.

12   **A    Initially aircraft accidents, accident**

13   **investigation.  There was one personnel issue.  And I**

14   **believe all the rest have been regarding asbestos**

15   **issues.**

16   Q    When did you start testifying in litigation

17   related to people who claimed that asbestos exposure

18   from a Pratt & Whitney product caused them to develop

19   an illness?

20   **A    It was in the early two-thousands.  I don't**

21   **have an exact date.**

22   Q    And approximately how many times in how many

23   different cases have you been consulted with regard to

24   people that contended that they had an

25   asbestos-related disease as a result of working with

1   or on Pratt & Whitney product?

2   **A    You said how many times have I consulted on**

3   **that?  Do you mean deposition?**

4   Q    Well, I meant approximately how many different

5   people -- different cases have you been involved with

6   where someone was claiming an asbestos-related disease

7   was caused by a Pratt & Whitney product?

8   **A    That would strictly be an estimate.**

9   Q    Sure.

10   **A    It has to be approximately 50, in that**

11   **ballpark somewhere.**

12   Q    And would the people who were claiming these

13   diseases be -- include people that developed the

14   disease mesothelioma?

15   **A    That's what I'm told, yes.**

16   Q    Would all of them be mesothelioma cases?

17   **A    I don't know that.**

18   Q    Would most of them have been mesothelioma

19   cases?

20            MR. GREENE:  Object to the form.

21            THE WITNESS:  All I can say is that I've

22   heard on a number of them that it was related to

23   mesothelioma.

24   BY MR. HATTEN:

25   Q    In each case, do you believe that it was a

Page 12

1   malignancy that you were consulting about?

2       **A     I'm not a medical person.  I really can't make**

3   **that judgment.**

4       Q     From what you were told, generally speaking,

5   about the cases, were they typically a malignancy or

6   mesothelioma?

7               MR. GREENE:  Object.  Asked and answered.

8               THE WITNESS:  I don't recall any

9   discussion about malignancy.  I only recall the

10  mesothelioma being mentioned.

11  BY MR. HATTEN:

12      Q     Okay.  In how many cases have you previously

13  testified for Pratt & Whitney at the request of the

14  law firm involving an asbestos-related disease?

15      **A     Again, I haven't kept track.  It's at least**

16  **ten times.**

17      Q     Have you ever testified in trial?

18      **A     No, I have not.**

19      Q     Has any other company ever asked you to

20  testify, or any other law firm ever asked you to

21  testify, in an asbestos-related matter?

22      **A     Early on there were a couple of other law**

23  **firms involved, and possibly one was just a name**

24  **change.  I don't recall if I've testified under those**

25  **names or not.**

Page 13

1    Q    Were the majority of these times when you

2    testified, did they involve the J57 jet engine?

3    **A    Some of them did, yes.**

4    Q    What other products, if any, can you recall

5    that an asbestos-related claim against Pratt & Whitney

6    involved?

7    **A    Which other engine models?**

8    Q    Yes.

9    **A    The JT8D, the JT3D.  I think I've also been**

10   **involved with the TF33 and the JT4.  And there were**

11   **some piston engines, some 2,800, and some of the other**

12   **piston engine models, also.**

13   Q    Now, did all of those engines contain asbestos

14   gaskets?

15   **A    At one time they did, yes.**

16   Q    Did all of those engines contain heatshields?

17   **A    Yes, they did.**

18   Q    And were all of those heatshields asbestos?

19   **A    No.**

20   Q    Were some of them?

21   **A    Some of them were.**

22   Q    Which types of asbestos-related heatshields

23   are you familiar with pertaining to jet engines

24   manufactured by Pratt & Whitney?

25           MR. GREENE:  Just object to the form.

1   And pursuant to our discussions before the deposition,

2   Mr. Sumner is prepared on the J57, the J75 and the

3   TF33, and can answer that question, I believe,

4   specific to those engines.

5                   MR. HATTEN:  Well, I'd like him to answer

6   my question, and then if you can -- if it's limited to

7   those three, fine, but if you'd answer my question.

8   Thank you.

9                   THE WITNESS:  There are several different

10  kinds of heatshields used on jet engines.  Some are

11  just a metal shield, an all-metal shield.  Others are

12  all metal but they're double-walled, a dead space in

13  the middle, similar to a thermos bottle construction,

14  and some have an insulating blanket which is fully

15  encapsulated in the sheet metal.  Those are the

16  primary types on a jet engine.

17  BY MR. HATTEN:

18  Q    Are you familiar with a product Min-K?

19  **A    Yes, I am.**

20  Q    And when did you first become familiar with

21  the product Min-K?

22  **A    Shortly after I began the consulting work,**

23  **after my retirement.**

24  Q    And what is it that you learned about the

25  product Min-K?

1      A      It's used in some of the heatshields on these

2   jet engines that I mentioned as a blanket within --

3   fully encapsulated within sheet metal.

4      Q      Have you ever seen it encapsulated in

5   fiberglass cloth?

6      A      Yes, fiberglass cloth is used in many

7   applications, as a blanket, as an insulating blanket.

8      Q      With Min-K as the interior insulation?

9      A      No, sometimes the fiberglass -- there's a

10  fiberglass blanket used rather than a Min-K blanket.

11  There's many of these heatshields which are strictly

12  fiberglass that have no asbestos in them.  Others are

13  Min-K, which I understand does have asbestos in them.

14     Q      If it's referred to as Min-K, and it's prior

15  to the mid to late seventies, it would be an

16  asbestos-containing product, correct?

17                MR. GREENE:  Objection to the form.

18                THE WITNESS:  I believe the Min-K product

19  was changed in the early seventies to remove the

20  asbestos content.

21  BY MR. HATTEN:

22     Q      Do you have a document that establishes that

23  date?

24     A      We have internal engineering changes within

25  Pratt & Whitney which give the reason for changes,

1    **because normally there's a part number change and we**

2    **have to give the reason for it, and that would be one**

3    **of the reasons given.**

4    Q    Did you bring that document with you?

5    **A    No, I did not.**

6    Q    Can you testify under oath as to what the date

7    of that document is?

8    **A    No.  There's many, many engineering changes.**

9    **More than one would have that particular information**

10   **in it.**

11   Q    If the Manville Corporation said that -- well,

12   you understand that that product was manufactured by

13   Johns Manville?

14   **A    That's my understanding, that's correct.**

15   Q    The Manville Corporation said that that

16   product was changed to a non-asbestos product in the

17   mid to late seventies.  Do you have any specific

18   documents that would contradict that?

19            MR. GREENE:  Objection to the form.

20            THE WITNESS:  The only documents I can

21   refer to are the engineering changes that I mentioned,

22   and these are often initiated and dated quite a bit

23   earlier than the actual change takes place, in

24   anticipation for the change.  So it could be a year or

25   two or three before the actual change happens.

Page 17

1  BY MR. HATTEN:

2      Q    I see.  So the company could have written

3  engineering documents in the early seventies and the

4  actual change to a non-asbestos product have actually

5  happened in the mid-seventies to late seventies?

6      **A    That's very common for that delay to be in**

7  **there, yes.**

8      Q    Now, you said that you first learned about

9  Min-K in the time period after you became a

10 consultant, is that correct?

11     **A    That's correct.**

12     Q    So would I be correct, then, that you do not

13 ever have any hands-on work with Min-K, when it

14 contained asbestos?

15     **A    I worked as an engineer in the Pratt & Whitney**

16 **shop where engines are tore down.  I visited many**

17 **airline shops around the world, probably most of them,**

18 **and I have handled those pieces, those heatshields,**

19 **and I've been aware of them, looked at them, handled**

20 **them, since the early seventies, possibly even earlier**

21 **than that, probably around 1970.**

22     Q    Would I be correct that you did not know,

23 then, at that time when you were handling them that it

24 was an asbestos product?

25     **A    That's correct.**

Page 18

```
 1              MR. GREENE:  Objection to the form.
 2    BY MR. HATTEN:
 3       Q    So Pratt & Whitney certainly did not ever give
 4    you any warnings or any instructions about any dangers
 5    associated with that product, is that correct?
 6              MR. GREENE:  Objection.  Assumes facts.
 7              You can answer.
 8              THE WITNESS:  That's correct.
 9    BY MR. HATTEN:
10       Q    Would that product have been on -- well, when
11    is the first time that you personally were aware of
12    what you now know is Min-K and what you now know is an
13    asbestos-containing product, when was the first time
14    that you were aware of that product on jet engines?
15              MR. GREENE:  Object to the form.
16              I'm not sure I understand.  It's Min-K
17    and heatshields, so --
18              MR. HATTEN:  We're talking about Min-K.
19    BY MR. HATTEN:
20       Q    Talking about the product Min-K.  You said you
21    learned about that, what it was, after 2001?
22       A    Correct.
23       Q    But you had actually worked with it earlier in
24    your career.
25              When was the first period of time that you
```

Page 19

1    would have worked with it?

2        A    I think, as I said a few minutes ago, my time

3    in engine shops, I handled heatshields.  Now, I don't

4    know if the particular ones I handled contained Min-K

5    as a blanket or a fiberglass blanket or some other

6    material.

7        Q    And what years, again, are we talking about?

8        A    I would estimate that was early seventies.

9        Q    So you did not work with it in the sixties?

10       A    No.  In the fuels and lubricants group, and --

11   I did not.  The first time would be when I first

12   started in the experimental test group, which I always

13   have trouble with these dates.  That may have been the

14   very late sixties when that started.

15       Q    '69?

16            MR. GREENE:  Just so the record's clear,

17   I think your testimony earlier was the test --

18   experimental test engineering is 1968 to 1972.

19            THE WITNESS:  Yeah, so okay, so it would

20   be 1968 or '69 when I first physically handled it.

21   BY MR. HATTEN:

22       Q    And that would have been in the testing area?

23       A    Yes.  It would be in the overall shop where

24   the test engines are torn down and rebuilt.

25       Q    Would I be correct that you did not do any

Page 20

1   testing at that time to determine any asbestos fiber

2   release from that product because you didn't know it

3   was asbestos?

4       **A    There was no fiber release from that part.**

5   **It's all encapsulated, entirely encapsulated in sheet**

6   **metal, and you can't see the insulating blanket**

7   **material inside.**

8       Q    And how is the shield put together?

9       **A    It's a sandwich with two pieces of sheet metal**

10  **with a space between them where the insulating blanket**

11  **is, and it's welded all the way around the outside, so**

12  **when you look at the part, all you see is the metal**

13  **part.**

14      Q    And have you ever had to open the shield?

15      **A    No.  There would be no reason to do that.**

16      Q    Have you ever seen the shield punctured?

17      **A    I've seen a crack.  On a heatshield.**

18      Q    And that would be caused by what?

19          MR. GREENE:  Objection to form.  Calls

20  for speculation.

21          THE WITNESS:  Yeah, I would assume it

22  would be from the environment that it's in, possibly

23  excessive vibration in an engine.

24  BY MR. HATTEN:

25      Q    You yourself have never had occasion to open

1      the heatshield, is that correct?

2          **A      That's correct.**

3          Q      In the overhaul of jet engines, the heatshield

4      is removed, is that correct?

5          **A      If it's a complete overhaul, yes.**

6          Q      And how many of these heatshields are there,

7      in a J57?

8          **A      I would have to count them up.  I can give you**

9      **a rough estimate of maybe 10 to 15 of them.**

10         Q      How frequently did you overhaul a J57?

11         **A      Personally?**

12         Q      Yes.

13         **A      I was the engineer supervising the work.  I**

14     **did not physically do any manual work on the engines.**

15         Q      Now, are you -- the heatshield was made at

16     Pratt & Whitney, is that correct?

17                MR. GREENE:  Objection to form.

18                THE WITNESS:  No, it was not.

19     BY MR. HATTEN:

20         Q      Where was it made?

21         **A      I don't know.  There were several different**

22     **heatshields and types of heatshields, so I don't know**

23     **where they were made.  There is an interrogatory,**

24     **which I'm told you've been supplied with, which gives**

25     **all our suppliers of these parts.**

Page 22

1      Q      Okay.  Are you aware of any warnings being on

2   a Min-K?

3      **A      On the part itself?**

4      Q      Yes.

5      **A      No.**

6      Q      Are you aware that Johns Manville began

7   putting warnings on Min-K in 1970?  Has anybody told

8   you that?

9      **A      No, I'm not aware of that.**

10      Q      The metal around the Min-K, you don't know

11   where that -- who put that metal on?

12      **A      No.  I never got into the supplier end of the**

13   **business.  I don't know who the suppliers of that was.**

14   **I would look at the interrogatory as a summary of our**

15   **best information.**

16      Q      Well, the interrogatory talks about Min-K,

17   doesn't talk about sheet metal.

18      **A      I don't know the answer to the question.**

19      Q      Do you know the difference between amosite and

20   chrysotile asbestos?

21      **A      No, I do not.**

22      Q      The Min-K product, do you know whether it was

23   a Min-K 100 or a Min-K 500 or the specific style

24   number of the Min-K that was on the J57?

25      **A      No, I don't.**

Page 23

1    Q    Do you know anything about the percentage of

2  asbestos that was in the Min-K product?

3    **A    No, I do not.  I am familiar with a report**

4  **from testing that we did, which I believe has that**

5  **information in it.**

6    Q    Testing that you did?

7    **A    This is testing that was requested by the law**

8  **firm.**

9    Q    And when was that done?

10   **A    This was in 2006.**

11           MR. HATTEN:  And has that been produced?

12           MR. GREENE:  Yes.  That's the Mlynarek

13  that was in the reports.

14           MR. HATTEN:  Oh, all right.

15  BY MR. HATTEN:

16   Q    Is that the only report that you know about

17  where that product was mentioned?

18   **A    That's the only one I'm aware of, yes.**

19   Q    Do you know what an MSDS sheet is?

20   **A    Yes, I do.**

21   Q    Have you ever seen an MSDS sheet for Min-K?

22   **A    No, I have not.**

23   Q    Who would have that, if it was received by

24  Pratt & Whitney?

25   **A    Typically that type of information goes to a**

1    different group, which was once called Health and

2    Safety.  I'm not sure what the current name of that

3    group is.

4        Q    Let me show you some correspondence from the

5    Manville Corporation concerning the various times that

6    they put labels on products and various warning

7    labels, and the first -- I'm going to just give you

8    the caution labels on the last page, and to ask if

9    you've ever seen those caution labels in association

10   with Min-K or any other asbestos-containing product

11   used by Pratt & Whitney?

12              MR. GREENE:  There's no indication on

13   here that this was produced or sent to anybody at

14   Pratt & Whitney, is that right?

15              MR. HATTEN:  No, that was produced to me

16   by the Manville Trust.

17              MR. GREENE:  Is that Exhibit Number 2?

18              MR. HATTEN:  That's Exhibit Number 2.

19              THE WITNESS:  Could you repeat the

20   question, please?

21   BY MR. HATTEN:

22       Q    There are two caution labels at the end of the

23   document.

24       A    Yes.

25       Q    Have you ever seen those caution labels on any

1  asbestos-containing product at Pratt & Whitney?

2          MR. GREENE:  Object.  Overbroad, as to

3  "any asbestos-containing product."

4          THE WITNESS:  I don't recall seeing these

5  particular labels.

6  BY MR. HATTEN:

7      Q    On any asbestos-containing product?

8          MR. GREENE:  Same objection.

9          THE WITNESS:  That's correct.

10 BY MR. HATTEN:

11     Q    Are you aware of whether or not any warning

12 like that was ever contained in any overhaul manual of

13 Pratt & Whitney pertaining to any asbestos-containing

14 product?

15         MR. GREENE:  Objection to form.

16 Overbroad.

17         THE WITNESS:  In what time frame?

18 BY MR. HATTEN:

19     Q    Let's start off with prior to 1980.

20     **A    I'm not aware of any prior to that.  I believe**

21 **there are some notes in there in places now.  I don't**

22 **have a date when they were originally placed in there.**

23 **It could have been a little bit before 1980.  I'm not**

24 **sure.**

25     Q    What is it -- what is your understanding as to

1    what warning is in the overhaul manuals of Pratt &

2    Whitney now with regard to the J57 engine?

3       A    The J57 I'm not sure.  I don't know even if it

4    has any at this point.  That's a manual which is owned

5    by and controlled by the military, not by Pratt &

6    Whitney.

7       Q    With regard to any other jet manufactured by

8    Pratt & Whitney, are there warning labels concerning

9    potential hazards and safety procedures concerning

10   asbestos products that are in those engines?

11              MR. GREENE:  With respect to a specific

12   time period?

13              MR. HATTEN:  Any time.

14              MR. GREENE:  Object to the form.

15   Overbroad, and outside the scope of the engines at

16   issue in the case.

17              THE WITNESS:  I believe there's a warning

18   or more than one warning there somewhere that I've

19   seen.  I couldn't tell you where it was or exactly

20   what it said.  I didn't spend any time looking for it

21   or paying a lot of attention to it.

22   BY MR. HATTEN:

23      Q    What particular product is the warning -- does

24   the warning relate to?

25      A    I don't remember, but it's the only product we

1    **have is jet engines.  I don't know which model.**

2        Q    Does it relate to asbestos gaskets?  Does it

3    relate to heatshields?  What asbestos-containing

4    component does it relate to?

5                MR. GREENE:  Objection to form.  Assumes

6    facts.

7                THE WITNESS:  I would have to go back and

8    find that note, notice, and read it.  I just don't

9    remember exactly what it says.

10   BY MR. HATTEN:

11       Q    Are there any other asbestos-containing

12   products other than asbestos gaskets and heatshields

13   that were in the J57 jet engine?

14       **A    I'm sorry, any other --**

15       Q    Asbestos-containing component parts in the J57

16   jet engine.

17       **A    There were other types of parts which had**

18   **material containing asbestos, yes.**

19       Q    Did any of those -- did any manuals published

20   by Pratt & Whitney concerning J57 jet engines ever

21   contain any warnings or safety instructions concerning

22   any of those asbestos-containing component parts?

23                MR. GREENE:  Object to the form, as to

24   the extent it's not limited to a particular time

25   period.

Page 28

1          THE WITNESS:  Not that I recall.

2          MR. HATTEN:  Let's mark this as Exhibit

3    Number 2.

4    (Exhibit 2, correspondence from Johns Manville, marked

5    for Identification)

6    BY MR. HATTEN:

7      Q    Let me -- would I be correct that you're

8    familiar with and the most knowledgeable person that's

9    going to be submitted by Pratt & Whitney concerning

10   the component parts of jet engines and the overhaul

11   process?

12     A    **That's my understanding, yes.**

13          MR. GREENE:  Specific to the three

14   engines that were mentioned earlier.

15          MR. HATTEN:  Yes.

16          Let me mark this as Exhibit Number 3.

17          This is the J57 overhaul instruction

18   manual dated September 1, 1970.

19   (Exhibit 3, J57 overhaul instruction manual dated

20   September 1, 1970, marked for identification)

21   BY MR. HATTEN:

22     Q    Are you familiar with this document?

23     A    **I have seen it, yes.**

24     Q    And is the purpose of this document to provide

25   instructions as to how to overhaul the J57 jet engine?

1              MR. GREENE:  Let me just note an

2    objection, and this is not a document that United

3    Technologies Corporation produced in this case.

4              THE WITNESS:  That's correct, it's not a

5    document that Pratt & Whitney produced, but my

6    understanding is that it's instructions for the

7    overhaul shop on how to overhaul a J57 jet engine.

8    BY MR. HATTEN:

9      Q   And Pratt & Whitney would have written it,

10   correct?

11             MR. GREENE:  Objection to the form.  This

12   may be getting into an area that another witness would

13   cover.

14   BY MR. HATTEN:

15     Q   Well, did Pratt & Whitney write these manuals,

16   this manual?

17             MR. GREENE:  Objection to form.

18             THE WITNESS:  Pratt & Whitney -- I'm

19   sorry.

20             MR. GREENE:  Mr. Shiffler is going to

21   discuss the relationship with the military and how the

22   manuals would have been generated, produced.

23             MR. HATTEN:  I understand that.

24             MR. GREENE:  He's the next witness.

25             MR. HATTEN:  I'm not asking him about the

1  military, I'm asking about the manual.

2          MR. GREENE:  Right, this manual for a

3  military engine.  So this is not the witness to answer

4  that particular question.

5  BY MR. HATTEN:

6    Q    Do you know or have a reasonable belief as to

7  who wrote this manual?

8          MR. GREENE:  Mr. Hatten --

9          MR. HATTEN:  Are you going to instruct

10  him not to answer?

11          MR. GREENE:  We're only going to answer

12  this question one time, and Mr. Shiffler is the person

13  that's going to answer questions like that.  And so

14  it's not a question for this witness to answer.

15          MR. HATTEN:  He may or may not be.  I'm

16  conducting the examination.  If you want to instruct

17  him not to answer, that's your job, but I'm going to

18  ask him the questions, and I've asked the question,

19  and I want an answer.

20          MR. GREENE:  Mr. Sumner, you can answer

21  that question if you know the answer, if you're

22  prepared to answer that question today.

23          THE WITNESS:  I agree that Mr. Shiffler

24  is a better person to answer this.  The information --

25  much of the information, technical information, about

1   the engine parts came from Pratt & Whitney, the

2   technical information.  As to who actually wrote the

3   manual, it's an Air Force document.  I don't know who

4   actually wrote the document.

5   BY MR. HATTEN:

6       Q    Let's go through this document just a minute.

7            On page -- the first -- I think it's the first

8   tab, if yours is consistent with mine.

9            All right, go to -- I guess it's just a few

10  pages in, J change 6.  Do you see that?

11      **A    J change 6.  Yes, I have that page.**

12      Q    The second item down says "Installation of

13  heatshielding and thermal blanket, 2, 3, 4 and 5,"

14  that relates to Min-K, correct?

15      **A    Not necessary.**

16      Q    In 1966?

17      **A    Not necessarily.  A lot of these blankets did**

18  **not contain Min-K.**

19      Q    All right.  The next one is, again,

20  "Installation of heatshielding and thermal blankets."

21            So these manuals provided information

22  concerning the installation of heatshielding and

23  thermal blankets, correct?  Whatever they were

24  composed of.

25      **A    That's what it appears to be, yes.**

Page 32

1    Q    Let's go to 4-28 in this manual.

2    **A    Okay, I have it.**

3    Q    Now, do you see there's a warning on that

4    page, 4-28, that says, "Due to sharp edges on turbine

5    inner seal, care should be taken to prevent entry to

6    hands."

7         Do you see that?

8    **A    Yes, I do.**

9    Q    Was it typical of these overhaul manuals to

10   provide warnings concerning procedures that caused

11   some risk of harm to the worker?

12            MR. GREENE:  Objection to the form.

13   Overbroad, vague.

14            THE WITNESS:  The military manuals I've

15   seen such as this one, yes, I have seen warnings like

16   that in them.

17   BY MR. HATTEN:

18   Q    This is a manual that I think you indicated

19   that Pratt & Whitney provided most of the information,

20   correct?

21            MR. GREENE:  Objection to the form.

22   Mischaracterizes the testimony.

23   BY MR. HATTEN:

24   Q    Let me rephrase the question.

25            Do you know who put that warning in this

1  manual, whether it was Pratt & Whitney or the Air

2  Force?

3     **A    No, I do not.  But I mentioned a few minutes**

4  **ago that Pratt & Whitney provided the technical**

5  **information, and I don't think this falls into that**

6  **category.**

7     Q    All right.  Let's go to 4-34.

8          Well, that's the same thing.  But take a look

9  at that.  I think it's the same type of warning.

10          Do you see that?  The bottom of the page?

11     **A    Yes.**

12     Q    That's the same type of warning about advising

13  the worker concerning a risk associated with the work,

14  correct?

15          MR. GREENE:  Objection to the form.  For

16  the record, it's reads "Due to sharp edges on turbine

17  inner shield, care shall be taken to avoid injury to

18  hands."

19          MR. HATTEN:  Okay.

20  BY MR. HATTEN:

21     Q    And similarly on 4-56, there are a number of

22  warnings on that page, three, I believe, about the

23  risk of harm associated with various procedures, in

24  the overhaul, correct?

25          MR. GREENE:  Objection to the form.

1        THE WITNESS:  Yes, I see those warnings.

2  BY MR. HATTEN:

3     Q    And then we go over to page 5-1.

4          On the right-hand side column, with regard to

5  a certain cleaning procedure, there's a warning that

6  says "Because of high alkalinity, this solution is

7  harmful to the skin and eyes especially when heated.

8  Use adequate ventilation.  Operators should wear

9  protective gloves, aprons and goggles."

10         Do you see that?

11    **A    Yes, I do.**

12    Q    And is cleaning one of the parts of an

13  overhaul?

14    **A    Yes, it is.**

15    Q    These cleaning products, are they manufactured

16  by Pratt & Whitney?

17    **A    No, they are not.**

18    Q    And so this overhaul manual contains a warning

19  concerning a product that Pratt & Whitney did not

20  manufacture, correct?

21    **A    That's what it appears to be, yes.**

22    Q    Thank you.  Let's go to the next one on page

23  6-20.

24         Page 6-20 appears the following note.

25  "Heatshield must be replaced on number 4 bearing

Page 35

1    housing.  Using plate and roller, install heatshield

2    by rolling lip over.  See group tool 180.  If

3    necessary, transfer drill the 0.276 to 0.286 inch

4    diameter holes through the heatshield."

5        Do you see that?

6    **A    Yes, I do.**

7    Q    So am I correct that one of the overhaul

8    processes with regard to heatshields involved drilling

9    holes through the product?

10            MR. GREENE:  Objection to the form.

11            THE WITNESS:  You know, again, this is an

12   Air Force document, and I don't recall that procedure

13   specifically used in Pratt & Whitney engines that I've

14   been involved with.  The Air Force and Mr. Shiffler

15   will tell you that the Air Force has the liberty to

16   alter and change, modify, their instructions any way

17   they wish.  And so I don't know the origin of this

18   procedure.

19   BY MR. HATTEN:

20   Q    This is the procedure for the J57 jet engine,

21   correct?

22   **A    Yes, it is.**

23   Q    The next one I'd like you to look at is on

24   page 6-56-A.  Okay?

25   **A    Yes, I have it.**

Page 36

1    Q    Do you have that document?

2    **A    Yes.**

3    Q    This relates to SermeTel W coating.  Do you

4  see that?

5    **A    Where is that on the page?**

6    Q    Top left-hand part of the page.  Right above

7  the word "warning".

8    **A    SermeTel W coating, yes.**

9    Q    And this reads, "SermeTel W paint contains

10  aluminum particles of 5 to 10 micron size.  These

11  particles, when accumulated in dried state, react

12  similar to pure aluminum of the same particle size

13  when ignited.  Explosive pressures are generated when

14  ignition of an air mixture, dust cloud, occurs.

15  SermeTel W paint also reacts with alkaline solutions

16  and many acids to liberate hydrogen gas which, when

17  ignited, generates explosive pressures.  Care shall

18  therefore be taken to prevent accumulation of paint

19  overspray residues.  Particular attention shall be

20  taken to assure accumulations do not occur where they

21  could be dispersed in air, shakedown of a duct, for

22  example, or where they may become mixed with alkalines

23  or certain acids."

24        Do you see that?

25    **A    I do.**

Page 37

```
 1      Q    Would I be correct that SermeTel W coating is

 2  not a product manufactured by Pratt & Whitney?

 3      A    That would be correct, yes.

 4      Q    And this warning about the dust particles

 5  associated with this product is in the overhaul manual

 6  of the J57 jet engine.

 7                MR. GREENE:  Objection to the form.

 8  BY MR. HATTEN:

 9      Q    Is that correct?

10                MR. GREENE:  Objection to the form.  It's

11  an overhaul manual generated by United States Air

12  Force.

13                THE WITNESS:  Yes, my answer would be the

14  same, it's in this manual generated, or which has --

15  the Air Force has responsibility for, for producing.

16  BY MR. HATTEN:

17      Q    Would I be correct that you don't have any

18  information that you can state under oath as to who

19  wrote what in this document?

20                MR. GREENE:  Objection.

21                MR. HATTEN:  If you're going to repeat --

22  if you're going to give him another answer like you

23  just did I'm going to try to stop that, because your

24  objection is to the form of the question only, only.

25                MR. GREENE:  My objection --
```

Page 38

1                     MR. HATTEN:  I want to make that clear.

2                     MR. GREENE:  You don't have to tell me

3      what the rules are.  I will make my objections as I

4      see fit.  My objection to this question is similar to

5      a --

6                     MR. HATTEN:  To the form of the question.

7                     MR. GREENE:  This is a question --

8                     MR. HATTEN:  Please, no further speaking

9      objections.

10                     MR. GREENE:  Then we're not going to go

11      forward at the moment.  I have an objection to put on

12      the record, and it goes to that this is not a question

13      that this witness --

14                     MR. HATTEN:  Objection to the -- I'm

15      going to call the court if you keep making these

16      speaking objections.  You have one objection only, and

17      that is to the form of the question in this

18      deposition.

19                     MR. GREENE:  Mr. Sumner is not designated

20      to answer that question pursuant to your notice.

21      Mr. Shiffler is going to be here to answer those

22      questions.

23                     MR. HATTEN:  He is --

24                     MR. GREENE:  And you already asked this

25      question to him once.

Page 39

1         MR. HATTEN:  He is designated as an

2    overhaul expert.

3         MR. GREENE:  That's not one of the

4    categories in your -- we don't need to be contentious.

5    That's not one of the categories.

6         MR. HATTEN:  Kevin, not going to argue

7    with you about it.  I'm going to ask the question.

8    BY MR. HATTEN:

9    Q    Am I correct that you cannot state under oath

10   what portions of this manual were written by Pratt &

11   Whitney and what portions, if any, were written by the

12   Air Force?

13        MR. GREENE:  Objection to the form.

14        THE WITNESS:  Yes, that's correct.

15   BY MR. HATTEN:

16   Q    Thank you.

17        I'd like you to turn to page 6-56D.  And if

18   you would look there on page -- on the right-hand side

19   of the page, first there is a warning about SermeTel

20   196 paint containing aluminum particles.  It's very

21   similar to the warning that we just read.  Do you

22   agree?

23        MR. GREENE:  Objection to the form.

24   Vague.

25        THE WITNESS:  Yes, it's similar.

1   BY MR. HATTEN:

2       Q    And then there's another warning about acetone

3   and benzene, in the next sentence.  Do you see that?

4       A    **Yes.**

5       Q    Now, am I correct that Pratt & Whitney did not

6   manufacture or sell SermeTel 196 paint?

7       A    **That's correct.**

8       Q    And am I correct that Pratt & Whitney --

9       A    **Excuse me.  Did you say sell?**

10      Q    You did didn't manufacture it.

11      A    **We didn't manufacture it, yes.**

12      Q    And the acetone and benzene, those are

13  products that you also did not manufacture, correct?

14      A    **Correct.**

15      Q    The SermeTel coating, that was part of the jet

16  engine, is that correct?

17      A    **It was applied to the jet engine parts, yes.**

18      Q    That was a -- what we'll call a component part

19  of the jet engine, correct?

20      A    **Well, the term "component" means something**

21  **else in a jet engine, but it was part of the engine,**

22  **yes.**

23      Q    It was integrated into the jet engine.

24      A    **Yes.**

25      Q    Correct?

Page 41

1    A    Yes.

2    Q    The next page I'd like you to look at is 6-85.

3         Do you see on this page that there are two

4    warnings, one on the left-hand column talking about

5    "Heat applied to rubber causes highly toxic fumes," do

6    you see that?

7    A    Yes.

8    Q    And another on the right talks about "Heating

9    sponge rubber so that it will expand to fill inside

10   the vanes creates highly poisonous gas known as

11   tetramethyl-succino-nitrile, TSN, which is mostly

12   retained in sponge rubber filling.  Extreme caution

13   must be used at all times in heating of sponge rubber.

14   Explicit safety instructions must be maintained and

15   adequate ventilation equipment must be used."

16        Do you see that?

17   A    Yes.

18   Q    Would I be correct that Pratt & Whitney did

19   not manufacture the heating sponge rubber?

20   A    That's correct.

21   Q    But that is a product that was incorporated

22   into the jet engine?

23   A    Yes.

24        MR. GREENE:  Let me make sure the

25   record's clear, it wasn't "adequate ventilation

1    equipment" but "adequate ventilated equipment".

2    BY MR. HATTEN:

3       Q    The next portion of this manual I'd like you

4    to look at is 6-88A.

5            Have you found that?

6       **A    Yes.**

7       Q    This paragraph says, "In removing rivets,

8    securing the front and rear lockplates to the inner

9    shroud and remove lockplates."  It says "Warning.

10   Heating of rubber filler inside vanes creates a highly

11   poisonous gas known as tetramethyl-succino-nitrile.

12   Use extreme caution."

13           It's the same warning as we saw before,

14   correct?

15      **A    I'm not sure I see where you are reading.**

16   **This is page -- says change 6, 6-88A?**

17      Q    Yes.  It says "Warning".

18      **A    Okay.**

19      Q    "Heating of rubber filled inside vanes creates

20   a highly poisonous gas known as

21   tetramethyl-succino-nitrile, TSN.  Use extreme caution

22   at all times when heating sponge rubber filler.

23   Explicit safety instructions must be secured, and

24   adequately ventilated equipment must be used."

25      **A    I see that, yes.**

Page 43

1      Q    And again, they're talking about a product

2    that was not manufactured by Pratt & Whitney, but is

3    incorporated into the J57 engine?

4      **A    That's correct.**

5      Q    I'd like you to look at page 690.

6      **A    I have it.**

7      Q    At the top right-hand column of 690 is another

8    warning virtually identical to the one we just read

9    concerning heating sponge rubber.  Do you agree?

10     **A    Yes.**

11     Q    Thank you.

12          Then we go to page 6-119.  On the left-hand

13   column, again, it's another warning about the dangers

14   associated with heating sponge rubber.  Do you see

15   that?

16     **A    Yes.**

17     Q    It's the same product that we just discussed.

18   All right.

19          Page 6-359.  Subparagraph 7, under

20   "Installation," it says "Fabricate an asbestos

21   retainer which will be circular in shape to fit snugly

22   in the throat of the inner liner on upstream edge of

23   the first segment.  Place retainer in throat of inner

24   liner."

25          Can you explain to me what this is all about?

1    A    I would like to look back --

2    Q    Sure.

3    A    -- a couple of pages.

4    Q    Sure.

5    A    Okay, that is not an engine part.  That's a --

6  apparently a retainer which is used during a repair

7  process.

8    Q    What do you mean by "a retainer"?

9    A    It calls it an asbestos retainer, and then on

10 page 6-358 there's a diagram, and I believe that

11 shaded portion is the retainer that they're talking

12 about.

13   Q    Number 7 and number 10?

14   A    Yes.

15   Q    Okay.  On page 6-358?

16   A    Yes.

17   Q    All right.  Now, that's a temporary retainer?

18   A    From just looking at it quickly, I believe

19 that's a retainer used when they're welding this

20 combustion chamber.  It's not a permanent part of the

21 combustion chamber.

22   Q    And this all relates to, as we go back a

23 couple pages, I thought I saw it --

24        Well, in any event, this relates to part of

25 the overhaul process of the J57, correct?

Page 45

1              MR. GREENE:  Objection to the form.

2              THE WITNESS:  It relates to the repair

3    process.  Overhaul does not necessarily involve repair

4    in every instance.

5    BY MR. HATTEN:

6        Q    Do you know if this is a similar retainer to

7    the J75 jet engine?

8        A    **No, I do not.**

9        Q    Well, let's talk about this retainer for just

10   a minute.  On number 8 right after 7 that you read it

11   says "Pack the throat area of the liner to the point

12   flush with flange with damp asbestos."

13             Do you see that?

14       A    **Yes.**

15       Q    What we're talking about there is pure

16   asbestos, correct?  We're talking about asbestos

17   fibers, asbestos shorts, some people call it, that you

18   wet and you pack, correct?

19             MR. GREENE:  Objection to the form.

20   Assumes facts.

21             THE WITNESS:  I don't know that.  I don't

22   know if it's one hundred percent asbestos or some

23   other mixture of materials.  It calls it asbestos.  I

24   don't know if it's a hundred percent asbestos or not.

25   I don't know.

Page 46

1    BY MR. HATTEN:

2       Q    There's no indication that there's anything

3    else but asbestos that's used for this process,

4    correct?  I mean it's not a finished product of -- it

5    doesn't call it by a name other than asbestos,

6    correct?

7                 MR. GREENE:  Objection to form.

8                 THE WITNESS:  That's what it's calling

9    it.  I suspect that actual material is called out

10   somewhere else and described more adequately.

11   BY MR. HATTEN:

12      Q    All right.  Let's go to -- let's go to page

13   6-397.  And this on the right-hand column says

14   "Machine ends of heatshield in accordance with scribe

15   marks made in steps S and T."

16                 MR. GREENE:  Where are you?  I'm sorry.

17                 MR. HATTEN:  Page 6-397.

18                 MR. GREENE:  We've got the page, just

19   where --

20                 MR. HATTEN:  Bottom right-hand corner.

21                 MR. GREENE:  Okay.

22                 THE WITNESS:  Okay.

23                 Yes.

24   BY MR. HATTEN:

25      Q    "Machine ends, in accordance with the scribe

1   marks use AMS 5680 or 5681 filler metal with insert."

2   And then it says "Pack tube with wet asbestos during

3   welding to minimize distortion."

4             MR. GREENE:  Just object to the form.  To

5   the extent you didn't read it fully into the record,

6   V, and then you quoted W.

7   BY MR. HATTEN:

8     Q    Do you see that?

9     **A    I see that, yes.  There's V, item V, there's a**

10   **note, and then there's item W.**

11     Q    And again, this is packing wet asbestos,

12   doesn't say anything about any product, just wet

13   asbestos during the welding to minimize distortion.

14   Do you see that?

15     **A    That's what it says, yes.**

16     Q    And have you seen that done?

17     **A    No, I have not.**

18     Q    This is part of the manual for the overhaul

19   and repair of the J57 jet engine, correct?

20             MR. GREENE:  Objection to the form, and

21   objection as previously stated.

22             THE WITNESS:  This is the repair section

23   of the manual, yes.

24   BY MR. HATTEN:

25     Q    Let's go back to page 6-361.

1    A    **361 or 51?**

2    Q    361, going backwards.

3         Do you see where it talks about a crossover to

4    tube heatshield replacement?

5    A    **Yes.**

6    Q    And do you see where it talks about grinding

7    off the welds, securing the heatshield to the outer

8    liners and cover and remove the heatshield?

9    A    **I see that, yes.**

10   Q    "Used heatshields may be reinstalled if they

11   meet their inspection requirements."

12   A    **Yes.**

13   Q    And then "Grind off the residual material,

14   weld material flush with but not below the surrounding

15   surface."

16   A    **Yes.**

17   Q    So one of the processes for these heatshields

18   is activity which involves grounding off the welds,

19   correct?

20   A    **That's what it says, yes.**

21   Q    And then on number 7, up on the right-hand

22   side column it says "If necessary, grind out hole in

23   the heatshield to inspect."

24        MR. GREENE:  Objection to the form.

25   Misstates the --

Page 49

1    BY MR. HATTEN:

2      Q    Well, the subject of the paragraph is,

3    "Inspect for proper clearance between the heatshield

4    and the chamber."  And then again, "Inspect for

5    minimum clearance between the heatshield and crossover

6    tube.  If necessary, grind out hole in the

7    heatshield."

8               MR. GREENE:  "To obtain," to complete

9    the --

10              MR. HATTEN:  "To obtain."

11              THE WITNESS:  Yes, I see that.

12   BY MR. HATTEN:

13     Q    On page 6-3666, top left, again, number 7, it

14   says "Grind off residual heatshield and crossover

15   tube, attaching weld material."

16          Do you see that?

17              MR. GREENE:  Just object to the form.

18   It's an incomplete statement of the document.

19              THE WITNESS:  Yes, I see that.

20   BY MR. HATTEN:

21     Q    This page, again, refers to grinding on the

22   heatshield.

23              MR. GREENE:  Objection to the form.

24   BY MR. HATTEN:

25     Q    Correct, as part of repair or overhaul?

Page 50

1      **A      Yes.**

2              MR. GREENE:  Objection to the form.

3  BY MR. HATTEN:

4      Q      Thank you.

5              Let's go to page 6-666.

6      **A      656.**

7      Q      Yes.  666.

8      **A      6-666.**

9      Q      Okay?  Do you see where it says "Note" on the

10  left-hand side?

11     **A      Yes.**

12     Q      Says "If aluminum nut cannot be moved far

13  enough away from the heat affected area, wrap it with

14  wet asbestos to keep it cool."

15     **A      I see that, yes.**

16     Q      Are you familiar with the use of wet asbestos

17  to protect aluminum during welding in the overhaul of

18  the J57?

19     **A      I am not familiar with that repair process,**

20  **no.**

21     Q      This is in the manual that we just have been

22  discussing for the overhaul and repair of a J57 jet

23  engine, correct?

24              MR. GREENE:  Objection to the form.

25              THE WITNESS:  Yes, and we don't know who

1   wrote it.

2   BY MR. HATTEN:

3       Q    You don't know who wrote it?

4       **A    I don't know who wrote it.**

5              MR. GREENE:  We've been going a little

6   over an hour.  Time for a quick break?

7              MR. HATTEN:  Sure.

8              THE VIDEOGRAPHER:  The time is now 11:26

9   and we're going off the record.

10       (Recess taken from 11:25 a.m. to 11:32 a.m.)

11              THE VIDEOGRAPHER:  11:33, and we are back

12   on the record.

13   BY MR. HATTEN:

14       Q    Just for the record, the first page of the

15   actual manual, the overhaul manual, references in

16   parenthesis, under the word "Aircraft Engines, Pratt &

17   Whitney Aircraft, Division of United Aircraft

18   Corporation.  Do you see that?

19       **A    Yes.**

20       Q    And your responsibility never did entail

21   writing an overhaul procedure book such as this, is

22   that correct?

23       **A    I aided in supplying technical content to some**

24   **manuals, but not the J57.**

25       Q    Let me ask you to look, please, now at this

Page 52

1    next document that I have for your consideration.

2        This document I'd like you to look at is the

3    Technical Manual Overhaul Instructions for the J57

4    Aircraft Engines, and this is published May 15, 1965.

5    Do you see that?

6    **A    Yes.**

7        MR. GREENE:  Let me just before you go,

8    just note an objection, that United Technologies

9    Corporation did not produce this manual in this case

10   as it is protected by statutes related to national

11   security, and we have not obtained the permission or

12   received approval of the Air Force to produce it in

13   the case.

14   BY MR. HATTEN:

15   Q    Now, does this -- on the one that you just

16   looked at, did you see anything on any page of this

17   document that said classified?

18        MR. GREENE:  Objection to the form.

19   BY MR. HATTEN:

20   Q    On the one you just looked at, Exhibit Number

21   3.

22   **A    I didn't notice on any of the pages, specific**

23   **pages that we looked at, but I also wasn't looking for**

24   **it.**

25   Q    Certainly none of the pages we talked about

Page 53

1  had the word classified on it, did it?

2  　　　　　MR. GREENE:  Objection to the form.

3  　　　　　THE WITNESS:  I didn't notice the words

4  classified on them, no.

5  BY MR. HATTEN:

6  　Q　Do you see the word classified on the front of

7  this manual?

8  　**A　No, I do not.**

9  　Q　I'd like you to draw your attention to page

10  5-3.

11  　　　　　And you see that the -- this product, or this

12  manual as of 1965 was discussed heatshields at pages

13  211, 213, 11, 13, and 203, at number 4 up from the

14  bottom and number 3 up from the bottom?

15  　**A　I see that.**

16  　Q　And that's under the section called

17  "Cleaning," correct?

18  　**A　Yes.**

19  　Q　And on page 6-35, if you could turn to that,

20  please.  There's a section here, 6-43, entitled

21  "Engine Heatshield Repair."

22  　**A　I see it.**

23  　Q　It says "Heatshields with chafing spots, nicks

24  and gouges not exceeding 50 percent of wall thickness

25  are acceptable providing burrs and high metal are

1    blended out.  Heatshields with chafing spots or damage

2    beyond 50 percent of the wall thickness may be

3    repaired as follows:"  And then it continues, "Use

4    suitable locally manufactured doubler patch and/or

5    flush doubler patch and install patch inboard or

6    outboard, whichever is applicable, by riveting.

7    Utilize aircraft type standard repair method for

8    removal, replacement and installation of rivets.  Use

9    suitable tools.  Re-form heatshields that are

10   distorted.  Repair or replace damaged attaching

11   brackets to conform with applicable blueprints.  After

12   rework or repair of heatshields treat for corrosion.

13   Heatshields that are considered beyond economical

14   repair will be condemned."

15          These are the instructions regarding repair of

16   heatshields.

17               MR. GREENE:  Objection to the form.

18   BY MR. HATTEN:

19       Q    During overhaul.

20       **A    Yes, but I don't see where it says what kind**

21   **of heatshield it is.  As I mentioned earlier, there's**

22   **many different kinds of heatshields.**

23       Q    This was before -- this 1965 is before you

24   actually worked on the J57, correct?

25       **A    That's correct.**

1    Q    Over here -- I'm not going to go through all

2    the different notes and warnings, and so forth, but on

3    page 10-38, I'd like you to turn to that, please.

4         Again, on the right-hand side, right column,

5    says "Repair of loose heatshields."  Says "Remove

6    loose heatshield from fuel manifold assembly by

7    breaking weld bead on both sides of the heatshield

8    using hand power tools.  Caution.  No surface other

9    than the heatshield must be touched with rotary burr

10   or wheel used to remove weld bead.  Remove insulation

11   and asbestos tape from expansion tubes.  Inspect tubes

12   for evidence of chafing.  Note.  Observe manner in

13   which insulation and asbestos tape were installed so

14   that at assembly they may be applied to tubes in the

15   same manner."

16        What insulation are they talking about?

17   **A    This is under the major heading of fuel**

18   **manifold heatshield inspection and repair, so these**

19   **are fuel manifold heatshields.**

20   Q    Would the insulation be the Min-K, or could it

21   be the Min-K?

22        MR. GREENE:  Objection to the form.

23        THE WITNESS:  It could be.  It doesn't

24   specify what the brand name of it is.

25   BY MR. HATTEN:

1    Q    But Min-K was a form of insulation that was

2  used for heatshields on the J57, correct?

3              MR. GREENE:  Objection to the form.

4              THE WITNESS:  I believe so, yes.

5  BY MR. HATTEN:

6    Q    And asbestos tape from expansion tubes, tell

7  me how you used asbestos -- how one would use asbestos

8  tape on the expansion tubes?

9    **A    I don't know the answer to that.**

10   Q    Let's go to B-2, which is in Appendix 2.

11 You've got an Appendix A, and then an Appendix B.  And

12 we're at B-2.  Do you see it?

13   **A    D?**

14             **MR. GREENE:  B.**

15             MR. HATTEN:  B as in boy.

16             THE WITNESS:  Oh, B as in boy, I'm sorry.

17 BY MR. HATTEN:

18   Q    And this is on table B-1, "Consumable Material

19 Specifications," and do you see "asbestos cement"?

20   **A    I see it on the list, yes.**

21   Q    And it says "FIRELITE, Johns Manville."

22        Are you familiar with FIRELITE asbestos cement

23 from Johns Manville?

24   **A    No, I'm not.**

25   Q    And it says the application is for the fuel

Page 57

1   manifold heatshields repair.  Are you familiar with

2   that process?

3       A    I am not familiar with the repair process, no.

4       Q    Are you aware of whether or not warnings were

5   on Johns Manville's asbestos cement beginning in 1964?

6               MR. GREENE:  Objection to the form.

7               THE WITNESS:  No, I'm not.

8   BY MR. HATTEN:

9       Q    Again, this technical manual of overhaul

10  instructions for the J57 is a document that you did

11  not participate in writing.

12      A    That's correct.

13      Q    Correct?

14          Is this a manual that you would have used?

15              MR. GREENE:  Objection to form.

16              THE WITNESS:  Personally?

17  BY MR. HATTEN:

18      Q    Or the men under your supervision.

19      A    Well, I never was directly involved with the

20  assembly or disassembly of the J57 engine, this

21  particular model.

22      Q    Okay.  And so you did not supervise the repair

23  and overhaul of the J57 engine?

24      A    That's correct.

25      Q    Which engines did you participate in the

Page 58

1  repair and overhaul of?

2    A    **By far the most common I was involved in was**

3  **the JT8D.**

4    Q    Okay.  And what were the years that you were

5  involved with the overhaul of that change?

6    A    **The same years we had spoken of before, 1968,**

7  **and on and off from that time all the way up to the**

8  **time I retired.**

9      **There were other engine models I was involved**

10  **in, also, but most of it was the JT8D.**

11    Q    Let's mark the 65 overhaul manual as Exhibit

12  Number 4.

13  (Exhibit 4, J57 overhaul instruction manual for 1965,

14  marked for identification)

15    Q    I understand your job did not involve any

16  decision-making with regard to whether warnings should

17  be put on products or not.

18    A    **That's correct.**

19    Q    And that would include any products, whether

20  it was asbestos or anything else.

21    A    **Yes.**

22    Q    Correct?

23    A    **Correct.**

24    Q    Have you ever read any documents pertaining to

25  the patents for heatshields?

Page 59

1      A      No.

2      Q      Let me show you this document dated July 18,

3   1972, relating to heatshields.  And you probably have

4   not ever seen it, but I'll just ask you if you have

5   ever seen that document before?

6      A      **No, I have not seen this document before.**

7      Q      Let me just read something to you and ask you

8   if you know anything about it.  Are you familiar with

9   heatshields in which the thermal insulating material

10  which is of the type known as Min-K is supplied in a

11  quilted form, stitched between two layers of glass

12  fiber fabric, as the edges of the insulating material

13  are liable to crumble they are dumped in a suitable

14  sealant such as Betime.  Are you familiar with

15  heatshields like that?

16             MR. GREENE:  Objection to the form.

17  Overbroad, and it's not a document he's seen before.

18             THE WITNESS:  I am only aware that Min-K

19  is used in some of these heatshields.  I've never

20  actually seen the Min-K because it was always

21  encapsulated, so I'm not familiar with that.

22  BY MR. HATTEN:

23     Q      So you haven't seen the --

24             Let me mark this as Exhibit Number 5.

25  (Exhibit 5, document dated July 18, 1972, relating to

1   heatshields, marked for identification)

2   Q    So you have not -- you never saw the packaging

3   of Min-K?

4   **A    No, never.**

5   Q    And never dealt with the purchase of it for

6   Pratt & Whitney?

7   **A    That's correct.**

8   Q    And you yourself did not specifically design

9   any aspect of the J57 or any jet engine that utilized

10   Min-K?

11   **A    That's correct, during that time frame.**

12   Q    When you arrived at Pratt & Whitney in --

13   1965?

14   **A    Yes.**

15   Q    Did they have a library?

16   **A    I'm sure they did at that time.  I became**

17   **aware of it several years later.  I had no occasion to**

18   **go looking for it at that time.**

19   Q    Where was the library?

20   **A    The first I became aware of it, it was in the**

21   **basement of the main administration building.**

22   Q    And tell me about how big it was and what it

23   looked like?

24   **A    It was fairly large.  I don't know how to**

25   **describe the size.  It had to be at least 50 by 100**

1   feet, maybe larger than that.  And it looks like a

2   library filled with book shelves.

3       Q    And would it be fair to say, then, they had

4   probably thousands of books?

5       A    Yes.

6       Q    And they have a card catalog?

7       A    That I don't recall.  I'm sure there was some

8   method.  I don't know what method they used.

9       Q    Did they have journals and things like that in

10  the library?

11             MR. GREENE:  I note an objection.  And

12  also this is a category that Ms. Harvey has been

13  designated to discuss.  Mr. Sumner has not been

14  prepared to answer questions pursuant to your notice

15  on this issue.

16  BY MR. HATTEN:

17      Q    Did they have journals as well as textbooks

18  there?

19      A    I remember seeing journals there, yes.

20      Q    Was there a librarian assigned to sort of be

21  the point person in that facility?

22      A    Yes, there was.

23      Q    And did all the engineers or employees at

24  Pratt & Whitney have access to this library and did

25  you have to have a special key or a code, or was it

Page 62

1    available for use by the engineers as they needed it?

2              MR. GREENE:  Objection to the form.

3              THE WITNESS:  As far as I know, it was.

4    BY MR. HATTEN:

5       Q    Available on an as-needed basis?

6              MR. GREENE:  Objection to the form.

7              THE WITNESS:  Yes.

8    BY MR. HATTEN:

9       Q    Was there a safety department at Pratt &

10   Whitney when you got there in 1965?

11      **A    There was a department called Health and**

12   **Safety, which would be the safety department.**

13      Q    And can you tell me how that was staffed?  Was

14   it --

15      **A    No.  I had very little direct contact with**

16   **them.**

17      Q    Was there a safety manual that you got when

18   you arrived at Pratt & Whitney?

19      **A    Not that I remember, no.**

20      Q    Did they have safety meetings on a regular

21   basis?

22      **A    Not that I was involved in, no.**

23      Q    How were you expected to know about various

24   dangerous chemicals or products that might come up in

25   your work?

Page 63

1    A    That department had a newsletter that went out

2  periodically to the employees, and it discussed things

3  like that.

4    Q    Did the newsletter have a name?

5    A    I'm sure it did.  I don't remember the name of

6  it.

7    Q    How often was the newsletter published?

8    A    I don't remember.  It was -- I don't know if

9  it was on a regular periodic basis, or on an as-needed

10 basis.  Every once in a while we got a newsletter.

11 That's all I remember.

12   Q    And that continued from 1965 until

13 approximately when?  Did it ever stop?

14   A    Yes, it did stop.  I don't remember in the

15 later years seeing it, but I -- it may have been in a

16 different form, but I don't recall when that

17 particular newsletter ended.

18   Q    Did you yourself ever receive any training

19 concerning the potential hazards of asbestos and any

20 safety procedures that should be followed when working

21 with or around it?

22         MR. GREENE:  Objection to the form.

23         THE WITNESS:  No, I did not.

24 BY MR. HATTEN:

25   Q    During what years did you work with or around

1   asbestos-containing products?

2       **A    The same years that I was involved in the**

3   **engine shops, which started in 1968, and I was**

4   **involved in engine shops right up until I retired.**

5       Q    During what years were asbestos-containing

6   products used in those shops?

7                MR. GREENE:  Objection to the form.

8   Outside the scope of the notice.

9                THE WITNESS:  I'm not familiar with the

10  asbestos products used in the shop.  I'm only familiar

11  with the engine parts that contained asbestos in the

12  shop.  And the engines we worked on, starting in 1968,

13  did contain some parts which had a percentage of

14  asbestos in them.  All the way up through, you know,

15  past 1977 here.

16  BY MR. HATTEN:

17      Q    Do you know what the percentage of asbestos is

18  in asbestos gaskets?

19      **A    No, but if I were -- if I had to find out, I**

20  **would look at the Mlynarek report.  I believe that**

21  **calls out the percentage in all the parts.**

22      Q    Is that the only document that you've ever

23  seen at Pratt & Whitney which dealt with asbestos as a

24  potential health hazard?

25               MR. GREENE:  Objection to the form.

1          THE WITNESS:  There are other documents

2    which identify parts which contain asbestos.  Now, I

3    think there was simply an identification for the most

4    part.

5    BY MR. HATTEN:

6    Q    Have you ever seen a warning label on any

7    asbestos-containing product at Pratt & Whitney in your

8    career?

9    **A    The only warning labels I have seen are --**

10   **were placed in boxes of spare parts that we shipped to**

11   **airline customers, or to our customers.**

12   Q    And when did that begin?

13   **A    I don't have an exact date.  It began probably**

14   **when it was required by OSHA, or whoever was**

15   **responsible for that.  Must have been somewhere around**

16   **1980.  I don't -- I really don't have a date.**

17   Q    Well, OSHA came into effect in 1972.  Would it

18   have been as early as the 1972 time frame that you

19   recall warnings on boxes of asbestos spare parts?

20          MR. GREENE:  Objection to form.  Asked

21   and answered.

22          THE WITNESS:  I don't know.  The first

23   time I ever saw these warning labels was when I became

24   in this work after 2001.

25   BY MR. HATTEN:

Page 66

1    Q    So during the time that you were actually

2  working at Pratt & Whitney, you never saw a warning --

3  asbestos warning label on anything, is that correct?

4    **A    That's -- not that I recall, that's correct.**

5    Q    And that would include asbestos gaskets, you

6  never saw a warning label on packaging or the product

7  itself?

8    **A    They may have been there, but I typically**

9  **wouldn't see the packaging in the work that I did.**

10   Q    You never saw any on the product itself,

11  correct?

12   **A    I've never seen any on the product itself, no.**

13   Q    And you don't know what was on the package?

14   **A    No.  I generally didn't see the packaging.**

15   Q    All right.  On Min-K, you never saw the

16  product or the packaging.

17   **A    That's correct.**

18   Q    Is that correct?

19   **A    That's correct.**

20   Q    On asbestos -- what other asbestos-containing

21  products were there on the J57 that you recall?

22   **A    The -- there are several different types of**

23  **parts which had a percentage of asbestos.  One was the**

24  **heatshields, some of the heatshields that we were**

25  **speaking of, the blanket type.  Some of the gaskets,**

1   **as we've spoken of.  There are clamps which hold**

2   **plumbing and wiring on the outside of the engine.**

3   **Some of those clamps have a Teflon cushion which**

4   **contains some percentage of asbestos in it.  There's**

5   **some wiring, electrical wiring on the outside of the**

6   **engine which has some asbestos-containing insulation**

7   **over it.**

8       Q    Would you have to strip that wiring?

9       **A    Yes.**

10          MR. GREENE:  Objection to the form.

11  Calls for speculation.

12          THE WITNESS:  The wiring had several

13  layers of insulation over the metal wire.  The very

14  first layer right against the wire was -- contained

15  asbestos, and then there were several layers over

16  that.

17  BY MR. HATTEN:

18      Q    What sort of tools would you use to strip the

19  asbestos from the wire?

20          MR. GREENE:  Object to the form.

21          THE WITNESS:  Again, we're getting into

22  repairs, and I'm not familiar with the repair

23  procedures.

24  BY MR. HATTEN:

25      Q    Any other asbestos-containing products on the

Page 68

1   J57?

2   **A     I believe there's something called a liner,**

3   **which may contain -- maybe contain some adhesive where**

4   **it's glued on, adhered to a part.**

5   Q     The adhesive had asbestos or the liner had

6   asbestos?

7   **A     The adhesive.**

8   **That's all I can think of off the top of my**

9   **head.**

10  Q     Would the adhesive have to be ground off,

11  sanded off, or removed at some point?

12           MR. GREENE:  Objection to the form.

13           THE WITNESS:  If -- I think that was

14  unusual.  Again, that's a repair procedure.  We sell

15  the part all glued together as one piece.

16  BY MR. HATTEN:

17  Q     With regard to replacement parts, for the jet

18  engines, did you have any responsibility for the

19  procurement or sale of the replacement parts?

20  **A     No, I did not.**

21  Q     Are you familiar with the fact that Pratt &

22  Whitney did purchase replacement parts and sell

23  replacement parts to its customers?

24  **A     Yes.**

25  Q     Are you familiar with the fact that Pratt &

1  Whitney would put its own packaging or label on the

2  replacement parts when it sent it to the customers?

3                MR. GREENE:  Objection to the form.

4  Vague as to "customers".

5                THE WITNESS:  I believe we packaged these

6  parts in Pratt & Whitney boxes, boxes which said Pratt

7  & Whitney on them, before sending them.

8  BY MR. HATTEN:

9     Q    So for instance, you would buy asbestos

10  gaskets for a J57 engine, send it to the Air Force or

11  whoever the customer was, in a Pratt & Whitney box,

12  correct?

13                MR. GREENE:  Just object to the form.

14  And I think this also gets into an area where

15  Mr. Shiffler is the person who's designated to answer

16  the questions.

17                THE WITNESS:  Yes, in fact I was just

18  going to say that the Pratt & Whitney boxes that I saw

19  were used in the commercial world to airline

20  customers.  Now, I'm not sure if those boxes were used

21  going to a military customer or not.  Mr. Shiffler

22  could probably tell you that.

23  BY MR. HATTEN:

24     Q    Did you ever see -- I think you said before,

25  you never saw any warning on any packaging or any

1  asbestos product itself, during the years that you

2  worked at Pratt & Whitney, correct?

3     **A     That's correct.  At least not that I can**

4  **recall.**

5     Q    And that would include boxes where Pratt &

6  Whitney was shipping asbestos-containing products to

7  someone else.

8              MR. GREENE:  Objection to the form.

9  Vague as to --

10  BY MR. HATTEN:

11    Q    Is that correct?

12             MR. GREENE:  Vague as to "someone else".

13             THE WITNESS:  Yes, but my exposure to

14  that was very, very limited.

15  BY MR. HATTEN:

16    Q    Did Pratt & Whitney have -- you said they had

17  testing facilities, you were in the testing

18  department?

19    **A     Yes.**

20    Q    Would I be correct that Pratt & Whitney had

21  microscopes?

22    **A     We had a laboratory with microscopes, yes.**

23    Q    Did Pratt & Whitney have an electron

24  microscope?

25    **A     They did.  I don't know when they -- that was**

Page 71

1    procured, but I know in the later years, say in the

2    nineteen-eighties or so, they did have electron

3    microscope.

4        Q    You don't know how long they had it, though?

5        A    I have no idea.

6        Q    Are you familiar with what's called an

7    impinger?

8        A    Impinger, no, I'm not.

9        Q    Did Pratt & Whitney have test chambers where

10   they tested products?

11       A    Yes.  We had test cells where the finished

12   engines were mounted and run.

13       Q    Did you have testing areas that were

14   ventilated that you could -- that they could run

15   different tests on component parts and that type of

16   thing?

17              MR. GREENE:  Objection to form.  Vague,

18   overbroad.

19              THE WITNESS:  We had other smaller test

20   cells to test individual component parts, yes.

21   BY MR. HATTEN:

22       Q    And what types of component parts would you

23   perform testing on at Pratt & Whitney?

24       A    We would test parts of the engine.  We may

25   test just, for example, the compressor section, or the

1   turbine section, or the fan section by itself without

2   it being assembled into an entire engine.

3       Q    Did you have a research and development

4   department at Pratt & Whitney?

5       A    Yes, we did, although it was a combination,

6   really, of the engineering department and the

7   materials lab.

8       Q    And the materials lab, did they test the

9   integrity, strength, and performance of component

10  materials that were used for the engine?

11      A    Yes, they did.

12      Q    And how many people were in that department?

13      A    I don't know the number, but it was a large

14  department.

15      Q    What are we talking about large, 50, a

16  hundred?

17      A    Probably one hundred people.

18      Q    And what were the variety of qualifications of

19  people that tested the materials used in jet engines?

20  Were they toxicologists, you know, materials experts,

21  those types of folks?

22      A    First let me retract the one hundred.  It may

23  not have been that large.  It may have been closer to

24  50, now that I think about it more, in that lab.

25          I think the majority of the people in there

Page 73

1    were metallurgists, and they were involved in testing

2    different alloys and exotic materials.

3        Q    For their performance and for their

4    characteristics under stress and that type of thing?

5        A    Yes.

6        Q    And all of these people that were working in

7    the testing department for materials, I mean I assume

8    they were college educated people?

9              MR. GREENE:  Objection to form.  Assumes

10   facts.

11             THE WITNESS:  They -- not all of them.

12   There were other people there.  There were technicians

13   there, there were office staff, things like that.

14   BY MR. HATTEN:

15       Q    Were the majority of them people that were

16   equipped with engineering degrees of one kind or

17   another, chemical engineering, mechanical engineering,

18   metallurgy, that type of thing?

19       A    The people that I dealt with did.  I can't

20   speak for the whole department.

21       Q    If someone wanted to run a test on an asbestos

22   product, for instance, Pratt & Whitney had the

23   capacity to do it, correct?

24             MR. GREENE:  Objection to form.  Calls

25   for speculation, outside the scope of the notice, and

1   designation, or the topics that Mr. Sumner's been

2   asked to testify about.

3                THE WITNESS:  We weren't specifically set

4   up to do that.  That wasn't the main function.  On

5   occasion we would ask the manufacturer or an

6   independent lab to do some testing on some of these

7   smaller parts.  We would test them on full scale

8   engines, we would run them during endurance tests, we

9   may run some laboratory tests on them, but it was --

10  could have been anywhere.  Could have been an outside

11  lab, could have been the manufacturer, could have been

12  us.

13  BY MR. HATTEN:

14     Q    Pratt & Whitney was a very sophisticated

15  company, correct?

16                MR. GREENE:  Objection to the form.

17                THE WITNESS:  Yes.  It's a very

18  sophisticated product.

19  BY MR. HATTEN:

20     Q    And Pratt & Whitney had been making high tech

21  products for airplanes since the nineteen-twenties,

22  correct?

23     **A    That's correct.**

24     Q    And at all times from the nineteen-twenties up

25  through the nineteen-seventies Pratt & Whitney was a

Page 75

1   leader in the technology of all aspects of airplane

2   engines, correct?

3       **A      I believe so, yes.**

4       Q    And for instance, Pratt & Whitney in the

5   nineteen-sixties participated in the activities that

6   led to the moon shot, correct, moon landing in 1969?

7       **A      Not the jet engine part of Pratt & Whitney.**

8   **There was another space company, another Pratt &**

9   **Whitney company involved in the space program.**

10      Q    It was under the umbrella of United

11  Technologies?

12      **A      Yes.**

13      Q    Another wholly owned subsidiary of United

14  Technologies, correct?

15              MR. GREENE:  Objection to form.

16              If you know.  I think it's an area

17  covered by another witness pursuant to the notice, but

18  you can answer if you can.

19              THE WITNESS:  I don't know the exact -- I

20  don't know if it was a wholly owned subsidiary or if

21  it had some other designation.  I don't know that.

22  BY MR. HATTEN:

23      Q    The jet engine that Pratt & Whitney designed,

24  patented and sold to the Air Force was a standard jet

25  engine, the J57, from the early nineteen-fifties until

Page 76

1   the mid-nineteen-seventies, correct?

2       **A    Yes.**

3       Q    And that engine had a -- had multiple military

4   as well as commercial applications throughout that

5   period of time?

6       **A    Yes, it did.**

7       Q    In Pratt & Whitney's answers to

8   interrogatories in this case, they have listed a

9   number of asbestos products on page 5 of their answers

10  in response to question Number 6, and I ask you to

11  take a look at these.

12          Are you familiar -- here, let me -- let me

13  give this one to you.  Mine's marked up.

14          If you turn to page 5.

15          MR. GREENE:  Just for the record, these

16  are United Technologies Corporation's responses to

17  plaintiff's master interrogatories and request for

18  production in the Burke case, correct?

19          MR. HATTEN:  Yes.

20          MR. GREENE:  Thanks.

21  BY MR. HATTEN:

22      Q    The list of products that are described on

23  pages 5 and 6 in response to interrogatory number 6,

24  are you aware of any testing done on any of those

25  products at Pratt & Whitney to determine any asbestos

Page 77

1   fiber release from the use or removal of those

2   products?

3       A    I'm not aware of any, no.

4       Q    Are you aware of any warning label or safety

5   procedures that were ever in place at Pratt & Whitney

6   for the handling, use, or removal of any of these

7   products?

8              MR. GREENE:  Objection to the form.

9              Could we narrow it to a specific time

10  period?

11             MR. HATTEN:  From 1965 to 1980.

12             THE WITNESS:  Not that I'm aware of.

13  BY MR. HATTEN:

14      Q    Are you aware of any after 1980?

15      A    Not until the Mlynarek report.

16      Q    In 2007?

17      A    2006.

18      Q    2006.  Okay.  But there were no -- I'm talking

19  about safety instructions to employees.

20             MR. GREENE:  I'll object.  I'm not sure

21  he understood the question.

22             MR. HATTEN:  I'll rephrase.

23             THE WITNESS:  That's correct.

24  BY MR. HATTEN:

25      Q    Are you aware of any safety instructions or

1  warnings to the employees about any of these products

2  at any time when you were working at Pratt & Whitney

3  between the years 1965 and 2001?

4     **A     I am not aware of any, no.**

5     Q     And would that apply to both the installation

6  of those products and the removal of those products?

7     **A     Yes, it would.**

8     Q     And as I understand it, you never worked on a

9  J57 jet engine, correct?

10    **A     I never physically worked on it.  But I was --**

11  **I had some other responsibilities related to it, but I**

12  **never physically worked on it.**

13    Q     Did you supervise the removal of asbestos

14  gaskets from the J57?

15    **A     No.**

16    Q     Did you supervise the removal of any

17  asbestos-containing product from a J57?

18    **A     No.**

19    Q     Did you see the tools used by anyone else to

20  perform those activities with asbestos products on a

21  J57?

22    **A     I've seen the general tooling that's used in**

23  **any jet engine shop.  Now, whether I've -- I have not**

24  **been to an Air Force or a Navy shop where they tore**

25  **down a J57 with those specific tools.  I suspect they**

1    **would be similar or the very same, but I haven't**

2    **specifically for J57, no.**

3        Q    Were asbestos gaskets or asbestos product or

4    any other asbestos product used on steel flanges in

5    the J57?

6        **A    What about them?**

7        Q    Were there asbestos gaskets used on steel

8    flanges in the J57 engine?

9        **A    Yes, there were.**

10        Q    Were there -- what kind of steel?

11        **A    It was a --**

12        Q    Stainless steel?

13        **A    It varies by location, but it's all steel**

14    **alloy of some sort.**

15        Q    Were there asbestos gaskets on a J57 that were

16    on an aluminum flange?

17        **A    I believe there were.  I believe there were.**

18    **I would have to double-check that to be absolutely**

19    **sure.**

20        Q    Were there any rules or regulations in the

21    shop or that you're aware of concerning -- from Pratt

22    & Whitney concerning the use of a power wire brush to

23    remove an asbestos gasket from a steel flange?

24                MR. GREENE:  Objection to the form.

25    Vague as to "shop".  Are you talking about on the

Page 80

1    Pratt & Whitney shop?

2              MR. HATTEN:  On a Pratt & Whitney J57 jet

3    engine.

4              MR. GREENE:  Just so I'm clear, a shop, a

5    Pratt & Whitney shop, or a -- any other old shop?

6              MR. HATTEN:  A Pratt & Whitney shop.

7              THE WITNESS:  A Pratt & Whitney shop

8    operated by Pratt & Whitney, Pratt & Whitney

9    employees, they are instructed not to use any kind of

10   a power tool or wire brush of any kind to remove

11   gaskets.

12   BY MR. HATTEN:

13       Q    And when was that regulation adopted?

14       **A    It was in place when I started in 1965, and I**

15   **suspect it was in place long before that.**

16       Q    What was the reason for that, on steel?

17       **A    Because for a gasket to seal properly, the**

18   **surface of the steel has to be very flat and smooth,**

19   **no scratches or no gouges in it, or it could leak.**

20       Q    Have you tested that hypothesis?

21       **A    I don't know.  I don't know if Pratt & Whitney**

22   **has tested that or not.**

23       Q    Have you yourself ever tested that idea?

24       **A    No.**

25       Q    Have you ever read or do you have any

1   documents that support that idea?

2      **A    We have manuals -- we have information about**

3   **standard shop practices which should or should not be**

4   **used, and that information is there.**

5      Q    Do you have any documents which support your

6   suggestion that the gasket would not be effective if a

7   hand wire brush was used on a steel flange?

8              MR. GREENE:  Objection to the form of the

9   question.

10            THE WITNESS:  Not that I'm aware of.

11  BY MR. HATTEN:

12      Q   Have you ever had a conversation with the

13  metallurgist about that?

14      **A    No.**

15      Q   And am I correct that you're not a

16  metallurgist?

17      **A    That's correct.**

18      Q   Were there any circumstances that you recall

19  where asbestos products were used at Pratt & Whitney

20  in which employees -- in which a recommendation was

21  made to wear a respirator?

22              MR. GREENE:  Objection to the form.

23  Overbroad.

24            THE WITNESS:  Not that I'm aware of.

25  BY MR. HATTEN:

Page 82

1   Q    Is there any circumstance where asbestos

2   products were used at Pratt & Whitney where employees

3   were advised to take any precautions to avoid

4   breathing asbestos dust?

5   A    Not that I'm aware of.  During that time

6   frame.

7   Q    During your employment.

8   A    I don't know about the later years.  There

9   could have been something.  It's not the type of thing

10  that I would have been involved in or necessarily seen

11  if it was there.

12  Q    Did you yourself belong to any associations of

13  professionals when you were at Pratt & Whitney?

14  A    Yes, I did.

15  Q    And what associations were they?

16  A    It was the International Association of Air

17  Safety Investigators.

18  Q    And what did they do?

19  A    It was an association of accident

20  investigators who investigated airplane accidents.

21  Q    And would I be correct that that didn't have

22  anything to do with asbestos at any time?

23  A    It was never a topic of discussion.

24  Q    Did you know Dr. Sidney Curtis?

25  A    No.

Page 83

1    Q    Dr. John Gallivan?

2    A    **Gallivan?**

3    Q    G-A-L-L-I-V-A-N.

4    A    **No.**

5    Q    Dr. Trudeau Horraux, H-O-R-R-A-U-X?

6    A    **No.**

7    Q    Dr. Stuart Jacobson?

8    A    **No.**

9    Q    Dr. Elliot McCurdy?

10   A    **No.**

11   Q    Or Dr. Ron Sorenson?

12   A    **No.**

13   Q    Did they have a medical department at Pratt &

14   Whitney?

15   A    **Yes.**

16   Q    And approximately how many physicians were in

17   that department?

18   A    **I don't know.**

19   Q    Were there physicians on the premises or at

20   the medical department throughout the time that you

21   were employed at Pratt & Whitney from 1965 to 2001?

22   A    **I believe so.**

23   Q    And was there like a medical clinic there?

24   A    **Yes.**

25   Q    Was there a medical director, do you know?

Page 84

1      **A      I believe there was.  I believe that was the**

2   **title of the person in charge there.**

3      Q    Would I be correct that you didn't have any

4   dealings with any manufacturers of any of the asbestos

5   products that were used on the J57 jet engines?

6      **A    That's correct.**

7      Q    If you were going to use a product that was a

8   known carcinogen, would you want to be told that it

9   was a carcinogen and that there were safety procedures

10  that you should follow?

11          MR. GREENE:  Objection to the form.

12  Outside the scope of the notice and the topic areas

13  for which Mr. Sumner's been designated to testify

14  today.

15          THE WITNESS:  If it's been established

16  that there was a hazard in handling that material,

17  yes.

18  BY MR. HATTEN:

19     Q    All of the various asbestos products that are

20  described in these answers to interrogatories on page

21  5 and 6 that we talked about, do you remember that?

22          MR. GREENE:  Referencing asbestos

23  components?

24          MR. HATTEN:  Yeah, the components, right.

25          THE WITNESS:  Yes.

Page 85

1    BY MR. HATTEN:

2        Q     These products were integrated into the J57

3    jet engine, correct?

4                  MR. GREENE:  Objection to the form.  The

5    term "integrated".

6                  THE WITNESS:  Yes, they were.

7    BY MR. HATTEN:

8        Q     Have you seen the website of Pratt & Whitney

9    which talks about "where we have been" and contains a

10   film of the various landmark scientific

11   accomplishments of Pratt & Whitney over time?

12       **A     No, I don't remember seeing that.  I've seen**

13   **the website.  I don't remember seeing that video.**

14       Q     Would it be correct that Pratt & Whitney was

15   at the forefront of science and technology from the

16   nineteen-twenties until the nineteen-eighties and

17   beyond?

18                  MR. GREENE:  Objection to the form.

19                  THE WITNESS:  Yes.

20                  MR. GREENE:  Vague as to the general term

21   "science".

22   BY MR. HATTEN:

23       Q     Was your answer yes?

24       **A     Yes, yes, definitely.**

25                  MR. HATTEN:  Let's go off the record a

Page 86

1    minute.

2                THE VIDEOGRAPHER:  The time is now 12:32

3    and we're going off the record.

4        (Recess taken from 12:31 p.m. to 12:40 p.m.)

5                THE VIDEOGRAPHER:  The time is now 12:40

6    and we're back on the record.

7    BY MR. HATTEN:

8        Q    Mr. Sumner, I'd like you to turn to page 48 of

9    the document in front of you.

10              Have we put a number on that, the answers to

11   interrogatories?  I think it would be number 6.  Okay,

12   if we could put a sticker on it.

13   (Exhibit 6, Answers to Interrogatories, marked for

14   identification)

15       Q    If you turn toward the last 20 percent, 48?

16       **A    I have it.**

17       Q    As a caution label in small print on this

18   picture, on this page, have you ever seen that label

19   on any asbestos product used on a Pratt & Whitney jet

20   engine?

21       **A    I believe I've seen that note or one very**

22   **similar in the box, not directly on the part but in a**

23   **box with a part.**

24       Q    Do you know which part and what time you saw

25   it?

1    A    I saw it after 2001.

2    Q    During the -- let me rephrase my question.

3         From 1965 to 2001, did you ever see that

4    caution label on any asbestos-containing product or

5    any packaging of any asbestos-containing product at

6    Pratt & Whitney?

7    A    No, not that I recall.

8    Q    On page 49 of the answers to interrogatories.

9         Did you ever see these caution labels and

10   danger warning labels on any asbestos-containing

11   product or in any packaging of any asbestos-containing

12   product at Pratt & Whitney?  And we're talking about

13   from 1965 to 2001.

14   A    No.

15   Q    Beginning on page 50 is a logo of Pratt &

16   Whitney.  Is that the logo that Pratt & Whitney put on

17   boxes of replacement parts?

18   A    Yes.

19   Q    All right.  Let's go to the next document.

20   And it's 23 pages long.

21        And I believe you previously said that you

22   were unaware of any procedures pertaining to asbestos

23   exposure at Pratt & Whitney during your employment

24   there.  Am I correct that you've never seen this

25   document?

Page 88

```
 1                    MR. GREENE:  Let me just object and --

 2   BY MR. HATTEN:

 3      Q    Before 2001.

 4                    MR. GREENE:  Sure.  Let me just object.

 5   And this is a document that Ms. Harvey would be

 6   designated to give testimony about.

 7                    MR. HATTEN:  I understand.

 8                    MR. GREENE:  Pursuant to your notice.

 9   BY MR. HATTEN:

10      Q    Am I correct that prior to 2001 this is a

11   document that you had not seen?

12      A    I believe that's true, yes.

13      Q    And would I also be correct that prior to 2001

14   you're unaware of the content of this document?

15      A    Yes.

16      Q    Now, did Pratt & Whitney hire or use -- let's

17   talk about the period 1965 to 1970.  Did Pratt &

18   Whitney have, for instance, boilers on the premises

19   that were maintained, repaired, overhauled?

20                    MR. GREENE:  Object to the form.  Outside

21   the scope of the notice, and outside the scope of the

22   topics Mr. Sumner's designated to testify about.

23                    THE WITNESS:  There were boilers as part

24   of the facilities at Pratt & Whitney, yes.

25   BY MR. HATTEN:
```

Page 89

1    Q    And would these would be large boilers like

2  Combustion Engineering or Babcock & Wilcox boilers?

3    **A    I have no idea.  I was never involved in the**

4  **actual facility.**

5    Q    Where were the boilers located?

6    **A    They're in several locations because there's**

7  **several buildings which had to be heated, and I**

8  **couldn't tell you every location.  I just know from**

9  **walking around over the years, all those years of**

10  **employment, that I have seen them.**

11    Q    Did Pratt & Whitney have people like pipe

12  fitters or machinists that worked with asbestos

13  gaskets on flanges and equipment other than jet

14  engines, I mean things like the power plant, the steam

15  plant, that type of thing?

16          MR. GREENE:  Objection to form.  Outside

17  the scope of the notice and the areas Mr. Sumner's

18  designated to testify about.

19          THE WITNESS:  I know we -- again, I'm not

20  familiar with that part of the business, but I know we

21  had -- yes, we had machinists and we had pipe fitters

22  and other people to take care of the facilities.

23  BY MR. HATTEN:

24    Q    And would that include people like insulators,

25  people that had to repair asbestos insulation on the

Page 90

1    steam lines that leaked and had to be replaced from

2    time to time as part of ordinary maintenance?

3              MR. GREENE:  Objection to form.  Assumes

4    facts, calls for speculation.

5              THE WITNESS:  I'm sure that had to be

6    done.  I don't know if an outside company would come

7    in to do that or if Pratt & Whitney employees would do

8    that.

9    BY MR. HATTEN:

10   Q    So were there places throughout the Pratt &

11   Whitney plant where asbestos pipe covering was used on

12   steam lines and boilers and that type of thing?

13             MR. GREENE:  Same objections.  Calls for

14   speculation.

15             THE WITNESS:  There were insulated pipes

16   in the plant.  I don't know if the insulation was

17   asbestos-containing or not.

18   BY MR. HATTEN:

19   Q    And these were steam lines in the

20   nineteen-sixties, you saw steam lines in the

21   nineteen-sixties and boilers in the nineteen-sixties?

22   **A    I couldn't tell you if they were steam lines.**

23   **I just remember walking through the facility, seeing**

24   **all kinds of pipes, wiring and everything else you'd**

25   **expect in a large factory.  I don't know what they**

1    carried, all of them.

2    Q    They were white, right?

3         MR. GREENE:  Objection to form.

4    Overbroad.

5         THE WITNESS:  Some were painted different

6    colors.  I don't know -- there may have been some

7    white ones.  I don't remember.

8    BY MR. HATTEN:

9    Q    Was there an apprentice program at Pratt &

10   Whitney for people that worked on jet engines?

11   **A    I'm not familiar with manufacture -- there's a**

12   **manufacturing part of it, and then there's an assembly**

13   **work with the finished product.  Can you specify**

14   **what --**

15   Q    Either place.  Was there an apprentice

16   program?

17   **A    I'm not familiar with it.  I think there was**

18   **of some kind.  I was never involved in that directly.**

19   Q    So you wouldn't know whether there were

20   teaching materials or manuals for teaching purposes of

21   apprentices who were either manufacturing jet engines

22   or repairing them?

23   **A    No, I don't know.**

24   Q    Did you have a repair manual --

25        MR. GREENE:  Objection to the form.

Page 92

1    BY MR. HATTEN:

2        Q    -- when you were in the shop?

3        A    **I had -- yes.  I had access to all the**

4    **manuals.**

5        Q    And would those manuals be similar to what we

6    saw today?

7        A    **Yes.  But primarily for --**

8        Q    We're referring to --

9             MR. GREENE:  I'm sorry, did you --

10   BY MR. HATTEN:

11       Q    We were referring to Exhibits Number what, 3

12   and 4?

13       A    **Yes.**

14            MR. GREENE:  And do you have more to add

15   to your answer?

16            THE WITNESS:  Well, I was just going to

17   clarify and say that the manuals I had direct access

18   to were Pratt & Whitney commercial engine manuals

19   written by Pratt & Whitney.  I didn't have the need on

20   a continuing basis to look at the military engine

21   manuals or to use those.

22   BY MR. HATTEN:

23       Q    And would I be correct, you've never compared

24   the two?

25       A    **Well, just in my mind, looking through this**

Page 93

1   manual, for example, I can see, yeah, yes, there are

2   some differences.  I've never directly put them side

3   by side to compare them, no.

4       Q    But as we agreed earlier, you don't know who

5   put the differences there, whether --

6       A    No.

7       Q    -- that was put there by Pratt & Whitney or

8   put there by the military?

9       A    That's true.

10      Q    Do you have the commercial J57 manuals?  Do

11  those exist?

12      A    This engine in the commercial world is called

13  a JT3.

14      Q    Okay.

15      A    And I can go to Pratt & Whitney facilities and

16  get access to that.

17           MR. HATTEN:  Counsel, we would

18  respectfully request that.  We've been requesting it,

19  but I'll make another request for that manual.

20  BY MR. HATTEN:

21      Q    Would it be true that the commercial

22  equivalent of these J57 jet engines -- is there just

23  one commercial equivalent, or are there multiple

24  commercial planes that use the J57?

25           MR. GREENE:  Objection to the form.

Page 94

1    Commercial planes don't use the J57.

2              MR. HATTEN:  Use the same engine.

3              THE WITNESS:  They use the JT3.

4              MR. HATTEN:  Yes.

5              THE WITNESS:  Which is very -- which is

6    almost identical, very similar, in the commercial

7    world.

8    BY MR. HATTEN:

9       Q    Are you aware that the J57 was designed by

10   Pratt & Whitney?

11             MR. GREENE:  Objection to the form.

12             THE WITNESS:  My understanding is that it

13   was, yes.

14   BY MR. HATTEN:

15      Q    Are you aware of the fact that the J57 was

16   patented by Pratt & Whitney?

17      **A    No, I never had occasion to go look for that.**

18      Q    Are you aware of whether or not the J57 was

19   licensed to the government?

20             MR. GREENE:  Objection to the form, and

21   outside the scope of the topics Mr. Sumner's

22   designated to testify about pursuant to your notice.

23             THE WITNESS:  Yes, I have no idea.

24   BY MR. HATTEN:

25      Q    Let me show you this document.

1          I got to admit it's a poor copy, but I

2    couldn't get -- I couldn't get a better copy.

3          Let me show you this off the internet.

4              MR. GREENE:   What was the website?

5              MR. HATTEN:   The Pratt & Whitney website.

6    BY MR. HATTEN:

7    Q    Okay?  Let me just read this into the record.

8          "The J57 was a twin-spool axle flow

9    configuration, a substantial departure from earlier

10   centrifugal flow designs.  It was an immediate

11   success, and its performance was described in

12   superlatives.  Pratt & Whitney had leapfrogged the

13   industry with its first turbo jet design.  In 1957 the

14   J57 won the prestigious Collier Trophy for greatest

15   achievement in American aviation.

16         "The military turned to the J57 for its first

17   fighter squadrons.  In May 1953 a J57-powered North

18   American F-100 Super Sabre became the first production

19   aircraft to exceed the speed of sound in level flight,

20   a feat accomplished on its maiden flight.  The popular

21   Conair F-102 Delta Dart was the next J57 powered

22   aircraft.  The Navy's Chance Vought F8U-1 used its

23   power to set the first official speed record in excess

24   of 1,000 miles per hour.  Other aircraft included

25   Lockheed's U2 reconnaissance plane, the prototype of

Page 96

1    Republic's F-105 Thunder Chief Fighter Bomber and

2    Northrop's Snark intercontinental guided missile.  The

3    engine was upgraded steadily to achieve higher thrust

4    levels.  It's the most powerful model developed in

5    19,600 pounds of thrust with after burning.

6         "In October 1958 the commercial version of the

7    J57, the JT3, brought American passengers into the jet

8    age of travel with the inaugural flight of Pan

9    American World Airways Boeing 707 from New York to

10   Paris.  Four engines, each rated at 13,000 pounds of

11   thrust, reached a cruising speed of 575 miles per

12   hour, 225 miles per hour faster than the newest

13   propeller driven airline of that time.

14        "The J57 and the JT3 were so far ahead of the

15   competition that virtually every aircraft manufacturer

16   in the United States designed an airplane around them.

17   A total of 21,186 of these turbo jets were built for

18   commercial and military applications before the last

19   one was shipped in 1965."

20        Is there anything about that that you disagree

21   with?

22             MR. GREENE:  Objection to the form of the

23   question.  Overbroad.

24             THE WITNESS:  There's -- no, there's

25   nothing I disagree with here.

1          MR. HATTEN:   Thank you.  We'll mark that

2   as number...

3   (Exhibit 7, Pratt & Whitney patent dated July 19,

4   1988, marked for identification)

5   BY MR. HATTEN:

6      Q    Are you familiar with this patent by Pratt &

7   Whitney dated July 19th, 1988, for a firewall seal?

8          MR. GREENE:   Just note my objection to

9   the irrelevance of the document dated some 11 years

10  after Mr. Burke's last exposure.

11  BY MR. HATTEN:

12     Q    Have you ever seen that before?

13     **A    No, I have not.**

14     Q    On page 3 of the document it says "At present

15  seals are often made of asbestos and silicone rubber.

16  These materials present no fire safety problems but

17  asbestos fibers are said to be a potential health

18  hazard."

19          Do you see that?

20     **A    Yes, I see that.  I don't know what fire seal**

21  **they're referring to here, though.**

22     Q    That's a type of heatshield, correct?

23          MR. GREENE:   Objection to the form.

24          THE WITNESS:   Well, a fire seal is often

25  times designed to prevent the spread of the flame or

Page 98

1    fire.

2    BY MR. HATTEN:

3        Q    Were there fire seals in the J57?

4        **A    There was one -- yes, there was one that went**

5    **around the entire engine, I believe.**

6        Q    And was that made of Min-K?

7        **A    No, it was not.**

8        Q    What was it made of?

9        **A    I would have to go and look at the drawings to**

10   **tell you that.**

11       Q    Was it a fibrous blanket?

12               MR. GREENE:   Objection.

13               THE WITNESS:   No, I think it was a metal,

14   a metal part, a sheet metal part.

15   BY MR. HATTEN:

16       Q    Do you know what was inside the sheet metal

17   part?

18       **A    I don't think anything was inside of it.   I**

19   **think it was a single layer of metal.   Now, it may**

20   **have had a seal, some kind of a softer seal around the**

21   **outside of it, but to know what that was made of, as I**

22   **say, I'd have to go find the drawing and look at it.**

23       Q    In 1988, in this patent application, Pratt &

24   Whitney said that present seals are often made of

25   asbestos.

Page 99

1      A      Pratt & Whitney said that?

2      Q      That's what they say here.

3             MR. GREENE:  I just object to the form.

4  It's a document he hasn't seen before.

5  BY MR. HATTEN:

6      Q      Is that inconsistent with what you know?

7      A      Do you mind just --

8      Q      Or is that something you don't know?

9      A      -- just stating that again?  The highlighted

10  part?

11      Q      The highlighted part.

12      A      Where does it say Pratt & Whitney says this?

13      Q      Look at the first page.  It's a Pratt &

14  Whitney patent.

15      A      Okay, this is a Pratt & Whitney Canada patent,

16  which is a different company.

17      Q      Is it a subsidiary of Pratt & Whitney America?

18      A      I don't know if it's considered a subsidiary

19  or what the relationship is, but I know it's a

20  separate company from Pratt & Whitney.

21      Q      And do you know anything about what the

22  relationship is between the two companies?

23      A      They share the same name, but I think it's a

24  separate entity.

25      Q      Okay.  This separate entity said present seals

1  are often made of asbestos.  You don't contradict

2  that, do you?

3            MR. GREENE:  Objection to the form.

4            THE WITNESS:  Jet engines in general have

5  had seals made of asbestos, yes.

6  BY MR. HATTEN:

7      Q    Thank you.

8      **A    In general.**

9            MR. HATTEN:  We'll mark that as Exhibit

10  Number 8.

11  (Exhibit 8, United States patent 4,758,028, marked for

12  identification)

13            MR. HATTEN:  And just put Exhibit Number

14  9 on this, please.

15  (Exhibit 9, marked for Identification)

16  BY MR. HATTEN:

17      Q    These are documents from the manual

18  depository, brochures about Min-K and manufacturing

19  specifications about Min-K.  Would you take a moment

20  and just look at that and confirm to me that this is

21  information that you did not know or receive between

22  1965 and 2001?

23      **A    I don't think there's anything in here that**

24  **I've -- that I saw prior to 2001.**

25      Q    Okay, thank you.

1    Now, I know somebody else is probably going to

2    talk about it, but there are other manufacturing

3    facilities of Pratt & Whitney other than the

4    Connecticut plant, is that correct, or not?

5    **A    There's more than one in Connecticut, but we**

6    **just talked about a separate entity, Pratt & Whitney**

7    **Canada, but as far as Pratt & Whitney major jet**

8    **engines that we've been talking about, I believe the**

9    **only manufacturing facilities are in Connecticut.**

10   Q    Okay.

11   **A    Now, are you talking about which time frame**

12   **now?**

13   Q    Let's talk about the period 1965 to 2001.  Are

14   you aware of business offices, places of business of

15   Pratt & Whitney in any state other than Connecticut?

16         MR. GREENE:  Object to the form.  And

17   there is another witness designated to talk about

18   those issues.

19         You can answer.

20         THE WITNESS:  We have several facilities

21   today all over the world.  We have offices at military

22   locations.  We have offices at commercial airline

23   locations.  So we are -- we have offices around the

24   world.  I think the only direct Pratt & Whitney

25   manufacturing facility, to my knowledge, is in

1    Connecticut.

2    BY MR. HATTEN:

3        Q    Can you name some of the states where you

4    have -- where Pratt & Whitney has offices, or had

5    offices during the period 1965 to 1980?

6        **A    Connecticut, New York, Georgia, Florida,**

7    **California, Washington, Texas, Kansas, Oklahoma.**

8        Q    Illinois?

9              MR. GREENE:  Objection to the form.

10             THE WITNESS:  Illinois, not that I

11   remember in Illinois.

12   BY MR. HATTEN:

13       Q    Virginia?

14       **A    Not that I remember in Virginia.**

15       Q    Any others you --

16       **A    It may have been there and I'm just not aware**

17   **they were there.**

18       Q    I understand.  I'm just asking for your

19   memory.

20             Any other states that you can recall?  Ohio?

21       **A    No, not that I can -- not that I'm aware of.**

22       Q    Maryland?

23       **A    Not that I'm aware of.**

24       Q    Delaware?

25       **A    No.**

1          MR. HATTEN:  May be about done, let me

2     check with counsel, and see if we can close up for

3     lunch.

4          THE VIDEOGRAPHER:  The time is 1:07,

5     we're going off the record.

6          (Recess taken from 1:07 p.m. to 1:08 p.m.)

7          THE VIDEOGRAPHER:  The time is now 1:08

8     and we're back on the record.

9     BY MR. HATTEN:

10    Q    You never had any responsibility yourself for

11    industrial hygiene, correct?

12    **A    That's correct.**

13    Q    Never worked with an industrial hygienist?

14    **A    Correct.**

15    Q    You did not have any responsibility yourself

16    for dealing with the Navy?

17         MR. GREENE:  You mean the Air Force?

18         MR. HATTEN:  Either one.

19         THE WITNESS:  Not in a technical role,

20    no.

21    BY MR. HATTEN:

22    Q    Did you deal with the Air Force?

23    **A    When I was in -- worked in financial I worked**

24    **on Air Force and Navy contracts.**

25    Q    Okay.  And that was all financial?

1      A     Yes.

2      Q     It didn't have anything to do with asbestos?

3      A     That's correct.

4      Q     You've not ever had any conversation with the

5   Air Force or the Navy or anybody in government about

6   asbestos?

7      A     That's correct.

8      Q     And am I correct you've never had any

9   conversation with any manufacturer of any

10  asbestos-containing product?

11     A     That's correct.

12             MR. HATTEN:  Your witness.

13             You want to break for lunch?  You want to

14  ask him any questions?

15             MR. GREENE:  I don't have any questions

16  for you, Mr. Sumner.  You have the right to read and

17  sign the transcript of this deposition, and I'd

18  recommend that you do so.

19             THE WITNESS:  Okay, I will.

20             THE VIDEOGRAPHER:  The time is now 1:10.

21  That concludes today's deposition.  We're now off the

22  record.

23             (Deposition concluded at 1:10 p.m)

24

25

Page 105

```
 1                        JURAT

 2

 3          I, JOHN SUMNER, do hereby certify that the

 4    foregoing testimony taken on June 18, 2014, is true

 5    and accurate, including any corrections noted on the

 6    corrections page, to the best of my knowledge and

 7    belief.

 8

 9
                         _____
10                            JOHN SUMNER

11

12

13

14

15       At _____ in said county of _____, this

16    _____day of _____, 2014, personally appeared

17    JOHN SUMNER, and he made oath to the truth of the

18    foregoing corrections by him subscribed.

19

20

21    Before me,_____, Notary Public

22    My commission expires:

23

24

25
```

1               TRANSCRIPT CORRECTIONS

2

    REPORTER:    Wendy Allen, RMR, CRR

3


4    CASE STYLE:  HOWARD D. BURKE and PATRICIA L. BURKE
             VS
5               WACO, INC., ET AL

6

    PAGE    LINE      CORRECTION                  REASON

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23

24                          NAME:   _____

25                          DATE:   _____

Page 107

1                  CERTIFICATE OF REPORTER

2       I, Wendy Allen, a RMR, CRR/Notary Public within and

3    for the State of Connecticut, do hereby certify there

4    came before me, on the 18th day of June, 2014, the

5    following named person, to wit:  JOHN SUMNER, who was

6    by me duly sworn to testify to the truth and nothing

7    but the truth; that he was thereupon carefully

8    examined upon his oath and his examination reduced to

9    writing under my supervision; that this deposition is

10   a true record of the testimony given by the witness.

11           I further certify that I am neither counsel

12   for, related to, nor employed by any of the parties to

13   the action in which this deposition is taken; and

14   further, that I am not a relative or employee of any

15   attorney or counsel employed by the parties hereto,

16   nor financially or otherwise interested in the outcome

17   of the action.

18       WITNESS my hand and affixed my seal this 23rd day

19   of June, 2014.

20

21

22                    _____

                              Wendy Allen, RMR, CRR
23

24   My commission expires:  April 15, 2015

25

# Exhibit G



Michele B. Fanney
(757) 628-5562
mfanney@wilsav.com

90089.001

May 8, 2014

**Via Federal Express & Email**

Erin E. Jewell, Esq.
Patten, Wornom, Hatten & Diamonstein, LC
12350 Jefferson Ave., Suite 300
Newport News, VA 23602

      Re:    Howard D. Burke and Patricia L. Burke v. Waco, Inc., et al.
              Case No. CL1301989F-15

Dear Erin:

        Enclosed please find United Technologies Corporation's Responses to Plaintiff's Master Interrogatories and Request for Production in connection with the above-captioned matter.

        Please do not hesitate to contact us should you have any questions or concerns.

                    Sincerely yours,

                    Michele B. Fanney

MDF:kvr
Enclosures
cc:     All Defense Counsel of Record (via email only)



Reply to Norfolk Office

440 MONTICELLO AVENUE  SUITE 2200  NORFOLK, VA 23510  757.628.5500  FACSIMILE 757.628.5566
222 CENTRAL PARK AVENUE  SUITE 1500  VIRGINIA BEACH, VIRGINIA 23462  757.628.5600  FACSIMILE 757.628.5659

WWW.WILLCOXANDSAVAGE.COM

I-1255592.1

**VIRGINIA:    IN THE CIRCUIT COURT FOR THE CITY OF NEWPORT NEWS**

| | |
|---|---|
| **HOWARD D. BURKE**<br>**and PATRICIA L. BURKE,**<br><br>    Plaintiffs,<br><br>v.<br><br>Waco, Inc., *et al.*,<br><br>    Defendants. | Case No.: CL13-01989F-15 (TF) |

## DEFENDANT UNITED TECHNOLOGIES CORPORATION'S RESPONSES TO PLAINTIFF'S MASTER INTERROGATORIES AND REQUEST FOR PRODUCTION

Defendant United Technologies Corporation, ("UTC") hereby responds to Plaintiffs' Master Set of Interrogatories and Request for Production. UTC states that discovery and investigation are continuing and limits its responses to data relevant to the incident alleged in the Complaint which has been reviewed or summarized. The following responses are given without prejudice to UTC's right to produce evidence of subsequently discovered facts.

### GENERAL STATEMENT AND OBJECTIONS

The following general statement and objections are made to each interrogatory or request, whether or not specifically referred to in each response:

1.    Nothing herein shall be construed as an admission by UTC regarding the admissibility or relevance of any fact or document, or the truth or accuracy of any characterization or statement of any kind contained in Plaintiff's Master Set of Interrogatories and Requests for Production.

2.    UTC objects to each request to the extent that it solicits information and/or documents protected from disclosure by the attorney-client privilege and/or the work product doctrine.

3.    Each and every request is answered subject to the General Statement and Objections set forth herein. These General Statement and Objections form a part of the answer to each and every request, and are set forth here to avoid the duplication and repetition of restating them for each answer. These General Statement and Objections may specifically be referred to in answers to requests for the purpose of clarity. The failure to specifically incorporate a General Statement or Objection should not, however, be construed as a waiver of any objection.

4.    UTC reserves the right to amend these answers and to introduce additional evidence (before or at the time of trial) gathered through ongoing investigation and discovery.

5. UTC objects to each request to the extent that it is so vague, ambiguous, and unintelligible as to make a response impossible without speculation. UTC further objects to these requests to the extent that each interrogatory is overly broad, and unduly burdensome.

6. UTC objects to the various instructions and definitions set forth by plaintiffs, as the definitions are overly broad, vague, ambiguous, and neither relevant nor calculated to lead to the discovery of admissible evidence.

7. UTC further objects to each request to the extent that it seeks information and/or documents which are confidential pursuant to the U.S. Department of Defense Directive No. 5230.25 which precludes government contractors that manufacture equipment for the U.S. Military from disclosing technical data or documents relating to military equipment without prior approval from the Department of Defense.

UTC responds to these interrogatories without waiving these general objections, or any other objections set forth herein:

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

State whether or not you are a corporation. If so state your correct corporate name, the state of your incorporation, the address of your principal place of business, the name and address of the person or entity authorized to accept, service of process on your behalf, and whether or not you have ever held a Certificate of Authority to do business in the State of Virginia.

### RESPONSE TO INTERROGATORY NO. 1:

UTC is incorporated in the State of Delaware. Its principal business address is United Technologies Building, One Financial Plaza, Hartford, Connecticut 06101. UTC's agent for service of process is CT Corporation. UTC does not hold a Certificate of Authority to do business in the State of Virginia.

### INTERROGATORY NO. 2:

Describe in detail your complete corporate history, including, but not limited to, your place and date of incorporation, and any mergers, consolidations, asset purchases, acquisitions or spin-offs which concern or affect the manufacture, sale, distribution, installation, use and/or removal of any product or equipment containing or incorporating any asbestos products, asbestos insulation or any other component part that contains asbestos fiber.

### RESPONSE TO INTERROGATORY NO. 2:

UTC was formed in 1929 as United Aircraft and Transportation Company. In 1934, it was incorporated as United Aircraft Company. In 1975, United Aircraft Company changed its name to United Technologies Corporation. Pratt & Whitney has been an unincorporated division of UTC during the entirety of UTC's existence.

**INTERROGATORY NO. 3:**

If you ever acquired another company corporation, company, or business which manufactured, sold, processed, distributed, installed, or contracted to apply products or equipment containing asbestos, please state the following concerning such other entity:

    a.    the full and correct name;

    b.    the principal place of business;

    c.    the state of incorporation;

    d.    the date of its acquisition by you; and

    e.    the products that the other entity manufactured, distributed, sold, used, installed, or contracted to apply.

**RESPONSE TO INTERROGATORY NO. 3:**

OBJECTION. This interrogatory is overly broad. Subject to and without waiving the objection, with respect to the UTC aviation engines to which Plaintiff alleges exposure in the *Howard Burke* matter, none.

**INTERROGATORY NO. 4:**

For any predecessor corporation or subsidiary identified in the preceding interrogatories, state whether you agreed to be, or had been held by any court to be, legally responsible for the past liabilities of any nature of any such corporation or entity. For each court which has so held, identify the case, the jurisdiction of the court, and the date of the order.

**RESPONSE TO INTERROGATORY NO. 4:**

Not applicable.

**INTERROGATORY NO. 5:**

If you currently have, or have had in the past, a department, division, subdivision, branch or group responsible for the design, development, manufacture, testing and/or use of products equipment containing or incorporating asbestos fibers, state the name of each such present or former corporate department, division, subdivision, branch or group and identify the person most knowledgeable about such department, division, subdivision, branch or group.

**RESPONSE TO INTERROGATORY NO. 5:**

OBJECTION. This interrogatory is overly broad. Subject to and without waiving the objection, with respect to the UTC aviation engines to which Plaintiff alleges exposure in the *Howard Burke* matter, the Pratt & Whitney division of UTC manufactures aviation engines, some of which, in the past, have incorporated some asbestos-containing components. Current UTC employee, Judy M. Harvey, and retired UTC employees, John C. Sumner and Allan J. Shiffler, have been produced for deposition in prior litigation by trial counsel for UTC as persons most knowledgeable regarding certain specified areas of inquiry concerning Pratt & Whitney aviation engines.

**INTERROGATORY NO. 6:**

Identify all equipment which contained any amount of asbestos as a component part which you designed, manufactured, processed, distributed, sold, relabeled, and/or otherwise placed in the stream of commerce including:

a.    the trade, brand name and/or generic name of each type of such equipment;

b.    a specific description of the equipment, including:

   i.    its nature, e.g. pump, valve, distiller, condenser, etc.;

   ii.   any logo or markings on the equipment;

   iii.  any component parts that accompanied or were specified for use with your equipment, i.e. insulation, packing, gaskets, rope, cement, etc.; and

   iv.   the type(s) and/or grade(s) of asbestos fiber contained in it;

c.    whether you designed, manufactured, processed, distributed, sold, relabeled and/or held a patent on the product;

d.    the inclusive date(s) that you first performed and last performed any of the activities described in subpart (c) on each such product;

e.    the location each plant or manufacturing facility in which the products listed in your answer to Interrogatory No. 6 were manufactured, assembled, or prepared for sale or marketing.

**RESPONSE TO INTERROGATORY NO. 6:**

OBJECTION.  This interrogatory is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence.  UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News.  There has been no attempt to limit the scope of this interrogatory to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period.  Plaintiff Howard Burke's alleged exposure to UTC products terminated in 1977.  Compliance with this request would require the retrieval and review of millions of documents from 1925 to the present.  Such a financially burdensome inquiry is beyond the scope of permissible discovery.  UTC additionally objects to this request in that it seeks information protected by attorney-client privilege and/or the attorney work product doctrine.  UTC further objects on the basis that this interrogatory seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information which are privileged and protected from disclosure.  UTC further objects to this interrogatory on the ground it seeks information protected from disclosure by statutes relating to national security.  The requested information as it relates to military aviation engines is protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained.  See Department of Defense Directive No. 5230.25 (November 6, 1984).

Without waiving the objection, UTC states it produced some aviation engines prior to 1977 that utilized some asbestos-containing parts, generally consisting of adhesives, loop clamp grommets, gaskets, packing, heat shields and thermocouple wire cables.

The above components were used for specialized applications in the aviation field.  They were manufactured by entities other than UTC.  UTC replaced the asbestos-containing components in its aviation engines with those utilizing non-asbestos materials as they became available from

4

T-1255501 1

manufacturers, were approved by various governmental agencies as meeting air worthiness requirements and were found to be reliable substitutes adequate to protect the safety of aircraft occupants. Accordingly, the types and quantities of the asbestos-containing parts offered by UTC became fewer as UTC's efforts and those of its suppliers progressed.

UTC additionally made available to its customers catalogs for the specialized parts used in its aviation engines. Some of the parts offered in these catalogs contained asbestos. These asbestos-containing parts, identified above, were manufactured by other companies and sold under their respective brand names to UTC. Thereafter, some of these parts were rebranded under the Pratt & Whitney name for resale as spare parts. UTC replaced the asbestos-containing parts offered in its catalogs with those utilizing non-asbestos materials as they became available from manufacturers and were found to be reliable substitutes. UTC shipped the spare parts, identified above, in sealed plastic or cardboard containers of various dimensions, depending on the size and shape of the parts. Labeling on packaging included the part name, part number and the Pratt & Whitney logo. Pratt & Whitney's logo generally has depicted an American eagle in flight, facing to the right and placed in front of a ring in which Pratt & Whitney's name, along with "Dependable Engines," is inscribed.

The type of asbestos fiber used in the above-referenced components is believed to have generally been chrysotile. UTC is currently aware of the following asbestos-containing components utilized in Pratt & Whitney jet aviation engines during the relevant time period:

| Components | Manufacturer & Part ID (w/ approx. percent. asbestos) |
|---|---|
| Adhesives/Linings | 3M Co., AF 3015 adhesive (2%)<br>3M Co., AF 130 film adhesive (10%)<br>3M Co., AF 131 film adhesive (10%)<br>3M Co., AF 143 film adhesive (10%)<br>3M Co., AF 453 film adhesive (10%)<br>AGC, 3087 (90%)<br>American Cyanamid, FM 40 adhesive, or equivalent (5%)<br>American Cyanamid, FM 400 adhesive, or equivalent (.6%)<br>American Cyanamid, FM 400-U Adhesive (.6%)<br>Ciba-Geigy (Reliable Mfg.), RMI 380 adhesive (14%)<br>Hysol-Dexter, EA 9649 R-S adhesive, or equivalent (2%)<br>Hysol-Dexter, Epon 929 adhesive (20%)<br>Johns-Manville, Plastiseal F (11%)<br>Raybestos, RL-1755 (40%)<br>Raybestos, RB 1908B (50%)<br>Raybestos, S-84015 (25%) |
| Heat Shields | Johns-Manville, Flex Min-K (10%) |
| Gaskets | AGC, Teflon asbestos (50%)<br><br>Anchor Packing Co., rubber asbestos sheet (50%)<br>Johns-Manville, Style 219 (85%)<br>Johns-Manville, JM-76 (65%)<br>Johns-Manville, aluminum asbestos gasket (25%)<br>Johns-Manville, 2012 Teflon asbestos (50%)<br>Johns-Manville, JM 397 (25-50%) |

|  | Raybestos, K-68, or equal, syn. rubber/asbestos (50%)<br>Raybestos, A56 (50%)<br>Raybestos, F53 (75%)<br>Raybestos, #840 asbestos (90%)<br>Raybestos, B 40 (90%) |
|---|---|
| Loop Clamp Grommets/<br>Cushioned Loop Clamps | AGC, 3117, wire reinforced Teflon impreg. sint. asbestos (50%)<br>AGC, 3140, Teflon impregnated asbestos (50%)<br>Harco, Grade AAAA asbestos (90%)<br>Johns-Manville, 2012 Teflon asbestos (50%)<br>Johns-Manville, MX 4138 (50%)<br>Quantum, Compound 700, or equivalent (50%)<br>Raybestos-Manhattan, LS 9244 (45%)<br>Raybestos-Manhattan, RM-840-W (90%) |
| Packing/<br>Preformed Packing | Abbott Riddle Co., #401R Teflon impregnated asbestos (70%)<br>Anchor Packing Co., #8938 (60%)<br>Anchor Packing Co., Teflon asbestos (60%)<br>Johns-Manville, 2012 Teflon asbestos (50%)<br>Johns-Manville, asbestos/mica/styrene/butadiene (25%)<br>Johns-Manville, Style 399 asbestos & plastic (25%)<br>Johns-Manville, Style R6 (60%)<br>Johns-Manville, MX 4713 (50%)<br>Johns-Manville, MX 4439 w/ MX 4766 cement (60%)<br>Johns-Manville, JM 397 (25%)<br>Johns-Manville, Type R397 (80%)<br>Raybestos-Manhattan, RM-363-NM, graphite and asbestos (60%)<br>Raybestos-Manhattan, RM-840-W (90%) |
| Thermocouple Cable | Harco, chromel wire covered with asbestos and fiberglass (15%) |
| Miscellaneous | Johns-Manville, transite washer (35%) |

Adhesives and liners consisted of epoxy film and were generally used on fan duct liner segments and fan cases, oil tank brackets and bleed control cams. Adhesives were subjected to an approximate range of 250°F-360°F in air temperature and up to 360° in air-oil mist temperature.

Loop clamp grommets and cushioned loop clamps were used to hold wiring harnesses and thermocouple cables in place on the general engine structure. Grommets and clamps were subjected to an approximate range of 350°-500° in air temperature and were required to withstand exposure to fuel, oil and hydraulic fluid.

Gaskets were used to seal juncture points on bearing oil lines, bleed converter valves, gearboxes and gearbox covers, turbine exhaust cases and other components. Typically, gaskets were subjected to an approximate range of 350°F-1100°F in air temperature, up to 1085° in turbine exhaust gas temperature and up to 500° in air/oil mist temperature.

Packing was generally used on bearing breather tubes and was required to resist up to 400°F in air-oil mist temperatures. Thermocouple cable was required to withstand air temperatures up to 925°F.

Heat shields served as protective barriers between high heat sections of the engines and heat-sensitive equipment, such as hydraulic lines. The blanket part of a heat shield was required to withstand temperatures up to 2,000°F.

Due to the passage of time, UTC is unable to identify the manufacturers of the asbestos-containing components on its Pratt & Whitney reciprocating piston aviation engines, which generally operated at much lower temperatures than jet engines. Asbestos-containing components utilized for a time on these aviation engines consisted of gaskets, packing and ignition harnesses. The type of asbestos fiber used in these components is believed to have generally been chrysotile.

Assessments were performed by Dr. Steven Mlynarek, Ph.D., in 2004 and 2006 regarding the potential release of asbestos fibers during overhaul and maintenance work on Pratt & Whitney piston and jet aviation engines. Dr. Mlynarek prepared written reports, dated November 29, 2004, and May 9, 2007. The results showed overhaul and maintenance work on the engines generated release of asbestos fibers at or below ambient levels. The published reports of Dr. Mlynarek have previously been provided to Plaintiff's counsel. The full reports of Dr. Mlynarek, including photos, are available through trial counsel for UTC.

## INTERROGATORY NO. 7:

As to each type of equipment contained within your response to Interrogatory No. 6, identify the following:

a.   any and all pertinent trademark that was applicable to the equipment during any time of its sale;

b.   any and all patents that are applicable to the equipment;

c.   any and all blueprints and manufacturing specifications that were applicable to the equipment;

d.   the label on the packaging of that particular equipment for each year of its manufacture and/or sale;

e.   any and all sales catalogues, brochures, specification sheets, performance data or other promotional material, as well as any and all installation materials, data or brochures which would have accompanied or been distributed in connection with the sale, installation, application or use of each such equipment;

f.   the exact manner in which the equipment was described in such catalogues, brochures, specification sheets or other promotional material for each year it appeared therein (as to this portion of the interrogatory, you may provide a copy of the document in lieu of describing the same); any and all photographs of the product for which you have knowledge;

h.   any and all samples of the product for which you have knowledge; and

i.   any and all packaging of the product for which you have knowledge.

## RESPONSE TO INTERROGATORY NO. 7:

OBJECTION.  This interrogatory is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence.  UTC is an active defendant in only one

asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News. There has been no attempt to limit the scope of this interrogatory to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. Plaintiff Howard Burke's alleged exposure to UTC products terminated in 1977. Compliance with this request would require the retrieval and review of millions of documents relating to the hundreds of different types of Pratt & Whitney aviation engines manufactured by UTC and the hundreds of thousands of components utilized in the manufacture of these aviation engines. Such a financially burdensome inquiry is beyond the scope of permissible discovery. UTC additionally objects to this request in that it seeks information protected by attorney-client privilege and/or the attorney work product doctrine. UTC further objects on the basis that this interrogatory seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information which are privileged and protected from disclosure. UTC further objects to this interrogatory on the ground it seeks information protected from disclosure by statutes relating to national security. The requested information as it relates to military aviation engines is protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained. See Department of Defense Directive No. 5230.25 (November 6, 1984).

**INTERROGATORY NO. 8:**

If you distributed, sold and/or otherwise placed in the stream of commerce bulk asbestos fibers, please state:

    a.    the type(s) and/or grade(s) of asbestos fiber;

    b.    the entity to whom the asbestos fiber was sold;

    c.    the product(s) in which the asbestos fiber was incorporated;

    d.    the inclusive date(s) that you first and last placed any quantity of bulk asbestos fiber into the stream of commerce to each entity; and

    e.    the identity of the person(s) most knowledgeable concerning each such bulk sale and produce any documentation concerning all such bulk sales of asbestos fiber.

**RESPONSE TO INTERROGATORY NO. 8:**

Not applicable.

**INTERROGATORY NO. 9:**

Have you ever conducted, performed, funded, or participated in tests, investigations, and/or studies

    a.    of ambient asbestos dust particles or fibers created during the manufacture, processing, assembling and/or end use of asbestos-containing products?

    b.    to determine whether any type of protective mask, respirator, protective clothing, containment system, ventilator, and/or ventilation system would either eliminate or reduce the inhalation of asbestos by your employees and/or contractors on your premises, their family members, and/or other third persons?

    c.    concerning asbestos-related diseases, asbestosis, mesothelioma, pulmonary disease or cancer?

**RESPONSE TO INTERROGATORY NO. 9:**

Assessments were performed by Dr. Steven Mlynarek, Ph.D., in 2004 and 2006 regarding the potential release of asbestos fibers during overhaul and maintenance work on Pratt & Whitney piston and jet aviation engines. Dr. Mlynarek prepared written reports, dated November 29, 2004, and May 9, 2007. The results showed overhaul and maintenance work on the engines generated release of asbestos fibers at or below ambient levels. The published reports of Dr. Mlynarek have previously been provided to Plaintiff's counsel. Copies are available upon request. The full reports of Dr. Mlynarek, including photos, are available upon request through trial counsel for UTC.

**INTERROGATORY NO. 10:**

If you answered yes to any part of the preceding interrogatory, state/identify the following:

a.   the location and address at which any such test, investigation, and/or study was conducted;

b.   the date of each such test, investigation, and/or study;

c.   the reason you became involved in each such test, investigation, and/or study;

d.   the person(s) conducting each such test, investigation, and/or study;

e.   whether you have any documents containing the results and/or conclusions of each such test, investigation, and/or study;

f.   if the results were disseminated, where and to whom and, if published, the name and identity of the publication;

g.   the results of such tests, investigations, and/or studies, and the data and assumptions relied on;

h.   the identity of the custodian of any such documents;

i.   whether any action was taken in response to any such test, investigation or study, and if so: the date and action taken; the identity of the person(s) who authorized or directed the action; any and all reasons why the action was taken; and the identity of all documents discussing the action considered and action taken by date, the subject, author and present custodian and location.

**RESPONSE TO INTERROGATORY NO. 10:**

Assessments were performed by Dr. Steven Mlynarek, Ph.D., in 2004 and 2006 regarding the potential release of asbestos fibers during overhaul and maintenance work on Pratt & Whitney piston and jet aviation engines. Dr. Mlynarek prepared written reports, dated November 29, 2004, and May 9, 2007. The results showed overhaul and maintenance work on the engines generated release of asbestos fibers at or below ambient levels. The published reports of Dr. Mlynarek have previously been provided to Plaintiff's counsel. Copies are available upon request. The full reports of Dr. Mlynarek, including photos, are available upon request through trial counsel for UTC.

**INTERROGATORY NO. 11:**

When and how did you first become aware that any warnings were placed on any asbestos containing products?

**RESPONSE TO INTERROGATORY NO. 11:**

As a company comprised of tens of thousands of individuals, UTC is unable to identify any particular date upon which it acquired said knowledge, but said knowledge likely was acquired during the time period in which OSHA and other governmental agencies promulgated regulations regarding the labeling of asbestos-containing materials.

**INTERROGATORY NO. 12:**

If any of the asbestos-containing products or asbestos-containing equipment you manufactured, processed, sold, distributed, and/or otherwise placed in the stream of commerce, contained any warning or caution concerning the health consequences of the use of the product or the breathing of asbestos dust particles or fibers:

a. state the wording of each warning or caution, or any proposed drafts of a warning or caution;

b. state the description of the size and location of each such printed warning or caution;

c. state the method used to distribute the warning to persons who were likely to use the product;

d. state the date each such warning was issued;

e. identify the person(s) who composed the warning;

f. state whether any person recommended at any time that the warning or caution be amended, altered, or changed in any manner and, if so, identify the person(s);

g. state whether the warning or caution was ever amended, altered, or changed in any manner and, if so, identify the person(s) doing so;

h. identify each person(s) who was involved in the decision to place the warning or caution on the product or to amend such warning or caution; and

i. identify and produce any special instructions provided with each product regarding its use or safety procedures to be employed by persons handling such product.

**RESPONSE TO INTERROGATORY NO. 12:**

Due to the passage of time, the exact date when warnings first appeared on packaging for asbestos-containing spare parts is unknown. Nevertheless, UTC believes that its practice was at all times in compliance with OSHA and other governmental regulations regarding the labeling of hazardous materials. Exemplars of known warning labels that were affixed to packaging for asbestos-containing spare parts are attached.

**INTERROGATORY NO. 13:**

Please identify the first twelve (12) proceedings wherein you were named as a defendant, respondent or other involuntary participant in a lawsuit, worker's compensation claim or other proceeding involving personal injury or wrongful death alleged to have resulted from exposure to airborne asbestos dust and fibers. Please be specific in your identification by stating:

a. the date you received notice of the claim;

b. the court or other forum in which it was filed;

c. a description of the type of claim (i.e., worker's compensation, third party liability, etc.);

d.     the type of injury allegedly sustained;

e.     the case number or identifying letters or name assigned to the action;

f.     identification each person claiming injury therein;

g.     copies of all interrogatories propounded to you and all of your answers to those interrogatories; and

h.     the custodian of all records that relate to the claim, e.g., depositions, expert reports, etc. (in lieu of answering the above question, you may attach copies of any and all such records).

## RESPONSE TO INTERROGATORY NO. 13:

OBJECTION.  This interrogatory is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence.  UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News.  There has been no attempt to limit the scope of this interrogatory to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period.  Compliance with this request would require the retrieval and review of thousands of documents relating to worker's compensation actions and civil asbestos litigation from approximately the past thirty years.  Such a financially burdensome inquiry is beyond the scope of permissible discovery.  UTC additionally objects to this request to the extent that it seeks documents protected from disclosure by the attorney-client privilege and/or the work product doctrine.

Without waiving the objection, UTC responds as follows:  UTC is currently aware of the following first twelve proceedings, all worker's compensation claims, filed against UTC alleging injuries arising from exposure to asbestos:

| Date of Filing | Claimant Name | State of Filing |
| --- | --- | --- |
| 10/15/84 | Williams, James | CT |
| 10/17/84 | Duggan, T. | CT |
| 10/22/84 | Maneeley, C. | CT |
| 10/31/84 | Cabera, Noem | CT |
| 12/26/85 | Sue Packett, Noritta | CT |
| 01/20/87 | Graham, Robert | CT |
| 03/11/87 | Nadeau, Raymond P. | CT |
| 03/19/87 | Silva, Jacinto | CT |
| 03/25/87 | Clavette, Patrick | CT |
| 03/26/87 | Silva, Jacinto | CT |
| 05/13/87 | DePratt, Roland | CT |
| 07/13/87 | Walrath, Keith | CT |

UTC believes the above claims to have related to asbestos-containing materials used in the construction or insulation of UTC premises and not to the asbestos-containing components utilized for a time in Pratt & Whitney aviation engines, identified in Response to Interrogatory No. 6, above.

UTC OBJECTS to producing additional information which is protected from discovery by the individual claimants' right to privacy.

**INTERROGATORY NO. 14:**

State separately as to the diseases asbestosis, lung cancer and mesothelioma:

a.    The date on which Defendant or its subsidiary or predecessor first knew or had reason to know that such disease can result from inhalation of asbestos fibers by humans.

b.    How Defendant became aware of the existence of the disease.

c.    Who within the company first discovered, recognized or understood the adverse consequences or effects of the disease and/or of asbestos exposure.

d.    What information was disseminated within Defendant's company or it subsidiary or predecessor regarding such adverse consequences or effects.

e.    Whether any such information is still maintained by Defendants or its subsidiary or predecessor in any written form.

f.    Who is the custodian of such information.

g.    The date on which you first received knowledge or information that the disease was caused by inhalation or asbestos fibers.

**RESPONSE TO INTERROGATORY NO. 14:**

As a company comprised of tens of thousands of individuals, UTC is unable to identify any particular date upon which it acquired knowledge of the association between asbestos exposure in certain circumstances and asbestosis, lung cancer or mesothelioma, but said knowledge had probably been acquired by 1968. UTC believes it was informed of such an association as this information generally became available to the public through governmental agencies and the media.

**INTERROGATORY NO. 15:**

Do you have knowledge of any asbestos-related deaths or any diagnosis of asbestos-related lung disease or abnormality prior to 1986 among any of your employees or any of their family members. If so:

a.    identify each such employee or family member;

b.    provide the job description and years of employment of each such person; and if the person is a family member of an employee, identify the employee and state the employee's job description and years of employment or agency;

c.    identify all medical records that you received in relation to each such person;

d.    identify and produce reports of asbestos related disease or abnormality that you furnished to any state or federal governmental body or agency; and

e.    identify the date you first obtained knowledge of this asbestos-related death, diagnosis, or abnormality.

**RESPONSE TO INTERROGATORY NO. 15:**

OBJECTION. This interrogatory is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. UTC is an active defendant in only one

asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News. There has been no attempt to limit the scope of this interrogatory to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. Compliance with this request would require the retrieval and review of the entire workers compensation history of UTC from 1925 to 1986. Such a financially burdensome inquiry is beyond the scope of permissible discovery. UTC additionally objects to this request to the extent that it seeks documents protected from disclosure by the attorney-client privilege and/or the work product doctrine.

Without waiving the objection, UTC responds as follows: UTC is currently aware of the following worker's compensation claims filed against UTC prior to 1986 alleging injuries arising from exposure to asbestos:

| Date of Filing | Claimant Name | State of Filing |
|---|---|---|
| 10/15/84 | Williams, James | CT |
| 10/17/84 | Duggan, T. | CT |
| 10/22/84 | Maneeley, C. | CT |
| 10/31/84 | Cabera, Noem | CT |
| 12/26/85 | Sue Packett, Noritta | CT |

UTC believes the above claims to have related to asbestos-containing materials used in the construction or insulation of UTC premises and not to the asbestos-containing components utilized for a time in Pratt & Whitney aviation engines, identified in Response to Interrogatory No. 6, above.

UTC OBJECTS to producing additional information which is protected from discovery by the individual claimants' right to privacy.

**INTERROGATORY NO. 16:**

Did you receive any reports or communications from your workmen's compensation insurance carrier or products liability insurance carrier with regard to any alleged hazards associated with the use or handling of asbestos-containing products, including but not limited to asbestos containing insulation products? If so, identify and produce each such report and identify the custodian of those records.

**RESPONSE TO INTERROGATORY NO. 16:**

UTC is currently unaware of having received any such reports or communications.

**INTERROGATORY NO. 17:**

State the names and addresses of all professional, trade, industrial, safety, hygiene, health associations, and/or research foundations or organizations you have been a member of since 1930, including but not limited to:

    a.    Asbestos Textile Institute (ATI);

    b.    Industrial Hygiene Foundation and/or Industrial health Foundation (IHF);

    c.    Industrial mineral Insulation Manufacturers Institute;

    d.    Magnesia Silica Insulation Manufacturers Association;

e.    National Insulation Manufacturers Association (NIMA);

f.    Thermal Insulation Manufacturers Association (TIMA);

g.    National Insulation Contractors Association (NICA);

h.    Southeastern Insulation Contractors Association (SEICA);

i.    Asbestos Information Association (AIA);

j.    Quebec Asbestos Mining Association (QAMA);

k.    National Safety Council;

l.    Asbestos Cement Producers Association;

m.    Refractories Institute;

n.    Chemical Manufacturers Association and/or its predecessor, the Manufacturing Chemist Association;

o.    Shipbuilder's Council of America (SCA);

P.    American Petroleum Institute (API);

q.    Illinois Manufacturers Association (IMA);

r.    Friction Materials Standards Institute;

s.    American Boiler Manufacturers Association;

t.    American Ceramic Society;

u.    Industrial Heating Equipment Association;

v.    Silica Safety Association; and

w.    any organizations or associations associated with the state of your headquarters or principal place of business; any other organizations or associations of manufacturers, including equipment manufacturers, asbestos insulation contractors, miners, distributors, importers, labelers, suppliers, and/or sellers of products containing asbestos fibers.

## RESPONSE TO INTERROGATORY NO. 17:

Upon information and belief, UTC thinks certain UTC employees may have been members of the National Safety Council and the American Society of Mechanical Engineers during the relevant time period.

## INTERROGATORY NO. 18:

For each organization listed in response to the preceding Interrogatory,

a.    state the date(s) of membership;

b.    identify all persons attending any of the organization's meetings on your behalf;

c.    identify the name(s) and nature of any and all notes, reports, minutes, studies, publications and other writings submitted by you or received by you from such organizations or associations relating to asbestos exposure, the sale, use, or handling of asbestos products, or any alleged health hazards associated with asbestos, any recommendation or discussion of warnings, caution labels, safety procedures, or testing

for the asbestos products, any claims for compensation arising out of persons who alleged asbestos related death, disease, abnormality or impairment.

**RESPONSE TO INTERROGATORY NO. 18:**

Due to the passage of time and that the memberships identified in Response to Interrogatory No. 17 were held individually by UTC employees, UTC is currently unaware of any information responsive to this request.

**INTERROGATORY NO. 19:**

State, whether your Board of Directors, prior to 1986, at any time had any meetings which included discussion of or reference to installation, removal, asbestos exposure, the sale, use, or handling of asbestos products, or any alleged health hazards associated with asbestos, any recommendation or discussion of warnings, caution labels, safety procedures, or testing for the asbestos products, any claims for compensation arising out of persons who alleged asbestos related death, disease, abnormality or impairment; and if so, (a)identify and produce all minutes of every meeting of your Board of Directors which makes reference to (directly or indirectly) these discussions or references; and (b) identify the location(s) and custodian(s) of such notes, reports, minutes, studies, publications and other writings.

**RESPONSE TO INTERROGATORY NO. 19:**

UTC is currently unaware of any such meetings.

**INTERROGATORY NO. 20:**

Identify your medical officers from 1940 through 1986. If you did not have a medical officer, please identify what person or persons performed functions related to employee health within your company.

**RESPONSE TO INTERROGATORY NO. 20:**

UTC is currently aware of the following medical officers in its employment during the referenced time period:

> Sidney Curtis, MD (deceased)
> John Gallivan, MD (deceased)
> Trudeau Horraux, MD
> Stuart Jacobson, MD
> Elliott McCurdy, MD (deceased)
> Ron Sorenson, MD

**INTERROGATORY NO. 21:**

Has Defendant ever given medical examinations or chest x-rays to its employees who were exposed to airborne asbestos dust and fibers? If so, state:

a. When said examinations or chest x-rays were given;

b. The names and current addresses of the persons who conducted these examinations and/or chest x-rays;

    c.     Whether any employees who were found to have any asbestos-induced abnormality were so advised.

## RESPONSE TO INTERROGATORY NO. 21:

UTC is currently unaware of any information responsive to this interrogatory. Nevertheless, UTC states its medical department generally conducts voluntary and mandatory medical examinations, which include chest X-rays and pulmonary function tests, of UTC employees.

## INTERROGATORY NO. 22:

Identify all persons employed by you, hired as independent contractors or consultants from 1940 through 1986 who:

    a.     functioned as industrial hygienists; (as used in this Interrogatory an industrial hygienist is one who performs engineering or health studies to identify and evaluate potential occupational health hazards and suggest methods of dealing with the same);

    b.     functioned as a safety officer (i.e. oversaw operational safety, construction safety, compliance with State and Federal safety regulations, compliance with state and Federal environmental regulations, purchasing, repair, and asbestos abatement and containment) in any one of your manufacturing plants, facilities, and/or job sites;

    c.     performed medical research; and

    d.     performed the duties of maintaining your library or collection of medical, industrial hygiene and safety documents, articles and books.

## RESPONSE TO INTERROGATORY NO. 22:

UTC is currently aware of the following industrial hygienists and safety officers in its employment during the referenced time period:

> Alan Abramoski
> Charles Benjamin
> Brian Berke
> Laurie Brodeur
> Marlene S.B. Cox (aka Marlene S. Badrick)
> Charles J. DeSimone
> John Dunston
> Adrienne Gadreau
> Lynn Hamel
> William Hargraves
> Christopher Holzner
> Steve Juers
> George Kreick
> Gerald Lancour
> Art Lang
> Tom J. Mannix (deceased)
> Richard Narus
> Richard J. Owen
> George E. Parsons
> William F. Patton

Patricia S. Wawzyniecki
Bruce A. Zaczynski

UTC does not maintain a formal library on the subjects of asbestos or occupational disease.

## INTERROGATORY NO. 23:

Have any person(s) testified on your behalf or provided information or documents to the Occupational Safety and Health Administration (OSHA), the National Institute of Occupational Safety and Health Administration (NIOSH), any U.S. Congressional committee or sub-committee, or state or federal agency on

a.   the biological effects on human life from exposure to asbestos;

b.   the setting, modification, feasibility and acceptance of allegedly safe or proper levels of such exposure to asbestos and asbestos products; and/or

c.   the diagnostic criteria for asbestos-induced diseases.

If so,

d.   identify each such person(s);

e.   produce all documents presented, utilized, submitted or concerning such testimony or submission of information; and

f.   state the date, place and circumstances of such testimony or submission of information.

## RESPONSE TO INTERROGATORY NO. 23:

UTC is currently unaware of any information responsive to this interrogatory.

## INTERROGATORY NO. 24:

If you ever became aware that there was any recommended threshold limit value which applied to the dust created from the use of asbestos-containing products, state:

a.   when and how you first became aware of such a threshold limit value and if you passed this information to any customers, clients, employees and/or contractors;

b.   when and how you became aware that your asbestos product and/or any place where your employees used, installed, repaired, removed, or handled insulation products was/were within the threshold limit value, and, if ever; and

c.   identify to whom this information was given, the method of communication, the exact contents of such information, the specific date such information was communicated, any documents which contain this information

## RESPONSE TO INTERROGATORY NO. 24:

OBJECTION. UTC objects to this request as being vague and overbroad as to time, place and scope. UTC additionally objects to this request as being irrelevant and unlikely to lead to the discovery of admissible evidence. UTC additionally objects to this request on the grounds it seeks the disclosure of documents protected from disclosure by the attorney-client privilege and/or the attorney work-product doctrine. UTC additionally objects to this request as being financially burdensome and oppressive. Compliance with this request would require the retrieval and review of every known document in the

17

possession or control of UTC from the beginning of time to the date hereof. Such a financially burdensome inquiry is beyond the scope of permissible discovery.

Without waiving the objection, UTC responds as follows: UTC is currently aware of the following first five documents it received regarding the association between certain circumstances of asbestos exposure and disease in human beings and/or relating to recommended threshold limits values for dust created from the use of asbestos-containing products:

1. Lynch, Jeremiah R., "Asbestos Study - Procedures and Findings," U.S. Department of Health, Education and Welfare, September 1965.
   This document was received by Pratt & Whitney on November 5, 1965.
2. Balzer, J. Leroy and W. Clark Cooper, MD, "The Work Environment of Insulating Workers," American Industrial Hygiene Association Journal, Volume 29, May-June, 1968.
   This document was received by Pratt & Whitney on August 7, 1968.
3. Keenan, Robert G. and Jeremiah R. Lynch, "Techniques for the Detection, Identification and Analysis of Fibers," George D. Clayton & Associates and Department of Health, Education and Welfare, March 5, 1969.
   This document was received by Pratt & Whitney on September 8, 1969.
4. Stanton, Mearl F., Robert Blackwell and Eliza Miller, "Experimental Pulmonary Carcinogenesis with Asbestos," American Industrial Hygiene Association Journal, Volume 30, May-June, 1969.
   This document was received by Pratt & Whitney on August 8, 1969.
5. "Emergency Asbestos Standard of 5 Fibers Issued," Occupational Health & Safety Letter, Vol. 1, No. 17, December 8, 1971.
   This document was received by Pratt & Whitney on December 13, 1971.

The above documents are available for review through trial counsel for UTC.

In addition, assessments were performed by Dr. Steven Mlynarek, Ph.D., in 2004 and 2006 regarding the potential release of asbestos fibers during overhaul and maintenance work on Pratt & Whitney piston and jet aviation engines. Dr. Mlynarek prepared written reports, dated November 29, 2004, and May 9, 2007. The results showed overhaul and maintenance work on the engines generated release of asbestos fibers at or below ambient levels. The published reports of Dr. Mlynarek have previously been provided to Plaintiff's counsel. Copies are available upon request. The full reports of Dr. Mlynarek, including photos, are available upon request through trial counsel for UTC.

On August 1, 1977, Pratt & Whitney issued a document known as *Administrative Control No. 14* to its workers to establish a protocol for the safe handling of asbestos-containing materials at its manufacturing and repair facilities. Although safety procedures in compliance with OSHA and other governmental regulations were in effect at Pratt & Whitney premises prior to this time, this is the earliest known written warning regarding the hazards of asbestos. This document was reissued in a revised form on February 17, 1987. A copy of the 1987 document is attached.

## INTERROGATORY NO. 25:

State the date, if ever, on which you began complying with any OSHA or other such state or federal regulations regarding asbestos. If you have complied with such regulation, for each regulation state:

a.     the regulation;

    b.    the method implemented to comply with the regulation;

    c.    whether you were ever fined and/or admonished in any way for failing to comply with OSHA or other such state or federal regulations regarding asbestos, and if so, state

        i.    the date and the government agency;

        ii.    the basis of the citation;

        iii.    any action taken by the agency involved;

        iv.    the identity of all documents related to such citation and provide copies.

## RESPONSE TO INTERROGATORY NO. 25:

UTC believes it has always been in compliance with OSHA and other state or federal regulations regarding the handling of asbestos-containing materials. UTC is currently unaware of ever having been cited for failing to comply with OSHA or other state or federal regulations relating to asbestos.

## INTERROGATORY NO. 26:

Do you have a record or document retention policy, plan, or program? If so, please describe such plan. If the plan is different for separate categories of records, describe the plan for each category, including:

    a.    identification of the custodian of the records;

    b.    the length of time for which records are retained;

    c.    identification of personnel responsible for determining the policy or plan from 1935 to the present;

    d.    identification of the personnel responsible for the removal and destruction of any records, pursuant to any such plans from 1935 to the present.

## RESPONSE TO INTERROGATORY NO. 26:

OBJECTION. This request is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. There has been no attempt to limit the scope of this interrogatory to a relevant time period, a relevant product or relevant records. Compliance with this request would require the search for and retrieval of every document in the possession of UTC having any conceivable relationship to document retention from 1925 to the present. Such a financially burdensome request is beyond the scope of permissible discovery.

## INTERROGATORY NO. 27:

Have you destroyed any documents, records or writings pertaining to:

    a.    health hazards of asbestos;

    b.    workers compensation claims arising out of exposure to asbestos;

    c.    cautions, caveats, warnings, or safety instructions relating to asbestos;

    d.    funding of studies about health hazards of asbestos;

    e.    the decision to install or remove asbestos from any property owned, rented or leased by you;

  f.  lawsuits arising out of injuries alleged to having been caused by asbestos;

  g.  sales of asbestos products;

  h.  contracts to use, install, repair or remove asbestos products; medical records of your employees; and

  j.  industrial hygiene reports including testing for asbestos dust on job sites or your premises.

If so, list every such document destroyed by author, date and subject matter, and person most knowledgeable about document.

### RESPONSE TO INTERROGATORY NO. 27:

OBJECTION. This request is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. There has been no attempt to limit the scope of this interrogatory to a relevant time period, a relevant product or relevant records. Compliance with this request would require the search for and retrieval of every document in the possession of UTC having any conceivable relationship to document retention from 1925 to the present. Such a financially burdensome request is beyond the scope of permissible discovery. UTC additionally objects to this request in that it seeks information protected by attorney-client privilege and/or the attorney work product doctrine.

### INTERROGATORY NO. 28:

Do you contend that there is any difference in carcinogenicity between chrysotile fiber, amosite fiber, crocidolite fiber, and/or tremolite fiber in the development of (a) mesothelioma; and (b) lung cancer? If so, explain in detail your contention as to the distinction between or among fiber types in the development of each disease and the medical authority you rely on, including but not limited to the date you first became aware of the distinction, who brought the distinction to your attention, and any documents that support your contention.

### RESPONSE TO INTERROGATORY NO. 28:

OBJECTION. This Interrogatory calls for expert opinion. Please see United Technologies Corporation's List of Factual and Expert Witnesses Who Will or May Be Called to Testify at Trial and exhibits attached to the same, which were previously served on Plaintiff's counsel in the *Howard Burke* matter.

### INTERROGATORY NO. 29:

Has Defendant or any of its subsidiary or predecessor companies at any time entered into a rebranding agreement with any other company, either as buyer or seller, concerning asbestos materials, asbestos products or asbestos-containing equipment? If so, state, as to each such agreement:

  a.  The name of the company manufacturing the asbestos products;

  b.  The trade name affixed to those products;

  c.  The periods of time covered by each such agreement;

  d.  The volume, in dollar amount, of each transaction;

  e.  The initial purchaser of the products; and

f.   The name, address and job title of each person having custody of any writings or contracts on those rebranding agreements.

## RESPONSE TO INTERROGATORY NO. 29:

UTC is currently unaware of having ever entered into any such agreement.

## INTERROGATORY NO. 30:

State whether you or any of your predecessors and/or subsidiaries maintain, from 1940 through the present or for any portion thereof, copies of invoices, shipping documents, bills of lading, purchase orders, or other documents of a similar nature relating to products or equipment containing asbestos that you mined, manufactured, marketed, sold or distributed. If so, state:

a.   The location of such documents.

b.   The name and address of the custodian of the documents.

c.   The format in which the documents are kept, i.e., hard copy, microfilm, microfiche, etc.

d.   In what form the documents can be accessed, i.e., by state, by product, etc., and if by product, whether kept according to asbestos or non-asbestos.

## RESPONSE TO INTERROGATORY NO. 30:

OBJECTION. This interrogatory is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News. There has been no attempt to limit the scope of this interrogatory to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. Plaintiff Howard Burke's alleged exposure to UTC products terminated in 1977. Compliance with this request would require the retrieval and review of millions of documents from 1925 to the present. Such a financially burdensome inquiry is beyond the scope of permissible discovery. UTC additionally objects to this request in that it seeks information protected by attorney-client privilege and/or the attorney work product doctrine. UTC further objects on the basis that this interrogatory seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information which are privileged and protected from disclosure. UTC further objects to this interrogatory on the ground it seeks information protected from disclosure by statutes relating to national security. The requested information as it relates to military aviation engines is protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained. See Department of Defense Directive No. 5230.25 (November 6, 1984).

## INTERROGATORY NO. 31:

Was each of your equipment generally expected to reach, or packaged to reach, the consumer or user, without substantial change in the condition in which it was sold? If not, with respect to any such product, explain in what way the Defendant claims its products were altered or substantially changed after sale or distribution and before reaching the user.

## RESPONSE TO INTERROGATORY NO. 31:

No. Aviation engines are not consumer products. Aviation engines must undergo significant change to fit their intended purpose; aviation engines are expected to be incorporated as sources of

power into military and commercial aircraft. Such incorporation involves substantial changes and additions to UTC's aviation engines by others.

## INTERROGATORY NO. 32:

Was it a foreseeable use of your asbestos-containing equipment that the asbestos-containing component parts or insulation may have been removed, stripped, or replaced at some time after installation?

## RESPONSE TO INTERROGATORY NO. 32:

OBJECTION. This Interrogatory seeks a legal conclusion. Subject to and without waiving this objection, UTC states only that it was foreseeable to UTC that component parts on its Pratt & Whitney aviation engines would be replaced during the normal course of engine repair and overhaul.

## INTERROGATORY NO. 33:

When, if ever, did Defendant or any of its predecessors-in-interest first receive a copy of the article entitled "A Health Survey of Pipe Covering Operations in Constructing Naval Vessels," published in January, 1946 in the Journal of Industrial Hygiene & Toxicology, and authored by W. Fleischer and P. Drinker, et al ("the Fleischer-Drinker Report")?

    a.     Identify the name and position of the employee or officer who received same;

    b.     Please produce all documents generated by Defendant which discuss or in any way reference the Fleischer-Drinker study prior to 1968;

    c.     Please produce all documents upon which your responses above are based;

    d.     Please identify the names(s) and address(es) of any person(s) who can verify your above response;

    e.     Did Defendant ever rely on the Fleischer-Drinker report in whole or in part as a basis that Defendant's asbestos products could be used in the workplace without risk of asbestos-related health impacts to the consumer and/or bystander;

    f.     Did Defendant ever rely on the Fleischer-Drinker report in whole or in part as a basis that Defendant's asbestos products could be used in the workplace without risk of asbestos-related health impacts to the consumer and/or bystander;

    g.     If so, please produce every document which evidences in any way that Defendant relied on the Fleischer-Drinker Report in whole or in part for the proposition stated in Interrogatory No. 33 (e) above;

    h.     If your answer to 33 (e) is yes, when was the first date Defendant relied on the Fleischer-Drinker Report in whole or in part for the proposition stated in 33 (e) above?

## RESPONSE TO INTERROGATORY NO. 33:

UTC is currently unaware of having received a copy of the cited article except during the course of litigation of lawsuits after the alleged time period of Mr. Burke's alleged exposure to asbestos.

## INTERROGATORY NO. 34:

When, if ever, did Defendant or any of its predecessors-in-interest first receive a copy of the article entitled A Study of Asbestos (sic) in the Asbestos Textile Industry, published in 1938 in Public

Health Bill (sic), No. 241, U.S. Public Health Service and authored by W.C. Dreessen ("the Dreessen Report")?

a.   Identify the name and position of the employee or officer who received same;

b.   Please produce all documents generated by Defendant which discuss or in any way reference the Dreessen study prior to 1968;

c.   Please produce all documents upon which your responses above are based;

d.   Please identify the name(s) and address(es) of any person(s) who can verify your above response;

e.   Did Defendant ever rely on the Dreessen Report in whole or in part as a basis that Defendant's asbestos products could be used in the workplace without risk of asbestos-related health impacts to the consumer and/or bystander;

f.   If so, please produce every document which evidences in any way that Defendant relied on the Dreessen Report in whole or in part for the proposition stated in Interrogatory No. 34 (e) above;

g.   If your answer to 34 (e) is yes, when was the first date Defendant relied on the Dreessen Report in whole or in part for the proposition stated in 34 (e) above?

**RESPONSE TO INTERROGATORY NO. 34:**

UTC is currently unaware of having received a copy of the cited article except during the course of litigation of asbestos related lawsuits after the alleged time period of Mr. Burke's alleged exposure to asbestos.

**INTERROGATORY NO. 35:**

Identify which equipment manufactured, distributed or otherwise placed into the stream of commerce by Defendant which qualified under any military specifications. For each asbestos-containing equipment manufactured, distributed, or otherwise placed into the stream of commerce by Defendant that qualified under one or more of the military specifications:

a.   State which military specification it satisfied; and

b.   State the inclusive dates that the equipment was listed on the military qualified products list for that particular military specification.

**RESPONSE TO INTERROGATORY NO. 35:**

OBJECTION. This interrogatory is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News. There has been no attempt to limit the scope of this interrogatory to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. Plaintiff Howard Burke's alleged exposure to UTC products terminated in 1977. Compliance with this request would require the retrieval and review of millions of documents relating to the hundreds of different types of Pratt & Whitney military aviation engines manufactured from 1925 to the present and the hundreds of thousands of components utilized in the manufacture of these military aviation engines. Such a financially burdensome inquiry is beyond the scope of permissible discovery. UTC additionally objects to this request in that it seeks information protected by attorney-client privilege and/or the attorney work product doctrine. UTC further objects on

the basis that this interrogatory seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information which are privileged and protected from disclosure. UTC further objects to this interrogatory on the ground it seeks information protected from disclosure by statutes relating to national security. The requested information as it relates to military aviation engines is protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained. See Department of Defense Directive No. 5230.25 (November 6, 1984).

Without waiving the objection, UTC responds as follows: Other than any military specifications for the components identified in Responses to Interrogatory No. 6, above, UTC identifies U.S. Air Force and Navy specification AN-9500 for the design and manufacture of military reciprocating aviation engines and specifications MIL-E-5007, MIL-E-5008, MIL-E-5009, MIL-E-5010 and superseding iterations for the design and manufacture of military jet aviation engines.

## INTERROGATORY NO. 36:

Was the composition of any of the asbestos-containing equipment manufactured and/or distributed by Defendant intentionally different with regard to sales by Defendant of said equipment to the United States Government or any of its agencies as compared to asbestos-containing equipment sold and/or distributed by Defendant for sale to non-governmental private industrial consumers? If so, state the following:

a. The type of asbestos-containing equipment in which the composition of the equipment was intentionally different with regard to sales by Defendant to the United States Government or any of its agencies as compared to sales to non-governmental private industrial consumers;

b. The trade name of any such equipment;

c. The time period during which such intentional variation in the composition of said equipment(s) occurred;

d. Describe each such intentional variation;

e. Explain why each such intentional variation occurred; and

f. Identify the person or persons who are most knowledgeable concerning these intentional variations.

## RESPONSE TO INTERROGATORY NO. 36:

OBJECTION. This interrogatory is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News. There has been no attempt to limit the scope of this interrogatory to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. Plaintiff Howard Burke's alleged exposure to UTC products terminated in 1977. Compliance with this request would require the retrieval and review of millions of documents relating to the hundreds of different types of Pratt & Whitney aviation engines manufactured by UTC and the hundreds of thousands of components utilized in the manufacture of these aviation engines. Such a financially burdensome inquiry is beyond the scope of permissible discovery. UTC additionally objects to this request in that it seeks information protected by attorney-client privilege and/or the attorney work product doctrine. UTC further objects on the basis that this interrogatory seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information which are privileged

and protected from disclosure. UTC further objects to this interrogatory on the ground it seeks information protected from disclosure by statutes relating to national security. The requested information as it relates to military aviation engines is protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained. See Department of Defense Directive No. 5230.25 (November 6, 1984).

Without waiving the objection, UTC responds as follows: UTC during its existence has designed and manufactured various aviation engines under the guidance and scrutiny of the U.S. military for use in U.S. military aircraft. Subject to approval from the U.S. government, UTC was permitted to create derivative aviation engines from military programs for commercial aerospace customers which were subject to the guidance and scrutiny of the FAA and other civil agencies. As the functions and performance ratings of the military aviation engines differed greatly from the commercial derivatives, so too did the components utilized on each type of engine.

## INTERROGATORY NO. 37:

Was there any difference in the packaging of any asbestos-containing equipment manufactured and/or distributed by Defendant and sold to the United States Government or any of its agencies and sold by Defendant to non-governmental private industrial consumers? If so, state the following:

a.  Identify the type of asbestos-containing equipment which was sold and/or distributed by Defendant to the United States Government or any of its agencies in packages that were substantially different from said equipment sold and/or distributed by Defendant to non-governmental private industrial consumers;

b.  The trade name of any such equipment;

c.  The time period during which such differences in packaging occurred;

d.  If there was a reason for each such difference in packaging, state what each such reason was for each packaging variation; and

e.  Identify and describe all variations in the packaging of asbestos-containing equipment(s) as specified above that was sold to the United States Government which distinguished such packaging from the asbestos-containing equipment that was sold to non-governmental private industrial consumers.

## RESPONSE TO INTERROGATORY NO. 37:

Spare parts, including some of the components identified in Response to Interrogatory No. 6, that were delivered by UTC to the U.S. military were removed from their original packaging upon receipt and placed into proprietary U.S. military packaging and/or containers.

## INTERROGATORY NO. 38:

When, if at all, did Defendant first learn that the United States Government knew that the use or handling of asbestos-containing products without respiratory protection could foreseeably cause lung diseases such as asbestosis, lung cancer, or mesothelioma?

a.  How did Defendant first learn that information;

b.  Identify the person or persons at Defendant who first learned this information;

c.  Identify any documents which support Defendant's answer to this interrogatory;

d.  Identify all persons who have knowledge concerning this interrogatory.

25

**RESPONSE TO INTERROGATORY NO. 38:**

UTC is currently unaware of any information responsive to this request. Nevertheless, it is UTC's general belief that the U.S. Government came into possession of such knowledge at some point prior to the time period OSHA began promulgating regulations regarding the potential hazards and safe handling of asbestos.

**INTERROGATORY NO. 39:**

With respect to any plants where Defendant produced, designed or tested asbestos-containing equipment, describe in detail any changes Defendant made in work practices and/or equipment used and/or policies developed during the period of its production of such asbestos-containing equipment, concerning the safety of its plant employees with respect to their exposure to airborne asbestos dust and fibers (which would relate to safety procedures, ventilation systems, cleaning procedures, safety equipment, etc.). For any such changes, practices, or policies:

    a.     State the nature of each such change, practice, or policy;

    b.     State the approximate date of such change, practice, or policy;

    c.     State the reason the changes were made; and

    d.     Identify any documents in your possession which reflect such change, practice, or policy; and

    e.     Identify the custodian(s) of said documents.

**RESPONSE TO INTERROGATORY NO. 39:**

On August 1, 1977, Pratt & Whitney issued a document known as Administrative Control No. 14 to its workers to establish a protocol for the safe handling of asbestos-containing materials at its manufacturing and repair facilities. This is the earliest known written policy regarding the safe handling of asbestos. This document was reissued in a revised form on February 17, 1987. A copy of the 1987 document is attached.

**INTERROGATORY NO. 40:**

If Defendant has ever given any information to Defendant's employees concerning any potential hazards of exposure to asbestos, state:

    a.     The specific information given;

    b.     The date(s) on which said information was given;

    c.     The manner in which said information was given;

    d.     By whom was said information given (give names and current addresses);

    e.     To whom was said information given (give names and current addresses); The name and current address of the custodian of any records concerning the information given.

**RESPONSE TO INTERROGATORY NO. 40:**

On August 1, 1977, Pratt & Whitney issued a document known as Administrative Control No. 14 to its workers to establish a protocol for the safe handling of asbestos-containing materials at its manufacturing and repair facilities. This is the earliest known written warning regarding the potential

hazards of asbestos. This document was reissued in a revised form on February 17, 1987. A copy of the 1987 document is attached.

## INTERROGATORY NO. 41:

With regard to any product or equipment containing asbestos, requiring asbestos-component parts or any amount of asbestos fiber, sold or distributed by Defendant without cautionary language on the package or on the product itself, has Defendant ever recalled the product or equipment for the purpose of affixing cautionary language describing the health hazards of exposure of human beings to airborne asbestos dust and fibers and/or how the product could be safely used. If so, state:

    a.    What product(s) or equipment were recalled;

    b.    The date or dates the product(s) or equipment were recalled; and

    c.    The name or names of persons who have knowledge of the recall of asbestos-containing product(s) or equipment by Defendant.

## RESPONSE TO INTERROGATORY NO. 41:

UTC is currently unaware of having ever recalled any UTC product for such purpose.

## INTERROGATORY NO. 42:

Has Defendant ever sent any advisory letter or memorandum to any of its customers (specifically including without limitation, any of the plaintiffs employers) which attempts to advise them of any health hazard that may be associated with the use of asbestos-containing products and/or any safety precautions or procedures which should have been followed when handling or using asbestos-containing products. If so,

    a.    Identify the author of each such advisory letter or memorandum;

    b.    State the content of each such advisory letter or memorandum;

    c.    Identify the person(s) to whom each such letter or memorandum was sent;

    d.    State the date on which each such letter was sent; and

    e.    Identify the custodian of all such advisory letters or memoranda.

## RESPONSE TO INTERROGATORY NO. 42:

OBJECTION. This interrogatory is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News. There has been no attempt to limit the scope of this interrogatory to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. Plaintiff Howard Burke's alleged exposure to UTC products terminated in 1977. Compliance with this request would require the retrieval and review of millions of documents from 1925 to the present. Such a financially burdensome inquiry is beyond the scope of permissible discovery. UTC further objects to this interrogatory on the ground it seeks information protected from disclosure by statutes relating to national security. The requested information as it relates to military aviation engines is protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained. See Department of Defense Directive No. 5230.25 (November 6, 1984).

Without waiving the objection, UTC states any written materials, including warnings, that accompanied Pratt & Whitney military aviation engines manufactured by UTC were controlled and specified by the U.S. military. To the best of UTC's knowledge, the U.S. military did not specify, approve or request (and UTC, therefore, was prohibited from providing) any warnings regarding the use or handling of asbestos-containing components on Pratt & Whitney military aviation engines during the relevant time period.

## INTERROGATORY NO. 43:

Does Defendant contend that its representative, i.e., salesmen or other agents or employees verbally communicated any information to any of its customers, or any agency of the United States Government, and/or plaintiff's employers which attempted to advise them of any health hazard that may be associated with the use of asbestos-containing products or asbestos-containing equipment which attempted to advise them of any safety precautions or procedures which should be followed when handling or using asbestos-containing products/equipment manufactured, sold, supplied, or distributed by Defendant? If so, identify each such customer or employer and for each such customer or employer:

    a.    Identify the Defendant representative who made each such verbal communication;

    b.    State the content of each such verbal communication;

    c.    Identify the person or persons to whom such verbal communication was made;

    d.    State the date on which each such verbal communication was made; and

    e.    Identify the custodian of any document(s) which concerns, confirms, or related to any such verbal communication.

## RESPONSE TO INTERROGATORY NO. 43:

UTC currently has no information responsive to this interrogatory.

## INTERROGATORY NO. 44:

Prior to 1972, did Defendant ever advise any purchaser or user of asbestos-containing products/equipment that there was any threshold limit value which applied to the dust created from the use of asbestos-containing products/equipment and/or that the dust associated with the use of asbestos-containing products/equipment should be kept below the threshold limit value of five million particles per cubic foot? If so,

    a.    Identify all persons, government agencies or companies to whom this information was given;

    b.    Identify the method by which this information was communicated;

    c.    State the exact contents of such information;

    d.    State the specific date such information was communicated to each such person;

    e.    Identify any and all documents which contain this information; and

    f.    Identify the custodian(s) of all such documents.

## RESPONSE TO INTERROGATORY NO. 44:

As to Pratt & Whitney aviation engines and the asbestos-containing components used for a time on some of these engines, not to UTC's knowledge.

**INTERROGATORY NO. 45:**

At any time during which Defendant sold or distributed asbestos-containing equipment, were you ever advised by any of the persons, government agencies or companies to whom you sold asbestos-containing equipment that such person knew that the use of asbestos-containing equipment could cause or contribute to cause illness or disease of any kind? If so:

    a.    Identify each such purchaser of asbestos-containing equipment that advised you of this information;

    b.    Specifically identify the disease entity of which you were advised;

    c.    State the information concerning the potential hazards of the use of asbestos-containing equipment that was communicated to you by that purchaser;

    d.    Identify the custodian of the documents which contain, refer, or relate to each such communication; and

    e.    Identify the names of the person(s) who received this information at Defendant.

**RESPONSE TO INTERROGATORY NO. 45:**

As to Pratt & Whitney aviation engines, UTC is currently unaware of any information responsive to this request. Nevertheless, it is UTC's general belief that the U.S. Government came into possession of such knowledge at some point prior to the time period OSHA began promulgating regulations regarding the potential hazards and safe handling of asbestos.

**INTERROGATORY NO. 46:**

Has Defendant sold and/or supplied any asbestos-containing equipment or products to persons, including shipyards, military bases or defense depots, distributors, suppliers, and/or contractors in the State of Virginia between 1940 and 1986? If your answer to this interrogatory is affirmative, state:

    a.    Whether said equipment or products were manufactured and/or distributed by Defendant directly or through a distributor, intermediary, agent, subsidiary, or other company;

    b.    The name of the business entity, if any, to which equipment or products containing asbestos were sold for distribution to persons in the State of Virginia;

    c.    The dates that said equipment or products were sold and/or distributed to persons in the State of Virginia;

    d.    The trade name of said equipment or product(s) sold and/or distributed to persons in the State of Virginia;

    e.    The quantity of said equipment or product(s) distributed;

    f.    The names and current addresses of any individuals employed by you or formerly employed by you who have knowledge of the sale(s);

    g.    Whether there are records in existence reflecting the sale or distribution of said equipment or products to persons in the State of Virginia; and

    h.    Who currently has possession of such records.

**RESPONSE TO INTERROGATORY NO. 46:**

OBJECTION. This interrogatory is overly broad and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving this objection, due to the passage of time, UTC is currently unaware of any information responsive to this request.

**INTERROGATORY NO. 47:**

Prior to 1986, was any information ever given to you by any business entity, or the employees of any business entity, including any other manufacturer, producer, or supplier of asbestos or asbestos-containing products regarding the potential health hazards of exposure to asbestos and/or how to safely use asbestos-containing products distributed by you? If so:

a.    Summarize the advice given;

b.    State the name(s) and address(es) of all persons employed or formerly employed by you who have knowledge of said advice;

c.    State the name(s) and address(es) of all persons employed or formerly employed by the business entities who have knowledge of said advice; and

d.    State the date(s) said advice was first given.

**RESPONSE TO INTERROGATORY NO. 47:**

OBJECTION. This interrogatory is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News. There has been no attempt to limit the scope of this interrogatory to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. Plaintiff Howard Burke's alleged exposure to UTC products terminated in 1977. Compliance with this request would require the retrieval and review of millions of documents from 1925 to 1986. Such a financially burdensome inquiry is beyond the scope of permissible discovery. UTC additionally objects to this request in that it seeks information protected by attorney-client privilege and/or the attorney work product doctrine. UTC further objects on the basis that this interrogatory seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information which are privileged and protected from disclosure. UTC further objects to this interrogatory on the ground it seeks information protected from disclosure by statutes relating to national security. The requested information as it relates to military aviation engines is protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained. See Department of Defense Directive No. 5230.25 (November 6, 1984).

Without waiving the objection, UTC responds as follows: As to the asbestos-containing components identified in Response to Interrogatory No. 6, due to the passage of time, UTC is currently unaware of any information responsive to this interrogatory.

**INTERROGATORY NO. 48:**

For the time period 1998 to the present, identify each of your current or former employees who have provided deposition testimony and/or trial testimony in any lawsuit in any state or federal court or any workers' compensation proceeding involving personal injury or wrongful death allegedly caused by exposure to asbestos products that were manufactured, sold, processed or distributed by you, and for each such witness, state:

a.    the name of such witness;

b.    the date on which such witness testified;

c.    the case name, jurisdiction, and civil action number where such testimony was given;

d.    the subject matter of such testimony;

e.    any and all exhibits that were referenced in such testimony.

## RESPONSE TO INTERROGATORY NO. 48:

UTC identifies the following depositions:

1.  Deposition of Darryl Zylka, taken October 4, 2002, in *Marion Dickerman v. Asbestos Defendants (BHC)*, San Francisco Superior Court Case No. 300726, California. Plaintiff's counsel of record was Brayton Purcell.

2.  Deposition of Allan Shiffler, taken February 19, 2008, in *Alan Cardwell and Lynn Cardwell v. AGCO Corporation, et al.*, 11th Judicial District Court Cause No. 2006-76664, Harris County, Texas. Plaintiff's counsel of record was Simon Eddins & Greenstone.

3.  Deposition of Allan Shiffler, taken March 26, 2008, in *Alan Cardwell and Lynn Cardwell v. AGCO Corporation, et al.*, 11th Judicial District Court Cause No. 2006-76664, Harris County, Texas. Plaintiff's counsel of record was Simon Eddins & Greenstone.

4.  Deposition of Judy Harvey, taken March 26, 2008, in *Alan Cardwell and Lynn Cardwell v. AGCO Corporation, et al.*, 11th Judicial District Court Cause No. 2006-76664, Harris County, Texas. Plaintiff's counsel of record was Simon Eddins & Greenstone.

5.  Deposition of John Sumner, taken March 26, 2008, in *Alan Cardwell and Lynn Cardwell v. AGCO Corporation, et al.*, 11th Judicial District Court Cause No. 2006-76664, Harris County, Texas. Plaintiff's counsel of record was Simon Eddins & Greenstone.

6.  Deposition of Allan Shiffler, taken July 29, 2008, in *John Loewen v. Allis Chalmers Corporation Product Liability Trust, et al.*, San Francisco Superior Court Case No. CGC-06-456825, California. Plaintiff's counsel of record was Brayton Purcell.

7.  Deposition of Steve Swigert, taken July 29, 2008, in *John Loewen v. Allis Chalmers Corporation Product Liability Trust, et al.*, San Francisco Superior Court Case No. CGC-06-456825, California. Plaintiff's counsel of record was Brayton Purcell.

8.  Deposition of John Sumner, taken July 29, 2008, in John Loewen v. Allis Chalmers Corporation Product Liability Trust, et al., San Francisco Superior Court Case No. CGC-06-456825, California. Plaintiff's counsel of record was Brayton Purcell.

9.  Deposition of Judy Harvey, taken July 29, 2008, in John Loewen v. Allis Chalmers Corporation Product Liability Trust, et al., San Francisco Superior Court Case No. CGC-06-456825, California. Plaintiff's counsel of record was Brayton Purcell.

10. Deposition of Robert Williams, taken June 5, 2009, in *Andrew Schnabel and Audrey Schnabel v. BorgWarner Morse Tec, Inc., et al.*, Los Angeles Superior Court Case No. BC392554, California. Plaintiffs' counsel of record was Waters & Kraus.

11. Deposition of Steve Swigert, taken June 4, 2009, in Andrew Schnabel and Audrey Schnabel v. BorgWarner Morse Tec, Inc., et al., Los Angeles Superior Court Case No. BC392554, California. Plaintiffs' counsel of record was Waters & Kraus.

12. Deposition of Judy Harvey, taken June 4, 2009, in Andrew Schnabel and Audrey Schnabel v. BorgWarner Morse Tec, Inc., et al., Los Angeles Superior Court Case No. BC392554, California. Plaintiffs' counsel of record was Waters & Kraus.

13. Deposition of John Sumner, taken June 4, 2009, in Andrew Schnabel and Audrey Schnabel v. BorgWarner Morse Tec, Inc., et al., Los Angeles Superior Court Case No. BC392554, California. Plaintiffs' counsel of record was Waters & Kraus.

14. Deposition of John Sumner, taken April 7, 2011, in *Sandra Louise Norsworthy v. Aircraft*

*Braking Systems, et al.,* Middlesex County Superior Court, Docket No. 08-4778, Massachusetts. Plaintiff's counsel of record was The Shepard Law Firm.

15. Deposition of Allan Shiffler, taken April 7, 2011, and April 8, 2011, in *Sandra Louise Norsworthy v. Aircraft Braking Systems, et al.,* Middlesex County Superior Court, Docket No. 08-4778, Massachusetts. Plaintiff's counsel of record was The Shepard Law Firm.

16. Deposition of John Sumner, taken May 31, 2012, in *Bonnie Von Dell and John Von Dell v. 3M Company a/k/a Minnesota Mining, et al.,* New Castle County Superior Court Cause No. N10C-09-124, Delaware. Plaintiff's counsel of record was Perry & Sensor and Simons, Eddins & Greenstone.

17. Deposition of John Sumner, taken August 15, 2012, in *Joseph Schwartz and Lenora Schwartz v. ABEX Corp., et al.,* U.S. District Court for the Eastern District of Pennsylvania, MDL Docket No. 875, No. 2:05-cv-02511-ER. Plaintiff's counsel of record was Locks Law Firm.

18. Deposition of John Sumner, taken October 5, 2012, in *Patti Donlon v. ACandS, Inc., et al.,* U.S. District Court for the Eastern District of Pennsylvania, MDL Docket No. 875, No. 2:11-cv-67721-ER. Plaintiff's counsel of record was Harowitz & Tigerman.

19. Deposition of John Sumner, taken January 30, 2013, and March 8 and 22, 2013, in *Jack Keyian and Penny Keyian v. United Technologies Corporation, et al.,* Los Angeles Superior Court Case No. BC468445. Plaintiff's counsel of record was Weitz & Luxenberg.

20. Deposition of John Sumner, taken March 13, 2013, in *Daisy Navarro v. ACandS, Inc., et al.,* Alameda County Superior Court Case No.RG 12652091. Plaintiff's counsel of record was Harowitz & Tigerman.

21. Deposition of Judy Harvey, taken March 13, 2013, in *Daisy Navarro v. ACandS, Inc., et al.,* Alameda County Superior Court Case No.RG 12652091. Plaintiff's counsel of record was Harowitz & Tigerman.

22. Deposition of Allan Shiffler, taken April 10, 2013, in *Patricia Ann Livingston (WD Gerald Livingston) v. ABB, Inc., et al.,* U.S. District Court for the Central District of California, Case No. 2:12-cv-01220-SVW. Plaintiff's counsel of record was Simon Greenstone Panatier Bartlett.

23. Deposition of Allan Shiffler, taken June 19, 2013, in *Diane Bowen (WD James Voliva) v. Curtiss-Wright Corporation, et al.,* U.S. District Court for the Eastern District of Pennsylvania, Case No. 3:11-cv-01554-VLB. Plaintiff's counsel of record was Karst & von Oiste.

24. Deposition of John Sumner, taken January 9, 2014, in *Charles Bradshaw and Vieno Bradshaw v. 3M Company, et al.,* Los Angeles Superior Court Case No. BC506292. Plaintiff's counsel of record was Levin Simes, LLP.

25. Deposition of Judy Harvey, taken February 27, 2014, in *Patricia Ann Livingston (WD Gerald Livingston) v. ABB, Inc., et al.,* U.S. District Court for the Central District of California, Case No. 2:12-cv-01220-SVW. Plaintiff's counsel of record was Simon Greenstone Panatier Bartlett.

26. Deposition of Allan Shiffler, taken February 28, 2014, in *Patricia Ann Livingston (WD Gerald Livingston) v. ABB, Inc., et al.,* U.S. District Court for the Central District of California, Case No. 2:12-cv-01220-SVW. Plaintiff's counsel of record was Simon Greenstone Panatier Bartlett.

Copies of some transcripts of the above depositions are available through trial counsel for UTC upon pre-payment of copying costs.

## INTERROGATORY NO. 49:

For the time period 1998 to the present, identify each person who has testified as an expert for you at trial or provided a deposition to Plaintiffs' Counsel in response to having been designated as an expert by you in any lawsuit in any state or federal court or any workers' compensation proceeding involving personal injury or wrongful death allegedly caused by exposure to asbestos products that were manufactured, sold, processed or distributed by you, and for each such expert, state:

      a.    the name of such witness;

      b.    the date on which such witness testified;

      c.    the case name, jurisdiction, and civil action number where such testimony was given;

      d.    the subject matter of such testimony;

      e,    any and all exhibits that were referenced in such testimony.

## RESPONSE TO INTERROGATORY NO. 49:

OBJECTION. This interrogatory is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News. There has been no attempt to limit the scope of this interrogatory to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. Compliance with this request would require the retrieval and review of thousands of documents relating to worker's compensation actions and civil asbestos litigation from approximately the past sixteen years. Such a financially burdensome inquiry is beyond the scope of permissible discovery.

## RESPONSES TO REQUESTS FOR PRODUCTION

## REQUEST FOR PRODUCTION NO. 1:

Produce all documents which relate, directly or indirectly, to your answers to any and all interrogatories above, including all subparts of each such interrogatory.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

OBJECTION. This request is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News. There has been no attempt to limit the scope of this request to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. Plaintiff Howard Burke's alleged exposure to UTC products terminated in 1977. Compliance with this request would require the retrieval and review of millions of documents from 1925 to the present. Such a financially burdensome inquiry is clearly beyond the scope of permissible discovery. UTC additionally objects to this request in that it seeks documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes. UTC further objects on the basis that this request seeks the production of documents which contain or reference confidential, financial, proprietary, business and/or other competitive information which are privileged and protected from disclosure. UTC further objects to this request on the ground it seeks documents protected from disclosure by statutes relating to

national security. The requested documents as they relate to military aviation engines are protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained. See Department of Defense Directive No. 5230.25 (November 6, 1984).

Without waiving the objection, UTC responds as follows: Exemplars of known warning labels that were affixed to packaging for asbestos-containing spare parts are attached. The full reports of Dr. Mlynarek, including photos, will be made available through trial counsel for UTC. The first five documents UTC received regarding the association between asbestos exposure and disease in human beings and/or relating to recommended threshold limit values for dust created from the use of asbestos-containing products will be made available through trial counsel for UTC. The 1987 copy of *Administrative Control No. 14* is attached. Upon request, U.S. Air Force and Navy specification AN-9500 for the design and manufacture of military reciprocating aviation engines and specifications MIL-E-5007, MIL-E-5008, MIL-E-5009, MIL-E-5010 and superseding iterations for the design and manufacture of military jet aviation engines will be made available through trial counsel for UTC. Copies of some transcripts of the depositions identified in Response to Interrogatory No. 48 will be made available through trial counsel for UTC upon pre-payment of copying costs.

## REQUEST FOR PRODUCTION NO. 2:

Produce any and all documents, including but not limited to, any pertinent trademarks, patents, contracts, blueprints, vendor drawings, specifications, technical manuals, handbooks, assembly instructions, operator's manuals, maintenance manuals, head sheets, index cards, order cards, correspondence, work orders, boiler logs, order forms, repair logs and/or performance data sheets, photographs or films relating to any asbestos-containing products or equipment, as previously defined herein, that were manufactured, distributed, supplied, sold or otherwise placed in the stream of commerce in Virginia by you at any time during the inclusive dates 1940 to 1980.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 2:

OBJECTION. This request is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News. There has been no attempt to limit the scope of this request to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. Plaintiff Howard Burke's alleged exposure to UTC products terminated in 1977. Compliance with this request would require the retrieval and review of millions of documents relating to hundreds of different types of Pratt & Whitney aviation engines manufactured between 1925 and 1980 and the hundreds of thousands of components utilized in the manufacture of these engines. Such a financially burdensome inquiry is beyond the scope of permissible discovery. UTC additionally objects to this request in that it seeks documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine. UTC further objects on the basis that this request seeks the production of documents which contain or reference confidential, financial, proprietary, business and/or other competitive information which are privileged and protected from disclosure. UTC further objects to this request on the ground it seeks documents protected from disclosure by statutes relating to national security. The requested documents as they relate to military aviation engines are protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained. See Department of Defense Directive No. 5230.25 (November 6, 1984).

**REQUEST FOR PRODUCTION NO. 3:**

Produce any and all sales catalogues, sales brochures, promotional materials, sales invoices, bills of lading, correspondence and/or purchase orders relating to any asbestos-containing products or equipment, as previously defined herein, that were manufactured, distributed, supplied, sold or otherwise placed in the stream of commerce in Virginia by you at any time during the inclusive dates 1940 to 1980.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

OBJECTION.  This request is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence.  UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News.  There has been no attempt to limit the scope of this request to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period.  Plaintiff Howard Burke's alleged exposure to UTC products terminated in 1977.  Compliance with this request would require the retrieval and review of millions of documents relating to hundreds of different types of Pratt & Whitney aviation engines manufactured between 1925 and 1980 and the hundreds of thousands of components utilized in the manufacture of these engines.  Such a financially burdensome inquiry is beyond the scope of permissible discovery.  UTC additionally objects to this request in that it seeks documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine.  UTC further objects on the basis that this request seeks the production of documents which contain or reference confidential, financial, proprietary, business and/or other competitive information which are privileged and protected from disclosure.  UTC further objects to this request on the ground it seeks documents protected from disclosure by statutes relating to national security.  The requested documents as they relate to military aviation engines are protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained.  See Department of Defense Directive No. 5230.25 (November 6, 1984).

**REQUEST FOR PRODUCTION NO. 4:**

Produce a copy of any logos, manufacture labels, caution or warning labels, or any other writing which was imprinted, stamped or otherwise affixed to any asbestos-containing products or equipment, as previously defined herein, or to the packaging of such products or equipment that was manufactured, distributed, supplied, sold or otherwise placed in the stream of commerce in Virginia by you at any time during the inclusive dates 1940 to 1980.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Exemplars of known warning labels that were affixed to packaging for asbestos-containing spare parts are attached.  It is currently unknown to UTC whether these or similarly worded labels accompanied the asbestos-containing components identified in Response to Interrogatory No. 6 shipped prior to 1981.

An exemplar of the Pratt & Whitney logo is attached.  This logo or similar logos would have been present on P&W engines and packaging for asbestos-containing spare parts shipped prior to 1981.

**REQUEST FOR PRODUCTION NO. 5:**

Produce copies of any documents and tangible things that you received or submitted to any of the organizations and/or associations listed on Exhibit A attached hereto, including but not limited to correspondence, publications, articles, notes, minutes, periodicals, bulletins and other documents.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

UTC is currently unaware of any documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 6:**

Produce any written recommendations provided to customers, installers and/or other end users of asbestos-containing products or equipment as previously defined herein, regarding the installation of asbestos-containing products or equipment that were manufactured, distributed, supplied, sold or otherwise placed in the stream of commerce in Virginia by you at any time during the inclusive dates 1940 to 1980.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

OBJECTION. This request assumes facts, is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News. There has been no attempt to limit the scope of this request to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. Plaintiff Howard Burke's alleged exposure to UTC products terminated in 1977. Compliance with this request would require the retrieval and review of millions of documents relating to hundreds of different types of Pratt & Whitney aviation engines manufactured between 1925 and 1980 and the hundreds of thousands of components utilized in the manufacture of these engines. Such a financially burdensome inquiry is beyond the scope of permissible discovery. UTC additionally objects to this request in that it seeks documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine. UTC further objects on the basis that this request seeks the production of documents which contain or reference confidential, financial, proprietary, business and/or other competitive information which are privileged and protected from disclosure. UTC further objects to this request on the ground it seeks documents protected from disclosure by statutes relating to national security. The requested documents as they relate to military aviation engines are protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained. See Department of Defense Directive No. 5230.25 (November 6, 1984).

**REQUEST FOR PRODUCTION NO. 7:**

Produce copies of the written results of any environmental tests, investigations, air sampling or any other dust monitoring studies conducted by, or on behalf of, you at any location regarding the release of asbestos into the atmosphere from asbestos-containing products or equipment, as previously defined herein, that was manufactured, distributed, supplied, sold or otherwise placed in the stream of commerce by you.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Assessments were performed by Dr. Steven Mlynarek, Ph.D., in 2004 and 2006 regarding the potential release of asbestos fibers during overhaul and maintenance work on Pratt & Whitney piston and

jet aviation engines. Dr. Mlynarek prepared written reports, dated November 29, 2004, and May 9, 2007. The results showed overhaul and maintenance work on the engines generated release of asbestos fibers at or below ambient levels. The published reports of Dr. Mlynarek have previously been provided to Plaintiff's counsel. The full reports of Dr. Mlynarek, including photos, are available through trial counsel for UTC.

## REQUEST FOR PRODUCTION NO. 8:

Produce minutes, notes, reports or memorandums of any meetings of your Board of Directors, managing members, company officers, or committees of management prior to 1986 wherein there were discussion of, or reference to, the installation, removal, or recall of asbestos-containing products or equipment or the sale, use or handling of asbestos-containing products or equipment or alleged health hazards associated with exposure to asbestos, any recommendation or discussions of warnings, caution labels, safety procedures, or testing for the asbestos boilers, any claims for compensation arising out of persons who alleged asbestos related death, disease, abnormality or impairment.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 8:

UTC is currently unaware of any documents responsive to this request.

## REQUEST FOR PRODUCTION NO. 9:

Produce copies of all documents obtained by, pursuant to, or under threat of subpoena, or under a Freedom of Information Act (FOIA) Request relating to this case.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 9:

UTC is currently unaware of any documents responsive to this request.

## REQUEST FOR PRODUCTION NO. 10:

Produce any and all documents which support your answer(s), to Plaintiffs Complaint or Plaintiff's Amended complaint, including documents which support your affirmative defenses to the Plaintiff's Complaint and/or Plaintiff's Amended Complaint.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 10:

OBJECTION. This request is vague and ambiguous. Further, this request is an improper attempt to invade the attorney/client privilege and obtain privileged attorney work product. The affirmative defenses were asserted by trial counsel, after privileged communication with his client.

Without waiving the objection, UTC identifies the exhibits to United Technologies Corporation's List of Factual and Expert Witnesses Who Will or May Be Called to Testify at Trial, which were previously served on Plaintiff's counsel, in support of the affirmative defenses, as well as the testimony of fact and expert witnesses identified by other parties to the *Burke* case, as well as personnel and medical records of the Plaintiff. UTC's discovery and investigation are ongoing and UTC reserves the right to supplement its response at a future date.

## REQUEST FOR PRODUCTION NO. 11:

Provide any and all curriculum vitae for your expert witnesses identified in your response to the Plaintiff's First Interrogatories or that you plan on calling to testify at the trial of this matter.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Please see United Technologies Corporation's List of Factual and Expert Witnesses Who Will or May Be Called to Testify at Trial and exhibits attached to the same, which were previously served on Plaintiff's counsel.

**REQUEST FOR PRODUCTION NO. 12:**

Provide representative testimony for any expert witness that you will or may call to testify at the trial of this matter.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

OBJECTION. This request seeks to impose a burden on UTC that is outside the scope of permissible expert discovery, is vague, irrelevant, ambiguous, overbroad, and not calculated to lead to the discovery of admissible evidence. Please see United Technologies Corporation's List of Factual and Expert Witnesses Who Will or May Be Called to Testify at Trial and exhibits attached to the same, which were previously served on Plaintiff's counsel.

**REQUEST FOR PRODUCTION NO. 13:**

Provide representative testimony for any corporate representative or other factual witness you will or may call to testify at the trial of this matter.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

OBJECTION. This Request is not reasonably calculated to lead to the discovery of admissible evidence, is overly broad, vague and ambiguous. The Request does not tailor the request for information as contemplated by the Rules of the Virginia Supreme Court with respect to corporate representative testimony. UTC does not understand the language, "representative testimony for any corporate representative or other factual witness."

Without waiving the objection, UTC states copies of some transcripts of the depositions identified in Response to Interrogatory No. 48 will be made available through trial counsel for UTC upon pre-payment of copying costs.

**REQUEST FOR PRODUCTION NO. 14:**

Provide any and all reports or other documents and things authored by your expert witnesses or which summarize or support your expert witnesses' opinions and conclusions.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

OBJECTION. This request seeks to impose a burden on UTC that is outside the scope of permissible expert discovery, is vague, irrelevant, ambiguous, overbroad, and not calculated to lead to the discovery of admissible evidence. Please see United Technologies Corporation's List of Factual and Expert Witnesses Who Will or May Be Called to Testify at Trial and exhibits attached to the same, which were previously served on Plaintiff's counsel.

**REQUEST FOR PRODUCTION NO. 15:**

Produce any reports of asbestos related disease or abnormality or copies of any workers compensation claims filed by any of your employees or former employees or any of their family members prior to 1986.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

OBJECTION. This request is irrelevant, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. Compliance with this request would require the retrieval and review of the personnel files of tens of thousands of UTC employees and former UTC employees and the entire workers compensation history of UTC from 1925 to 1986. Such a financially burdensome inquiry is beyond the scope of permissible discovery. Further, the requested documents are protected from discovery by the employees'/patients' rights of privacy. Further, Plaintiff Burke did not claim to have ever been employed by UTC or worked at a UTC-related facility.

**REQUEST FOR PRODUCTION NO. 16:**

Produce all correspondence, agreements or other documents reflecting an obligation, or arguably reflecting an obligation, on the part of any entity including, but not limited to individuals, corporations, partnerships or the like to satisfy part or all of a judgment which may be entered in this action, or to indemnify or reimburse you for payments made to satisfy a judgment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

OBJECTION. This request is vague, ambiguous, overbroad, burdensome and not calculated to lead to the discovery of admissible evidence.

Without waiving the objection, UTC states it believes it is adequately insured to cover the claims made by Plaintiff in this matter pursuant to multiple policies of insurance issued through Global Aerospace with combined limits of liability in excess of $100 million. There is no reservation of rights.

**REQUEST FOR PRODUCTION NO. 17:**

Produce for inspection and/or testing samples of all asbestos-containing products you possess or control which were identified in your answer to Interrogatory no. 6 above.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

OBJECTION. This request is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. There has been no attempt to limit the scope of this request to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. UTC additionally objects to this request in that it seeks materials protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine. UTC further objects on the basis that this request seeks the production of materials that are the product of confidential, financial, proprietary, business and/or other competitive information which are privileged and protected from disclosure. UTC further objects to this request on the ground it seeks materials protected from disclosure by statutes relating to national security. The requested samples as they relate to military aviation engines are protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained. See Department of Defense Directive No. 5230.25 (November 6, 1984).

Without waiving the objection, UTC responds as follows: Please see the bulk sample results in the full reports of Dr. Mlynarek, which are available through trial counsel for UTC.

**REQUEST FOR PRODUCTION NO. 18:**

Produce for inspection any and all other tangible objects and things that were identified and/or that relate, directly or indirectly, to your answers to any and all interrogatories above, including all subparts of each such interrogatory.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

OBJECTION. This request is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News. There has been no attempt to limit the scope of this request to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. Plaintiff Howard Burke's alleged exposure to UTC products terminated in 1977. Compliance with this request would require the retrieval and review of millions of documents from 1925 to the present. Such a financially burdensome inquiry is beyond the scope of permissible discovery. UTC additionally objects to this request in that it seeks documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes. UTC further objects on the basis that this request seeks the production of documents which contain or reference confidential, financial, proprietary, business and/or other competitive information which are privileged and protected from disclosure. UTC further objects to this request on the ground it seeks documents protected from disclosure by statutes relating to national security. The requested documents as they relate to military aviation engines are protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained. See Department of Defense Directive No. 5230.25 (November 6, 1984).

Without waiving the objection, UTC responds as follows: Exemplars of known warning labels that were affixed to packaging for asbestos-containing spare parts are attached. The full reports of Dr. Mlynarek, including photos, will be made available through trial counsel for UTC. The first five documents UTC received regarding the association between asbestos exposure and disease in human beings and/or relating to recommended threshold limit values for dust created from the use of asbestos-containing products will be made available through trial counsel for UTC. The 1987 copy of *Administrative Control No.* 14 is attached. Upon request, U.S. Air Force and Navy specification AN-9500 for the design and manufacture of military reciprocating aviation engines and specifications MIL-E-5007, MIL-E-5008, MIL-E-5009, MIL-E-5010 and superseding iterations for the design and manufacture of military jet aviation engines will be made available through trial counsel for UTC. Copies of some transcripts of the depositions identified in Response to Interrogatory No. 48 will be made available through trial counsel for UTC upon pre-payment of copying costs.

**REQUEST FOR PRODUCTION NO. 19:**

Produce a copy of your document retention policy.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

OBJECTION. This request is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. There has been no attempt to limit the scope of this request to a relevant time period, a relevant product or relevant records. Compliance with this

request would require the search for and retrieval of every document in the possession of UTC having any conceivable relationship to document retention from 1925 to the present. Such a financially burdensome request is beyond the scope of permissible discovery.

**REQUEST FOR PRODUCTION NO. 20:**

Produce all correspondence, agreements or other documents reflecting an obligation, or arguably reflecting an obligation, on the part of any entity including, but not limited to individuals, corporations, partnerships or the like to satisfy part or all of a judgment which may be entered in this action, or to indemnify or reimburse you for payments made to satisfy a judgment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

OBJECTION. This request is duplicative of Request for Production No. 16, above. See the prior response to Request for Production No. 16.

**REQUEST FOR PRODUCTION NO. 21:**

Produce all documents and tangible things that relate in any way to the sale, supply, and/or distribution of any asbestos-containing products and/or asbestos-containing equipment to any of the other defendants named in this case.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

OBJECTION. This request is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News. There has been no attempt to limit the scope of this request to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. Plaintiff Howard Burke's alleged exposure to UTC products terminated in 1977. Compliance with this request would require the retrieval and review of millions of documents from 1925 to the present. Such a financially burdensome inquiry is beyond the scope of permissible discovery. UTC additionally objects to this request in that it seeks documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine. UTC further objects on the basis that this request seeks the production of documents which contain or reference confidential, financial, proprietary, business and/or other competitive information which are privileged and protected from disclosure. UTC further objects to this request on the ground it seeks documents protected from disclosure by statutes relating to national security. The requested documents as they relate to military aviation engines are protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained. See Department of Defense Directive No. 5230.25 (November 6, 1984).

**REQUEST FOR PRODUCTION NO. 22:**

Produce all documents and tangible things, including, but not limited to invoices, purchase orders, contracts, bills of lading, or other documents that relate or pertain in any way to the sale, supply, and/or distribution of any asbestos-containing products and/or asbestos-containing equipment to the following locations or entities:

a. Lakeland (sic) Air Force Base in San Antonio, Texas

b. Chanute Air Force Base, Illinois

c. Plattsburgh Air Force Base in New York

    d.     Byrd Field, in Richmond, Virginia

    e.     Defense Industrial Supply Center

## RESPONSE TO REQUEST FOR PRODUCTION NO. 22:

OBJECTION. This request is vague, ambiguous, overbroad, burdensome and not calculated to lead to the discovery of admissible evidence. UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News. There has been no attempt to limit the scope of this request to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. Plaintiff Howard Burke's alleged exposure to UTC products terminated in 1977. Compliance with this request would require the retrieval and review of millions of documents from 1925 to the present. Such a financially burdensome inquiry is beyond the scope of permissible discovery. UTC additionally objects to this request in that it seeks documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine. UTC further objects on the basis that this request seeks the production of documents which contain or reference confidential, financial, proprietary, business and/or other competitive information which are privileged and protected from disclosure. UTC further objects to this request on the ground it seeks documents protected from disclosure by statutes relating to national security. The requested documents as they relate to military aviation engines are protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained. See Department of Defense Directive No. 5230.25 (November 6, 1984).

## REQUEST FOR PRODUCTION NO. 23:

Produce all documents and tangible things relating to the utilization, purchase, acquisition, and sale of asbestos-containing products and/or equipment, including, but not limited to ordering and sales paperwork, requisitions, invoices, shipping documents, bills of lading, price quotations, and any other communications between you and any manufacturer, distributor, or supplier of any asbestos-containing products utilized at each of the following locations or entities:

    a.     Lakeland Air-Force Base in San Antonio, Texas

    b.     Chanute Air Force Base, Illinois

    c.     Plattsburgh Air Force Base in New York

    d.     Byrd Field, in Richmond Virginia

    e.     Defense Industrial Supply Center

## RESPONSE TO REQUEST FOR PRODUCTION NO. 23:

OBJECTION. This request is vague, ambiguous, overbroad, burdensome and not calculated to lead to the discovery of admissible evidence. UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News. There has been no attempt to limit the scope of this request to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. Plaintiff Howard Burke's alleged exposure to UTC products terminated in 1977. Compliance with this request would require the retrieval and review of millions of documents from 1925 to the present. Such a financially burdensome inquiry is beyond the scope of permissible discovery. UTC additionally objects to this request in that it seeks documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine. UTC further objects on the basis that this request seeks the production of documents which contain or reference confidential, financial, proprietary, business and/or other competitive information which are privileged

and protected from disclosure. UTC further objects to this request on the ground it seeks documents protected from disclosure by statutes relating to national security. The requested documents as they relate to military aviation engines are protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained. See Department of Defense Directive No. 5230.25 (November 6, 1984).

**REQUEST FOR PRODUCTION NO. 24:**

Produce all documents and tangible things relating to any communications made, at any time, between you and any other manufacturer, supplier, or distributor of asbestos-containing products about the use of or hazards of asbestos and/or asbestos-containing products.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

OBJECTION. This request is vague, ambiguous, overbroad, burdensome and not calculated to lead to the discovery of admissible evidence. UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News. There has been no attempt to limit the scope of this request to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. Plaintiff Howard Burke's alleged exposure to UTC products terminated in 1977. Compliance with this request would require the retrieval and review of millions of documents from 1925 to the present. Such a financially burdensome inquiry is beyond the scope of permissible discovery. UTC additionally objects to this request in that it seeks documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine. UTC further objects on the basis that this request seeks the production of documents which contain or reference confidential, financial, proprietary, business and/or other competitive information which are privileged and protected from disclosure. UTC further objects to this request on the ground it seeks documents protected from disclosure by statutes relating to national security. The requested documents as they relate to military aviation engines are protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained. See Department of Defense Directive No. 5230.25 (November 6, 1984).

**REQUEST FOR PRODUCTION NO. 25:**

Produce any and all documents and tangible things that relate in any way to any communications made, at any time, that were submitted to the Environmental Protection Agency (EPA), the Occupational Safety and Health Administration or any other state or federal government agency that pertain to information about asbestos-containing products that you manufactured, sold, distributed or otherwise supplied.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

UTC is currently unaware of any documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 26:**

Any additional documents not specifically requested be produced above which relate, directly or indirectly, to any of your answers to any to and all interrogatories herein.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

OBJECTION. This request is vague, ambiguous, overbroad, financially burdensome and not calculated to lead to the discovery of admissible evidence. UTC is an active defendant in only one asbestos matter, *Howard Burke*, in the Circuit Court for the City of Newport News. There has been no attempt to limit the scope of this request to the specific UTC products to which Plaintiff Howard Burke allegedly was exposed or to a relevant time period. Plaintiff Howard Burke's alleged exposure to UTC products terminated in 1977. Compliance with this request would require the retrieval and review of millions of documents from 1925 to the present. Such a financially burdensome inquiry is beyond the scope of permissible discovery. UTC additionally objects to this request in that it seeks documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes. UTC further objects on the basis that this request seeks the production of documents which contain or reference confidential, financial, proprietary, business and/or other competitive information which are privileged and protected from disclosure. UTC further objects to this request on the ground it seeks documents protected from disclosure by statutes relating to national security. The requested documents as they relate to military aviation engines are protected from disclosure by law, absent express written consent from the U.S. military, which has not been obtained. See Department of Defense Directive No. 5230.25 (November 6, 1984).

UNITED TECHNOLOGIES CORPORATION

By: _Michel B._ _____
Of Counsel

Bruce T. Bishop, Esq. (VSB#16029)
Kevin P. Greene, Esq. (VSB#48334)
Michele B. Fanney, Esq. (VSB#83874)
WILLCOX & SAVAGE, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, VA 23510
*Counsel for United Technologies Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of **United Technologies Corporation's Objections and Responses to Plaintiff's Master Interrogatories and Request for Production of Documents** in the case of *Howard D. Burke and Patricia L. Burke v. Waco, Inc., et al.* was served by electronic mail (as a PDF attachment) to all counsel of record on this 8th day of May, 2014, and via electronic mail and U.S. Mail to plaintiff's counsel:

Robert R. Hatten, Esq.
Erin E. Jewell, Esq.
Patton, Wornom, Hatten & Diamonstein, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, VA 23602

Pursuant to Rule 1:12 of the Rules of the Supreme Court of Virginia, a copy of this Certificate of Service was also served via facsimile to all known counsel of record as follows:

Timothy S. Brunick, Esq.
Clarke, Dolph, Rapaport, Hardy & Hull, PLC
Smithfield Bldg., Ste. 101A
6160 Kempsville Circle
Norfolk, VA 23502
**WARREN PUMPS, INC.**

Anthony Taddeo, Esq.
Taddeo & Sturm, PLC
3 West Cary St.
Richmond, VA 23220
**FOSTER-WHEELER CORPORATION**
**taddeo@taddeosturm.com**

Henry N. Ware, Jr., Esq.
Spotts, Fain, P.C.
411 E. Franklin St., Suite 601
Richmond, VA 23219
**INGERSOLL-RAND CO.**
**hnware@spottsfain.com**

John P. Fishwick, Jr., Esq.
Lichtenstein & Fishwick, P.L.C.
P.O. Box 601
Roanoke, VA 24004
**METROPOLITAN LIFE INSURANCE CO.**
**jpf@vatrials.com**

James G. Kennedy, Esq.
Pierce, Herns, Sloan & McLeod
321 E Bay St.
Charleston, SC 29401
**UNION CARBIDE CORPORATION**
**jameskennedy@phswlaw.com**

Vincent J. Palmiotto, Esq.
Kira L. Cook, Esq.
Dehay & Elliston, L.L.P.
365 South Charles St., #1300
Baltimore, MD 21201
**DANA CORPORATION**
**vpalmiotto@dehay.com  cook@dehay.com**

Jeffrey Poretz, Esq.
Miles & Stockbridge, P.C.
1751 Pinnacle Dr., Suite 500
McLean, VA 22102-3833
**SB DECKING CO. INC.**
**jporetz@milesstockbridge.com**

Robert L. O'Donnell, Esq.
Vandeventer Black LLP
500 World Trade Center
Norfolk, VA 23510
**J. HENRY HOLLAND**
**rodonnell@vanblk.com**

Martin A. Conn, Esq.
MORAN REEVES & CONN PC
100 Shockoe Slip, 4th Floor
Richmond, VA 23219
**THE BOEING COMPANY**
**mconn@mrcpclaw.com**

George J. Dancigers, Esq.
McKenry, Dancigers, Warner, Dawson & Lake, P.C.
192 Ballard Court, Suite 400
Virginia Beach, VA 23462
**WACO, INC.**
**gjdancigers@va-law.org**

_Michael B. ___

UTC'S RESPONSE TO PLAINTIFFS' MASTER INTERROGATORIES AND REQUESTS FOR PRODUCTION
L-1255501 1

**VERIFICATION**

I, Charles R. Crenshaw, declare as follows:

I am authorized to make this verification for and on behalf of Defendant UNITED TECHNOLOGIES CORPORATION ("UTC"), and I make this verification for that reason.

The information set forth in DEFENDANT UNITED TECHNOLOGIES CORPORATION'S RESPONSES TO PLAINTIFF'S MASTER INTERROGATORIES AND REQUEST FOR PRODUCTION (the "Responses") was gathered and collected by persons with knowledge of UTC's various records and files which are kept by UTC in the regular and ordinary course of its business. The persons who have gathered and collected this material have reported to me that the Responses truly and correctly reflect the information gathered and the contents of said records and files. Accordingly, I state that the Responses are true and correct according to my knowledge, UTC's records and files and the information transmitted to me as described above.

I declare under penalty of perjury under the laws of the State of Connecticut that the foregoing is true and correct and that this Verification was executed on May ___7___, 2014, at Bloomfield, Connecticut.

*Charles R. Crenshaw*

Charles R. Crenshaw, Declarant

## EXHIBIT A

a)   Asbestos Textile Institute (ATI);
b)   Industrial Hygiene Foundation and/or Industrial Health Foundation (IHF);
c)   Industrial Mineral Insulation Manufacturers Institute;
d)   Magnesia Silica Insulation Manufacturers Association;
e)   National Insulation Manufacturers Association (NIMA);
f)   Thermal Insulation Manufacturers Association (TIMA;
g)   National Insulation Contractors Association (NICA);
h)   Southeastern Insulation Contractors Association (SEICA);
i)   Asbestos Information Association (AIA);
j)   Quebec Asbestos Mining Association (QAMA);
k)   National Safety Council;
l)   Asbestos Cement Producers Association;
m)   Refractories Institute;
n)   Chemical Manufacturers Association and/or its predecessor, the Manufacturing Chemist Association;
o)   Shipbuilder's Council of America (SCA);
p)   American Petroleum Institute (API);
q)   Illinois Manufacturers Association (IMA)

L.1255501 1

**CAUTION:**
Contains Asbestos fibers.
Avoid creating dust. Breathing
Asbestos dust may cause
serious bodily harm.

UTC's Response to Plaintiffs' Master Interrogatories and Requests for Production

1-1255591.1







UTC's Response to Plaintiffs' Master Interrogatories and Requests for Production

1-1255591 1

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL | | NO. 14 |
|---|---|---|---|
| | ASBESTOS | | |
| | **REVISED** 2-17-87 | **ISSUED** 8-1-77 | PAGE 1 OF 23 |

I. SCOPE

This Standard Safety Practice establishes the protocol to be used by Pratt and Whitney Connecticut, New York, Maine and Georgia locations when handling, removing, and/or disposing of asbestos-containing materials.

II. GENERAL

Asbestos abatement work shall not be performed by Pratt & Whitney employees unless they are properly trained.

This Standard Safety Practice is based upon current technology and is consistant with the requirements set forth in the Occupational Safety and Health Administration (OSHA) Asbestos Standards (29 CFR 1910.1001 and 1926.58).

Asbestos, a family of minerals, occurs naturally in the earth as masses of fibers. These fibers, due to their inherent crystalline structure, may break into a dust of microscopic fibers which can float in the air, stick to clothes, and be easily inhaled or swallowed.

Prior to the early 1970's, asbestos was used extensively in thermal insulation and fireproofing. Its non-combustible, heat-resistant, and pliable properties made it nearly indispensable to commercial and industrial consumers. Asbestos might be present in:

Heat insulating and friction materials

Fireproofing materials

Block and pipe insulation

Cements, mortars, grouting, blankets, tape

Epoxies, adhesives, paints

Gaskets, grommet cushions, and other engine parts

For some time, medical and safety professionals have recognized the serious threat asbestos poses to human health. In recent years, asbestos has reached the status of being one of the prime hazards in occupational and environmental fields. A definite link exists between inhaling microscopic asbestos fibers and the scarring of lung tissues (asbestosis), lung cancer, and cancer of the lung pleura (mesothelioma).

Unpublished Work — © United Technologies Corporation 1986

| **OCCUPATIONAL SAFETY AND HEALTH** | **ADMINISTRATIVE CONTROL**<br>ASBESTOS | | NO. 14 |
|---|---|---|---|
| | **REVISED**<br>2-17-87 | **ISSUED**<br>8-1-77 | PAGE 2<br>OF 23 |

III. **RESPONSIBILITIES**

A. **Industrial Hygiene and Safety**

1. Establish the Industrial Hygiene and Safety protocol for handling, removal, repair, maintenance, renovation, demolition, and disposal of asbestos-containing materials.

2. Assure laboratory analysis is performed on suspected asbestos-containing materials.

3. Schedule, conduct, and/or approve industrial hygiene monitoring.

4. Maintain industrial hygiene exposure records, training records, and compliance program records.

5. Conduct employee information training.

6. Review Standard Safety Practice No. 14 with Plant Engineering, Engineering Division North, and Manufacturing Support and other supervision to review the safeguards applicable for the option chosen (refer to Section IV).

7. Review controls prior to the commencement of asbestos-related work.

8. Audit asbestos operations or asbestos-related work.

9. Inform employees of personal monitoring results.

10. Conduct respirator fit testing.

11. Provide information to Medical regarding employee exposure for medical surveillance.

12. Maintain a supply of respiratory protective equipment.

B. **Plant Engineering, Engineering Division North, Manufacturing Support, Manufacturing Engineering**

1. Review each job with Industrial Hygiene and Safety after determining whether Option 1 or Option 2 will be utilized for work involving asbestos. Option 1 involves Pratt & Whitney employees, Option 2 involves outside contractors.

Unpublished Work — © United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL<br>ASBESTOS | | NO. 14 |
|---|---|---|---|
| | **REVISED**<br>2-17-87 | **ISSUED**<br>8-1-77 | **PAGE** 3<br>**OF** 23 |

2. Ensure contractors implement requirements specified in Option 2  (see section IV).

3. Designate a person who has completed an Asbestos Training Course or equivalent to supervise and coordinate asbestos activities as required for Options 1 and 2.  (see section IV).

4. Ensure Pratt & Whitney employees carry out requirements specified in Option 1.  (see section IV).

5. Implement programs and procedures to ensure asbestos-containing waste materials are stored, transported, labeled, and disposed of in accordance with applicable OSHA, EPA, DEP, and local rules and regulations, and with Building Services procedures.

6. Maintain an inventory of personal protective clothing, supplies, and equipment.

7. Repair, patch, remove, or replace friable asbestos-containing materials in and on facility structures and equipment.

8. Select and use asbestos free substitutes whenever possible, and obtain and apply non-asbestos materials to substitute for those currently containing asbestos.

9. Inform supervision in the area where asbestos work will be performed of the nature of the asbestos work, and the existance and requirements pertaining to regulated areas.

10. The designated person shall complete the forms <u>Checklist for Working With Asbestos</u>, Appendices II and III, and forward to Industrial Hygiene and Safety within five (5) days of the start of asbestos-related work.

11. The designated person shall contact the Pratt & Whitney Environmental Protection Group and/or Environmental Coordinator for Notification and Permit requirements.

C. <u>Supervision</u>

1. Notify Plant Engineering, Engineering Division North, and/or Manufacturing Support where suspected friable asbestos-containing materials are in need of repair, patching, replacement, cleanup, and disposal.

Unpublished Work — ⓒ United Technologies Corporation 1986



| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL<br>ASBESTOS | | NO. 14 |
|---|---|---|---|
| | **REVISED**<br>2-17-87 | **ISSUED**<br>8-1-77 | **PAGE** 4<br>**OF** 23 |

2. Notify and review all operations involving asbestos-containing materials with Industrial Hygiene and Safety.

3. Provide Industrial Hygiene and Safety with names of employees who work with asbestos.

4. Inform Industrial Hygiene and Safety whenever there is a change in production, process, control equipment, personnel, or work practices involving asbestos-related work.

5. Inform employees when asbestos is present, and the quantity, location, manner of use, release, storage, control, protective measures and procedures involved with its handling and/or use.

6. Instruct employees working with asbestos-containing materials on the hazards of asbestos, and required procedures to avoid exposure.

7. Ensure employees who work with asbestos use the controls detailed in Section IV.

8. Assist in employee medical, respirator, information training, and monitoring programs.

9. Ensure asbestos-containing materials or their containers are clearly identified and labeled with the warning label (See Section IV.K.).

10. Ensure asbestos-containing waste generated by Pratt & Whitney employees are packaged and labeled in accordance with EPA, DEP, and OSHA regulations, and transported in accordance with Building Services procedures.

11. Maintain assigned areas free of friable asbestos-containing dusts.

12. Ensure only authorized employees enter regulated areas.

D. <u>Medical</u>

1. Provide or make available to Pratt & Whitney employees medical examinations relative to asbestos exposures in accordance with 29 CFR 1910.1001 (See Appendix I).

Unpublished Work — © United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL ASBESTOS | | NO. 14 |
|---|---|---|---|
| | **REVISED** 2-17-87 | **ISSUED** 8-1-77 | PAGE 5 OF 23 |

2. Provide Industrial Hygiene and Safety a written opinion signed by the examining physician whether the employee can perform asbestos related work and wear a respirator.

3. Maintain employee medical records in accordance with 29 CFR 1910.20, Access to Employee Exposure and Medical Records.

4. Provide employees with Medical information as required by 29 CFR 1910.1001, and a copy of the written, signed, examining physician's opinion.

IV. INDUSTRIAL HYGIENE AND SAFETY PROTOCOL

A. Notification

1. Every asbestos-related job shall be reviewed by Industrial Hygiene and Safety.

2. Prior to the commencement of any Option 1 repair, maintenance, removal, demolition, or renovation of facilities structures, Industrial Hygiene and Safety, Environmental Protection Group and/or Environmental Coordinator, Building Services, and area supervision shall be notified.

3. A minimum of 30 days notification is required prior to removal, renovation, demolition, and disposal for scheduled non-emergency jobs.

4. A minimum of 10 days notification is required prior to routine repair and maintenance type jobs.

5. Emergencies shall be reported to Plant Engineering who will in turn notify Industrial Hygiene and Safety.

B. Asbestos Identification

1. Materials that are suspected to contain asbestos shall have their contents verified by laboratory analysis. Contact Industrial Hygiene and Safety to obtain and/or coordinate bulk sampling.

2. In an emergency situation such as a broken, insulated water line, or in situations requiring immediate attention, any material whose composition has not been determined is handled, removed and disposed of as an asbestos-containing material.

Unpublished Work — © United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL ASBESTOS | | NO. 14 |
|---|---|---|---|
| | REVISED 2-17-87 | ISSUED 8-1-77 | PAGE 6 OF 23 |

C. <u>In-House Pratt & Whitney Employees - Option 1.</u>

Sections A through Q apply to Option 1.

1. Whenever Pratt & Whitney employees are involved in any asbestos-related maintenance, repair, patching, renovation, and demolition work, Plant Engineering, Engineering Division North, or Manufacturing Support shall appoint designated person to supervise and coordinate all aspects of the asbestos-related job.

2. <u>Designated Person</u>

The person selected to oversee the asbestos activities is to perform or supervise the following:

a. Set up the negative-pressure enclosure.

b. Ensure the integrity of the enclosure.

c. Control entry to and exit from the enclosure.

d. Supervise exposure monitoring.

e. Ensure employees working within the enclosure wear the personal protective clothing and respirators.

f. Ensure employees use control equipment, acceptable work methods, and personal protective equipment.

g. Ensure employees use the hygiene facilities and follow decontamination procedures.

h. Ensure engineering equipment used is in working condition and functioning properly.

The person selected must be trained in asbestos abatement, OSHA asbestos standards, asbestos identification, asbestos removal procedures, and practices for reducing the hazard. Training shall be obtained through completion of an Asbestos Training course, or equivalent.

D. <u>Regulated Areas</u>

1. Areas where airborne concentrations of asbestos fibers exceed the permissible exposure limit shall be established as a regulated area.

Unpublished Work —   © United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL ASBESTOS | | NO. 14 |
|---|---|---|---|
| | REVISED 2-17-87 | ISSUED 8-1-77 | PAGE 7 OF 23 |

An example of a regulated area is the inside of a removal enclosure.

2. The area shall be demarcated in a manner which clearly defines the area and minimizes the number of persons exposed to asbestos.

3. Access to regulated areas shall be limited to authorized persons determined by supervision, Industrial Hygiene and Safety, and designated person.

4. Persons entering regulated areas shall be supplied with and required to use a respirator and personal protective clothing  (See Section H).

5. Eating, drinking, smoking, chewing tobacco or gum, and applying cosmetics is prohibited in regulated areas.

6. Warning signs shall be posted at all approaches and entrances to the regulated areas.

E.  Monitoring

1. Exposure monitoring shall be conducted and/or approved by Industrial Hygiene and Safety.

2. Results of exposure monitoring will be provided to each employee or posted in a location which is readily accessible to the affected employees as soon as possible upon receipt of data.

F.  Observation of Monitoring

1. When observation of monitoring requires entry into a regulated area, the observers shall be provided with and required to use the specified personal protective equipment, respirator, and clothing, and to follow all applicable decontamination and health procedures.

G.  Hygiene Facilities

1. Clean change rooms shall be provided for Pratt and Whitney employees in areas where airborne concentrations of asbestos exceed the permissible exposure limit.  The change rooms shall be equipped with two separate lockers or storage facilities for each employee.

Unpublished Work —  © United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL ASBESTOS | | NO. 14 |
|---|---|---|---|
| | **REVISED** 2-17-87 | **ISSUED** 8-1-77 | **PAGE** 8 **OF** 23 |

2. Shower facilities, consisting of one shower per 10 employees of the same gender per shift, shall be provided for employees exposed at or above the permissible exposure limit. Separate facilities shall be provided for each gender.

3. Employees who work in areas where airborne exposure is above the permissible exposure limit are required to shower at the end of the work shift.

H. Decontamination Facility (Construction)

1. A decontamination facility must be provided adjacent and connected to the regulated area in asbestos-related repair, maintenance, renovation and demolition work, as required. The facility shall be used by persons to enter and exit the regulated area and for decontamination of employees.

2. The decontamination facility shall consist of an equipment room, a shower area, and clean room in series, with the equipment room adjacent to the regulated area.

   Separate facilities shall be provided for men and women if both are required to enter the regulated area.

3. The equipment room is used to hold supplies of impermeable, labeled bags and containers for containment and disposal of contaminated protective clothing and equipment.

4. Decontamination Entry Procedure

   The following procedure shall be followed to enter the regulated area.

   a. Persons must enter the decontamination facility through the clean room.

   b. Street clothing is to be removed and placed in a locker or container provided for use.

   c. Respirators must be put on first then protective clothing and any other required equipment.

   d. Persons must enter the regulated area through the shower and equipment rooms.

Unpublished Work — © United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL ASBESTOS | NO. 14 |
|---|---|---|
| | REVISED 2-17-87 | ISSUED 8-1-77 | PAGE 9 OF 23 |

5. **Decontamination Exit Procedure**

The following procedure shall be used to exit the regulated area.

a. Before leaving the regulated area, remove all gross contamination and debris from protective clothing.

b. Enter the equipment room, and remove protective clothing, monogoggles, and/or face shield. Leave the respirator on. Place clothing into labeled impermeable bags or containers and seal for disposal.

c. Enter the shower area and shower. Remove the respirator after it is thoroughly wet. After showering, wash the respirator and any other protective equipment such as goggles and face shield. Wipe equipment dry with a towel.

d. Enter the change room, and replace street clothing. Place respirator and any other protective equipment in assigned storage area.

I. **Engineering Controls and Work Practices**

1. Where feasible, engineering controls shall be used to ensure that each employee working with asbestos-containing materials is not exposed to concentrations exceeding the action level.

2. Whenever the feasible engineering controls and work practices are not sufficient to reduce employee exposure to or below the action level, engineering controls and work practices shall be used to reduce exposure to the lowest level achievable, then employee protection shall be supplemented by the use of respirators.

3. Local exhaust ventilation and dust collection systems which are designed, constructed, installed, and maintained in accordance with ANSI Z9.2-1979 shall be used as an engineering control when employee exposure exceeds permissible limits.

4. All hand and power-operated tools which may cause the release of airborne asbestos fibers in excess of permissible limits, such as saws, abrasive wheels, drills, and sanding units, shall be equipped with local exhaust ventilation systems.

Unpublished Work — © United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL ASBESTOS | NO. 14 | |
|---|---|---|---|
| | REVISED 2-17-87 | ISSUED 8-1-77 | PAGE 10 OF 23 |

5. Wet methods shall be used when friable asbestos-containing materials are handled, removed, cut, or scored, unless the usefulness of the product is diminished.

6. Spraying asbestos-containing materials is prohibited after July 20, 1988.

7. Use of compressed air in asbestos related work is prohibited unless it is part of an installed push-pull ventilation system.

J. Personal Protective Equipment and Clothing

1. Respiratory protective devices shall be worn under the following conditions:

   a. During the time interval when feasible engineering controls and work practices are being installed or implemented to reduce exposure below the action level;

   b. During maintenance and repair activities involving asbestos-containing materials;

   c. When engineering controls and work practices do not sufficiently reduce exposure to or below the permissible limits;

   d. In emergencies.

2. Respirators shall be selected by Industrial Hygiene and Safety.

3. Respirators shall be fit-tested on each employee required to wear an air-purifying respirator when intially issued and every 6 months thereafter.

4. Employees shall use the respirator as instructed, and replace respirator filters as instructed by Industrial Hygiene and Safety.

5. Coveralls or similar full-body clothing, gloves, head and foot coverings, and if necessary, face shields or vented goggles shall be worn by employees in areas where airborne exposure to asbestos exceeds or is likely to exceed the permissible exposure limit.

Unpublished Work — © United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | **ADMINISTRATIVE CONTROL**<br>ASBESTOS | | NO. 14 |
|---|---|---|---|
| | REVISED<br>2-17-87 | ISSUED<br>8-1-77 | PAGE 11<br>OF 23 |

6. Contaminated personal protective clothing and equipment used in regulated areas shall be removed only in shower rooms, and placed into sealed, labeled containers for removal and disposal or cleaning.

7. Employees are permitted to leave regulated areas to wash their face in the shower room to prevent skin irritation associated with respirator use.

8. Containers of contaminated personal protective equipment and clothing shall be removed from change rooms only by authorized employees.

9. Laundering and/or disposal of contaminated gear shall be accomplished in a manner which prevents exposure above the action level.

10. Persons laundering or cleaning the gear shall be informed that the items are contaminated with asbestos, the potentially harmful effects of asbestos, and requirement to prevent release of airborne asbestos in excess of permissible exposure limits.

K. Signs and Labels

1. Warning signs shall be posted at all approaches to each regulated area.

2. The warning sign shall state:

DANGER<br>
ASBESTOS<br>
CANCER AND LUNG DISEASE HAZARD<br>
AUTHORIZED PERSONNEL ONLY<br>
RESPIRATORS AND PROTECTIVE CLOTHING<br>
ARE REQUIRED IN THIS AREA

3. Warning labels shall be affixed to all raw materials, mixtures, scrap, waste, debris, and other products containing 0.1% or more, asbestos or to their containers.

Unpublished Work — © United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL ASBESTOS | NO. 14 |
|---|---|---|
| | **REVISED** 2-17-87 | **ISSUED** 8-1-77 | **PAGE** 12 **OF** 23 |

4. The warning label shall comply with the label
   requirements of the Hazard Communications Standard, and
   shall state:

DANGER
CONTAINS ASBESTOS FIBERS
AVOID CREATING DUST
CANCER AND LUNG DISEASE HAZARD

L. Employee Information Training

1. Employees who may be exposed to airborne asbestos fibers
   exceeding the action level shall be enrolled in the
   asbestos information training program.

2. The employees shall attend training classes prior to or
   at the time of initial assignment, and annually
   thereafter, as required.

3. Information training shall cover a review of the
   asbestos standard, appendices, and the following topics:

   a. Health effect associated with asbestos exposure.

   b. The relationship between smoking and asbestos
      exposure in producing lung cancer.

   c. The quantity, location, manner of use, release, and
      storage of asbestos or asbestos-containing materials
      related to the employee's assignment, and specific
      nature of operations which could result in exposure.

   d. Engineering controls and work practices associated
      with the employee's job assignments.

   e. Specific procedures implemented to prevent employees
      from exposure, such as work practices, emergency
      procedures, spill cleanup procedures, personal
      protective equipment.

   f. The purpose, proper use, and limitations of
      respirators and protective clothing.

   g. The purpose and description of the medical
      surveillance program.

   h. Methods used to recognize asbestos.

Unpublished Work — © United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL ASBESTOS | | NO. 14 |
|---|---|---|---|
| | REVISED 2-17-87 | ISSUED 8-1-77 | PAGE 13 OF 23 |

4. Copies of the asbestos standard shall be available.

M. Housekeeping

1. All surfaces are to be maintained free of accumulations of friable asbestos-containing materials.

2. Spills and sudden releases are to be cleaned up promptly.

3. Surfaces shall be cleaned by vacuuming with a high-efficiency filtered vacuum system, by wet wiping, or by wet sweeping.

4. USE OF COMPRESSED AIR TO CLEAN SURFACES IS PROHIBITED.

5. DRY SWEEPING, SHOVELING, BRUSHING AND CLEANUP IS PROHIBITED.

N. Waste Disposal

1. Asbestos-containing waste, scrap, debris, bags, containers, equipment, and clothing shall be collected and disposed of in sealed, labeled, impermeable bags or closed containers.

2. The Pratt and Whitney Environmental Protection Group and/or Environmental Coordinator shall be contacted for guidance relating to proper disposal methods, containers, disposal sites, notification, permits, and transportation requirements.

O. Medical Requirements

1. Employees who are or will be exposed to airborne asbestos at or above the action level shall be enrolled in the asbestos medical surveillance program.

2. Examinations shall be made available to affected employees at the following frequency:

a. Prior to initial assignment (preplacement);

b. Annually;

c. Within 30 days of termination of employment.

Unpublished Work — © United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL ASBESTOS | | NO. 14 |
|---|---|---|---|
| | REVISED 2-17-87 | ISSUED 8-1-77 | PAGE 14 OF 23 |

P.  **Compliance Program**

1. When initial monitoring indicates airborne asbestos fibers exceed the permissible exposure limit, or when required engineering controls and work practices are not yet instituted, a written compliance program shall be established by Industrial Hygiene & Safety to document reduction of employee exposure and compliance with acceptable engineering controls and work practices.

2. The programs shall be reviewed and updated on a case by case basis. Work which is not in compliance with regulations shall be brought into compliance no later than July 20, 1988.

3. Rotating employees to achieve compliance is prohibited.

Q.  **Recordkeeping**

1. Industrial Hygiene and Safety shall maintain exposure records, information training records, and compliance program records.

2. Medical shall maintain medical opinions and records.

R.  **Contractors - Option 2**

Sections A and B also apply to Option 2.

It is strongly recommended that qualified asbestos contractors be hired to perform any asbestos-related maintenance, repair, removal, renovation, and demolition activities when feasible.

1. The Pratt and Whitney designated persons overseeing the asbestos-related work with asbestos contractors shall ensure that the contractor performs asbestos-related work in accordance with OSHA regulations and Pratt and Whitney's Administrative Control No. 14 on Asbestos to protect Pratt and Whitney employees.

2. The Pratt & Whitney designated person shall ensure Appendix III, **Checklist for Working with Asbestos - Contractors** is completed prior to the contractor beginning work, and will audit the contractor to assure controls specified are used throughout the job.

Unpublished Work — © United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL ASBESTOS | NO. 14 |
|---|---|---|
| | REVISED 2-17-87 | ISSUED 8-1-77 | PAGE 15 OF 23 |

3. Industrial Hygiene and Safety shall review all asbestos repair, removal, maintenance, renovation, and demolition work before the work takes place.

4. Contractors and the Pratt and Whitney designated person shall inform other contractors and Pratt and Whitney personnel in the vicinity of the worksite of the nature of asbestos work, and the existence and requirements pertaining to regulated areas.

5. Contractors are required to supply their workers with the appropriate personal protective equipment, clothing, and respirators.

6. Contractors shall use negative pressure enclosures, wet methods, HEPA air handling units and vacuum units, decontamination facilities, and any other equipment or procedures required by OSHA or the Assistant Secretary of Labor.

7. Contractors are responsible for posting the OSHA warning signs at all approaches to regulated areas, and affixing labels to disposal bags and containers.

8. Contractors should provide the sealed, impermeable bags or closed containers for waste disposal.

9. Contractors are responsible for training their own employees, providing medical surveillance, monitoring their employees, and carrying out compliance programs.

10. Contractors are responsible for cleaning surfaces in the asbestos work area by wet methods and high efficiency vacuuming. Dry cleanup is prohibited.

11. Contractors are responsible for demonstrating airborne asbestos fiber levels within regulated areas after abatement activites are less than the re-occupancy level established by Industrial Hygiene and Safety before the area can be released.

Unpublished Work — ©  United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL ASBESTOS | NO. 14 |
|---|---|---|
| | REVISED 2-17-87 | ISSUED 8-1-77 | PAGE 16 OF 23 |

Appendix I

Medical Protocol for Asbestos Examinations

1. The Company must provide or make available at its expense, a medical examination relative to asbestos prior to an employee's first assignment in an occupation or job which exposes or is likely to expose the employee to airborne concentrations of asbestos fibers at or above the action level.

2. Examinations and procedures shall be performed by or under the supervision of a licensed physician. Persons other than licensed physician who administer pulmonary function testing shall complete a spirometry course sponsored by an appropriate academic or professional institution.

3. The initial examination is to include:

   a. A medical and work history.

   b. A complete physical examinations of all systems with emphasis on the respiratory system, cardiovascular system, and digestive tract.

   c. Completion of the Initial Medical Questionaire, Part 1.

   d. A 14 x 17 PA chest x-ray.

   e. Pulmonary function tests to include forced vital capacity (FVC) and forced expiratory capacity at 1 second ($FEV_{1.0}$).

   f. Any additional tests deemed appropriate by the examining physician.

4. Periodic examinations must be made available annually, and consist of the same examination as the initial examination, except that the frequency of chest x-rays shall be according to the table below, and the Periodic Medical Questionnaire, Part 2, completed:

| | Frequency Employee Age | | |
|---|---|---|---|
| Years Since First Exposure | 15-35 | >35-45 | >45 |
| 0 to 10 | Every 5 yrs. | Every 5 yrs. | Every 5 yrs. |
| >10 | Every 5 yrs. | Every 2 yrs. | Every year. |

Unpublished Work —   © United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL ASBESTOS | | NO. 14 |
|---|---|---|---|
| | REVISED 2-17-87 | ISSUED 8-1-77 | PAGE 17 OF 23 |

## Appendix I (Continued)

Termination of employment medical examination must be provided or made available within thirty calendar days before or after the date of termination of employment. The examination must include the same items as periodic examinations.

5.  No medical examination is required upon termination if records show the employee was provided with initial or periodic examinations within the past 1-year period.

6.  The examining physician is to be provided with the following information:

    a.  A copy of the OSHA Asbestos Standard and Appendices D and E.

    b.  A description of the affected employee's duties related to asbestos exposure.

    c.  The employee's anticipated or measured dose level.

    d.  A description of personal protective clothing, equipment and respirator to be used.

    e.  Information from previous medical examinations not otherwise available to the examining physician.

7.  The examining physician must provide a written, signed opinion to Industrial Hygiene and Safety which includes:

    a.  Whether the employee does or does not have a detected medical condition which would place the employee at an increased risk of material health impairment from exposure to airborne asbestos.

    b.  Any recommended limitations on the employee or the employee's use of personal protective equipment such as clothing and respirators.

    c.  A statement that the employee has been informed by the physician of the results of the medical examination and of any medical conditions resulting from airborne asbestos exposure which require further explanation or treatment.

Unpublished Work — ©  United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL | NO. 14 | |
|---|---|---|---|
| | ASBESTOS | | |
| | **REVISED** 2-17-87 | **ISSUED** 8-1-77 | **PAGE** 18 **OF** 23 |

## Appendix I (Continued)

The physician must not reveal specific findings or diagnoses unrelated to occupational asbestos exposure in the written signed opinion.

8.  Records must be maintained in accordance with 29 CFR 1910.20.

   The records must include the following information:

   a.  Employee name and social security number.

   b.  A copy of the physician's written opinion.

   c.  Any employee medical complaints related to asbestos exposure.

   d.  A copy of the information provided to the physician.

   e.  Medical questionnaire responses.

   Records must be maintained for at least the duration of employment plus 30 years.

Unpublished Work —   ⓒ  United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL ASBESTOS | NO. 14 |
|---|---|---|
| | REVISED 2-17-87 | ISSUED 8-1-77 | PAGE 19 OF 23 |

Appendix II

**Checklist for Working With Asbestos – Option 1 Pratt & Whitney**

1. Location of asbestos-suspect material _____

2. Date, sample no., results of laboratory analysis _____

3. Nature of work to be performed:
   Removal/demolition _____
   Encapsulation _____
   Maintenance/repair _____
   Other _____

4. Schedule dates of work to be performed _____

5. Estimated time length to completion _____

6. Estimated number of employees involved, names, clock numbers (attach list) _____

7. Date of notification of Industrial Hygiene & Safety _____

8. Medical surveillance provided _____

9. Industrial Hygiene & Safety Information _____

10. Notification of Environmental Protection Group and/or Environmental Coordinator _____

11. EPA notified and permits obtained _____

12. <u>Negative Air Pressure</u>
    HEPA vacuum cleaner _____
    HEPA ventilation system _____
    Negative pressure achieved _____
    Constant operation _____

Unpublished Work — © United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL ASBESTOS | NO. 14 |
|---|---|---|
| | REVISED 2-17-87 / ISSUED 8-1-77 | PAGE 20 OF 23 |

Appendix II (Continued)

13. <u>Work Site Barrier</u>
   Floor covered                        _____
   Walls covered                    _____
   All edges sealed               _____
   Penetrations sealed         _____
   Entry curtains                 _____
   Glove bag                      _____

14. <u>Signs/Labels</u>
   At all approaches and entrance   _____
   Bags labeled                   _____
   Laundering container/clothes container
    labeled                      _____

15. <u>Work Procedures</u>
   Decontamination entry/exit procedures posted_____
   Waste promptly bagged        _____
   Material worked wet          _____
   HEPA vacuum used            _____
   No smoking, eating, drinking   _____
   Work area cleaned (wet wiped, vacuumed)_____
   Personnel decontaminated each departure_____
   Authorized personnel list posted   _____

16. <u>Protective Equipment</u>
   Full-body disposable clothing, head, hand, foot _____
   Respirators used (Type:_____) _____
                  (see IH & S)
   Clothing used only once, or cleaned  _____

Unpublished Work — © United Technologies Corporation 1986



| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL ASBESTOS | | NO. 14 |
|---|---|---|---|
| | REVISED 2-17-87 | ISSUED 8-1-77 | PAGE 21 OF 23 |

Appendix II (Continued)

17. <u>Showers</u>
   On-site _____
   Functioning _____
   Soap and Towels _____
   Used by all affected personnel _____

18. Name _____
    Ext. _____

Unpublished Work — © United Technologies Corporation 1986

| OCCUPATIONAL SAFETY AND HEALTH | ADMINISTRATIVE CONTROL | | NO. 14 |
|---|---|---|---|
| | ASBESTOS | | |
| | REVISED 2-17-87 | ISSUED 8-1-77 | PAGE 22 OF 23 |

## Appendix III

### Checklist for Working With Asbestos - Option 2 Contractors

1.  Location of asbestos-suspect material _____

2.  Date, sample no., results of laboratory analysis _____

3.  Nature of work to be performed:
    Removal/demolition                      _____
    Encapsulation                           _____
    Maintenance/repair                      _____
    Other                                   _____

4.  Schedule dates of work to be performed _____

5.  Estimated time length to completion    _____

6.  Estimated number of employees involved _____

7.  Date of notification of Industrial Hygiene & Safety _____

8.  Notification of Environmental Protection Group
    and/or Environmental Coordinator        _____

9.  EPA notified and permits obtained       _____

10. Negative Air Pressure
    HEPA vacuum cleaner                     _____
    HEPA ventilation system                 _____
    Negative pressure achieved              _____
    Constant operation                      _____

11. Work Site Barrier
    Floor covered                           _____
    Walls covered                           _____
    All edges sealed                        _____
    Penetrations sealed                     _____
    Entry curtains                          _____
    Glove bag                               _____

Unpublished Work — © United Technologies Corporation 1986

| ☀ **OCCUPATIONAL SAFETY AND HEALTH** | **ADMINISTRATIVE CONTROL** ASBESTOS | NO. 14 |
|---|---|---|
| | REVISED  2-17-87 | ISSUED  8-1-77 | PAGE 23 OF 23 |

Appendix III (Continued)

12. Signs/Labels

At all approaches and entrance _____
Bags labeled _____

13. Work Procedures

Waste promptly bagged _____
Material worked wet _____
HEPA vacuum used _____
Work area cleaned (wet wiped, vacuumed)_____
Personnel decontaminated each departure_____
Authorized personnel list posted _____

14. Name _____
Ext. _____

Unpublished Work — ©  United Technologies Corporation 1986

# Exhibit H-1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| CINDY S. BROWN, as Personal Representative To The Estate of Walter E. Brown, Plaintiff, | ) ) ) ) ) C.A. No. 3:14-cv-01495 |
| v. | ) ) DECLARATION OF JOHN C. SUMNER ) IN SUPPORT OF DEFENDANT UNITED |
| CBS CORPORATION, et al., Defendants. | ) TECHNOLOGIES CORPORATION'S ) MOTION FOR SUMMARY JUDGMENT |

I, John C. Sumner, declare and state as follows:

1.  I am over the age of 18 years of age and am competent to testify to the facts set forth in this declaration. I have personal knowledge of the facts contained in this declaration.

2.  I have been involved in the aerospace industry since 1965. I graduated from Western New England University in Springfield, Massachusetts, with a BS in Mechanical Engineering and later earned a Master of Business Administration degree from the same school. I was hired by Pratt & Whitney, an unincorporated division of United Technologies Corporation ("UTC"), in East Hartford, Connecticut, as an aerospace engineer in 1965. Pratt & Whitney manufactures aviation engines. I worked for Pratt & Whitney from 1965 until my retirement in 2001. Since that time, I have acted as a consultant for Pratt & Whitney. During the time that I worked for Pratt & Whitney, I had many roles and duties. I started as an engineer and retired as a manager. Over the course of my career, I was involved with military engine contracts, supervised personnel, and assisted with the development of products and maintenance of engines.

3.    As a result of my 36 years of employment with Pratt & Whitney, I am familiar with the products designed and manufactured by Pratt & Whitney and the maintenance and repair of Pratt & Whitney aviation engines, including the J48, J57, J60, J75,R-4360, and TF33 engines at issue.

4.    Pratt & Whitney does not install engines on airframes. Rather, the purchaser of the engines, which typically can be the airframe manufacturer, a commercial carrier, or the United States military, will order engines from Pratt & Whitney. Pratt & Whitney will then manufacture the engines to the airframe manufacturer's or the U.S. military's specifications and ship the engines to the airframe manufacturer, who then installs the engines on the aircraft before delivery to the purchaser of the aircraft.

5.    There are substantial non-engine products, which generally include clamps, hoses, gaskets, insulation, cables, lines, tubes, ducts and related equipment, which are provided and installed by others on the engine or on the airframe around the engine in order to install a Pratt & Whitney engine on an aircraft.    In the aviation industry, these products and equipment are called "Quick Engine Change" kits or "QEC." As aviation engines can power many different airframe models, and as each airframe model differs from other models, Pratt & Whitney does not design, specify or supply QEC kits. QEC kits are airframe-specific. The airframe manufacturer designs and obtains these parts from companies other than Pratt & Whitney. In addition, an airframe manufacturer may install components on the engine to generate electrical, hydraulic or pneumatic power for other systems on the airframe. These applications also require similar non-engine products and equipment provided by other companies to be installed on or around the engine.

04/05/2016 14:11 8599145072 WINDSOR FEDERAL PAGE 04/09

6.     Airframe manufacturers design aircraft so that engines can be easily and quickly changed. This allows for an engine to be removed for maintenance and replaced by a spare engine so that the aircraft can continue in operation with only minimal delays.

7.     Based upon my work experience with engines that Pratt & Whitney supplied to the United States military, I am familiar with the manner in which Pratt & Whitney military engines were designed, built, and supplied to the U.S. Air Force. I have knowledge of the extent of the involvement of the U.S. military in the design, manufacture, approval, and receipt of the military aircraft engines manufactured by Pratt & Whitney. The manner in which the Air Force contracted with Pratt & Whitney for aircraft engines, as described herein, was typical of the performance of all engine contracts between Pratt & Whitney and the Air Force.

8.     Based on my nearly four decades as an aerospace engineer for Pratt & Whitney, where I was involved in the design and maintenance of aviation engines, as well as the extensive historical document reviews that I have performed regarding the contracting process for military engines at Pratt & Whitney, I can testify that the system for submission and approval by the U.S. Air Force described herein was in use at Pratt & Whitney dating back to the 1930s. This is based on institutional knowledge I have acquired over the course of my 36 years of employment at Pratt & Whitney, including participation in the day-to-day affairs of Pratt & Whitney and its engineering departments and interactions with experienced peer groups within Pratt & Whitney, and was set forth in documents that I observed, reviewed, and worked with as part of my daily duties and in the ordinary course of business at Pratt & Whitney. I have reviewed historical engine documents, including model specifications, design and construction drawings, schematics, and engineering data dating back to the 1930s. The historical records I reviewed identified the precise military specifications that were followed in the design and manufacture of the engines and documented the submission and approval process.

9.      The manner in which the U.S. Air Force contracted with Pratt & Whitney for aircraft engines as described herein was the same for all engine models and/or variants, because the same departments within Pratt & Whitney – including the contract department, engineering and design department, manufacturing group, program management group, publications, quality assurance department, finance department and others – were involved in each engine contract and the same departmental processes were utilized for each contract with the Air Force.

10.     During all aspects of its design and manufacture of military aircraft engines supplied to the U.S. Air Force (i.e., design, manufacture, and testing of such engines), Pratt & Whitney performed its work under the immediate oversight of the Air Force. The Air Force would review and approve or reject engineering and design proposals from Pratt & Whitney. This oversight and approval process was exercised through contract documents, design and construction drawings, written specifications, and personal oversight of Pratt & Whitney's work by military engineers, military inspectors and military specialists who were resident on-site at Pratt & Whitney. No aspect of the development, manufacture, and testing of the engines intended for use by the Air Force escaped this close supervision and oversight.

11.     A contract with the U.S. Air Force to deliver an aircraft engine had a development stage and a production phase. During the development stage, the Air Force provided extensive and detailed performance and construction specifications to be incorporated in each contract for the design and manufacture of Pratt &Whitney aircraft engines, which provided the design requirements, operating characteristics, performance requirements, detailed configuration definitions, construction standards, mandatory qualification and acceptance testing procedures, and documentation requirements for aircraft engines. For example, aviation turbojet engines – like the J48, J57, J60, J75,R-4360, and TF33 engines at issue in this case – were governed by MIL-E-5007 and its various iterations. A true and correct copy of MIL-E-5007C, which would

have been incorporated in Pratt & Whitney's contracts with the U.S. Air Force for the production

of turbojet engines, is attached hereto as **Exhibit A** to illustrate the level of detail and specificity

of the U.S. Air Force's specifications for aircraft engines.

12.    MIL-E-5007 included design and construction requirements for component parts,

and each of the specifications for the component parts had, in turn, a set of underlying

specifications of its own. MIL-E-5007 mandated, to the extent possible, the use of military

standard parts developed specifically for use in aircraft engines. No changes in the design or

material of parts listed in an approved engine parts list could be made without approval by the

U.S. Air Force in accordance with the applicable contract requirements. For example, MIL-E-

5007C, Paragraph 3.5, p. 9, states:

> **3.5. Materials and processes**. Materials and processes used in the
> manufacture of military engines shall conform to applicable
> specifications in accordance with ANA Bulletin No. 343. When an
> engine manufacturer's specifications are used for materials and
> processes, such specifications shall be submitted to the
> Government for review prior to start of PFRT [Preliminary Flight
> Rating Test] . . . .

13.    Pratt & Whitney manufactured aviation jet engines that included a limited number

of internal parts that contained asbestos. Some clamps were made of metal. Others included a

cushion or grommet, which may or may not have contained asbestos. Some, but not all, of the

gaskets and packing contained asbestos. In addition, some, but not all, of the cable and wire

contained an internal layer of asbestos-containing paper, which was covered by multiple layers

of non-asbestos material. Finally, some, but not all, of the heatshields include an asbestos

material completely covered and encapsulated by metal. The use of each of these components

was specified or approved by the U.S. Air Force. The U.S. Air Force was fully aware of the use

of asbestos-containing components in Pratt & Whitney aircraft engines built for the Air Force. In

fact, the Air Force required some components to include asbestos.

14. The J48 engine did not have any external heatshields.

15. Moreover, even where an asbestos-containing component incorporated in an engine was not specifically called out in an Air Force specification or standard, the Air Force was aware of and approved the use of that component and its material composition. The contracts required Pratt & Whitney to submit detailed engine drawings, schematics, model specifications, and engineering data to the U.S. Air Force for review and approval before production could begin. See for example, Paragraph 3.7, "Drawings and diagrams," in **Exhibit A**. These drawings included a bill of materials containing drawings of every part used in the engine and a description of the material composition of those parts. The drawings, which were approved by the Air Force, indicated precisely where asbestos materials would be used in various parts of the engine. Production could begin only after the Air Force approved of the drawings. In short, if a Pratt & Whitney aircraft engine supplied to the U.S. Air Force contained an asbestos-containing component, then use of that asbestos-containing component was either mandated by the U.S. Air Force or was approved by the Air Force and its engineers.

16. There was a continuous back and forth exchange between Pratt & Whitney and the Air Force engineers during each phase of the production of the engines, including the initial design phase. Pratt & Whitney and the Air Force engineers undertook preliminary design reviews to ensure that the engine design met the Air Force's needs. The Air Force provided guidance to Pratt & Whitney on the design of the engines and its assessment of preliminary designs. The final design of the engines submitted to the Air Force for review and approval, including the use of asbestos and non-asbestos-containing components, was the final result of this collaborative effort between Pratt & Whitney and the Air Force engineers.

17. Even after submittal of the design drawings to the Air Force, the Air Force could require changes in design, materials, and documentation before approving the design and

authorizing manufacture of the equipment. The design, specification, and manufacture of the Pratt & Whitney aircraft engines supplied to the Air Force were approved by the appropriate Air Force personnel after careful deliberation and meetings with Pratt & Whitney engineers. Air Force engineers and inspectors were personally onsite on a daily basis at Pratt & Whitney facilities to oversee, inspect, and approve the work performed by Pratt & Whitney engineers and other personnel, including approval of any changes to engine design or specifications on all aircraft engines supplied to the Air Force. These onsite representatives had different areas of specialty, such as engineering, contracts and quality control.

18.     The continuous back and forth exchange between Pratt & Whitney and Air Force engineers continued through each phase of the production of the engines to discuss design features, production progress, and the results of equipment tests. In fact, this back and forth exchange continued even after the Air Force accepted an engine into service; Pratt & Whitney provided continuing engineering support for legacy military engines through product improvement contracts with the Air Force. The qualification and acceptance testing of the engines was also governed by detailed Air Force specifications. Attached hereto as **Exhibit B** is a true and correct copy of specification MIL-E-5009C, which sets forth the testing requirements for turbojet aircraft engines. The Air Force inspectors on-site were empowered to require Pratt & Whitney to test component parts and the finished assembly, and to accept or reject any non-conforming units. If, at any point, any material, feature or component of the engine failed to comply with the applicable military and contract specifications or performance requirements, it would have been rejected by the Air Force. The Air Force's acceptance of an engine signified that it had been manufactured in accordance with all of the requirements of the Air Force's contract and related specifications.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Signed at _GRANBY, CT_, on April _5_, 2016.


_____
John C. Sumner


In witness, I sign my name and affixed my official seal this _5_ day of April 2016.

_____
Notary Public

My commission expires: 6/30/2020

# Exhibit H-2

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CINDY S. BROWN, as Personal Representative To The Estate Of Walter E. Brown,<br>　　　　　Plaintiff,<br>vs.<br><br>CBS CORPORATION,  et al.,<br>　　　　　Defendants. | Case No.: 3:12-cv-01495<br><br><br>(Transferred from the State Court of Connecticut, C.A.: FBT-CV-12-6030795)<br><br>April 5, 2016 |

**DEFENDANT UNITED TECHNOLOGIES CORPORATION'S
LOCAL RULE 56(A)(1) STATEMENT**

　　　　Pursuant to Rule 56(a)(1) of the Local Rules of Civil Procedure, Defendant United Technologies Corporation ("Pratt & Whitney") submits the following material facts in support of its Motion for Summary Judgment:

　　1.　　This product liability action was brought by Cindy Brown ("Plaintiff") as personal representative of Walter Brown ("Mr. Brown").  (See Pl.'s Third Am. Compl. at ¶¶ 1-4, attached hereto as Ex. A).

　　2.　　Plaintiff claims that Mr. Brown was injured as a result of his exposure to asbestos containing components included in engines manufactured by Pratt & Whitney through his work in the United States Air Force from 1950 to 1970.  (See Ex. A ¶ 4).

　　3.　　Plaintiff also claims that Pratt & Whitney's actions amount to gross negligence. (See Ex. A ¶¶ 33-38).

　　4.　　Additionally, Plaintiff claims that Pratt & Whitney's actions resulted in Mr. Brown's wrongful death.  (See Ex. A ¶¶ 39-40).

1

*Oral Argument Requested*
*Testimony Not Required*

77.     While stationed at Laon-Couvron Air Base, Mr. Brown served as part of the 66th Tactical Reconnaissance Wing and the 66th Combined Aircraft Maintenance Squadron (Ex. H at Ex. A. pp.5, 11-12).

78.     Mr. Brown reported to the 66th Tactical Reconnaissance Wing in August of 1969; between August of 1960 and June of 1962, Mr. Brown was an Engine Inspection Crew Chief for a J57-P-55 jet engine manufactured by Pratt & Whitney and a J33-A-35 engine manufactured by Allison, and was responsible for supervising five Jet Engine Mechanics. (Ex. H at Ex. A. p. 12).

79.     Neither Mr. Brown nor the Jet Engine Mechanics who performed jet engine inspections under Mr. Brown's supervision performed maintenance on the engines they inspected; their job was to note discrepancies and conditions on an engine that required repair by Airmen assigned to work in a Jet Engine Shop. (Ex. H at Ex. A. p. 12).

80.     Plaintiff's expert, Steven Hays, agreed that asbestos exposure from the inspection of engines would not occur, unless parts needed to be removed.  (Ex. C 168:20-169:11).

81.     In June of 1962, Mr. Brown reported to the 66th Combined Aircraft Maintenance Squadron; while serving in this Squadron, Mr. Brown's duties involved analyzing and troubleshooting Pratt & Whitney J57 engine malfunctions from the aircraft's cockpit. (Ex. H at Ex. A. p. 13).

82.     If cockpit engine gauges showed incorrect J57 readings, the engine was removed from the aircraft, stripped of the QECK and accessories, and sent to the shop for repairs. (Ex. H at Ex. A. p. 13).

11

*Oral Argument Requested*
*Testimony Not Required*

83. The components that disconnected the J57 engines from the aircraft were QECK parts. (Ex. H at 13).

84. These QECK parts and accessories were not manufactured or provided by Pratt & Whitney. (Ex. H at Ex. A. p. 13).

85. While serving with the 66th Combined Aircraft Maintenance Squadron, Mr. Brown also supervised Jet Engine Mechanics; as a supervisor, Mr. Brown did not perform maintenance on the Pratt & Whitney J57 engine. (Ex. H. at Ex. A. p. 13).

86. While at Laon-Couvron, Mr. Brown did not perform maintenance on a Pratt & Whitney engine. (Ex. H at Ex. A. pp. 11-13).

87. From July of 1963 to June of 1966, Mr. Brown served at Hunter Air Force Base in Georgia. (See Ex. H at Ex. A. p. 5).

88. While at Hunter Air Force Base, none of the squadrons that Mr. Brown was assigned to operated or maintained Air Force aircraft powered by Pratt & Whitney engines. (Ex. H at Ex. A. pp. 2, 13-14).

89. While at Hunter Air Force Base, Mr. Brown testified that he saw someone from a distance perform work on the R-4360 manufactured by Pratt & Whitney, but he did not describe the work performed, whether asbestos-containing components were being manipulated, or how far from the work Mr. Brown was when such work was being conducted. (Ex. D 450:19-452:12).

90. Mr. Brown did not perform work on the R-4360 while at Hunter Air Force Base. (Ex. D 452:4-9).

91. From July of 1966 to November of 1967, Mr. Brown served at Kirtland Air Force Base in New Mexico. (See Ex. H at Ex. A. p. 5).

12

Respectfully submitted,
The Defendant,
UNITED TECHNOLOGIES CORP.,

By its counsel,

/s/ Judith A. Perritano
Judith A. Perritano
Federal Bar No. phv06065
Charles K. Mone
Federal Bar No. ct420348
**PIERCE, DAVIS & PERRITANO, LLP**
10 Post Office Square, Suite 1100N
Boston, MA  02109
Phone: (617) 350-0950
Fax:  (617) 350-7760
Email: jperritano@piercedavis.com

## **CERTIFICATION**

I, Judith A. Perritano, hereby certify that a true copy of the foregoing Local Rule 56(a) Statement was served electronically on all counsel of records through the United States District Court's Electronic Filing System on April 5, 2016.

/s/*Judith A. Perritano*
Judith A. Perritano

*Oral Argument Requested*
*Testimony Not Required*

# Exhibit H-3

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF CONNECTICUT

CINDY S. BROWN, Personal Representative      C.A. No. 3:12-cv-01495-AWT
to the Estate of WALTER E. BROWN,

                                 **DECLARATION OF JOHN C. SUMNER**

        Plaintiff,

v.

CBS CORPORATION, INC., et al,

          Defendants.


        I, John C. Sumner, declare and state as follows:

        1.      I am over the age of 18 years of age and am competent to testify to the facts set forth in this declaration. The facts contained in this declaration were gathered and collected by myself and persons with knowledge of UTC's various records and files which are kept by UTC in the regular and ordinary course of its business.

        2.      I have been involved in the aerospace industry since 1965. I graduated from Western New England University in Springfield, Massachusetts, with a BS in Mechanical Engineering and later earned a Master of Business Administration degree from the same school. I was hired by Pratt & Whitney, an unincorporated division of United Technologies Corporation, in East Hartford, Connecticut, as an aerospace engineer in 1965. Pratt & Whitney manufactures aviation engines. I worked for Pratt & Whitney from 1965 until my retirement in 2001. During the time that I worked for Pratt & Whitney, I had many roles and duties. I started as an engineer and retired as a manager. Over the course of my career, I was involved with military contracts, supervised personnel, and assisted with the development of products and maintenance of engines.

JKH-074908.000548/363187.1

3.     As a result of my 36 years of employment with Pratt & Whitney, I am familiar with the products designed and manufactured by Pratt & Whitney.

4.     I spent approximately 160 hours preparing for Pratt & Whitney's corporate deposition in this case. The time spent included searching for and reviewing documents relating to the engines at issue in this case.

5.     Following the deposition, I spent an additional 40 hours in an effort to respond to the following questions set forth in Plaintiff's Motion to Compel:

     a.  The type of asbestos fiber used in the gaskets found on the Pratt & Whitney engines at issue in the case;
     b.  The names of the manufacturers (who manufactured asbestos gaskets for Pratt & Whitney engines) that sold the gaskets directly to the United States military, rather than to Pratt & Whitney for resale;
     c.  The brand names/manufacturer names of asbestos-containing products used in the Pratt & Whitney engines at issue;

6.     Based upon my further review of available Pratt & Whitney documents, AMS and military specifications related to the asbestos-containing parts at issue, and other product information from the various gasket manufacturers, the only type of asbestos fiber identified in the documents for gaskets used in the Pratt & Whitney military engines at issue is chrysotile.

7.     The following manufacturers made pre-cut gaskets for use in Pratt & Whitney military engines which also were available for sale directly to the military: Raybestos, Anchor Packing and Johns-Manville. My review of Pratt & Whitney documents, including specifications, did not reveal any additional manufacturers for pre-cut gaskets beyond these three manufacturers that have previously been identified in DEFENDANT UNITED TECHNOLOGIES CORPORATION'S RESPONSES TO PLAINTIFF'S INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS (the "Responses").

8.     I also reviewed Pratt & Whitney documents and other available information, including specifications, to identify the manufacturer and/or brand names of the asbestos-

containing components, generally consisting of clamps/grommets, gaskets, packing, thermocouple cable and heat shields, that may have been used for a time in some of Pratt & Whitney's military engines.   My review of these documents did not reveal any additional manufacturers and/or brand names beyond those already identified in the Responses:

 a. Clamps/Grommets: Quantum Compound 700; Johns-Manville MX 4138; AGC 3140; Harco grade AAAA Asbestos; AGC 3117; Johns-Manville 2012; Raybestos LS-9244; Raybestos, RM-840-W;

 b. Gaskets: Anchor Packing Co., rubber asbestos sheet; Johns-Manville, aluminum asbestos; Johns-Manville, JM-397; Johns-Manville, Style 219; Raybestos K-68; Johns-Manville Teflon Asbestos 2012; Raybestos F53; Raybestos, A-56; Raybestos, #840;

 c. Packing: Abbott Biddle Co. 401R Teflon impregnated packing; Anchor Packing 8938; Anchor Packing Teflon Asbestos; Raybestos Manhattan RM-363-NM; Johns-Manville Style 399; Johns-Manville Teflon Asbestos 2012;; Raybestos RM 840-W; Johns-Manville, asbestos/mica/styrene/butadiene; Johns-Manville, Style R-6; Johns-Manville, MX 4713;

 d. Thermocouple Cable: Harco, chromel wire covered with a single layer of asbestos cloth which, in turn, was encased by several layers of non-asbestos covering, including two outer layers of metallic braided protective covering;

 e. Heat/Shields: Johns-Mansville – Flex Min-K completely encapsulated in an airtight metal container.

9. Not all of the clamps/grommets, gaskets, packing, thermocouple cable and heat shields utilized on the Pratt & Whitney military aviation engines at issue utilized asbestos.  In

fact, the majority of these types of components on the Pratt & Whitney military aviation engines at issue never contained asbestos.

I declare under penalty of perjury that the foregoing is true and correct.

Signed at _EAST HARTFORD, CT._

_4/24/15_
Date

_John C. Sumner_
John C. Sumner

Subscribed and Sworn to before me, a Notary Public, in and for County of __HARTFORD__ and State of Connecticut, this __24th__ day of __April__, __2015__.

_Deborah A. Forbes_
Notary Public

My Commission Expires __10-31-18__

**DEBORAH A. FORBES**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES OCT. 31, 2018

# Exhibit I

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

TERRI D. COLE,
Personal Representative of
The Estate of Winfred L. Crosby,

         CASE NO: 0:22-cv-62225-RKA

      Plaintiffs,

v.

BASF CORPORATION, et al.,

      Defendants.

_____/

### DEFENDANT RTX CORPORATION F/K/A UNITED TECHNOLOGIES CORPORATION'S NOTICE OF SERVING FURTHER AMENDED AND SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SUPPLEMENTAL REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Discovery Order 168 issued by Court Magistrate Judge, Jared M. Strauss, Defendant, RTX Corporation f/k/a United Technologies Corporation ("RTX" or "Defendant"), by and through undersigned counsel, pursuant to Fed. R. Civ. P. 33 and 34, gives notice that Defendant's Further Amended and Supplemental Responses to Plaintiff's Supplemental Request for Production of Documents have been served on all counsel of record.

### CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via Electronic Mail, to all counsel of record, this 12th day of January 2023.

        **LUKS, SANTANIELLO,**
        **PETRILLO, COHEN & PETERFRIEND**
        *Attorneys for Defendant* RTX Corporation
        150 West Flagler Street - 26th Floor
        Miami, FL  33130
        Telephone:  (305) 377-8900
        Facsimile:   (305) 377-8901

By:  _/s/ Stuart Cohen_____
       Stuart L. Cohen
       scohen@insurancedefense.net
       Florida Bar No. 0927066
       John C. Reddin
       Florida Bar No.: 1025086
       jreddin@insurancedefense.net

## FURTHER AMENDED AND SUPPLEMENTAL RESPONSES TO PLAINTIFF'S
## FIRST SUPPLEMENTAL REQUEST FOR PRODUCTION OF DOCUMENTS

**Supplemental Request for Production No. 1**: All documents comprising any written statements by individuals other than Winfred Crosby that pertain to him, his family, any co-workers, the locations he worked at, products he worked with, where he lived and/or the allegations in this lawsuit.

**RESPONSE:**

OBJECTION. This request is compound, vague and ambiguous, overly broad, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. There has been no attempt to limit the scope of this request to the subject matter of this litigation or to a relevant time period. Defendant additionally objects to this request as it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes.

Subject to and without waiving the objections, other than the reports of Defendant's expert witnesses, which have been produced to Plaintiff, and the transcript for the deposition of Decedent's coworker, James Estes, Defendant responds that it is currently unaware of any documents responsive to this request. Defendant further is currently unaware of any documents comprising any written statement relating to asbestos and its alleged hazards for the Pratt & Whitney J57 engines at issue.

**Supplemental Request for Production No. 2:** All documents reflecting the identity of persons you believe to have knowledge of the facts alleged in the Complaint in this case, your Answer and / or any affirmative defenses asserted by you, including but not limited to declarations, affidavits, interview notes, names and contact information.

**RESPONSE:**

OBJECTION. This request is compound, vague and ambiguous, overly broad, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request as it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes.

Subject to and without waiving the objections, Defendant is not aware of any documents other than those identified and/or produced in this case, including Defendant's List of Expert Witnesses and its Rule 26 initial disclosures.

**Supplemental Request for Production No. 3:** All documents concerning communications you or your counsel have had with any persons you believe to have knowledge of the facts alleged in the Complaint in this case, your Answer and / or any affirmative defenses asserted by you.

**RESPONSE:**

OBJECTION. This request is vague and ambiguous, overly broad, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request as it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes.

Subject to and without waiving the objections, please see the reports of Defendant's expert witnesses, which have been produced to Plaintiff's counsel. Defendant has no further documents responsive to this request.

**Supplemental Request for Production No. 4**: Produce all documents you contend support the affirmative defenses you have raised in this case.

**RESPONSE:**

OBJECTION. This request is vague and ambiguous, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant additionally objects to this request in that it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and is an impermissible attempt to invade the attorney client privilege and force the disclosure of attorney work product and thought processes. Defendant further objects to this request to the extent it seeks the premature disclosure of expert witness documents and/or information. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure.

Subject to and without waiving the objections, Defendant states it is currently unaware of any responsive documents in addition to those identified and/or produced in this case.

Defendant's investigation is ongoing and Defendant reserves the right to amend and/or supplement this response in the future.

**Supplemental Request for Production No. 5**: For each expert you have retained and intend to call at trial, produce all invoices paid by you or any attorney or agent acting on your behalf to said expert (or any employer of the expert) between 2000 and the present date.

**RESPONSE:**

OBJECTION. This request is vague and ambiguous, overly broad, unduly burdensome, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence.

Subject to and without waiving the objections, please see invoices produced by Defendant.

**Supplemental Request for Production No. 17:**   All documents concerning the manufacture of your asbestos-containing products, including but not limited to those used in/on the aircraft engines at issue.

**RESPONSE:**

OBJECTION. This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period. Defendant additionally objects to this request to the extent it seeks information and/or documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant additionally objects to this request to the extent it seeks documents that are the property of the U.S. Air Force and that cannot be disseminated without its express permission. Defendant further objects to the definitions of the terms, "asbestos-containing products" and "aircraft engines at issue," used in this discovery as they are compound and/or vague and ambiguous.

As to the chrysotile-containing parts manufactured by entities other than Defendant for use in the Pratt & Whitney J57-P-19W and J57-P-29WA military engines at issue, please see documents produced by Defendant.

**Supplemental Request for Production No. 18:**   If you claim that any government agency, specifically including but not limited to the United States Air Force, prohibited you from providing any warnings/cautions concerning health hazards and/or the hazards of asbestos (or potential hazards of same), produce all documents that support your claim.

**RESPONSE:**

OBJECTION. This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Additionally, this request is irrelevant to the extent that it seeks documents and/or information outside of the products of Defendant allegedly at issue and outside of the relevant time period. Defendant further objects to this request on the basis that it assumes there was a basis or a duty or obligation to provide any such warnings by Pratt & Whitney. Defendant further objects to the definitions of the terms, "health hazards" and "hazards of asbestos," used in this discovery as they are compound and vague and ambiguous.

Subject to and without waiving the objections, Defendant states that it is currently unaware of any documents responsive to this request.

**Supplemental Request for Production No. 19:**  If you contend that the federal government (including any officer, agent, agency or department thereof) directed, participated in, and/or otherwise influenced the design of any and/or all materials, products and equipment at issue in this case, produce all documents that support your claim.

**RESPONSE:**

OBJECTION. This request is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence.

Subject to and without waiving the objections, as to the Pratt & Whitney engines at issue, please see the following documents previously produced by Defendant in this matter:

| Title | Bates Nos. |
|---|---|
| MIL-E-5007 – Military Specification, Engines, Aircraft, Turbojet and Turbofan, General Specifications For | RTC-CROSBY 000001-000323 |
| MIL-E-5008 – Military Specification, Engines, Aircraft, Turbojet, Model Specification For | RTC-CROSBY 000324-000384 |
| MIL-E-5009 – Military Specification, Engines, Aircraft, Turbojet and Turbofan, Qualification Tests For | RTC-CROSBY 000385-000481 |
| MIL-E-5010 – Military Specification, Engines, Aircraft, Turbojet and Turbofan, Acceptance Test For | RTC-CROSBY 000482-000488 |
| Correspondence – PWA to AMC Re Qualification of J57-P-7 Engine | RTC-CROSBY 000489-000491 |
| Correspondence – PWA to BuAer Re Qualification of J57-P-8 Engines | RTC-CROSBY 000492-000493 |
| Correspondence – PWA to AMC Re 150-Hour Qualification Test on J57-P-1 Engine | RTC-CROSBY 000494-000495 |
| Correspondence – PWA to BuAer Re 150-Hour Qualification Test on J57-P-1 Engine | RTC-CROSBY 000496-000497 |
| Correspondence – USAF to PWA Re 150-Hour Qualification Test on J57-P-1 Engine | RTC-CROSBY 000498-000501 |
| Correspondence – PWA to BuAer re: J57 Model Specification Revisions | RTC-CROSBY 000502 |
| Army-Navy Aeronautical Bulletin 143 – Specifications and Standards; Use Of | RTC-CROSBY 000503-000521 |
| Numerical List – U.S. Air Force and Air Force-Navy Aeronautical Standard Drawings | RTC-CROSBY 000522-000557 |
| MIL-G-7021 – Military Specification, Gaskets and Sheet; Fuel, Lubricant, Coolant and Temperature Resistant | RTC-CROSBY 000558-000 |
| AN-G-171 – Army-Navy Aeronautical Specification, Gaskets and Sheet; Fuel, Lubricant, Coolant and Temperature Resistant | RTC-CROSBY 000559-000571 |
| MIL-A-7021 – Military Specification, Asbestos Sheet, Compressed, For Fuel, Lubricant, Coolant, Water, and High Temperature Resistant Gaskets | RTC-CROSBY 000572-000608 |
| AMS 3839 – Aerospace Material Specifications, Fabric, Wire Reinforced Asbestos | RTC-CROSBY 000609-000610 |
| AN900 – Air Force-Navy Aeronautical Standard, Gasket – Copper-Asbestos, Annular | RTC-CROSBY 000611 |
| MS35769 – Military Standard, Gasket – Copper – Asbestos | RTC-CROSBY 000612-000613 |

12

| | |
|---|---|
| AN4045 – Air Force-Navy Aeronautical Standard, Gasket - Type X Or XV Engine Accessory Drive | RTC-CROSBY 000614 |
| AN123020 thru AN123119 – Air Force-Navy Aeronautical Standard, Gasket, Aluminum-Asbestos, Annular | RTC-CROSBY 000615 |
| MS9134 – Military Standard, Asbestos Gasket, Type X or XV Engine Accessory Drive | RTC-CROSBY 000616 |
| MS9136 – Military Standard, Asbestos Gasket, Type XII, XIV, and XVII Engine Accessory Drive | RTC-CROSBY 000617 |
| MS9137 – Military Standard, Asbestos Gasket, Type XIII Engine Accessory Drive | RTC-CROSBY 000618 |
| MS9139 – Military Standard, Asbestos Gasket, Tupe XVI and XVIII Engine Accessory Drive | RTC-CROSBY 000619 |
| MS9377 – Military Standard, Asbestos Gasket, Engine Accessory Drive | RTC-CROSBY 000620 |
| Correspondence – PWA to BuAer Listing AN, MS, and AS Equivalents to PWA Parts | RTC-CROSBY 000621-000632 |
| MS9514 – Military Standard, Cushion, Loop Clamp, Fabric, Wire Reinforced Asbestos (AMS 3839) | RTC-CROSBY 000633 |
| MS9515 – Military Standard, Cushion, Loop Clamp, Fabric, Wire Reinforced Asbestos (AMS 3839) | RTC-CROSBY 000634 |
| MS9825 – Military Standard, Clamp, Loop-Cushioned, Joggled, Fabric, Wire Reinforced Asbestos, Corrosion Resisting Steel | RTC-CROSBY 000635 |
| MS9826 – Military Standard, Clamp, Loop-Cushioned, Joggled, Fabric, Wire Reinforced Asbestos, Corrosion Resisting Steel | RTC-CROSBY 000636 |
| MS33666 – Military Standard, Packing, Preformed - Aeronautic, Elastomeric, Range of Sizes | RTC-CROSBY 000637-000644 |
| Air Force-Navy Aeronautical Bulletin 182 - Material Changes and Substitutions: Aircraft Engine Parts (Production Contracts) | RTC-CROSBY 000645-000654 |
| Air Force-Navy Aeronautical Bulletin 343 – Specifications and Standards Applicable to Aircraft Engines and Propellers, Use of | RTC-CROSBY 000655-000695 |
| Military Bulletin 343 - Documents Applicable to Aircraft Engines and Propellers, Use Of | RTC-CROSBY 000696-000770 |
| MIL-W-25038 – Military Specification – Wire, Electrical, High Temperature and Fire Resistant | RTC-CROSBY 000771-000851 |
| Correspondence – PWA to BuAer and Air Materiel Command Re: Conference to Provision Pratt & Whitney J57-P-1 Engine, Engine Container and Accessories | RTC-CROSBY 000852-000853 |
| Air Force-Navy Aeronautical Bulletin 423 - Engines: Aircraft, Vendor Substantiation Tests For | RTC-CROSBY 000854-000860 |
| MIL-STD-1529 – Military Standard – Vendor Substantiation for Aerospace Propulsion Systems | RTC-CROSBY 000861-000870 |
| Air Force-Navy Aeronautical Bulletin 445 - Engineering Changes to Weapons, Systems, Equipment and Facilities | RTC-CROSBY 000871-000910 |

13

| PWA Engineering Change Proposal 54891 and Related Correspondence | RTC-CROSBY 000911-000921 |
|---|---|
| PWA Engineering Change Proposal 54905 and Related Correspondence | RTC-CROSBY 000922-000934 |
| PWA Engineering Change Proposal 54230 and Related Correspondence | RTC-CROSBY 000935-000951 |
| PWA Engineering Change Proposal 50997 and Related Correspondence | RTC-CROSBY 000952-000958 |
| Correspondence – BuAer to PWA Re: PWA Specification No. N-1700 Covering the Model J57-P-10 Model Engine | RTC-CROSBY 0003404-3406 |
| Correspondence – BuAer to PWA Re: J57 Turbo-Jet Engine Bulletin No. 169 | RTC-CROSBY 003407-003408 |
| Change Order No. 2 to Air Force Contract AF 33 (038)-9505 | RTC-CROSBY 000959-000960 |
| Correspondence – AMC to BuAer Re: Diversion of J57 Capacity by PWA | RTC-CROSBY 000961-000962 |
| Monthly Progress Report No. 40 (J75 Development) - Air Force Contract AF 33 (600)-22940, Supplemental Agreement No. 5 | RTC-CROSBY 003409-003412 |
| Monthly Progress Report No. 41 on J75 Engine Development (Air Force) | RTC-CROSBY 003413-003418 |
| Air Force Contract AF 33 (038)-9505 | RTC-CROSBY 000963-000997 |
| Air Force Contract AF 33 (600)-5839 | RTC-CROSBY 003419-003435 |
| Air Force Contract AF 18 (600)-126 | RTC-CROSBY 003436-003447 |
| Air Force Contract No. AF 33 (038)-20569 (Turbine Disk and Bucket Cooling Investigation) Correspondence and Encl. Contract | RTC-CROSBY 003448-003459 |
| Correspondence – PWA to USAF Re: Research and Advanced Development Proposals | RTC-CROSBY 003460-003465 |
| Supplemental Agreement No. 3 to Air Force Contract AF 33(038)-9505 | RTC-CROSBY 000998-001002 |
| Supplemental Agreement No. 4 to Air Force Contract AF 33(038)-9505 | RTC-CROSBY 003466-003472 |
| Navy Contract 57-235-f for Continued Development of J57 Aircraft Engines | RTC-CROSBY 001003-001006 |
| Correspondence – PWA to USAF Re: Quotation Covering Second Phase of a Research Program (Contract W33 (038) - no-18662 - Inquiry 48464) | RTC-CROSBY 003473-003480 |
| Correspondence – PWA to BuAer Submitting Subcontractor Forms | RTC-CROSBY 001007-001011 |
| Correspondence – PWA to AMC Re Standardization of J57 Engines for F-102 and F4D Aircraft – Preliminary Report | RTC-CROSBY 001012-001013 |
| Correspondence – PWA to BuAer Re Progress Payments under PWA Contracts | RTC-CROSBY 001014-001017 |
| BuAer Request  for J57 Engine Data Release | RTC-CROSBY 001018 |

14

| | |
|---|---|
| Correspondence – PWA to USAF Re: Proposal for Continued Development of J75 Engine | RTC-CROSBY 003481-003486 |
| Army Testing of Simplex Oil Seal Rings | RTC-CROSBY 001019 |
| Installation Engineering Report - Summary of Work Done - Conclusions - Essential results of tests | RTC-CROSBY 003487-003488 |
| Installation Engineering Report - Summary of Work Done - Results of Test | RTC-CROSBY 003489 |
| General Gas Turbine Engine Bulletin No. 34, Revision A | RTC-CROSBY 001020-001024 |
| PWA Internal Memo – VSX Engine Pre-Bidders Conference | RTC-CROSBY 001025-001026 |
| PWA Internal Memo – VSX Timing | RTC-CROSBY 001027 |
| PWA Internal Memo – VSX Powerplant Bidders' Briefing | RTC-CROSBY 001028-001030 |
| PWA Internal Memo – Supplement to 3-10-1966 Corr. Re: VSX Bid | RTC-CROSBY 001031-001036 |
| PWA Internal Memo – Mission Requirements and Specifications for VSX Bid | RTC-CROSBY 001037 |
| PWA Internal Memo – VSX Engine Bid Specification Revisions | RTC-CROSBY 001038 |
| PWA Internal Memo – VSX Engine RFP | RTC-CROSBY 001039-001040 |
| PWA Internal Memo – JTF-10-15 Availability (Up-rated TF30-P-8) | RTC-CROSBY 001041 |
| PWA Internal Memo – VSX Powerplant Bidder's Briefing | RTC-CROSBY 001042-001043 |
| PWA Internal Memo – Why We Lost | RTC-CROSBY 001044-001045 |
| PWA Internal Memo – JTF10A-15 Situation | RTC-CROSBY 001046-001047 |
| Correspondence – PWA to San Antonio Air Materiel Area Re: Competitive Procurement of Critical Engine Parts | RTC-CROSBY 001048-001052 |
| Correspondence – PWA to San Antonio Air Material Area Re: Competitive Procurement of Critical Engine Parts | RTC-CROSBY 001053-001054 |
| Correspondence – USAF to PWA Re: Competitive Procurement of Critical Engine Parts | RTC-CROSBY 001055 |
| Development (Class 1B) Engineering Change in Design - Change No. 184638 | RTC-CROSBY 001056-001061 |
| Development (Class 1B) Engineering Change in Design - Change No. 180716 | RTC-CROSBY 001062-001067 |
| Development (Class 1B) Engineering Change in Design - Change No. 184260 | RTC-CROSBY 001068-001070 |
| Manufacturing Class II, Engineering Change in Design, Pratt & Whitney Aircraft, East Hartford, CT - Change No. 252959 | RTC-CROSBY 001071-001072 |
| Development (Class II) Engineering Change in Design - Change No. 193599 | RTC-CROSBY 001073-001076 |

| | |
|---|---|
| Development (Class II) Engineering Change in Design - Change No. 250795 | RTC-CROSBY 001077-001080 |
| Manufacturing (Class II) Engineering Change in Design – Change No. 252961 | RTC-CROSBY 001081 |
| Correspondence – PWA to Naval Air Technical Services Facility Re: Propose Publication Plan | RTC-CROSBY 001082-001100 |
| MIL-M-81203 – Military Specification – Manuals, Technical; In-Progress Reviews, Validation and Verification, Support Of | RTC-CROSBY 001101-001112 |
| MIL-H-5473 – Military Specification – Handbooks; Maintenance Instructions (Aircraft) | RTC-CROSBY 001113-001147 |
| MIL-H-5474 – Military Specification – Handbooks and Breakdowns; General Preparation of | RTC-CROSBY 001148-001246 |
| AN-H-7 – Army-Navy Aeronautical Specification – Handbooks and Catalogs; General Specification for Preparation of | RTC-CROSBY 001247-001322 |
| Manual – Handbook of Instructions for Airplane Designers, Vol. I, Materiel Command U.S. Army Air Forces, July 1, 1936 | RTC-CROSBY 001323-001500 |
| Manual – Handbook of Instructions for Airplane Designers, Vol. II, Materiel Command U.S. Army Air Forces, July 1, 1936 | RTC-CROSBY 001501-001625 |
| Air-Force Navy Aeronautical Design Standard – AND10230, Reference Chart, Aircraft Engine Accessory Drives | RTC-CROSBY 003543-003544 |

Additionally, Defendant identifies the transcript for the deposition of Jack Sumner, taken December 5, 2023, in this matter.

Defendant currently is unaware of any further documents responsive to this request.

**Supplemental Request for Production No. 20:**   All documents concerning your communications with the U.S. government, specially including but not limited to the United States Air Force, concerning the aircraft issue.

**RESPONSE:**

OBJECTION. This request is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant further objects to the definition of the term, "aircraft at issue," used in this discovery as it is vague and ambiguous.

Subject to and without waiving the objections, as to the Pratt & Whitney engines at issue, please see the following documents previously produced by Defendant in this matter:

| Title | Bates Nos. |
|---|---|

| Correspondence – PWA to AMC Re Qualification of J57-P-7 Engine | RTC-CROSBY 000489-000491 |
| Correspondence – PWA to BuAer Re Qualification of J57-P-8 Engines | RTC-CROSBY 000492-000493 |
| Correspondence – PWA to AMC Re 150-Hour Qualification Test on J57-P-1 Engine | RTC-CROSBY 000494-000495 |
| Correspondence – PWA to BuAer Re 150-Hour Qualification Test on J57-P-1 Engine | RTC-CROSBY 000496-000497 |
| Correspondence – USAF to PWA Re 150-Hour Qualification Test on J57-P-1 Engine | RTC-CROSBY 000498-000501 |
| Correspondence – PWA to BuAer re: J57 Model Specification Revisions | RTC-CROSBY 000502 |
| Correspondence – PWA to BuAer and Air Materiel Command Re: Conference to Provision Pratt & Whitney J57-P-1 Engine, Engine Container and Accessories | RTC-CROSBY 000852-000853 |
| PWA Engineering Change Proposal 54891 and Related Correspondence | RTC-CROSBY 000911-000921 |
| PWA Engineering Change Proposal 54905 and Related Correspondence | RTC-CROSBY 000922-000934 |
| PWA Engineering Change Proposal 54230 and Related Correspondence | RTC-CROSBY 000935-000951 |
| PWA Engineering Change Proposal 50997 and Related Correspondence | RTC-CROSBY 000952-000958 |
| Correspondence – BuAer to PWA Re: PWA Specification No. N-1700 Covering the Model J57-P-10 Model Engine | RTC-CROSBY 0003404-3406 |
| Correspondence – BuAer to PWA Re: J57 Turbo-Jet Engine Bulletin No. 169 | RTC-CROSBY 003407-003408 |
| Change Order No. 2 to Air Force Contract AF 33 (038)-9505 | RTC-CROSBY 000959-000960 |
| Correspondence – AMC to BuAer Re: Diversion of J57 Capacity by PWA | RTC-CROSBY 000961-000962 |
| Monthly Progress Report No. 40 (J75 Development) - Air Force Contract AF 33 (600)-22940, Supplemental Agreement No. 5 | RTC-CROSBY 003409-003412 |
| Monthly Progress Report No. 41 on J75 Engine Development (Air Force) | RTC-CROSBY 003413-003418 |
| Air Force Contract AF 33 (038)-9505 | RTC-CROSBY 000963-000997 |
| Air Force Contract AF 33 (600)-5839 | RTC-CROSBY 003419-003435 |
| Air Force Contract AF 18 (600)-126 | RTC-CROSBY 003436-003447 |
| Air Force Contract No. AF 33 (038)-20569 (Turbine Disk and Bucket Cooling Investigation) Correspondence and Encl. Contract | RTC-CROSBY 003448-003459 |
| Correspondence – PWA to USAF Re: Research and Advanced Development Proposals | RTC-CROSBY 003460-003465 |

| Supplemental Agreement No. 3 to Air Force Contract AF 33(038)-9505 | RTC-CROSBY 000998-001002 |
| Supplemental Agreement No. 4 to Air Force Contract AF 33(038)-9505 | RTC-CROSBY 003466-003472 |
| Correspondence – PWA to USAF Re: Quotation Covering Second Phase of a Research Program (Contract W33 (038) - no-18662 - Inquiry 48464) | RTC-CROSBY 003473-003480 |
| Correspondence – PWA to AMC Re Standardization of J57 Engines for F-102 and F4D Aircraft – Preliminary Report | RTC-CROSBY 001012-001013 |
| Correspondence – PWA to San Antonio Air Materiel Area Re: Competitive Procurement of Critical Engine Parts | RTC-CROSBY 001048-001052 |
| Correspondence – PWA to San Antonio Air Material Area Re: Competitive Procurement of Critical Engine Parts | RTC-CROSBY 001053-001054 |
| Correspondence – USAF to PWA Re: Competitive Procurement of Critical Engine Parts | RTC-CROSBY 001055 |
| Development (Class 1B) Engineering Change in Design - Change No. 184638 | RTC-CROSBY 001056-001061 |
| Development (Class 1B) Engineering Change in Design - Change No. 180716 | RTC-CROSBY 001062-001067 |
| Development (Class 1B) Engineering Change in Design - Change No. 184260 | RTC-CROSBY 001068-001070 |
| Manufacturing Class II, Engineering Change in Design, Pratt & Whitney Aircraft, East Hartford, CT - Change No. 252959 | RTC-CROSBY 001071-001072 |
| Development (Class II) Engineering Change in Design - Change No. 193599 | RTC-CROSBY 001073-001076 |
| Development (Class II) Engineering Change in Design - Change No. 250795 | RTC-CROSBY 001077-001080 |
| Manufacturing (Class II) Engineering Change in Design – Change No. 252961 | RTC-CROSBY 001081 |

Additionally, Defendant identifies the transcript for the deposition of Jack Sumner, taken December 5, 2023, in this matter.

Defendant currently is unaware of any further documents responsive to this request.

**Supplemental Request for Production No. 21:** All documents concerning your communications with the U.S. government, specifically including but not limited to the United States Air Force, concerning the aircraft engines at issue.

**RESPONSE:**

Please see Defendant's OBJECTION and Response to Supplemental Request for Production No. 20, above, which is incorporated herein by reference.

**Supplemental Request for Production No. 22:** All documents concerning the specification of asbestos-containing materials in/on the aircraft at issue.

**RESPONSE:**

OBJECTION. This request assumes facts and is vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant additionally objects to this request to the extent it seeks documents that are the property of the U.S. Air Force and that cannot be disseminated without its express permission. Defendant further objects to the definitions of the terms, "asbestos-containing materials" and "aircraft at issue," used in this discovery as they are compound and/or vague and ambiguous.

Subject to and without waiving the objections, Defendant states that it did not design, manufacture, or supply the Boeing B-52D aircraft at issue in this matter or any of the airframe components used in the manufacture of these aircraft and, therefore, beyond what has been identified or produced in this case, is unaware of any documents responsive to this request.

As to the Pratt & Whitney engines at issue, please see Defendant's Response to Supplemental Request for Production No. 19, above, and the following additional documents previously produced by Defendant:

| Title | Bates Nos. |
|---|---|
| Pratt & Whitney J57-P-19W/-29WA Military Engines Asbestos Parts List | RTC-CROSBY 003494-003496 |
| Aerospace Standard – AS100003, Gasket – Type XII and XIV Engine Accessory Drive | RTC-CROSBY 003497-003498 |
| PWA Engineering Drawing – Part No. 185276, Gasket – Oil Pump & Accessory Drive Housing | RTC-CROSBY 003499 |
| PWA Engineering Drawing – Part No. 326231, Gasket - .4455 x .125 x .094 | RTC-CROSBY 003500 |
| Aeronautical Material Specification – AMS 3232, Asbestos and Synthetic Rubber Sheet, Hot Oil Resistant | RTC-CROSBY 003501-003503 |
| PWA Engineering Drawing – Part No. 310612, Clip Assembly, .250 OD Tube | RTC-CROSBY 003504 |
| PWA Engineering Drawing – Part No. 310613, Clip Assembly, .3125 OD Tube | RTC-CROSBY 003505 |
| Aerospace Material Specification – AMS 3839, Fabric, Wire Reinforced Asbestos, PTFE Impregnated, Sintered | RTC-CROSBY 003506-003507 |
| PWA Engineering Drawing – Part No. 215936, Tape, 1.000 Wide x .015 Thick | RTC-CROSBY 003508 |
| PWA Engineering Drawing – Part No. 259836, Packing, Preformed | RTC-CROSBY 003509 |
| Air-Force Navy Aeronautical Design Standard – AND10230, Reference Chart, Aircraft Engine Accessory Drives | RTC-CROSBY 003543-003544 |

Additionally, Defendant identifies the transcript for the deposition of Jack Sumner, taken December 5, 2023, in this matter.

Defendant currently is unaware of any further documents responsive to this request.

**Supplemental Request for Production No. 23**   All documents concerning the specification of asbestos-containing materials in/on the aircraft engines at issue.

   **RESPONSE:**

   Please see <u>OBJECTION</u> and <u>Response to Supplemental Request for Production No. 22</u>, above, which is incorporated herein by reference.

**Supplemental Request for Production No. 24:**   All documents concerning the use of asbestos-containing materials in/on the aircraft at issue.

   **RESPONSE:**

   Please see <u>OBJECTION</u> and <u>Response to Supplemental Request for Production No. 22</u>, above, which is incorporated herein by reference.

**Supplemental Request for Production No. 25:**   All documents concerning the use of asbestos-containing materials in/on the aircraft engines at issue.

   **RESPONSE:**

   Please see <u>OBJECTION</u> and <u>Response to Supplemental Request for Production No. 22</u>, above, which is incorporated herein by reference.

**Supplemental Request for Production No. 26:** All parts, operation, repair, maintenance, service, or similar manuals, instruction books, engineering diagrams, correspondence, or other documents in any way pertaining to asbestos-containing materials used in / on the aircraft at issue.

   **RESPONSE:**

   <u>OBJECTION</u>. This request assumes facts and is compound, vague and ambiguous, unduly burdensome, overly broad, oppressive, harassing, and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant further objects on the basis that this request seeks the disclosure of information and/or documents which contain or reference confidential, financial, proprietary, business and/or other competitive information that is privileged and protected from disclosure. Defendant additionally objects to this request to the extent it seeks documents that are the property of the U.S. Air Force and that cannot be disseminated without its express permission. Defendant further objects to the definitions of the terms, "asbestos-containing materials" and "aircraft at issue," used in this discovery as they are compound and/or vague and ambiguous.

   With respect to Illustrated Parts Breakdowns or manuals for the Pratt & Whitney J57 engines at issue, please see the privilege log produced by Defendant.

# VERIFICATION

I, John C. Sumner, declare as follows:

I am authorized to make this verification for and on behalf of Defendant RTX CORPORATION, formerly known as UNITED TECHNOLOGIES CORPORATION ("RTX"), and I make this verification for that reason.

The information set forth in DEFENDANT RTX CORPORATION'S FURTHER AMENDED AND SUPPLMENTAL RESPONSES TO PLAINTIFFS' FIRST SUPPLEMENTAL REQUEST FOR PRODUCTION (the "Responses") was gathered and collected by persons with knowledge of RTX's various records and files which are kept by RTX in the regular and ordinary course of its business. The persons who have gathered and collected this material have reported to me that the Responses truly and correctly reflect the information gathered and the contents of said records and files. Accordingly, I state that the Responses are true and correct according to my knowledge, RTX's records and files and the information transmitted to me as described above.

I declare under penalty of perjury under the laws of the State of Connecticut that the foregoing is true and correct and that this Verification was executed on January __12__, 2024, at Granby, Connecticut.

_____
John C. Sumner, Declarant